**FILED** AUG 1 0 2016

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA
## PHILADELPHIA DIVISION

| | |
|---|---|
| JENNIFER SWEDA, BENJAMIN A. WIGGINS, ROBERT L. YOUNG, FAITH PICKERING, PUSHKAR SOHONI, AND REBECCA N. TONER, individually and as representatives of a class of participants and beneficiaries on behalf of the University of Pennsylvania Matching Plan, | **16    4329**<br><br>Civil Action No.<br><br>COMPLAINT—CLASS ACTION<br><br>JURY TRIAL DEMANDED |
| *Plaintiffs,* | |
| v. | |
| THE UNIVERSITY OF PENNSYLVANIA AND JACK HEUER, | |
| *Defendants.* | |

1.     Plaintiffs Jennifer Sweda, Benjamin A. Wiggins, Robert L. Young, Faith Pickering, Pushkar Sohoni, and Rebecca N. Toner, individually and as representatives of a class of participants and beneficiaries in the University of Pennsylvania Matching Plan ("Plan"), bring this action under 29 U.S.C. §1132(a)(2) and (3) on behalf of the Plan against Defendants University of Pennsylvania and Jack Heuer for breach of fiduciary duties under ERISA.[1]

2.     The duties of loyalty and prudence are the "highest known to the law" and require fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth,* 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). As fiduciaries to the Plan, Defendants are obligated to act for the exclusive benefit of

---

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.

participants and beneficiaries and to ensure that Plan expenses are reasonable and the Plan's investments are prudent. The marketplace for retirement plan services is established and competitive. Billion-dollar-defined contribution plans, like the Plan, have significant bargaining power to demand low-cost administrative and investment management services. Instead of using the Plan's bargaining power to benefit participants and beneficiaries, Defendants allowed unreasonable expenses to be charged to participants for administration of the Plan and retained high-cost and poor-performing investments compared to available alternatives.

3.     To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plan, bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan any profits made through Defendants' use of Plan assets. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

4.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

5.     This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the subject

2

Plan is administered, where at least one of the alleged breaches took place, and where at least one defendant resides.

## PARTIES

### The University of Pennsylvania Matching Plan

6.      The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

7.      The Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1).

8.      The Plan provides for retirement income for certain employees of the University of Pennsylvania. That retirement income depends upon contributions made on behalf of each employee by his or her employer, deferrals of employee compensation and employer matching contributions, and performance of investment options net of fees and expenses exclusively controlled by the fiduciaries of the Plan.

9.      As of December 31, 2014, the Plan had $3.8 billion in net assets and 26,904 participants with account balances. As such, it is one of the largest defined contribution plans in the United States, ranking in the top 1% of all defined contribution plans that filed a Form 5500 with the Department of Labor based on total plan assets. Plans of such great size are commonly referred to as "jumbo plans."

### Plaintiffs

10.     Jennifer Sweda resides in Philadelphia, Pennsylvania, and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

3

11.    Benjamin A. Wiggins resides in Pittsburgh, Pennsylvania, and is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

12.    Robert L. Young resides in Upper Darby, Pennsylvania, and is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

13.    Faith Pickering resides in Exton, Pennsylvania, and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

14.    Pushkar Sohoni resides in Philadelphia, Pennsylvania, and is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

15.    Rebecca N. Toner resides in Philadelphia, Pennsylvania, and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

**Defendants**

16.    The University of Pennsylvania, incorporated as the Trustees of the University of Pennsylvania, is a non-profit corporation organized under Pennsylvania law with its principal place of business in Philadelphia, Pennsylvania. The University of Pennsylvania is the fiduciary responsible for the control, management and administration of the Plan, in accordance with 29 U.S.C. §1102(a). Upon information and belief, the University of Pennsylvania has exclusive responsibility and complete discretionary authority to control the operation,

4

management and administration of the Plan, with all powers necessary to enable the University to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

17. The University of Pennsylvania is a fiduciary to the Plan because it exercised discretionary authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of its assets, and has discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

18. The University of Pennsylvania appointed the Vice President of Human Resources of the University of Pennsylvania to serve as the Plan Administrator under 29 U.S.C. §1002(16)(A)(i). The Plan Administrator is responsible for all matters relating to the Plan, including, but not limited to: interpreting the Plan's provisions, resolving questions about eligibility to participate in the Plan, making decisions about claims for benefits, and establishing rules and procedures for the Plan's operation. The Plan Administrator may delegate responsibility for any aspect of the Plan's administration to other individuals or entities.

5

19.     Jack Heuer is the current Vice President of Human Resources of the University of Pennsylvania and serves as the Plan Administrator.

20.     The Vice President of Human Resources is a fiduciary to the Plan because he exercised discretionary authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of its assets, and has discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

21.     Because Jack Heuer and any delegates described above have acted as alleged herein as the agents of the University of Pennsylvania, all defendants are collectively referred to hereafter as Defendants.

## FACTS APPLICABLE TO ALL COUNTS

### I.     Plan investments

22.     Under the terms of the Plan, Plan participants are eligible to contribute a discretionary amount of their annual compensation to the Plan and the University of Pennsylvania makes a matching contribution.

23.     Defendants exercise exclusive and discretionary authority and control over the investment options that are included in the Plan.

24.     Defendants have provided as Plan investment options mutual funds and insurance company variable annuity products offered by the Teachers Insurance and Annuity Association of America and College Retirement Equities Fund ("TIAA-CREF") and the Vanguard Group, Inc. ("Vanguard"). Defendants

6

select investment options into which participants' investments are directed, and decide which investment options to remove from the Plan.

25.     As of December 31, 2014, Defendants selected a total of 78 investment options to provide to Plan participants. Among the available investments, 30 were TIAA-CREF investments, and 48 were Vanguard investments. These investments included mutual funds, an insurance separate account, variable annuity options, and a fixed annuity option. The mutual funds included *retail* share class mutual funds, despite the mammoth size of the Plan. These retail share class mutual funds are designed for small individual investors and are identical in every respect to institutional share class funds, except for much higher fees.

26.     These investments are designated by the University of Pennsylvania as available investment alternatives offered under the Plan.

27.     The TIAA Traditional Annuity offered in the Plan is a fixed annuity contract that guarantees principal and a contractually specified minimum interest rate. Assets invested in the TIAA Traditional Annuity are held in the general account of Teachers Insurance and Annuity Association of America and are backed by the claims-paying ability of Teachers Insurance and Annuity Association of America.

28.     The TIAA Traditional Annuity has severe restrictions and penalties for withdrawal if participants wish to change their investments in the Plan. For example, some participants who invest in the TIAA Traditional Annuity may withdraw or change their investment in a single lump sum within 120 days of

7

termination of employment, but, to do so, such participants must pay a 2.5%
surrender charge. Rather than being available to participants if they wish to
liquidate their funds earlier, the only way for participants to withdraw or change
their TIAA Traditional Annuity investment is to spread withdrawal over a *ten-year
period,* unless a substantial penalty is paid. Thus, participants who wish to
withdraw their investment without penalty can only do so over ten years.

29.     The Plan's CREF Stock Account, CREF Global Equities Account,
CREF Equity Index Account, CREF Growth Account, CREF Social Choice Account,
CREF Money Market Account, and CREF Bond Market Account are variable
annuities, which invest in underlying securities for a given investment mandate.
The value of each participant's investment in the variable annuity changes over
time based on investment performance and expenses of the account.

30.     The expense ratio of the CREF variable annuity accounts is made up of
multiple layers of expense charges called:

     a.  "administrative expense" charge (24 bps);[2]

     b.  "distribution expense" charge (9.5 bps);

     c.  "mortality and expense risk" charge (0.5 bps); and

     d.  "investment advisory expense" charge (ranging from 4 bps to 12.5 bps).

31.     The TIAA Real Estate Account is an insurance separate account
maintained by TIAA-CREF. An insurance separate account is an investment vehicle
that aggregates assets from more than one retirement plan for a given investment

_____

[2] One basis point is equal to 1/100th of one percent (or 0.01%). Expenses are as of
May 1, 2014.

strategy, but those assets are segregated from the insurance company's general account assets. Similar to the CREF variable annuity accounts, the expense ratio of the TIAA Real Estate Account is made up of multiple layers of expense charges. As of May 1, 2013, these charges were called:

     a. "administrative expense" charge (26.5 bps);

     b. "distribution expense" charge (8 bps);

     c. "mortality and expense risk" charge (0.5 bps);

     d. "liquidity guarantee" (18 bps); and

     e. "investment management expense" charge (36.5 bps).

32.    The remaining TIAA-CREF funds are registered investment companies under the Investment Company Act of 1940, known as mutual funds. The TIAA-CREF mutual funds charge varying amounts for investment management, but also charge distribution, marketing, and other expenses, depending on the investment at issue and share class.

33.    The Vanguard investment options offered to Plan participants are exclusively mutual funds that charge varying amounts for investment management, but also charge for distribution, marketing, and other expenses, depending on the investment at issue and share class.

34.    Mutual funds have shareholders who are not participants in the Plan, or any retirement plan, and who purchase shares as a result of marketing the fund. However, all shareholders in mutual funds, including Plan participants, pay the expenses set forth in ¶¶32–33.

9

35.     As of December 31, 2014, of the Plan's $3.8 billion in net assets, TIAA-CREF investments accounted for $2.5 billion, and Vanguard investments accounted for $1.3 billion.

## II.    Defendants' actions caused Plan participants to pay excessive administrative and recordkeeping fees in violation of ERISA's requirement that fees be reasonable.

36.     Recordkeeping is a service necessary for every defined contribution plan. The market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to a large defined contribution plan like the Plan. These recordkeepers primarily differentiate themselves based on price and vigorously compete for business by offering the best price.

37.     To ensure that plan administrative and recordkeeping expenses are and remain reasonable for the services provided, prudent fiduciaries of large defined contribution plans put the plan's recordkeeping and administrative services out for competitive bidding at regular intervals of approximately three years.

38.     The cost of recordkeeping services depends on the number of participants, not on the amount of assets in the participant's account. Thus, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account. For this reason, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees on the basis of a fixed dollar amount for each participant in the plan rather than as a percentage of plan assets. Otherwise, as plan assets increase through

10

participant contributions or investment gains, the recordkeeping expense increases without any change in the recordkeeping and administrative services.

39.    Jumbo defined contribution plans, like the Plan, experience economies of scale for recordkeeping and administrative services. As the number of participants in the plan increases, the per-participant fee charged for recordkeeping and administrative services declines. These lower administrative expenses are readily available for plans with a great number of participants, such as the Plan.

40.    Some investments engage in a practice known as revenue sharing. In a revenue sharing arrangement, a mutual fund or other investment vehicle directs a portion of the expense ratio—the asset-based fees it charges to investors—to the plan's recordkeeper, putatively for providing recordkeeping and administrative services for the investment. Because revenue sharing arrangements provide asset-based fees, prudent fiduciaries, if they use asset-based charges to pay for recordkeeping at all, monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper is not receiving unreasonable compensation. A prudent fiduciary must ensure that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable recordkeeping fee. Because revenue sharing payments are asset-based, they often bear no relation to a reasonable recordkeeping fee and can provide excessive compensation, or may be used as kickbacks to induce recordkeepers to have their high priced funds included as plan investment options.

11

41.     Prudent fiduciaries of similarly sized defined contribution plans use a single recordkeeper rather than hiring multiple recordkeepers and custodians or trustees. This leverages plan assets to ensure that plan participants pay only reasonable recordkeeping fees, while also simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when more than one recordkeeper is used.

42.     According to a 2013 survey of 403(b) plans, more than *90%* of plans use a single recordkeeper rather than multiple recordkeepers to provide administrative and recordkeeping services to participants. See LIMRA Retirement Research, *403(b) Plan Sponsor Research* (2013).[3]

43.     It is well known in the defined contribution plan industry that plans with dozens of choices and multiple recordkeepers "fail" as a model based on two primary flaws:

> **1. The choices are overwhelming**. Numerous studies have demonstrated that when people are given too many choices of anything, they lose confidence or make no decision.
> **2. The multi-recordkeeper platform is inefficient**. It does not allow sponsors to leverage total plan assets and receive appropriate pricing based on aggregate assets.

The Standard Retirement Services, Inc., *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 (Nov. 2009)(emphasis in original).[4]

44.     The benefits of using a single recordkeeper are clear.

---

[3] Available at
http://www.limra.com/uploadedFiles/limracom/LIMRA_Root/Secure_Retirement_Ins titute/News_Center/Reports/130329-01exec.pdf.

[4] Available at https://www.standard.com/pensions/publications/14883_1109.pdf.

By selecting a single recordkeeper, plan sponsors can enhance their purchasing power and negotiate lower, transparent investment fees for participants. Participants will benefit from a more manageable number of institutional-quality investment options to choose from. Participants will also benefit from customized and consistent enrollment, education and ongoing communication materials.[5]

45.     In a study titled "How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It", AonHewitt, an independent investment consultant, similarly recognized:

> 403(b) plan sponsors can dramatically reduce participant-borne costs while improving employees' retirement readiness by:
>
> > – Reducing the number of investment options, utilizing an "open architecture" investment menu, and packaging the options within a "tiered" structure.
> >
> > – Consolidating recordkeepers to improve efficiencies and reduce compliance-related risks.
> >
> > – Leveraging aggregate plan size and scale to negotiate competitive pricing.[6]

46.     Another independent investment consultant, Towers Watson, also recognized that using multiple recordkeepers has caused:

> high investment and administrative costs, and complex choices for plan participants in terms of the number of vendors and the array of investment options. Additionally, this complexity has made it difficult for employers to monitor available choices and provide ongoing oversight...Such designs typically are expensive and fail to leverage plan size. They can also be confusing to the average plan participant,

---

[5] *Id.*

[6] AonHewitt, *How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It* (Jan. 2016), available at https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-4bc0-aac1-1685d2a64078/How_403(b)_Plans_are_Wasting_Nearly_$10_Billion_Annually_Whitepaper_FINAL.pdf.aspx.

who is likely to fall short of achieving retirement readiness and would benefit from more guidance.

Peter Grant and Gary Kilpatrick, *Higher Education's Response to a New Defined Contribution Environment*, TOWERS WATSON VIEWPOINTS, at 2 (2012).[7]

47.     Other industry literature makes the same points. See, e.g., Kristen Heinzinger, *Paring Down Providers: A 403(b) Sponsor's Experience,* PLANSPONSOR (Dec. 6, 2012)("One advantage of consolidating to a single provider was an overall drop in administrative fees and expenses. Recordkeeping basis points returned to the plan sponsors rather than to the vendor. All plan money aggregated into a single platform, and participants were able to save on fee structure. This also eliminated the complications and confusion of having three different recordkeepers.");[8] Paul B. Lasiter, *Single Provider, Multiple Choices*, BUSINESS OFFICER (Mar. 2010)(identifying, among other things, the key disadvantages of maintaining a multi-provider platform including the fact that it is "cumbersome and costly to continue overseeing multiple vendors").[9]

48.     Use of a single recordkeeper is also less confusing to participants and results in their avoiding paying excessive recordkeeping fees. *Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29,

---

[7] Available at https://www.towerswatson.com/DownloadMedia.aspx?media=%7B08A2F366-14E3-4C52-BB78-8930F598FD26%7D.

[8] Available at http://www.plansponsor.com/paring-down-providers-a-403b-sponsors-experience/?fullstory=true.

[9] Available at http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_Provider_Multiple_Choices.html.

2010)(recognizing the following benefits, among others: "The plan participant experience is better" because "employees are benefiting from less confusion as a result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because "[w]ith a reduced number of vendors in the equation, plan sponsors are better able to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per-participant ratio").[10]

49.    Despite the long-recognized benefits of a single recordkeeper for a defined contribution plan, Defendants selected and retained two recordkeepers (TIAA-CREF and Vanguard) to provide such services. This inefficient and costly structure has caused Plan participants to pay excessive and unreasonable fees for Plan recordkeeping and administrative services.

50.    The Plan's recordkeepers receive compensation for providing administrative and recordkeeping services through per-participant fees and revenue sharing payments from the Plan's investments.

51.    Upon information and belief and industry experts, the amount of revenue sharing kicked back to the TIAA-CREF recordkeeping entity for the Plan's TIAA-CREF investments is set forth below.

| TIAA-CREF Investment | Revenue Share |
|---|---|
| CREF variable annuity contracts | 24 bps |

---

[10] Available at http://www.plansponsor.com/vendor-consolidation-in-higher-education/?fullstory=true.

| TIAA-CREF Investment | Revenue Share |
|---|---|
| Premier share class of TIAA-CREF mutual funds | 15 bps |
| Retirement share class of TIAA-CREF mutual funds | 25 bps |
| TIAA Real Estate Account | 24–26.5 bps |
| TIAA Traditional Annuity | 15 bps |

52.     Upon information and belief, Vanguard is compensated for recordkeeping services based on internal revenue sharing it receives from the Vanguard Investor share mutual funds, a higher-priced share class than institutional rates readily available to a jumbo plan such as the Plan.

53.     In addition, TIAA-CREF and Vanguard receive additional indirect compensation, including float, revenue derived from securities lending, distribution fees, mortality and expense charges, surrender charges, spread, and redemption fees.

54.     Based on the Plan's features, the nature of the administrative services provided by Vanguard and TIAA-CREF, the Plan's participant level (roughly 20,000), and the recordkeeping market, the outside limit of a reasonable recordkeeping fee for the Plan would have been $700,000 to $750,000 (or $35 per participant with an account balance).

55.     Based on the direct and indirect compensation levels shown on the Plan's publicly available Form 5500s filed with the Department of Labor, and the internal revenue share allocated to each of the Plan's recordkeepers, the Plan paid between $4.4 million and $5.5 million (or approximately $220 to $250 per

16

participant) per year from 2010 to 2014, over 614% higher than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year.

56.     The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, *A Look at 401(k) Plan Fees,* at 1–2 (Aug. 2013).[11]

57.     Defendants failed to prudently monitor and control the compensation paid for recordkeeping and administrative services, particularly the asset-based revenue sharing received by TIAA-CREF and Vanguard as Plan assets grew. From the beginning of 2009 to the end of 2014, the Plan's assets increased from $2.2 billion to over $3.8 billion, an increase of *73%.* Because revenue sharing payments are asset-based, the already excessive compensation paid to the Plan's recordkeepers became even more excessive as the Plan's assets grew, even though the administrative services provided to the Plan remained the same. Defendants could have capped the amount of revenue sharing to ensure that any excessive amounts were returned to the Plan, but failed to do so.

58.     Upon information and belief, Defendants also failed to conduct a competitive bidding process for the Plan's recordkeeping services. A competitive bidding process for the Plan's recordkeeping services would have produced a

---

[11] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

reasonable recordkeeping fee for the Plan. This competitive bidding process would have enabled Defendants to select a single recordkeeper charging reasonable fees, to negotiate a reduction in recordkeeping fees, and to rebate any excess expenses paid by participants for recordkeeping services.

59.     Defendants failed to prudently monitor and control TIAA-CREF's and Vanguard's recordkeeping compensation to ensure that only reasonable fees were charged for recordkeeping and administrative services. Had Defendants monitored the compensation paid to the Plan's recordkeepers and ensured that participants were only charged reasonable fees for administrative and recordkeeping services, Plan participants would not have lost in excess of $26 million of their retirement savings through unreasonable recordkeeping fees.[12]

## III.     Defendants failed to prudently consider dramatically lower-cost investments that were available to the Plan, including identical mutual funds in lower-cost share classes.

60.     Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 Fin. Analysts J. 7, 8 (Jan./Feb. 1991);[13] see also Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns,* 65 J. Fin. 1915, 1915 (2010)("After costs…in

---

[12] Plan losses have been brought forward to the present value using the investment returns of the S&P 500 index to compensate participants who have not been reimbursed for their losses. This is because the excessive fees participants paid would have remained in Plan investments growing with the market.

[13] Available at http://www.cfapubs.org/doi/pdf/10.2469/faj.v47.n1.7.

terms of net returns to investors, active investment must be a negative sum game.").

61.     To the extent managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Fama & French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, at 1931–34; see also Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. FIN. 1655, 1690 (2000)("on a net-return level, the funds underperform broad market indexes by one percent per year").

62.     If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. FIN. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. FIN. 57, 57, 59 (1997)(measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). However, the *worst-performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

63.     Accordingly, investment costs are of paramount importance to prudent investment selection, and a prudent fiduciary will not select higher-cost actively

managed funds without a documented process to realistically conclude that the fund
is likely to be that extremely rare exception, if one even exists, that will outperform
its benchmark index over time, net of investment expenses.

64.    Moreover, large retirement plans have substantial bargaining power to
negotiate low fees for investment management services.

> The fiduciaries also must consider the size and purchasing power of
> their plan and select the share classes (or alternative investments)
> that a fiduciary who is knowledgeable about such matters would select
> under the circumstances. In other words, the "prevailing
> circumstances"—such as the size of the plan—are a part of a prudent
> decisionmaking process. The failure to understand the concepts and to
> know about the alternatives could be a costly fiduciary breach.

Fred Reish, *Class–ifying Mutual Funds*, PLANSPONSOR (Jan. 2011).[14]

65.    Apart from the fact that a prudent fiduciary will carefully weigh
whether an actively managed fund is likely to outperform an index over time, net of
fees, academic and financial industry literature demonstrates that high expenses
are not correlated with superior investment management. Indeed, funds with high
fees on average perform worse than less expensive funds even on a *pre-fee basis*.
Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in
the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2008);
see also Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U.
PA. L. REV. 1961, 1993 (2010)(summarizing numerous studies showing that "the
most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced
> through higher expense ratios. On the contrary, it appears that the effect of

---

[14] Available at http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed mutual funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

66.     Lower-cost institutional share classes of mutual funds, as compared to retail shares are available to institutional investors, and far lower-cost share classes are available to jumbo investors like the Plan. In addition, insurance company pooled separate accounts are available that can significantly reduce investment fees charged on mutual fund investments to defined contribution plans.

67.     Minimum investment thresholds for institutional share classes are routinely waived by the investment provider if not reached by a single fund based on the retirement plan's total investment in the provider's platform. Therefore, it is commonly understood by investment managers of large pools of assets that, for a retirement plan of the Plan's size, if requested, the investment provider would make available lower-cost share classes for the Plan, if there were any fund that did not individually reach the threshold.

68.     Despite these lower-cost options, Defendants selected and continue to use Plan investment options with far higher costs than were and are available for the Plan based on its size. Moreover, for the *exact same mutual fund option*, the Plan has selected and continues to provide far higher-cost share classes of mutual funds, identical in every respect except fees, to funds readily available to the Plan.

69.     Lower-cost share class *identical* alternatives to the Plan's mutual funds included:

21

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard 500 Index Fund (Signal) (VIFSX) | 7 bps | Vanguard Institutional Index (Instl Pl) (VIIIX) | 2 bps | 250% |
| Vanguard Asset Allocation Fund (Inv) (VAAPX) | 27 bps | Vanguard Asset Allocation Fund (Adm) (VAARX) | 19 bps | 42% |
| Vanguard Balanced Index Fund (Inv) (VBINX) | 26 bps | Vanguard Balanced Index Fund (Instl) (VBAIX) | 8 bps | 225% |
| Vanguard Capital Opportunity Fund (Inv) (VHCOX) | 48 bps | Vanguard Capital Opportunity Fund (Adm) (VHCAX) | 41 bps | 17% |
| Vanguard Developed Markets Index Fund (Inv) (VDMIX) | 22 bps | Vanguard Developed Markets Index Fund (Instl Pl) (VDMPX) | 6 bps | 267% |
| Vanguard Emerging Markets Stock Index Fund (Signal) (VERSX) | 22 bps | Vanguard Emerging Markets Stock Index Fund (Instl) (VEMIX) | 15 bps | 47% |
| Vanguard Emerging Markets Stock Index Fund (Signal) (VERSX) | 20 bps | Vanguard Emerging Markets Stock Index Fund (Instl Pl) (VEMRX) | 10 bps | 100% |
| Vanguard Emerging Markets Stock Index Fund (Instl) (VEMIX) | 12 bps | Vanguard Emerging Markets Stock Index Fund (Instl Pl) (VEMRX) | 10 bps | 20% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Energy Fund (Inv) (VGENX) | 38 bps | Vanguard Energy Fund (Adm) (VGELX) | 31 bps | 23% |
| Vanguard Equity Income Fund (Inv) (VEIPX) | 31 bps | Vanguard Equity Income Fund (Adm) (VEIRX) | 22 bps | 41% |
| Vanguard European Stock Index Fund (Inv) (VEURX) | 26 bps | Vanguard European Stock Index Fund (Instl) (VESIX) | 10 bps | 160% |
| Vanguard Explorer Fund (Inv) (VEXPX) | 49 bps | Vanguard Explorer Fund (Adm) (VEXRX) | 32 bps | 53% |
| Vanguard Extended Market Index Fund (Inv) (VEXMX) | 26 bps | Vanguard Extended Market Index Fund (Instl) (VIEIX) | 8 bps | 225% |
| Vanguard Extended Market Index Fund (Inv) (VEXMX) | 24 bps | Vanguard Extended Market Index Fund (Instl Pl) (VEMPX) | 6 bps | 300% |
| Vanguard GNMA Fund (Inv) (VFIIX) | 23 bps | Vanguard GNMA Fund (Adm) (VFIJX) | 13 bps | 77% |
| Vanguard Growth and Income Fund (Inv) (VQNPX) | 32 bps | Vanguard Growth and Income Fund (Adm) (VGIAX) | 21 bps | 52% |
| Vanguard Growth Index Fund (Signal) (VIGSX) | 12 bps | Vanguard Growth Index Fund (Instl) (VIGIX) | 8 bps | 50% |
| Vanguard Health Care Fund (Inv) (VGHCX) | 36 bps | Vanguard Health Care Fund (Adm) (VGHAX) | 29 bps | 24% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard High-Yield Corporate Fund (Inv) (VWEHX) | 28 bps | Vanguard High-Yield Corporate Fund (Adm) (VWEAX) | 15 bps | 87% |
| Vanguard Inflation-Protected Securities Fund (Inv) (VIPSX) | 22 bps | Vanguard Inflation-Protected Securities Fund (Instl) (VIPIX) | 7 bps | 214% |
| Vanguard Institutional Index Fund (Instl) (VINIX) | 4 bps | Vanguard Institutional Index Fund (Instl Pl) (VIIIX) | 2 bps | 100% |
| Vanguard Intermediate-Term Bond Index Fund (Inv) (VBIIX) | 22 bps | Vanguard Intermediate-Term Bond Index Fund (Instl) (VBIMX) | 7 bps | 214% |
| Vanguard Intermediate-Term Bond Index Fund (Inv) (VBIIX) | 20 bps | Vanguard Intermediate-Term Bond Index Fund (Instl Pl) (VBIUX) | 5 bps | 300% |
| Vanguard Intermediate-Term Investment Grade Fund (Inv) (VFICX) | 24 bps | Vanguard Intermediate-Term Investment Grade Fund (Adm) (VFIDX) | 11 bps | 118% |
| Vanguard Intermediate-Term Treasury Fund (Inv) (VFITX) | 25 bps | Vanguard Intermediate-Term Treasury Fund (Adm) (VFIUX) | 12 bps | 108% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard International Growth Fund (Inv) (VWIGX) | 49 bps | Vanguard International Growth Fund (Adm) (VWILX) | 33 bps | 48% |
| Vanguard Large-Cap Index Fund (Inv) (VLACX) | 26 bps | Vanguard Large-Cap Index Fund (Instl) (VLISX) | 8 bps | 225% |
| Vanguard Long-Term Bond Index Fund (Inv) (VBLTX) | 22 bps | Vanguard Long-Term Bond Index Fund (Instl) (VBLLX) | 7 bps | 214% |
| Vanguard Long-Term Bond Index Fund (Inv) (VBLTX) | 20 bps | Vanguard Long-Term Bond Index Fund (Instl Pl) (VBLIX) | 5 bps | 300% |
| Vanguard Long-Term Investment Grade Bond (Inv) (VWESX) | 26 bps | Vanguard Long-Term Investment Grade Bond (Adm) (VWETX) | 13 bps | 100% |
| Vanguard Long-Term Treasury Fund (Inv) (VUSTX) | 25 bps | Vanguard Long-Term Treasury Fund (Adm) (VUSUX) | 12 bps | 108% |
| Vanguard Mid-Cap Index Fund (Inv) (VIMSX) | 26 bps | Vanguard Mid-Cap Index Fund (Instl) (VMCIX) | 8 bps | 225% |
| Vanguard Mid-Cap Index Fund (Inv) (VIMSX) | 24 bps | Vanguard Mid-Cap Index Fund (Instl Pl) (VMCPX) | 6 bps | 300% |
| Vanguard Morgan Growth Fund (Inv) (VMRGX) | 43 bps | Vanguard Morgan Growth Fund (Adm) (VMRAX) | 29 bps | 48% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Pacific Stock Index Fund (Inv) (VPACX) | 26 bps | Vanguard Pacific Stock Index Fund (Instl) (VPKIX) | 10 bps | 160% |
| Vanguard PRIMECAP Fund (Inv) (VPMCX) | 45 bps | Vanguard PRIMECAP Fund (Adm) (VPMAX) | 36 bps | 25% |
| Vanguard Prime Money Market Fund (Inv) (VMMXX) | 23 bps | Vanguard Prime Money Market Fund (Adm) (VMRXX) | 9 bps | 156% |
| Vanguard REIT Index Fund (Inv) (VGSIX) | 26 bps | Vanguard REIT Index Fund (Instl) (VGSNX) | 9 bps | 189% |
| Vanguard Short-Term Bond Index Fund (Inv) (VBISX) | 22 bps | Vanguard Short-Term Bond Index Fund (Adm) (VBIRX) | 11 bps | 100% |
| Vanguard Short-Term Federal Fund (Inv) (VSGBX) | 22 bps | Vanguard Short-Term Federal Fund (Adm) (VSGDX) | 12 bps | 83% |
| Vanguard Short-Term Investment Grade Fund (Inv) (VFSTX) | 24 bps | Vanguard Short-Term Investment Grade Fund (Instl) (VFSIX) | 9 bps | 167% |
| Vanguard Short-Term Treasury Fund (Inv) (VFISX) | 22 bps | Vanguard Short-Term Treasury Fund (Adm) (VFIRX) | 12 bps | 83% |
| Vanguard Small-Cap Growth Index Fund (Inv) (VISGX) | 26 bps | Vanguard Small-Cap Growth Index Fund (Instl) (VSGIX) | 8 bps | 225% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Small-Cap Index Fund (Inv) (NAESX) | 26 bps | Vanguard Small-Cap Index Fund (Instl) (VSCIX) | 8 bps | 225% |
| Vanguard Small-Cap Index Fund (Inv) (NAESX) | 24 bps | Vanguard Small-Cap Index Fund (Instl Pl) (VSCPX) | 6 bps | 300% |
| Vanguard Small-Cap Value Index Fund (Inv) (VISVX) | 26 bps | Vanguard Small-Cap Value Index Fund (Instl) (VSIIX) | 8 bps | 225% |
| Vanguard Total Bond Market Index Fund (Signal) (VBTSX) | 12 bps | Vanguard Total Bond Market Index Fund (Instl) (VBTIX) | 7 bps | 71% |
| Vanguard Total Bond Market Index Fund (Signal) (VBTSX) | 11 bps | Vanguard Total Bond Market Index Fund (Instl Pl) (VBMPX) | 5 bps | 120% |
| Vanguard Total Bond Market Index Fund (Instl) (VBTIX) | 7 bps | Vanguard Total Bond Market Index Fund (Instl Pl) (VBMPX) | 5 bps | 40% |
| Vanguard Total International Stock Index Fund (Inv) (VGTSX) | 22 bps | Vanguard Total International Stock Index Fund (Instl Pl) (VTPSX) | 10 bps | 120% |
| Vanguard Total Stock Market Index Fund (Signal) (VTSSX) | 6 bps | Vanguard Institutional Total Stock Market Index Fund (Instl Pl) (VITPX) | 2 bps | 200% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Total Stock Market Index Fund (Instl) (VITSX) | 4 bps | Vanguard Institutional Total Stock Market Index Fund (Instl Pl) (VITPX) | 2 bps | 100% |
| Vanguard U.S. Growth Fund (Inv) (VWUSX) | 45 bps | Vanguard U.S. Growth Fund (Adm) (VWUAX) | 29 bps | 55% |
| Vanguard Value Index Fund (Inv) (VIVAX) | 26 bps | Vanguard Value Index Fund (Instl) (VIVIX) | 8 bps | 225% |
| Vanguard Wellesley Income Fund (Inv) (VWINX) | 28 bps | Vanguard Wellesley Income Fund (Adm) (VWIAX) | 21 bps | 33% |
| Vanguard Wellington Fund (Inv) (VWELX) | 30 bps | Vanguard Wellington Fund (Adm) (VWENX) | 22 bps | 36% |
| Vanguard Windsor Fund (Inv) (VWNDX) | 33 bps | Vanguard Windsor Fund (Adm) (VWNEX) | 22 bps | 50% |
| Vanguard Windsor II Fund (Inv) (VWNFX) | 35 bps | Vanguard Windsor II Fund (Adm) (VWNAX) | 27 bps | 30% |
| TIAA-CREF Bond Index Fund (Prem) (TBIPX) | 28 bps | TIAA-CREF Bond Index Fund (Instl) (TBIIX) | 13 bps | 115% |
| TIAA-CREF High-Yield Fund (Prem) (TIHPX) | 54 bps | TIAA-CREF High-Yield Fund (Instl) (TIHYX) | 39 bps | 38% |
| TIAA-CREF International Equity Fund (Prem) (TREPX) | 68 bps | TIAA-CREF International Equity Fund (Instl) (TIIEX) | 57 bps | 19% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| TIAA-CREF International Equity Fund (Ret) (TRERX) | 78 bps | TIAA-CREF International Equity Fund (Instl) (TIIEX) | 57 bps | 37% |
| TIAA-CREF International Equity Index Fund (Prem) (TRIPX) | 23 bps | TIAA-CREF International Equity Index Fund (Instl) (TCIEX) | 8 bps | 188% |
| TIAA-CREF Large-Cap Value (Prem) (TRCPX) | 64 bps | TIAA-CREF Large-Cap Value (Instl) (TRLIX) | 49 bps | 31% |
| TIAA-CREF Large-Cap Value (Ret) (TRLCX) | 74 bps | TIAA-CREF Large-Cap Value (Instl) (TRLIX) | 49 bps | 51% |
| TIAA-CREF Mid-Cap Growth Fund (Prem) (TRGPX) | 67 bps | TIAA-CREF Mid-Cap Growth Fund (Instl) (TRPWX) | 52 bps | 29% |
| TIAA-CREF Mid-Cap Growth Fund (Ret) (TRGMX) | 77 bps | TIAA-CREF Mid-Cap Growth Fund (Instl) (TRPWX) | 52 bps | 48% |
| TIAA-CREF Mid-Cap Value Fund (Prem) (TRVPX ) | 64 bps | TIAA-CREF Mid-Cap Value Fund (Instl) (TIMVX) | 49 bps | 31% |
| TIAA-CREF Mid-Cap Value Fund (Ret) (TRVRX ) | 74 bps | TIAA-CREF Mid-Cap Value Fund (Instl) (TIMVX) | 49 bps | 51% |
| TIAA-CREF Small-Cap Equity (Prem) (TSRPX) | 70 bps | TIAA-CREF Small-Cap Equity (Instl) (TISEX) | 55 bps | 27% |
| TIAA-CREF Small-Cap Equity (Ret) (TRSEX) | 80 bps | TIAA-CREF Small-Cap Equity (Instl) (TISEX) | 55 bps | 45% |

70.    These lower-cost share classes of the identical mutual funds for the Plan have been available for years, some dating back to the early 2000s or before.

71.    The failure to select lower-cost share classes for the Plan's mutual fund options *identical in all respects* (portfolio manager, underlying investments, and asset allocation) *except for cost* demonstrates that Defendants failed to consider the size and purchasing power of the Plan when selecting share classes and failed to engage in a prudent process in the selection, monitoring, and retention of those mutual funds.

72.    Had the amounts invested in the higher-cost share class mutual fund options instead been invested in the readily available lower-cost share class mutual fund options, Plan participants would not have lost millions of dollars of their retirement savings.

## IV.    Defendants selected and retained a large number of duplicative investment options, diluting the Plan's ability to pay lower fees and confusing participants.

73.    Defendants provided a dizzying array of duplicative funds in the same investment style, thereby depriving the Plan of its bargaining power associated with offering a single option in each investment style, which significantly reduces investment fees, and leading to "decision paralysis" for participants. Over 75 investment options were offered and continue to be offered to participants for the following asset classes: target date and asset allocation funds, large-cap domestic equities, mid-cap domestic equities, small-cap domestic equities, international equities, fixed income, money market, real estate, and fixed guaranteed annuity.

74.     In comparison, according to Callan Investments Institute's 2015
Defined Contribution Trends survey, defined contribution plans in 2014 had on
average 15 investment options, excluding target date funds. See Callan Investments
Institute, *2015 Defined Contribution Trends*, at 28 (2015).[15] This provides choice of
investment style to participants while maintaining a larger pool of assets in each
investment style.

75.     A larger pool of assets in each investment style significantly reduces
fees paid by participants. By consolidating duplicative investments of the same
investment style into a single investment option, the Plan would then have the
ability to command lower-cost investments, such as low-cost institutional share
class of the selected mutual fund option.

76.     Prudent fiduciaries of large defined contribution plans engage in a
detailed due diligence process to select and retain investments for a plan based on
the risk, investment return, and expenses of available investment alternatives.
Overall, the investment lineup should provide participants with the ability to
diversify their portfolio appropriately while benefiting from the size of the pooled
assets of other employees and retirees.

77.     Within each asset class and investment style deemed appropriate for
the participant-directed retirement plan, prudent fiduciaries make a reasoned
determination and select a prudent investment option. Unlike Defendants, prudent
fiduciaries do not select and retain numerous investment options for a single asset

---

[15]Available at https://www.callan.com/research/files/990.pdf.

class and investment style. When many investment options in a single investment style are plan options, fiduciaries lose the bargaining power to get lower investment management expenses for that style.

78.    In addition, providing multiple options in a single investment style adds unnecessary complexity to the investment lineup and leads to participant confusion. See The Standard, *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 ("Numerous studies have demonstrated that when people are given too many choices of anything, they lose confidence or make no decision."); Michael Liersch, *Choice in Retirement Plans: How Participant Behavior Differs in Plans Offering Advice, Managed Accounts, and Target-Date Investments,* T. ROWE PRICE RETIREMENT RESEARCH, at 2 (Apr. 2009)("Offering too many choices to consumers can lead to decision paralysis, preventing consumers from making decisions.").[16]

79.    Moreover, having numerous actively managed funds in the Plan within the same investment style results in the Plan effectively having an index fund return, while paying much higher fees for active management than the fees charged by a passive index fund, which has much lower fees because there is no need in an index fund for active management and its higher fees.

80.    From 2010 to the present, the Plan offered a proliferation of duplicative investments in every major asset class and investment style, including balanced/asset allocation (3–10 options), fixed income and high yield bond (14–18

---

[16] Available at
http://www.behavioralresearch.com/Publications/Choice_in_Retirement_Plans_April_2009.pdf.

options), international (8–15 options), large cap domestic equities (14–27 options),

mid cap domestic equities (6–11 options), small cap domestic equities (5–7 options),

real estate (2 options), money market (2–4 options), and target date investments (2

fund families). Such a dizzying array of duplicative funds in a single investment

style violates the well-recognized industry principle that too many choices harm

participants and are paralyzing.

81.     For illustration purposes, the Plan's four large cap domestic blend

investments as of December 31, 2014, are summarized below and compared to a

single lower-cost alternative that was available to the Plan: the large cap blend

Vanguard Institutional Index Fund-Instl. Plus (VIIIX), which mirrors the market

and has an expense ratio of 2 bps.

| Large Cap Blend Investments | Assets | Plan Fee | Lower-Cost Alternative Fee | Plan's Excess Cost |
|---|---|---|---|---|
| CREF Stock Account | $753,152,128 | 46 bps | 2 bps | 2200% |
| CREF Equity Index Account | $86,587,630 | 37 bps | 2 bps | 1750% |
| Vanguard Institutional Index Fund-Instl (VINIX) | $120,459,283 | 4 bps | 2 bps | 100% |
| Vanguard Total Stock Market Index Fund-Instl (VITSX) | $64,508,300 | 4 bps | 2 bps | 100% |
| Total | $1,024,707,341 | | | |

82.     With over *$800 million* held in the CREF Stock Account and the CREF

Equity Index Account, these large cap blend options were *23 and 18 times* more

expensive than the lower-cost Vanguard option with an expense ratio of 2 bps,

respectively.



83.     Many other large cap index funds are also available at massively lower costs than the Plan's large cap funds. Had the amounts invested in the Plan's large cap blend options been consolidated into a single large cap blend investment, such as the Vanguard Institutional Index Fund-Instl. Plus, Plan participants would have avoided paying in excess of $3 million in fees for 2014 alone, and many more millions since 2010.

84.     Similarly, the Plan offers *eleven* different fixed income investments as of December 31, 2014. These funds are summarized below and compared to a far lower-cost readily available alternative, the Vanguard Total Bond Market Index Fund-Instl Plus (VBMPX) with an expense ratio of 5 bps.

| Fixed Income Investments | Assets | Plan Fee | Lower-Cost Alternative Fee | Plan's Excess Cost |
|---|---|---|---|---|
| CREF Bond Market Fund | $67,681,000 | 44 bps | 5 bps | 780% |

34

| Fixed Income Investments | Assets | Plan Fee | Lower-Cost Alternative Fee | Plan's Excess Cost |
|---|---|---|---|---|
| CREF Inflation-Linked Bond Fund | $35,735,301 | 39 bps | 5 bps | 680% |
| TIAA-CREF Bond Index Fund-Prem (TBIPX) | $8,211,935 | 27 bps | 5 bps | 440% |
| Vanguard Inflation-Protected Securities Fund-Inv (VIPSX) | $15,501,746 | 20 bps | 5 bps | 300% |
| Vanguard Intermediate-Term Bond Index Fund-Inv (VBIIX) | $12,358,006 | 20 bps | 5 bps | 300% |
| Vanguard Intermediate-Term Treasury Fund-Inv (VFITX) | $6,384,162 | 20 bps | 5 bps | 300% |
| Vanguard Long-Term Bond Index Fund-Inv (VBLTX) | $5,581,631 | 20 bps | 5 bps | 300% |
| Vanguard Long-Term Investment Grade Bond-Inv (VWESX) | $8,805,651 | 22 bps | 5 bps | 340% |
| Vanguard Short-Term Investment Grade Fund-Inv (VFSTX) | $19,461,893 | 20 bps | 5 bps | 300% |
| Vanguard Total Bond Market Index Fund-Instl (VBTIX) | $41,086,928 | 6 bps | 5 bps | 20% |
| Vanguard Long-Term Treasury Fund-Inv (VUSTX) | $6,569,316 | 20 bps | 5 bps | 300% |
| **Total** | **$227,377,569** | | | |

85.    Had the amounts in the Plan's fixed income investments instead been

consolidated into a single fixed income investment, such as the Vanguard Total

Bond Market Index Fund-Instl Plus, Plan participants would have saved