# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA
### PHILADELPHIA DIVISION

| | |
|---|---|
| JENNIFER SWEDA, BENJAMIN A. WIGGINS, ROBERT L. YOUNG, FAITH PICKERING, PUSHKAR SOHONI, AND REBECCA N. TONER, individually and as representatives of a class of participants and beneficiaries on behalf of the University of Pennsylvania Matching Plan, | No. 2:16-cv-04329-GEKP |
| *Plaintiffs,* | AMENDED COMPLAINT— CLASS ACTION |
| v. | JURY TRIAL DEMANDED |
| THE UNIVERSITY OF PENNSYLVANIA, INVESTMENT COMMITTEE, AND JACK HEUER, | |
| *Defendants.* | |

## AMENDED COMPLAINT

1.      Plaintiffs Jennifer Sweda, Benjamin A. Wiggins, Robert L. Young, Faith Pickering, Pushkar Sohoni, and Rebecca N. Toner, individually and as representatives of a class of participants and beneficiaries in the University of Pennsylvania Matching Plan ("Plan"), bring this action under 29 U.S.C. §1132(a)(2) on behalf of the Plan against Defendants University of Pennsylvania and Jack Heuer for breach of fiduciary duties under ERISA.[1]

2.      ERISA's fiduciary duties "are those of trustees of an express trust—the highest known to the law." *Donovan v. Bierwirth,* 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982); *Solis v. Koresko*, 884 F. Supp. 2d 261, 292 (E.D. Pa. 2012); 29 U.S.C.

---

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.

§1104(a). An ERISA fiduciary "is duty-bound "to make such investments and only such investments as a prudent [person] would make of his own property. . . ."" *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996) (quoting Restatement (Second) of Trusts § 227 (1959)). Fiduciaries must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants," *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original), and must "remove imprudent ones" within a reasonable time, *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828–29 (2015).

3.     The marketplace for retirement plan services is established and competitive. Billion-dollar-defined contribution plans, like the Plan—which is among the largest 0.02% of defined contribution plans in the United States—have tremendous bargaining power to demand low-cost administrative and investment management services. As a fiduciary to the Plan, Defendants are obligated to limit the Plan's expenses to a reasonable amount, to ensure that *each* fund in the Plan is a prudent option for participants to invest their retirement savings and priced at a reasonable level for the size of the Plan; and to analyze the costs and benefits of alternatives for the Plan's administrative and investment structure. Defendants must make those decisions for the exclusive benefit of participants, and not for the benefit of conflicted third parties, such as the Plan's service providers.

4.     Instead of using the Plan's bargaining power to limit expenses to a reasonable amount and exercising independent judgment to determine what investments to include in the Plan, Defendants squandered that leverage by

2

allowing the Plan's conflicted third party service providers—TIAA-CREF and Vanguard—to dictate the Plan's investment lineup, to link their recordkeeping services to the placement of investment products in the Plan, and to collect unlimited asset-based compensation from their own proprietary products. As a result, Defendants allowed unreasonable expenses to be charged to participants for administration of the Plan, and retained investments with excessive costs and poor performance compared to available alternatives, thereby causing the Plan and participants to suffer significant losses of retirement savings.

5.      To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plan, bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan any profits made through Defendants' use of Plan assets. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

6.      **Subject-matter jurisdiction.** This action arises under federal law, 29 U.S.C. §1132(a)(2). This Court has jurisdiction under 28 U.S.C. §1331 and 29 U.S.C. §1132(e)(1).

7.      **Venue.** This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the subject Plan is administered, where at least one of the alleged breaches took place, and where at least one defendant resides.

8.    **Standing.** An action under §1132(a)(2) allows recovery only for a plan, and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *Id*. at 254. Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of the plan to seek relief on behalf of the plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses caused by Defendants' fiduciary breaches and remain exposed to harm and continued future losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs. To the extent the Plaintiffs must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, each Plaintiff has suffered such an injury, in at least the following ways:

a. The named Plaintiffs and all participants in the Plan suffered financial harm as a result of the imprudent or excessive-fee options in the Plan because Defendants' inclusion of those options deprived participants of the opportunity to grow their retirement savings by investing in prudent options with reasonable fees, which would have been available in the Plan if Defendants had satisfied their fiduciary obligations. All participants continue to be harmed by the ongoing inclusion of these imprudent and excessive-cost options and payment of excessive recordkeeping fees.

b.  The named Plaintiffs and all participants in the Plan were
    financially harmed by Defendants' improper bundling of some of the
    Plan's investment products, improperly allowing the companies who
    did recordkeeping for the Plan to require inclusion of their
    investment products in the Plan, instead of each investment option
    being independently selected.

c.  The named Plaintiffs' individual accounts in the Plan were further
    harmed by Defendants' breaches of fiduciary duties because one or
    more of the named Plaintiffs during the proposed class period (1)
    invested in underperforming options including the CREF Stock and
    TIAA Real Estate accounts—which were in the Plan because of
    improperly bundling with TIAA's recordkeeping services and which
    Defendants also failed to remove from the Plan when it was clear
    from past poor performance and their excessive fees that they were
    imprudent investments—at a time when those options
    underperformed numerous prudent alternatives in which the assets
    would have been invested had Defendants not breached their
    fiduciary duties, (2) invested in excessive-cost investment options,
    including funds that paid revenue sharing to the Plan's
    recordkeepers and higher-cost share classes of Plan mutual funds
    priced for small investors when far lower-cost but otherwise
    identical share classes of the same mutual funds were available

based on the enormous size of the Plan, resulting in a loss of
retirement savings, and (3) through their investments in those
mutual funds and other investments and the fees charged on their
investments in those funds, paid a portion of the Plan's excessive
administrative and recordkeeping fees, which would not have been
incurred had defendants discharged their fiduciary duties to the
Plan, resulting in a loss of retirement savings.

## PARTIES

### The University of Pennsylvania Matching Plan

9.     The Plan is a defined contribution, individual account, employee
pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

10.    The Plan is established and maintained under a written document in
accordance with 29 U.S.C. §1102(a)(1). The Plan was most recently amended and
restated effective January 1, 2009.

11.    The Plan provides for retirement income benefits for certain employees
of the University of Pennsylvania. That retirement income depends upon deferrals
of the employee's compensation, contributions made on behalf of each employee by
his or her employer, and performance of investment options net of fees and
expenses.

12.    As of December 31, 2014, the Plan had $3.8 billion in net assets and
21,412 participants with account balances. It is among the largest 0.02% of all
defined contribution plans in the United States based on total assets. Plans of such
great size are commonly referred to as "jumbo plans." As such, the Plan has

enormous bargaining power by reason of its massive size to command very low investment management and recordkeeping fees for its participants.

**Plaintiffs**

13.     Jennifer Sweda resides in Philadelphia, Pennsylvania, She is a Librarian in the Catalog Department at Van Pelt Library. She is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

14.     Benjamin A. Wiggins resides in Minneapolis, Minnesota. He was formerly a Director of Distance Learning Initiatives in University of Pennsylvania's Department of Online Learning. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

15.     Robert L. Young resides in Upper Darby, Pennsylvania. He is a Staff Physical Therapist in University of Pennsylvania's Department of Nursing Life Program. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

16.     Faith Pickering resides in Exton, Pennsylvania. She is a Cardio Vascular Clinical Manager of Research in University of Pennsylvania's Heart Failure Heart Transplant Department. She is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

17.     Pushkar Sohoni resides in Philadelphia, Pennsylvania. He is a South Asia Studies Librarian at the University of Pennsylvania Libraries. He is a

participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

18.     Rebecca N. Toner resides in Philadelphia, Pennsylvania. She is a Language Specialist in University of Pennsylvania's English Language Programs. She is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

**Defendants**

19.     The University of Pennsylvania, incorporated as the Trustees of the University of Pennsylvania, is a non-profit corporation organized under Pennsylvania law with its principal place of business in Philadelphia, Pennsylvania. The University of Pennsylvania is the fiduciary responsible for the control, management and administration of the Plan, in accordance with 29 U.S.C. §1102(a). The University of Pennsylvania, acting through its Board of Trustees, has primary responsibility and discretionary authority to control the operation, management and administration of the Plan, with all powers necessary to enable the University to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

20.     The University of Pennsylvania is a fiduciary to the Plan because it is a "named fiduciary" under the Plan and because it exercised discretionary authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of its assets, and has

8

discretionary authority or discretionary responsibility in the administration of the Plan, as described more fully below. 29 U.S.C. §1002(21)(A)(i) and (iii).

21.     The University of Pennsylvania, through its Board of Trustees, appointed an Investment Committee as a named fiduciary with the authority and responsibility over investment matters, including but not limited to responsibility for the selection, monitoring, and removal of Plan investment options and providers. The members of the Investment Committee are appointed by the University of Pennsylvania, acting through its Board of Trustees.

22.     The Investment Committee is a fiduciary to the Plan because it is a "named fiduciary" under the Plan and because it exercised discretionary authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of its assets, and has discretionary authority or discretionary responsibility in the administration of the Plan, as described more fully below. 29 U.S.C. §1002(21)(A)(i) and (iii).

23.     The University of Pennsylvania appointed the Vice President of Human Resources of the University of Pennsylvania to serve as the Plan Administrator under 29 U.S.C. §1002(16)(A)(i). The Plan Administrator is a named fiduciary responsible for Plan-related matters including, but not limited to interpreting the Plan's provisions, resolving questions about eligibility to participate in the Plan, making decisions about claims for benefits, and establishing rules and procedures for the Plan's operation. The Plan Administrator may delegate

responsibility for any aspect of the Plan's administration to other individuals or entities.

24.    Jack Heuer is the current Vice President of Human Resources of the University of Pennsylvania and serves as the Plan Administrator.

25.    The Vice President of Human Resources is a fiduciary to the Plan because it is a named fiduciary under the Plan and because it exercised discretionary authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of its assets, and has discretionary authority or discretionary responsibility in the administration of the Plan, as described more fully below. 29 U.S.C. §1002(21)(A)(i) and (iii).

26.    Because Jack Heuer, the Investment Committee and its members, and any delegates described above have acted as alleged herein as the agents of the University of Pennsylvania, all defendants are collectively referred to hereafter as Defendants.

## ERISA'S FIDUCIARY STANDARDS

27.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a)(1). The statute states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)    for the exclusive purpose of
>       (i)    providing benefits to participants and their beneficiaries; and
>       (ii)    defraying reasonable expenses of administering the plan;

[and]

(B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

28.    Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and for the *exclusive* benefit of participants in the plan, and not for the benefit of third parties including service providers to the plan such as recordkeepers and those who provide investment products. Fiduciaries must ensure that the amount of fees paid to those service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

29.    When making investment decisions, an ERISA fiduciary "is duty-bound "to make such investments and only such investments as a prudent [person] would make of his own property. . . .'" *In re Unisys*, 74 F.3d at 434 (quoting Restatement (Second) of Trusts § 227 (1959)). "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996). A defined contribution plan fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of

11

investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Instead, fiduciaries must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original); *see also* 29 C.F.R. § 2550.404a-1; DOL Adv. Opinion 98-04A; DOL Adv. Opinion 88-16A. Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones" within a reasonable time. *Tibble*, 135 S. Ct. at 1828–29.

30.     The general fiduciary duties imposed by 29 U.S.C. §1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. §1106, and are considered *per se* violations because they entail a high potential for abuse. Section 1106(a)(1) states, in pertinent part, that:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
> (A)     sale or exchange, or leasing, of any property between the plan and a party in interest;
> * * *
> (C)     furnishing of goods, services, or facilities between the plan and party in interest;
> (D)     transfer to, or use by or for the benefit of a party in interest, of any assets of the plan…

31.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

> (1)   if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]

> (2)   if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

> (3)   if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

32.     29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## BACKGROUND FACTS

## I.     Defined contribution plans, services, and fees.

33.     "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008). In the private sector, such plans have largely replaced the defined benefit pension plans that were

America's retirement system when ERISA was enacted in 1974.

34.     Each participant in a defined contribution plan has an individual account, and directs their plan contributions into one or more investment options in a lineup chosen by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826.

35.     The majority of fees assessed to participants in a defined contribution plan are attributable to two general categories of services: plan administration (including recordkeeping), and investment management. These expenses "can sometimes significantly reduce the value of an account in a defined-contribution plan." *Id.*

36.     The plan's fiduciaries have control over these expenses. The fiduciaries are responsible for hiring administrative service providers, such as a recordkeeper, and negotiating and approving those service providers' compensation. The fiduciaries also have exclusive control over the menu of investment options to which participants may direct the assets in their accounts. Those selections each have their own fees which are deducted from the returns that participants receive on their investments.

37.     These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year

career makes a difference of *28%* in savings at retirement. U.S. Dep't of Labor, *A Look at 401(k) Plan Fees,* at 1–2 (Aug. 2013).[2] Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control these costs and ensure that participants pay no more than a reasonable level of fees. This is particularly true for multi-billion dollar plans like the Plan, which have the bargaining power to obtain the highest level of service and the lowest fees. The fees available to multi-billion dollar retirement plans are orders of magnitude lower than the much higher retail fees available to small investors.

38.     The entities that provide services to defined contribution plans have an incentive to maximize their fees by putting their own higher-cost funds in plans and collecting the highest amount possible for recordkeeping. For each additional dollar in fees paid to a service provider, participants' retirement savings are directly reduced by the same amount, and participants lose the potential for those lost assets to grow over the remainder of their careers. Accordingly, participants' retirement security is directly affected by the diligence used by plan fiduciaries to control, negotiate, and reduce the plan's fees.

39.     Fiduciaries must be cognizant of providers' self-interest in maximizing fees, and not simply accede to the providers' preferred investment lineup—*i.e.*, proprietary funds that will generate substantial fee revenue for the provider—or agree to the provider's administrative fee quotes without negotiating or considering alternatives. In order to act in the exclusive interest of participants and not in the

---

[2] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

service providers' interest, fiduciaries must negotiate as if their own money was at stake. Instead of simply accepting the investment funds or fees demanded by these conflicted providers, fiduciaries must consider whether participants would be better served by using alternative investment products or services.

## A.   Recordkeeping

40.   Recordkeeping is a service necessary for every defined contribution plan. The recordkeeper keeps track of the amount of each participant's investments in the various options in the plan, and typically provides each participant with a quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about the plan and to review their accounts. The recordkeeper may also provide access to investment education materials or investment advice. These services are largely commodities, and the market for recordkeeping services is highly competitive.

41.   There are numerous recordkeepers in the marketplace who are capable of providing a high level of service and who will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan. These recordkeepers will readily respond to a request for proposal and will tailor their bids based on the desired services (*e.g.*, recordkeeping, website, call center, etc.). In light of the commoditized nature of their services, recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for jumbo plans like the Plan.

## B.   Investment options

42.   Defined contribution fiduciaries determine the available investment

options in a plan. Each investment option is typically a pooled investment product, such as a mutual fund, and invests in a diversified portfolio of securities in a broad asset class such as fixed income, bonds, or equities.

43.     Investment options can be passively or actively managed. In a passively managed or "index" fund, the investment manager attempts to match the performance of a given benchmark index by holding a representative sample of securities in that index, such as the S&P 500. In an actively managed fund, the investment manager uses her judgment in buying and selling individual securities (*e.g.*, stocks, bonds, etc.) in an attempt to generate investment returns that surpass a benchmark index, net of fees. Because no stock selection or research is necessary for the manager to track the index and trading is limited, passively managed investments charge significantly lower fees than actively managed funds.

44.     Mutual fund fees are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the mutual fund deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points (bps).[3] The fees deducted from a mutual fund's assets reduce the value of the shares owned by fund investors.

45.     Many mutual funds offer their investors different share classes. Retail share classes are marketed to individuals with small amounts to invest. Institutional share classes are offered to investors with large amounts to invest, such as large retirement plans. The different share classes of a given mutual fund

_____

[3] One basis point is equal to 1/100th of one percent (or 0.01%).

have the identical manager, are managed identically, and invest in the same portfolio of securities. The only difference is that the retail shares charge significantly higher fees, resulting in retail class investors receiving lower returns. The share classes are otherwise identical in all respects.

46.     Some mutual funds engage in a practice known as "revenue sharing." In a revenue-sharing arrangement, a mutual fund pays a portion of its expense ratio to the entity providing administrative and recordkeeping services to a plan, putatively as compensation for providing those services. The difference in fees between a mutual fund's retail and institutional share classes is often attributable to revenue sharing. To illustrate, a fund's retail share class may have an expense ratio of 100 bps, including 25 bps of revenue sharing, while the institutional share charges 75 bps, with no or lesser revenue sharing. The presence of revenue sharing thus provides an incentive for administrative service providers to recommend that the fiduciary select higher cost funds, including in-house funds of the administrative service provider that pay the provider revenue sharing. "[V]ery little about the mutual fund industry," including revenue sharing practices, "can plausibly be described as transparent[.]" *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 907 (7th Cir. 2013).

47.     The importance of fees in prudent investment selection cannot be overstated. The prudent investor rule developed in the common law of trusts, which which informs ERISA's fiduciary duties, emphasizes "the duty to avoid unwarranted costs[.]" Restatement (Third) of Trusts ch. 17, intro. note (2007); *see*

18

*Tibble*, 135 S. Ct. at 1828 (discussing Restatement (Third) of Trusts §90 in finding a continuing duty to monitor under ERISA). As the Restatement explains, "cost-conscious management is fundamental to prudence in the investment function." Restatement (Third) of Trusts § 90 cmt. b. While a fiduciary may consider higher-cost, actively-managed mutual funds as an alternative to index funds, "active management strategies involve investigation expenses and other transaction costs . . . that must be considered, realistically, in relation to the likelihood of increased return from such strategies." Restatement (Third) of Trusts ch. 17, intro. note; *id*. § 90 cmt. h(2).

48.    Academic and financial industry literature demonstrates that high expenses are not correlated with superior investment management. As discussed in University of Pennsylvania's law review, numerous studies show that "the most consistent predictor of a fund's return to investors is the fund's expense ratio[.]" Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010). Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2008). The empirical evidence shows that "low-quality funds charge higher fees," such that "[p]rice and quality thus seem to be *inversely related* in the market for actively managed mutual funds." *Id*. at 883. (emphasis added).

49.    In light of this effect of fees on expected returns, fiduciaries must

carefully consider whether the added cost of actively-managed funds is realistically justified by an expectation of higher returns. Restatement (Third) of Trusts ch. 17, intro. note; *id*. § 90 cmt. h(2). A prudent investor will not select higher-cost actively managed funds without analyzing whether a particular investment manager is likely to beat the overwhelming odds against outperforming its benchmark index over time, net of the fund's higher investment expenses.

## II.   403(b) plans share common fiduciary duties with 401(k) plans.

50.   Defined contribution plans can qualify for favored tax treatment under different sections of the Internal Revenue Code. Plans offered by corporate employers typically qualify under 26 U.S.C. §401(k), and are commonly referred to as 401(k) plans. Tax-exempt organizations, public schools (including state colleges and universities), and churches are eligible to offer plans qualified under §403(b), commonly known as 403(b) plans. 26 U.S.C. §403(b)(1)(A).

51.   403(b) plans sponsored by tax-exempt organizations such as private universities are subject to Title I of ERISA and its fiduciary requirements, unless the plan satisfies a 1979 "safe-harbor" regulation based on the employer having limited involvement in operating the plan. 29 C.F.R. §2510.3-2(f). To the best of Plaintiffs' knowledge, the Plan has never qualified for the safe harbor, and thus has long been subject to ERISA's fiduciary requirements. In the Plan's annual reports (Forms 5500) filed with the Department of Labor, Defendants have acknowledged the Plan is subject to ERISA.

52.   Although 401(k) plans and 403(b) plans have different historical origins, legislative and regulatory developments over several decades largely eroded

those differences, as reflected in final 403(b) regulations published by the IRS on July 26, 2007, which became effective January 1, 2009. These regulations required certain employers, such as those that previously qualified for the safe harbor, to become more involved with administering their plans than they had previously, potentially disqualifying those plans from ERISA safe harbor status and subjecting the plans to ERISA fiduciary requirements for the first time. However, for plans like the Plans that were *already* subject to ERISA's fiduciary requirements because they were never safe-harbor plans, the IRS regulations had no effect on the Plans' status for ERISA fiduciary purposes; ERISA already required Defendants to be actively involved in exercising care, prudence, skill, and diligence in administering the Plans for the exclusive benefit of participants.

53.     Regardless of any historical differences between 401(k) and 403(b) plans, it is clear that both types of plans have the same fundamental purpose: allowing employees to save for a secure retirement. The duties of fiduciaries in both are the same: to operate as a financial expert familiar with investment practices, to operate the plan for the exclusive benefit of employees and retirees, and to make sure that fees are reasonable and investments are prudent. Participants in both types of plans depend on their plan fiduciaries to ensure that those savings are not depleted by excessive fees or imprudent investments. Accordingly, the historical differences and investment limitations of 403(b) plans do not allow 403(b) fiduciaries to exercise a lesser degree of care or attention to fees and investments than their 401(k) counterparts.

III.   **Fiduciaries of 403(b) plans that historically offered multiple recordkeepers and a large number of their proprietary investments have now rejected that model.**

54.    As the Department of Labor recognized in connection with the new IRS regulations, historically, many 403(b) sponsors had treated their plans as a collection of individual contracts under which employees could take various actions without the consent or involvement of the employer or plan administrator, instead of fiduciaries evaluating investment options placed in the plan. Field Assistance Bulletin 2009-02.

55.    Some 403(b) plans historically before 2009 included multiple bundled service providers, with each performing the recordkeeping function for its own investment products in the plan, unlike 401(k) plans which had a single recordkeeper. In fact, "403(b) plan investment options were often 'sold' by record keepers and their representatives rather than offered by plan sponsors as evaluated investments." Fiduciary Plan Governance, LLC, *Legacy Investments in Higher Education: What is a Plan Sponsor's Responsibility to Participants*?[4] Indeed, sponsors of these plans often took a "'hands off' approach to plan oversight." *Id*. This practice resulted in plans having excessive recordkeeping costs and structures involving multiple recordkeepers with each recordkeeper having its own investment options in the plan. This left participants with the task of navigating a haphazard collection of duplicative and overlapping investment options from the various recordkeepers, and ultimately led to them paying excessive and unnecessary fees,

---

[4] http://www.fiduciaryplangovernance.com/blog/legacy-investments-in-higher-education-what-is-a-plan-sponsors-responsibility-to-participants.

both for recordkeeping and for investment products in the plans. *Id.* In some cases the recordkeeper insisted on its own funds being included in the plan without any resistance or analysis of those funds by the fiduciaries.

56.  Under the 2007 final regulations that became effective January 1, 2009,[5] certain employers with 403(b) plans were compelled to exercise greater control over their 403(b) plans than they had previously. The regulations are expressly intended to make 403(b) plans more like 401(k) plans.

57.  Once the final regulations were published, many 403(b) plan fiduciaries recognized that fulfilling their fiduciary obligations—whether on an ongoing basis or for the first time—required them to engage, if they had not already been doing so, in a comprehensive review of their plans' fees, investment options and structure, and service provider arrangements, to determine whether changes had to be made for the benefit of participants.

58.  As a result, the fiduciaries of many 403(b) plans implemented dramatic overhauls to their plans and acknowledged that these changes were necessary to comply with the IRS regulations and to satisfy their fiduciary obligations under ERISA.

59.  For example, the fiduciaries of the Loyola Marymount University (LMU) Defined Contribution Plan, a 403(b) plan, recognized that under the new regulations, "Recordkeeping must be consolidated and/or managed by a single

---

[5] 403(b) plan sponsors had almost a year and a half to make changes necessary to comply before the regulation became effective January 1, 2009.

party."[6] "Keeping two on-going record keepers in 2009 would mean that faculty/staff would pay higher fees and receive reduced services."[7] Thus, in 2008, to assist LMU in assessing the plan's investment options and recordkeeping services, LMU hired an independent third party consultant, Hewitt Associates (n/k/a AonHewitt), to issue a request for proposal to seven different 403(b) recordkeeping providers, including AIG Retirement, Diversified Investment Advisors, Fidelity, ING, Lincoln Financial Group, Principal Financial Group, and TAA-CREF.[8] LMU consolidated from two recordkeepers to one effective on the date the final regulation became effective, January 1, 2009. Loyola Marymount's fiduciaries recognized that a dual recordkeeper structure would require its employees to pay higher fees for overlapping services, and because consultants, legal counsel, and all of the recordkeeping firms interviewed recommended that LMU use only one record keeper, starting in January 2009.[9] Moreover, LMU selected Diversified as the new recordkeeper because Diversified "is not an investment manager and therefore, does not require that certain investment options be offered by LMU." LMU was therefore able to offer "best in class" funds in each fund category.[10]

60.     Similarly, the fiduciaries of the Pepperdine University Retirement Plan reviewed their plan after the IRS 403(b) regulations were published and recognized the implications of maintaining four different recordkeepers. In order to

---

[6] *See* LMU 403(b) Retirement Plan Project Overview, at 1, available at http://www.lmu.edu/AssetFactory.aspx?vid=33038.

[7] *Id*. at 2.

[8] *See* http://www.lmu.edu/AssetFactory.aspx?vid=32045.

[9] LMU 403(b) Retirement Plan Project Overview, at 2.

[10] *Id.* at 6.

comply with its fiduciary responsibilities, Pepperdine determined that it must make certain changes to the plan, including "[c]onsolidating recordkeeping (by having one fund provider manage administration for multiple providers or by moving to a sole administrator scenario)."[11] Pepperdine retained an independent third party consultant to assist the fiduciaries in issuing a request for proposal to 403(b) recordkeeping providers. Following the competitive bidding process, effective February 1, 2009, Pepperdine selected Diversified, a recordkeeper which does not offer proprietary investments, as the "sole administrator" and consolidated from four recordkeepers (Fidelity, TIAA-CREF, Vanguard, and Prudential) to a single recordkeeper. Pepperdine found that the benefits of consolidation included lower costs and more robust services, as well as a streamlined compliance process and simplified data coordination.[12] Pepperdine acknowledged that maintaining a multiple-vendor platform was not a "cost-effective, viable option."[13] Recognizing the inefficiencies and overlapping work in a multiple recordkeeper arrangement, Pepperdine determined that costs were "higher in a multivendor arrangement, because each vendor receives only a portion of the ongoing total plan contributions," while a single provider allowed to "realize true economies of scale."[14]

61.     Pepperdine also recognized that the bundled model demanded by

---

[11] *See* Pepperdine University Participant Q & A, available at http://community.pepperdine.edu/hr/content/benefits/fulltime/faq.pdf.
[12] *Id.*
[13] Paul B. Lasiter, *Single Provider, Multiple Choices*, NACUBO, available at http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_Provider_Multiple_Choices.html.
[14] *Id.*

certain providers was not in participants' interest. Using those providers "meant being obligated to offer some or all of that provider's proprietary funds on the plan's investment menu—*whether or not those investments offered participants the best range of choice, value, and relative performance*." [15] (emphasis added). Acting in participants' interest required that the fiduciaries instead have the ability to select those "funds that the university—working with an independent financial adviser—could identify as being the 'best options in their respective asset classes.'"[16] After weighing and analyzing a variety of factors, Pepperdine determined that "consolidating with a single vendor has been the straightforward solution to achieving" the objective of acting "for the exclusive benefit of plan participants." The benefits of consolidation included "[a] better fiduciary process with ongoing evaluation" of plan investments, "[e]conomies of scale," and "[g]reater transparency of fees and lowered costs for plan participants."[17]

62.    In the fall of 2008, in response to the new, not yet effective regulations and required changes within the defined contribution industry, Purdue University began a comprehensive review of its defined contribution retirement program. Purdue recognized that "*[t]he primary intent of the regulations was to reduce the difference between Section 403(b) plans, Section 401(k) plans* and Section 457(b) plans; to enhance 403(b) plan compliance; and to establish a more structured

---

[15] *Id.*

[16] *Id.*

[17] *Id.*

retirement program for employees in the non-profit sector." [18] Purdue hired an independent third party consultant, EnnisKnupp & Associates (n/k/a AonHewitt), to assist the fiduciaries in evaluating the investment options, participants' fees, and recordkeeping services, which included developing and issuing an RFP to recordkeepers. The "benefits" of Purdue's program enhancements included the transition from five providers (TIAA-CREF, Fidelity, American Century, Lincoln, and VALIC) to a single administrative service provider (Fidelity) with a corresponding significant reduction in recordkeeping expenses. The reformed plan "[p]rovided a transparent investment and administrative fee structure" and "[l]everaged plan assets to lower administrative and investment fees, including access to institutional share class funds and a flat administrative fee, instead of administrative fees as a percentage of retirement savings." Purdue reduced the number of investment options from 381 to 19, "eliminating redundant investment options with varying levels of expenses" and replacing the menu of duplicative investment options with "a limited menu of pre-screened, broadly diversified investment options."[19] Purdue's analysis showed that "reducing administrative and investment plan fees under the new structure for a plan of Purdue's size, would increase participant balances by an estimated *$3–4 million per year* which is then compounded over time." *Id.* (emphasis added).

---

[18] James S. Almond, *403(b) Plan Redesign–Making a Good Retirement Plan Better*, Purdue University (emphasis added), available at http://www.cacubo.org/wp-content/uploads/2016/02/10_403b_Plan_Redesign_Making_a_Good_Retirement_Plan_Better.docx.

[19] *Id.*

63.     Likewise, California Institute of Technology (CalTech) TIAA-CREF DC Retirement Plan consolidated from multiple recordkeepers (TIAA-CREF and Fidelity) to a single recordkeeper (TIAA-CREF) effective January 1, 2010, with the assistance of an independent third party consultant, Mercer Investment Consulting.[20] In selecting a core set of investment options for the plan, CalTech eliminated over 100 Fidelity mutual fund options. Based on disclosures in the plan's Forms 5500 filed with the Department of Labor, between 2013 and 2015, CalTech negotiated over *$15 million* in revenue sharing rebates from TIAA-CREF, which was returned to the plan to benefit participants.

64.     Extensive industry literature shows that these plan sponsors are not outliers. Rather, their actions are consistent with the actions of similarly situated fiduciaries of other defined contribution plans, including 403(b) plans, who have also comprehensively reviewed their plans and reduced recordkeeping and investment management fees and consolidated recordkeepers and investment options, leading to enhanced retirement security for their plans' participants.

65.     In connection with a plan redesign project at the University of Notre Dame, independent investment consultant Hewitt EnnisKnupp (n/k/a AonHewitt) issued a "403(b) Plan Redesign Working Paper" which set forth 403(b) fiduciary best practices taken in response to the IRS 403(b) regulations.[21] Hewitt noted that

---

[20] *Caltech Names TIAA-CREF Recordkeeper,* Institutional Investor (Dec. 10, 2009), available at http://www.institutionalinvestor.com/Article/2355324/Search/Caltech-Names-TIAA-CREF-Record-Keeper.html#/.WBn8Oy0rKpp.

[21] Hewitt EnnisKnupp, *403(b) Plan Redesign Working Paper: University of Notre Dame* (Feb. 2014), available at https://workplacecontent.fidelity.com/bin-

"[w]ith the issuance of new Internal Revenue Service regulations in 2008, there has been an accelerated evolution of the 403(b) marketplace into something that more closely resembles the private sector 401(k) market."[22]

66.     Hewitt noted several areas of plan improvements. *First*, recordkeeper consolidation provided "many benefits to participants," including cost savings. Although the multiple-recordkeeper model had been common in the higher-education marketplace, "[e]xperience and research suggests that this type of administrative structure can be costly and confusing to faculty and staff."[23] "The multiple-recordkeeper model tends to divide participant assets into individual accounts held at separate recordkeepers resulting in costs that are meaningfully higher than under a single recordkeeper model."[24] Such "[e]xcess fees and misallocated costs are a potential threat to the financial security of many defined contribution plan participants."[25]

67.     *Second*, Hewitt recommended that plans "unbundl[e]" investment management and administrative services, and to replace revenue sharing arrangements with "explicit, hard dollar administrative fee[s]." Hewitt's "experience and research suggests that the transparency gained through an 'unbundled' administrative fee solution with little or no revenue sharing typically results in

---

public/070_NB_PreLogin_Pages/documents/ND_403(b)%20Plan%20Redesign%20White%20Paper.pdf.

[22] *Id.* at 3.

[23] *Id.* at 4.

[24] *Id.* at 5.

[25] *Id.*

meaningful fee savings for participants."[26] An unbundled arrangement allows plan fiduciaries "to determine whether or not the internal administrative fee allocations used by the existing bundled recordkeepers is a true representation of the costs of these services." *Id*. An unbundled arrangement also provided opportunities to incorporate "'institutional' share classes of funds" into the investment lineup.

68.    Further, according to a 2013 survey of 403(b) plans, more than 90% of plans use a single recordkeeper to provide administrative and recordkeeping services to participants. *See* LIMRA Retirement Research, *403(b) Plan Sponsor Research* (2013).[27]

69.    Annual surveys by Plan Sponsor Council of America found that in each year from 2010 through 2014, unlike the Plan, the overwhelming majority of 403(b) plans—over 80%—have only a single recordkeeper, and provide an average of 28 investment fund options.[28] An earlier PSCA survey of 403(b) plans found that as of 2009, 57% of 403(b) plan fiduciaries had made changes to their plans as a result of the new 403(b) regulations that became effective January 1, 2009.[29]

70.    The majority of plans use a single recordkeeper because a "**multi-**

---

[26] *Id*. at 6.

[27] Available at http://www.limra.com/uploadedFiles/limracom/LIMRA_Root/Secure_Retirement_Institute/News_Center/Reports/130329-01exec.pdf.

[28] Each PSCA survey covers the year prior to the year indicated in the title. PSCA's 2015 Benchmarking Survey of 403(b) Plans, at 32, 65; PSCA's 2014 Benchmarking Survey of 403(b) Plans, at 32, 61; PSCA's 2013 Benchmarking Survey of 403(b) Plans, at 32, 61, 64; PSCA's 2013 Benchmarking Survey of 403(b) Plans, at 32, 61, 64; PSCA's 2012 Benchmarking Survey of 403(b) Plans, at 30, 61, 64; PSCA's 2012 Benchmarking Survey of 403(b) Plans, at 30, 61, 64; PSCA's 2011 Benchmarking Survey of 403(b) Plans, at 28, 55, 59.

[29] PSCA's 2010 Benchmarking Survey of 403(b) Plans at 45.

**recordkeeper platform is inefficient**" and squanders the ability to leverage a plan's bargaining power. The Standard Retirement Services, Inc., *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 (Nov. 2009)(emphasis in original).[30] "By selecting a single recordkeeper, plan sponsors can enhance their purchasing power and negotiate lower, transparent investment fees for participants," while allowing participants to "benefit from a more manageable number of institutional-quality investment options to choose from."[31] Additional benefits of a single recordkeeper platform include simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when more than one recordkeeper is used.

71.     AonHewitt, an independent investment consultant, similarly recognized that "403(b) plan sponsors can dramatically reduce participant-borne costs while improving employees' retirement readiness by" "[c]onsolidating recordkeepers," "[l]everaging aggregate plan size and scale to negotiate competitive pricing, and reducing the number of investment options and "utilizing an 'open architecture' investment menu[.]" AonHewitt, *How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It* (Jan. 2016).[32]

72.     Another independent investment consultant, Towers Watson, also

---

[30] Available at https://www.standard.com/pensions/publications/14883_1109.pdf.
[31] *Id.*
[32] Available at
https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-4bc0-aac1-1685d2a64078/How_403(b)_Plans_are_Wasting_Nearly_$10_Billion_Annually_Whitepaper_FINAL.pdf.aspx.

recognized that using multiple recordkeepers makes it "difficult for employers to monitor available choices and provide ongoing oversight" while harming participants through "high investment and administrative costs" and a lack of guidance needed to achieve retirement readiness. Peter Grant and Gary Kilpatrick, *Higher Education's Response to a New Defined Contribution Environment*, TOWERS WATSON VIEWPOINTS, at 2 (2012).[33]

73.    The recommendations of these independent, widely used investment consultants are buttressed by other industry literature supporting the fact that the use of a single recordkeeper provides reasonable fees. See, e.g., Kristen Heinzinger, *Paring Down Providers: A 403(b) Sponsor's Experience,* PLANSPONSOR (Dec. 6, 2012)("One advantage of consolidating to a single provider was an overall drop in administrative fees and expenses. Recordkeeping basis points returned to the plan sponsors rather than to the vendor. All plan money aggregated into a single platform, and participants were able to save on fee structure. This also eliminated the complications and confusion of having three different recordkeepers.");[34] Paul B. Lasiter, *Single Provider, Multiple Choices*, BUSINESS OFFICER (Mar. 2010)(identifying, among other things, the key disadvantages of maintaining a multi-provider platform including the fact that it is "cumbersome and costly to

---

[33] Available at
https://www.towerswatson.com/DownloadMedia.aspx?media=%7B08A2F366-14E3-4C52-BB78-8930F598FD26%7D.
[34] Available at http://www.plansponsor.com/paring-down-providers-a-403b-sponsors-experience/?fullstory=true.

continue overseeing multiple vendors.").[35]

74.     Use of a single recordkeeper is also less confusing to participants and eliminates excessive, overlapping recordkeeping fees. *Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29, 2010)(recognizing the following benefits, among others: "The plan participant experience is better" because "employees are benefiting from less confusion as a result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because "[w]ith a reduced number of vendors in the equation, plan sponsors are better able to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per-participant ratio").[36]

## DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES AND COMMITTED PROHIBITED TRANSACTIONS

75.     The Plan's retention of multiple recordkeepers and exclusive use of those recordkeepers' proprietary funds—which the recordkeepers required to be included in the Plan—demonstrates that, in contrast with the comprehensive plan reviews conducted by the similarly situated fiduciaries described above, Defendants failed to adequately engage in a similar analysis. Had Defendants conducted such a review of the Plan, Defendants would not have allowed the Plan to continue to pay excessive administrative fees; would not have maintained an inefficient multi-

---

[35] Available at http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_Provider_Multiple_Choices.html.

[36] Available at http://www.plansponsor.com/vendor-consolidation-in-higher-education/?fullstory=true.

recordkeeper structure; would not have continued to include over 78–118 investment options in the Plan, including duplicative funds in numerous investment styles and higher-cost retail share classes for which identical lower-cost versions of the same funds were available; and would not have retained investment options in the Plan despite a sustained track record of underperformance. This follows because a prudent process would have produced a different outcome.

**I.      The Plan's investments and multiple recordkeepers.**

76.     Defendants exercise exclusive control over the investment options that are included in the Plan, and determine which investment options to remove from the Plan. Defendants also exercise exclusive control over hiring a recordkeeper for the Plan, and negotiating and approving the recordkeeper's compensation.

77.     Since 2010, the Plan has offered as many as 118 investment options. As of December 31, 2014, the Plan offered a total of 78 investment options, including 48 mutual funds managed by the Vanguard Group, Inc. ("Vanguard"), and 30 options managed by TIAA-CREF, including mutual funds, fixed and variable annuities, and an insurance company separate account. Despite the mammoth size of the Plan, the mutual funds included *retail* share classes designed for small individual investors, which are identical in every respect to institutional share classes of the same funds, except for much higher fees.

78.     Both TIAA-CREF and Vanguard serve as the recordkeeper for their respective proprietary investments.

34

79.     As of December 31, 2014, of the Plan's $3.8 billion in net assets, $2.5 billion was invested in TIAA-CREF investment options, and $1.3 billion was invested in Vanguard investment options.

## II.     Defendants improperly allowed TIAA-CREF to require its investment products to be included in the Plan regardless of the prudence of those options and to provide recordkeeping for its proprietary funds.

80.     TIAA-CREF is an insurance company financial services provider that historically has dominated the market for services to educational institution 403(b) plans, and has heavily marketed to them. TIAA-CREF consists of two companion organizations: Teachers Insurance and Annuity Association of America, and College Retirement Equities Fund. The services that TIAA-CREF provides to 403(b) plans include annuities, mutual funds, trust services, and administrative services.

81.     Although TIAA-CREF's marketing materials suggest that it is a "nonprofit" organization, that is misleading. In 1998, Congress revoked both TIAA's and CREF's statuses as tax-deductible 501(c)(3) charitable organizations because TIAA-CREF "competed directly with for-profit insurance companies and mutual fund groups."[37] As a result, they are subject to federal income taxation and are not 501(c)(3) charitable organizations.

82.     While CREF is organized as a New York not-for-profit corporation, TIAA is organized as a *for-profit* stock life insurance company. TIAA's "operating surplus" is spent, loaned, and otherwise distributed to some of its

---

[37] Reed Abelson, *Budget Deal to Cost T.I.A.A.-C.R.E.F. Its Tax Exemption*, N.Y. Times (July 30, 2007), available at http://www.nytimes.com/1997/07/30/business/budget-deal-to-cost-tiaa-cref-its-tax-exemption.html.

subsidiaries as well. An example is, Nuveen Investments, a for-profit investment manager, which TIAA acquired in April 2014 for an enterprise value of $6.25 billion. TIAA owns and controls numerous for-profit subsidiaries, which send dividends to TIAA.[38]

83.    Consistent with its conduct as a profit-seeking enterprise, the compensation of TIAA's CEO and other executives is greater than or close to the very highest paid executives of some of Wall Street's largest for-profit investment managers and insurance companies, such as J.P. Morgan Chase, Prudential, Deutsche Bank, and Metlife. In 2015, TIAA's CEO received $18 million in compensation,[39] more than the CEOs of Metlife ($14 million) and Deutsche Bank ($5.2 million), and just below the CEOs of J.P. Morgan Chase ($18.2 million) and Prudential ($19.9 million). In fact, TIAA's five highest-ranking "named executive officers" earned a combined total of well over $40 million in compensation in 2015. *Id.* TIAA's compensation disclosures further state that its employees' compensation and benefits programs are linked to "*profitability*."[40] (emphasis added). When expressed as a percentage of assets under management, TIAA's CEO had the very highest compensation rate among reporting investment companies.

---

[38] *2015 Annual Statement of the Teachers Insurance and Annuity Association of America* 39, 112–19 (Jan. 26, 2016), available at https://www.tiaa.org/public/pdf/tiaa_annual_statement_2015.pdf; *see also* https://www.tiaa.org/public/pdf/C16623_where-tiaa-profits-go.pdf.

[39] TIAA Compensation Disclosures, *Executive Compensation Discussion and Analysis* 20 (May 2016), available at https://www.tiaa.org/public/pdf/about/governance/exec_comp_policy.pdf.

[40] TIAA Compensation Disclosures, *Executive Compensation Discussion and Analysis* 3 (May 2016), available at https://www.tiaa.org/public/pdf/about/governance/exec_comp_policy.pdf.



84.     TIAA-CREF provided its 403(b) plan services exclusively on a bundled basis. If a plan wished to offer the fixed TIAA Traditional Annuity, TIAA-CREF required that the CREF Stock Account and Money Market Account also be put in the plan, and required the plan to use TIAA as recordkeeper for its proprietary products.

85.     ERISA requires fiduciaries to independently evaluate the prudence of each investment option offered in a defined contribution plan, *DiFelice*, 497 F.3d at 423, and to remove imprudent investments within a reasonable time, *Tibble*, 135 S. Ct. at 1828–29.

86.     By using TIAA-CREF, Defendants locked the Plan into an arrangement in advance in which certain investments could not be removed from

the plan—*even if the funds were not prudent investments or would become imprudent in the future.* By accepting this arrangement, Defendants precluded an open architecture platform in which investments could be selected on their merits, and not merely because the funds were the recordkeeper's proprietary products that the recordkeeper demanded to include in the Plan. By agreeing to TIAA's bundling requirement, Defendants subjected the plan to using multiple recordkeepers in order to offer any non-TIAA-CREF investments. This resulted in an inefficient and excessively expensive plan structure.

87.     By causing or allowing the Plan to enter such a bundled arrangement with TIAA-CREF, Defendants agreed to lock University of Pennsylvania employees into funds which had not been screened by a fiduciary. It can never be prudent to lock funds in a plan for the future and to keep them in because of recordkeeping. Defendants thus failed to discharge their duty to independently evaluate whether each investment option was prudent for the Plan, and to determine whether the use of TIAA as a plan recordkeeper was prudent, reasonably priced, and in the exclusive interest of participants. Instead of acting solely in the interest of participants, Defendants allowed TIAA's financial interest to dictate the Plan's investment selections and recordkeeping arrangement. Because Defendants allowed the CREF Stock to be locked into the Plan, Defendants could not satisfy their duty to remove investments that are *no longer prudent* within a reasonable time. As a result of Defendants' breach in allowing CREF Stock to be retained in the Plan because TIAA-CREF demanded it and not based on an independent and ongoing assessment

of the merits of the option, the Plan suffered massive losses compared to prudent alternatives, as discussed in more detail below.

88.     The TIAA Traditional Annuity offered in the Plan is a fixed annuity contract that guarantees principal and a contractually specified minimum interest rate. Assets invested in the TIAA Traditional Annuity are held in TIAA's general account and are backed by the claims-paying ability of TIAA.

89.     The TIAA Traditional Annuity has severe restrictions and penalties for withdrawal if participants wish to change their investments in the Plan. For example, some participants who invest in the TIAA Traditional Annuity may withdraw or change their investment in a single lump sum within 120 days of termination of employment, but, to do so, such participants must pay a 2.5% surrender charge. The only way for participants to withdraw or change their TIAA Traditional Annuity investment without paying this substantial penalty is to spread withdrawal over a *ten-year period*.

90.     The Plan's CREF Stock Account, CREF Global Equities Account, CREF Equity Index Account, CREF Growth Account, CREF Social Choice Account, CREF Money Market Account, and CREF Bond Market Account are variable annuities, which invest in underlying securities for a given investment mandate. The value of each participant's investment in the variable annuity changes over time based on investment performance and expenses of the account.

91.     The expense ratio of the CREF variable annuity accounts is made up of multiple layers of expense charges called:

    a.  "administrative expense" charge (24 bps);[41]

    b.  "distribution expense" charge (9.5 bps);

    c.  "mortality and expense risk" charge (0.5 bps); and

    d.  "investment advisory expense" charge (ranging from 4 bps to 12.5 bps).

92.    Two of these four layers of fees charged on the CREF variable annuity accounts, including the CREF Stock Account, are unreasonable for the actual services provided by TIAA-CREF to the Plan's participants, and the other two provide no benefit to the Plan's participants.

    a.  **Administrative expenses (or recordkeeping fees):** The administrative fee assessed on each variable annuity option is charged as a percentage of assets, rather than a flat fee per participant. Recordkeeping costs depend on the number of participant accounts that the recordkeeper will service in the plan rather than the size of assets because a higher account balance costs no more to track than a lower account balance. As a result, as the growth in the Plan's assets outpaced the growth in participants, the fees paid to TIAA-CREF likewise increased even though the services provided did not increase at the same rate, resulting in further unreasonable compensation.

    b.  **Distribution expenses (or 12b-1 fees):** Distribution expenses are charged for services performed for marketing and advertising of the fund to potential investors. However, in a retirement plan, the funds are selected

---

[41] Expenses are as of May 1, 2014.

by the sponsor. Thus, marketing and distribution services provide no benefit to plan participants and are wholly unnecessary. Being charged for such wholly useless expenses causes a loss of retirement assets to participants with no benefit.

**c.   Mortality and expense risk charges:** Some annuity or insurance providers charge mortality and expense risk charges to compensate the insurance company for the risk it assumes when providing periodic income or payments to the investor over her lifetime, which will vary depending on the value of the underlying investments. However, in the CREF variable annuities in the Plan, the participant does not make the choice of whether to take the account's value in a lump sum or an annuity until retirement. Thus, this charge only benefits a participant if she elects at the time of retirement to annuitize her holdings in the account to provide for periodic income. Prior to annuitizing her account, the participant derives no benefit for paying such a charge, year after year, and TIAA-CREF provides no actual services or incurs any risk to justify the fee until a decision is made at retirement to convert the value of the lump sum to an annuity. Moreover, most participants in retirement plans recordkept by TIAA-CREF do not elect to annuitize their holdings in their variable annuity accounts upon retirement. Yet, *all* participants pay these fees for many years regardless of whether they annuitize their variable annuity account.

41

**d. Investment advisory expense charge (or investment management fees):** It is a fundamentally established principle of investment management that larger asset size enables the asset holder to obtain lower investment management fees as a percentage of assets. Fund managers institute breakpoints, whereby the investment management fee is reduced, as asset size goes up, at pre-specified asset thresholds to pass along economies of scale to the investor. For example, if $5 million is a breakpoint, one fee, based on a percentage of assets, will be charged on the first $5 million, and a lesser percentage will be charged on the next portion of the assets, or on all assets. A large investor will therefore be charged a lower fee, on a percentage of assets, than a smaller investor to recognize the economies of scale generated from the higher asset levels. Jumbo plans, such as the Plan, can command extremely low fees. Despite this recognized principle, TIAA-CREF has not instituted *any* breakpoints whatsoever on its investment management fees to pass along economies of scale experienced by jumbo plan investors. The Plan's fiduciaries did not obtain the lower investment management fees that come with the Plan's enormous asset size. As a result, the Plan, with billions of dollars invested in CREF variable annuities, pay the same asset-based fee as the smallest clients with a tiny fraction of their total assets, resulting in a windfall to TIAA-CREF and excessive fees paid by employees and retirees in the Plan.

93.     The excessiveness of this investment management fee is even more egregious because of the way critics have documented CREF "manages" the CREF Stock Account by investing nearly two out of every three dollars in companies held by its benchmark index, the Russell 3000 Index. [42]

94.     The TIAA Real Estate Account is an insurance separate account maintained by TIAA-CREF. An insurance separate account is a pooled investment vehicle that aggregates assets from more than one retirement plan, but is segregated from the insurance company's general account assets. Similar to the CREF variable annuity accounts, the expense ratio of the TIAA Real Estate Account is made up of the same four layers of excessive expenses detailed above, and even adds a fifth layer for a so-called "liquidity guarantee." As of May 1, 2013, these charges consisted of the following:

   a.   "administrative expense" charge (26.5 bps);

   b.   "distribution expense" charge (8 bps);

   c.   "mortality and expense risk" charge (0.5 bps);

   d.   "liquidity guarantee" (18 bps); and

   e.   "investment management expense" charge (36.5 bps).

95.     The 18 bps "liquidity guarantee" expense of the TIAA Real Estate Account is yet another excessive fee that is not charged by better performing and lower cost mutual funds such as the Vanguard REIT Index (Inst) which has a *total*

---

[42] Funding Universe, *Teachers Insurance and Annuities Association – College Retirement Equities Fund History*, available at http://www.fundinguniverse.com/company-histories/teachers-insurance-and-annuity-association-college-retirement-equities-fund-history/.

expense ratio of 8 bps. *See infra* ¶¶**Error! Reference source not found.–Error! Reference source not found.**.

96.     The remaining TIAA-CREF funds are mutual funds. The TIAA-CREF mutual funds charge varying amounts for investment management, but also charge distribution, marketing, and other expenses, depending on the investment at issue and share class.

97.     Thus, Plan participants are paying for marketing costs of funds which their employer has placed in their retirement plan when such marketing costs provide no benefit to them. Other mutual funds that were available to the Plan do not include such marketing costs.

## II.     Defendants caused the Plan to pay excessive administrative and recordkeeping fees.

98.     As set forth above, the market for recordkeeping services is highly competitive and there are numerous recordkeepers in the market who can provide a high level of service to large defined contribution plan who will readily respond to a request for proposals.

99.     The recordkeeper's cost for providing services depends on the number of participants in the plan, not the amount of assets in the plan or in an individual account. The cost of recordkeeping a $75,000 account balance is the same as a $7,500 account. Accordingly, if a plan fiduciary negotiates a flat price based on the number of participants in the plan, that ensures that the amount of compensation is tied to the actual services provided and does not grow based on matters that have

nothing to do with the services provided, such as an increase in plan assets due to market growth or greater plan contributions by the employee.

100.   For example, if a plan has 20,000 participants, a fiduciary could negotiate a plan-level contract to pay the recordkeeper $700,000 per year, based on a flat annual fee of $35 per participant account serviced. That rate could then be assessed either by charging the same $35 to every participant in the plan, or *pro rata* as a percentage of assets. If the plan's assets increase during the contract while the number of participants stays constant, the recordkeeper's compensation does not change, because the services provided have not changed.

101.   Although paying for recordkeeping with asset-based revenue sharing is not *per se* violation of ERISA, it can lead to excessive fees if not monitored and capped. If a fiduciary allows the plan recordkeeper to be compensated with revenue sharing from plan mutual funds—which is based on a percentage of assets charged to fund investors, as discussed *supra* ¶46—then the payments can become excessive (or even moreso) based on an increase in plan assets alone, while the services have not changed. The opposite is generally not true. If plan assets decline, participants will not receive a sustained benefit of paying lower fees, because the recordkeeper will demand that the plan make up the shortfall through additional direct payments.

102.   Thus, if a fiduciary decides to use revenue sharing to pay for recordkeeping, it is critical to (1) determine and monitor the amount of the revenue sharing and any other sources of compensation that the provider has received, (2)

compare that amount to the price that would be available on a flat per-participant basis, and (3) control the amount of fees paid through recordkeeping by obtaining rebates of any revenue sharing amounts that exceed the reasonable level of fees.

103.    In order to determine the second element—the price that would be available to the plan on a flat per-participant basis—prudent fiduciaries of jumbo plans solicit bids from competing providers. For such large plans, bids are customized based on the particular services required for the plan. Recordkeeping fees for jumbo plans have also declined significantly in recent years due to increased technological efficiency, competition, and increased attention to fees by sponsors of other plans such that fees that may have been reasonable at one time may have become excessive based on current market conditions. Accordingly, the only way to determine the true market price at a given time is to obtain competitive bids. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (a 401(k) excessive fee case which denied summary judgment based in part on the opinion of an independent consultant that "'without an actual fee quote comparison'—*i.e.,* a bid from another service provider—[consultant] 'could not comment on the competitiveness of [recordkeeper's] fee amount for the services provided.'"). Industry experts recognize that this principle applies fully in the 403(b) context, just as in the 401(k) context. Compared to benchmarking, "the RFP is a far better way to negotiate fee and service improvements for higher education organizations." Fiduciary Plan Governance, LLC, *Buying Power for Higher Education Institutions:*

*When you Have It and When You Don't – Part 2*.[43] Indeed, "[c]onducting periodic due diligence RFPs is a critical part of fulfilling the fiduciary duty." Western PA Healthcare News, *403(b) Retirement Plans: Why a Due Diligence Request for Proposal*.[2] Engaging in in this RFP process "allows plan sponsors . . .to meet their fiduciary obligations, provides leverage to renegotiate services and fees; enhances service and investment opportunities and improves overall plan operation." *Id.* Prudent fiduciaries of defined contribution plans—including 403(b) plans—thus obtain competitive bids for recordkeeping at regular intervals of approximately three years

104.   Jumbo defined contribution plans, like the Plan, experience economies of scale for recordkeeping and administrative services. As the number of participants in the plan increases, the per-participant fee charged for recordkeeping and administrative services declines. These lower administrative expenses are readily available for plans with a great number of participants, such as the Plan.

105.   Because revenue sharing arrangements provide asset-based fees, prudent fiduciaries, if they use asset-based charges to pay for recordkeeping at all, monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper is not receiving unreasonable compensation. A prudent fiduciary must ensure that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable recordkeeping fee. Plan fiduciaries must be

---

[43] http://www.fiduciaryplangovernance.com/blog/buying-power-for-higher-education-institutions-when-you-have-it-and-when-you-dont-part-2

aware of and consider the incentive that revenue sharing provides to recordkeepers to demand that their high priced funds included as plan investment options.

106.    As set forth above, ¶¶57–74, extensive industry literature and the experience of similarly situated defined contribution plan fiduciaries has shown that multiple recordkeeper platforms are inefficient and result in excessive fees, and that a single recordkeeper platform offers many advantages such as leveraging the plan's participant base to ensure that participants pay only reasonable recordkeeping fees, while also simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when more than one recordkeeper is used.

107.    Despite the long-recognized benefits of a single recordkeeper for a defined contribution plan, Defendants selected and retained two recordkeepers (TIAA-CREF and Vanguard). This inefficient and costly structure has caused Plan participants to pay excessive and unreasonable fees for Plan recordkeeping and administrative services.

108.    The Plan's recordkeepers receive compensation for providing administrative and recordkeeping services through per-participant fees and revenue sharing payments from the Plan's investments. Instead of obtaining a flat per-participant rate or sufficient rebates of excessive revenue sharing for the Plan, Defendants allowed these two recordkeepers—TIAA-CREF and Vanguard—to collect excessive asset-based revenue sharing as payment for administrative services.

109.   Based upon information from sources including industry experts, the amount of revenue sharing kicked back to the TIAA-CREF recordkeeping entity for the Plan's TIAA-CREF investments is set forth below.

| TIAA-CREF Investment | Revenue Share |
|---|---|
| CREF variable annuity contracts | 24 bps |
| Premier share class of TIAA-CREF mutual funds | 15 bps |
| Retirement share class of TIAA-CREF mutual funds | 25 bps |
| TIAA Real Estate Account | 24–26.5 bps |
| TIAA Traditional Annuity | 15 bps |

110.   Vanguard is also compensated for recordkeeping services based on internal revenue sharing it receives from the Vanguard Investor share class mutual funds that Defendants included in the Plan, which charged higher fees than the institutional share classes that were available to the Plan.

111.   In addition, TIAA-CREF and Vanguard receive additional indirect compensation, including float, securities lending revenue, distribution fees, mortality and expense charges, surrender charges, spread, and redemption fees.

112.   Instead of discharging their fiduciary duties to act prudently and in the exclusive interest of participants, Defendants served TIAA-CREF's and Vanguard's financial interests. Defendants failed to obtain competitive bids to determine whether the amounts paid to TIAA-CREF and Vanguard were reasonable compared to market rates, and to determine whether participants would benefit from hiring a different recordkeeper with lower fees. Defendants also failed

to assess whether each of the funds that paid revenue sharing to TIAA-CREF and Vanguard was a prudent choice for the Plan compared to non-proprietary alternatives that did not pay such revenue sharing. Instead, Defendants included funds in the Plan not based on their merits, but because TIAA-CREF and Vanguard requested the funds' inclusion. This benefited TIAA-CREF and Vanguard because it allowed them to collect revenue sharing and investment management fees from their proprietary investment funds, but did not benefit participants.

113.    Defendants were also required under ERISA to determine and monitor all sources of TIAA-CREF's and Vanguard's compensation, and to ensure that the compensation was limited to a reasonable amount for the services provided. Had Defendants discharged those duties, they would not have selected and retained as Plan investments options proprietary funds of the Plan's recordkeepers while failing to consider non-proprietary alternatives, and would not have allowed the Plan to pay excessive sums for recordkeeping. Defendants' failure to properly monitor and cap the recordkeepers' compensation caused the Plan to pay excessive recordkeeping fees, as follows.

114.    Experts in the recordkeeping industry with vast experience in requests for proposals and information for similar plans have determined the market rate that the Plan likely would have been able to obtain had the fiduciaries put the Plan's recordkeeping services out for competitive bidding. Based on the Plan's features, the nature and type of administrative services provided by Vanguard and TIAA-CREF, the Plan's participant level (roughly 20,000–21,400),

and the recordkeeping market, the outside limit of a reasonable recordkeeping fee for the Plan would have been $700,000 to $750,000 (or $35 per participant with an account balance).

115.    Based on schedules regarding service provider compensation shown on the Plan's publicly available Form 5500s filed with the Department of Labor, and upon information regarding the rate of internal revenue share allocated to each of the Plan's recordkeepers, the Plan paid between $4.4 million and $5.5 million (or approximately $220 to $250 per participant) per year from 2010 to 2014, *over 614%* higher than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year. The Plan's recently released 2015 Form 5500 shows that the Plan's recordkeeping fees continue to be excessive.

116.    Defendants failed to prudently monitor and control the compensation paid for recordkeeping and administrative services, particularly the asset-based revenue sharing received by TIAA-CREF and Vanguard as Plan assets grew. From the beginning of 2009 to the end of 2014, the Plan's assets increased from $2.2 billion to over $3.8 billion, an increase of *73%*. Because revenue sharing payments are asset-based, the already excessive compensation paid to the Plan's recordkeepers became even more excessive as the Plan's assets grew, even though the administrative services provided to the Plan did not increase at a similar rate. Defendants could have capped the amount of revenue sharing to ensure that any excessive amounts were returned to the Plan, but failed to do so.

117.   To discharge their fiduciary duties, Defendants were required to obtain sufficient information regarding all sources of compensation received by the Plan's recordkeepers, including the amount of any revenue sharing payments, to make an informed assessment as to whether the amount of compensation was no more than reasonable for the services provided. Had Defendants accounted for and monitored those payments, it would have been apparent that TIAA-CREF and Vanguard were receiving excessive fees and that participants were losing retirement savings as a result.

118.   Soliciting competitive bids from other recordkeepers would have allowed Defendants to reduce the Plan's excessive recordkeeping fees to reasonable levels. Had Defendants conducted a competitive bidding process for the Plan's recordkeeping services, and not allowed bundling of recordkeeping with the recordkeepers' investment products, the process would have resulted in very substantial reductions in the Plan's recordkeeping fees, totaling millions of dollars. This competitive bidding process would have enabled Defendants to select a recordkeeper charging reasonable fees, negotiate a reduction in recordkeeping fees, and obtain rebates of any excess expenses paid by participants for recordkeeping services.

119.   Aside from the failures to monitor the amount of revenue sharing payments and to solicit competitive bids, Defendants also failed to negotiate rebates of excessive fee payments to TIAA-CREF and Vanguard for years. As a specific example, because the multi-billion dollar Plan paid the same percentage of asset-

52

based fees as much smaller plans that used TIAA-CREF's products and services,
Defendants could have demanded "plan pricing" rebates from TIAA-CREF based on
the Plan's economies of scale. Just as with investment management fees, the Plan's
size would have enabled Defendants to command a much lower fee. Defendants
could have also demanded similar rebates from Vanguard. Had Defendants
negotiated for these rebates, the Plan's recordkeeping fees would have been
reduced, avoiding additional losses of retirement savings

120.   By failing to prudently monitor and control the Plan's recordkeeping
and administrative fees, particularly the open-ended asset-based revenue sharing
received by TIAA-CREF and Vanguard, and maintaining an inefficient and costly
structure of multiple recordkeepers, Defendants caused the Plan's participants to
pay excessive and unreasonable fees for recordkeeping and administrative services.
As a result, the Plan and participants lost in excess of $26 million in retirement
savings due to unreasonable recordkeeping fees.[44]

## III.   Defendants caused the Plan to pay wholly unnecessary and excessive fees by using higher-cost share classes of Plan mutual funds instead of identical versions of the same funds in lower-cost share classes.

121.   Jumbo retirement plans have massive bargaining power to negotiate
low fees for investment management services. If a plan invests in mutual funds,
fiduciaries must review and consider the available share classes. Because the only
difference between the various share classes is fees, selecting a higher-cost share

---

[44] Plan losses have been brought forward to the present value using the
investment returns of the S&P 500 index to compensate participants who have not
been reimbursed for their losses. This is because the excessive fees participants paid
would have remained in Plan investments growing with the market.

class results in the plan paying wholly unnecessary fees. Accordingly, absent some compelling reason to opt for the higher-cost version, prudent fiduciaries will select the lowest-cost share class available to the plan. As a prominent legal counsel to defined contribution fiduciaries explained:

> The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the "prevailing circumstances"—such as the size of the plan—are a part of a prudent decisionmaking process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach.

Fred Reish, *Class–ifying Mutual Funds*, PLANSPONSOR (Jan. 2011).[45]

122.    Given that defined contribution plan fiduciaries are held to the standard of a knowledgeable financial expert, a fiduciary should know the basic principle that asset size matters, and must review a fund's prospectus to determine if a lower-cost chare class of the same fund is available, to avoid saddling the plan with unnecessary fees.

123.    Jumbo investors like the Plan can obtain share classes with far lower costs than retail mutual fund shares. In addition, insurance company pooled separate accounts are available that can significantly reduce investment fees charged on mutual fund investments in defined contribution plans.

124.    Moreover, lower-cost share classes of mutual fund investment options were readily available to the Plan. Minimum investment thresholds for institutional share classes are routinely waived by the investment provider if not reached by a

---

[45] Available at http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

single fund based on the retirement plan's total investment in the provider's

platform.

> For large 401(k) plans with over a billion dollars in total
> assets…mutual funds will often waive an investment minimum for
> institutional share classes. It is also common for investment advisors
> representing large 401(k) plans to call mutual funds and request
> waivers of the investment minimums so as to secure the institutional
> shares.

*Tibble v. Edison Int'l*, No. 07-5359, 2010 U.S. Dist. LEXIS 69119, at *27–28 (C.D.

Cal. July 8, 2010), *aff'd* 729 F.3d 1110 (9th Cir. 2013).

125.    In fact, Vanguard expressly "reserves the right to establish higher or

lower minimum amounts for certain investors", including when the "plan sponsor's

aggregate assets within the Vanguard Funds will likely generate substantial

economies in the servicing of their accounts."[46]

126.    For Vanguard and TIAA-CREF mutual fund options, as further

support of the routine waiver of investment minimums for large institutional

investors, fiduciaries of other defined contribution plans have successfully

negotiated on behalf of their plan less expensive institutional share classes for a

particular mutual fund option despite that fund not meeting the minimum

investment threshold.

127.    Defendants knew or should have known that investment providers

would have allowed the Plan to provide lower-cost share classes to participants if

Defendants had asked.

---

[46] *See* Vanguard Funds Multiple Class Plan, available at
https://www.sec.gov/Archives/edgar/data/1409957/000093247113007109/multiplecla
ssplanvanguardfun.pdf.

128.    Despite these far lower-cost options that were available, Defendants selected and continue to retain Plan investment options with far higher costs than were and are available for the Plan based on their size, such as separate accounts and collective trusts. Moreover, Defendants saddled the Plan with unnecessary fees by using much higher-cost share classes, when a lower-cost share class of the *exact same mutual fund option* was available that was identical in every way except that it charged lower fees. The following table sets forth each higher-cost mutual fund share class that was included in the Plan during the proposed class period for which a significantly lower-cost, but otherwise identical, share class of the same mutual fund was available. The expense ratio identified for the Plan's investment option and the lower-cost share class alternative are based on the earliest date during the proposed class period that the higher-cost fund was included in the Plan:

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard 500 Index Fund (Signal) (VIFSX) | 7 bps | Vanguard Institutional Index (Instl Pl) (VIIIX) | 2 bps | 250% |
| Vanguard Asset Allocation Fund (Inv) (VAAPX) | 27 bps | Vanguard Asset Allocation Fund (Adm) (VAARX) | 19 bps | 42% |
| Vanguard Balanced Index Fund (Inv) (VBINX) | 26 bps | Vanguard Balanced Index Fund (Instl) (VBAIX) | 8 bps | 225% |
| Vanguard Capital Opportunity Fund (Inv) (VHCOX) | 48 bps | Vanguard Capital Opportunity Fund (Adm) (VHCAX) | 41 bps | 17% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Developed Markets Index Fund (Inv) (VDMIX) | 22 bps | Vanguard Developed Markets Index Fund (Instl Pl) (VDMPX) | 6 bps | 267% |
| Vanguard Emerging Markets Stock Index Fund (Signal) (VERSX) | 22 bps | Vanguard Emerging Markets Stock Index Fund (Instl) (VEMIX) | 15 bps | 47% |
| Vanguard Emerging Markets Stock Index Fund (Signal) (VERSX) | 20 bps | Vanguard Emerging Markets Stock Index Fund (Instl Pl) (VEMRX) | 10 bps | 100% |
| Vanguard Emerging Markets Stock Index Fund (Instl) (VEMIX) | 12 bps | Vanguard Emerging Markets Stock Index Fund (Instl Pl) (VEMRX) | 10 bps | 20% |
| Vanguard Energy Fund (Inv) (VGENX) | 38 bps | Vanguard Energy Fund (Adm) (VGELX) | 31 bps | 23% |
| Vanguard Equity Income Fund (Inv) (VEIPX) | 31 bps | Vanguard Equity Income Fund (Adm) (VEIRX) | 22 bps | 41% |
| Vanguard European Stock Index Fund (Inv) (VEURX) | 26 bps | Vanguard European Stock Index Fund (Instl) (VESIX) | 10 bps | 160% |
| Vanguard Explorer Fund (Inv) (VEXPX) | 49 bps | Vanguard Explorer Fund (Adm) (VEXRX) | 32 bps | 53% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Extended Market Index Fund (Inv) (VEXMX) | 26 bps | Vanguard Extended Market Index Fund (Instl) (VIEIX) | 8 bps | 225% |
| Vanguard Extended Market Index Fund (Inv) (VEXMX) | 24 bps | Vanguard Extended Market Index Fund (Instl Pl) (VEMPX) | 6 bps | 300% |
| Vanguard GNMA Fund (Inv) (VFIIX) | 23 bps | Vanguard GNMA Fund (Adm) (VFIJX) | 13 bps | 77% |
| Vanguard Growth and Income Fund (Inv) (VQNPX) | 32 bps | Vanguard Growth and Income Fund (Adm) (VGIAX) | 21 bps | 52% |
| Vanguard Growth Index Fund (Signal) (VIGSX) | 12 bps | Vanguard Growth Index Fund (Instl) (VIGIX) | 8 bps | 50% |
| Vanguard Health Care Fund (Inv) (VGHCX) | 36 bps | Vanguard Health Care Fund (Adm) (VGHAX) | 29 bps | 24% |
| Vanguard High-Yield Corporate Fund (Inv) (VWEHX) | 28 bps | Vanguard High-Yield Corporate Fund (Adm) (VWEAX) | 15 bps | 87% |
| Vanguard Inflation-Protected Securities Fund (Inv) (VIPSX) | 22 bps | Vanguard Inflation-Protected Securities Fund (Instl) (VIPIX) | 7 bps | 214% |
| Vanguard Institutional Index Fund (Instl) (VINIX) | 4 bps | Vanguard Institutional Index Fund (Instl Pl) (VIIIX) | 2 bps | 100% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Intermediate-Term Bond Index Fund (Inv) (VBIIX) | 22 bps | Vanguard Intermediate-Term Bond Index Fund (Instl) (VBIMX) | 7 bps | 214% |
| Vanguard Intermediate-Term Bond Index Fund (Inv) (VBIIX) | 20 bps | Vanguard Intermediate-Term Bond Index Fund (Instl Pl) (VBIUX) | 5 bps | 300% |
| Vanguard Intermediate-Term Investment Grade Fund (Inv) (VFICX) | 24 bps | Vanguard Intermediate-Term Investment Grade Fund (Adm) (VFIDX) | 11 bps | 118% |
| Vanguard Intermediate-Term Treasury Fund (Inv) (VFITX) | 25 bps | Vanguard Intermediate-Term Treasury Fund (Adm) (VFIUX) | 12 bps | 108% |
| Vanguard International Growth Fund (Inv) (VWIGX) | 49 bps | Vanguard International Growth Fund (Adm) (VWILX) | 33 bps | 48% |
| Vanguard Large-Cap Index Fund (Inv) (VLACX) | 26 bps | Vanguard Large-Cap Index Fund (Instl) (VLISX) | 8 bps | 225% |
| Vanguard Long-Term Bond Index Fund (Inv) (VBLTX) | 22 bps | Vanguard Long-Term Bond Index Fund (Instl) (VBLLX) | 7 bps | 214% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Long-Term Bond Index Fund (Inv) (VBLTX) | 20 bps | Vanguard Long-Term Bond Index Fund (Instl Pl) (VBLIX) | 5 bps | 300% |
| Vanguard Long-Term Investment Grade Bond (Inv) (VWESX) | 26 bps | Vanguard Long-Term Investment Grade Bond (Adm) (VWETX) | 13 bps | 100% |
| Vanguard Long-Term Treasury Fund (Inv) (VUSTX) | 25 bps | Vanguard Long-Term Treasury Fund (Adm) (VUSUX) | 12 bps | 108% |
| Vanguard Mid-Cap Index Fund (Inv) (VIMSX) | 26 bps | Vanguard Mid-Cap Index Fund (Instl) (VMCIX) | 8 bps | 225% |
| Vanguard Mid-Cap Index Fund (Inv) (VIMSX) | 24 bps | Vanguard Mid-Cap Index Fund (Instl Pl) (VMCPX) | 6 bps | 300% |
| Vanguard Morgan Growth Fund (Inv) (VMRGX) | 43 bps | Vanguard Morgan Growth Fund (Adm) (VMRAX) | 29 bps | 48% |
| Vanguard Pacific Stock Index Fund (Inv) (VPACX) | 26 bps | Vanguard Pacific Stock Index Fund (Instl) (VPKIX) | 10 bps | 160% |
| Vanguard PRIMECAP Fund (Inv) (VPMCX) | 45 bps | Vanguard PRIMECAP Fund (Adm) (VPMAX) | 36 bps | 25% |
| Vanguard Prime Money Market Fund (Inv) (VMMXX) | 23 bps | Vanguard Prime Money Market Fund (Adm) (VMRXX) | 9 bps | 156% |
| Vanguard REIT Index Fund (Inv) (VGSIX) | 26 bps | Vanguard REIT Index Fund (Instl) (VGSNX) | 9 bps | 189% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Short-Term Bond Index Fund (Inv) (VBISX) | 22 bps | Vanguard Short-Term Bond Index Fund (Adm) (VBIRX) | 11 bps | 100% |
| Vanguard Short-Term Federal Fund (Inv) (VSGBX) | 22 bps | Vanguard Short-Term Federal Fund (Adm) (VSGDX) | 12 bps | 83% |
| Vanguard Short-Term Investment Grade Fund (Inv) (VFSTX) | 24 bps | Vanguard Short-Term Investment Grade Fund (Instl) (VFSIX) | 9 bps | 167% |
| Vanguard Short-Term Treasury Fund (Inv) (VFISX) | 22 bps | Vanguard Short-Term Treasury Fund (Adm) (VFIRX) | 12 bps | 83% |
| Vanguard Small-Cap Growth Index Fund (Inv) (VISGX) | 26 bps | Vanguard Small-Cap Growth Index Fund (Instl) (VSGIX) | 8 bps | 225% |
| Vanguard Small-Cap Index Fund (Inv) (NAESX) | 26 bps | Vanguard Small-Cap Index Fund (Instl) (VSCIX) | 8 bps | 225% |
| Vanguard Small-Cap Index Fund (Inv) (NAESX) | 24 bps | Vanguard Small-Cap Index Fund (Instl Pl) (VSCPX) | 6 bps | 300% |
| Vanguard Small-Cap Value Index Fund (Inv) (VISVX) | 26 bps | Vanguard Small-Cap Value Index Fund (Instl) (VSIIX) | 8 bps | 225% |
| Vanguard Total Bond Market Index Fund (Signal) (VBTSX) | 12 bps | Vanguard Total Bond Market Index Fund (Instl) (VBTIX) | 7 bps | 71% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Total Bond Market Index Fund (Signal) (VBTSX) | 11 bps | Vanguard Total Bond Market Index Fund (Instl Pl) (VBMPX) | 5 bps | 120% |
| Vanguard Total Bond Market Index Fund (Instl) (VBTIX) | 7 bps | Vanguard Total Bond Market Index Fund (Instl Pl) (VBMPX) | 5 bps | 40% |
| Vanguard Total International Stock Index Fund (Inv) (VGTSX) | 22 bps | Vanguard Total International Stock Index Fund (Instl Pl) (VTPSX) | 10 bps | 120% |
| Vanguard Total Stock Market Index Fund (Signal) (VTSSX) | 6 bps | Vanguard Institutional Total Stock Market Index Fund (Instl Pl) (VITPX) | 2 bps | 200% |
| Vanguard Total Stock Market Index Fund (Instl) (VITSX) | 4 bps | Vanguard Institutional Total Stock Market Index Fund (Instl Pl) (VITPX) | 2 bps | 100% |
| Vanguard U.S. Growth Fund (Inv) (VWUSX) | 45 bps | Vanguard U.S. Growth Fund (Adm) (VWUAX) | 29 bps | 55% |
| Vanguard Value Index Fund (Inv) (VIVAX) | 26 bps | Vanguard Value Index Fund (Instl) (VIVIX) | 8 bps | 225% |
| Vanguard Wellesley Income Fund (Inv) (VWINX) | 28 bps | Vanguard Wellesley Income Fund (Adm) (VWIAX) | 21 bps | 33% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Wellington Fund (Inv) (VWELX) | 30 bps | Vanguard Wellington Fund (Adm) (VWENX) | 22 bps | 36% |
| Vanguard Windsor Fund (Inv) (VWNDX) | 33 bps | Vanguard Windsor Fund (Adm) (VWNEX) | 22 bps | 50% |
| Vanguard Windsor II Fund (Inv) (VWNFX) | 35 bps | Vanguard Windsor II Fund (Adm) (VWNAX) | 27 bps | 30% |
| TIAA-CREF Bond Index Fund (Prem) (TBIPX) | 28 bps | TIAA-CREF Bond Index Fund (Instl) (TBIIX) | 13 bps | 115% |
| TIAA-CREF High-Yield Fund (Prem) (TIHPX) | 54 bps | TIAA-CREF High-Yield Fund (Instl) (TIHYX) | 39 bps | 38% |
| TIAA-CREF International Equity Fund (Prem) (TREPX) | 68 bps | TIAA-CREF International Equity Fund (Instl) (TIIEX) | 57 bps | 19% |
| TIAA-CREF International Equity Fund (Ret) (TRERX) | 78 bps | TIAA-CREF International Equity Fund (Instl) (TIIEX) | 57 bps | 37% |
| TIAA-CREF International Equity Index Fund (Prem) (TRIPX) | 23 bps | TIAA-CREF International Equity Index Fund (Instl) (TCIEX) | 8 bps | 188% |
| TIAA-CREF Large-Cap Value (Prem) (TRCPX) | 64 bps | TIAA-CREF Large-Cap Value (Instl) (TRLIX) | 49 bps | 31% |
| TIAA-CREF Large-Cap Value (Ret) (TRLCX) | 74 bps | TIAA-CREF Large-Cap Value (Instl) (TRLIX) | 49 bps | 51% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| TIAA-CREF Mid-Cap Growth Fund (Prem) (TRGPX) | 67 bps | TIAA-CREF Mid-Cap Growth Fund (Instl) (TRPWX) | 52 bps | 29% |
| TIAA-CREF Mid-Cap Growth Fund (Ret) (TRGMX) | 77 bps | TIAA-CREF Mid-Cap Growth Fund (Instl) (TRPWX) | 52 bps | 48% |
| TIAA-CREF Mid-Cap Value Fund (Prem) (TRVPX ) | 64 bps | TIAA-CREF Mid-Cap Value Fund (Instl) (TIMVX) | 49 bps | 31% |
| TIAA-CREF Mid-Cap Value Fund (Ret) (TRVRX ) | 74 bps | TIAA-CREF Mid-Cap Value Fund (Instl) (TIMVX) | 49 bps | 51% |
| TIAA-CREF Small-Cap Equity (Prem) (TSRPX) | 70 bps | TIAA-CREF Small-Cap Equity (Instl) (TISEX) | 55 bps | 27% |
| TIAA-CREF Small-Cap Equity (Ret) (TRSEX) | 80 bps | TIAA-CREF Small-Cap Equity (Instl) (TISEX) | 55 bps | 45% |

129.    These lower-cost share classes of the identical mutual funds for the Plan have been available for years, some dating back to the early 2000s or before.

130.    Because the share classes have identical portfolio managers, underlying investments, and asset allocations, and differ only in cost, Defendants' failure to select the lower-cost share classes for the Plan's mutual fund options demonstrates that Defendants failed to prudently consider and use the size and purchasing power of the Plan when selecting the Plan's investment options.

131.    Defendants' use of the higher-cost share classes instead of the available lower-cost versions caused millions of dollars in lost retirement savings.

**IV.    Defendants selected and retained a large number of duplicative
investment options, diluting the Plan's bargaining power and
causing the Plan to pay excessive fees.**

132.    Defendants provided a dizzying array of duplicative funds in the same
investment style, thereby depriving the Plan of its bargaining power associated
with offering a single option in each investment style, which significantly reduces
investment fees, and leading to what industry experts have described as "decision
paralysis" for participants. See, *e.g.,* Michael Liersch, *Choice in Retirement Plans:
How Participant Behavior Differs in Plans Offering Advice, Managed Accounts, and
Target-Date Investments,* T. ROWE PRICE RETIREMENT RESEARCH, at 2 (Apr.
2009)("Offering too many choices to consumers can lead to decision paralysis,
preventing consumers from making decisions."). Defendants placed between 78–118
investment options in the core lineup, from the following asset classes: target date
and asset allocation funds, large-cap domestic equities, mid-cap domestic equities,
small-cap domestic equities, international equities, fixed income, money market,
real estate, and fixed guaranteed annuity.

133.    In comparison, according to Callan Investments Institute's 2015
Defined Contribution Trends survey, defined contribution plans in 2014 had on
average 15 investment options, excluding target date funds. See Callan Investments
Institute, *2015 Defined Contribution Trends,* at 28 (2015).[47] This number of options
provides participants with a choice of investment styles while maintaining a larger
pool of assets in each investment style, which benefits participants by avoiding
participant confusion and obtaining lower fees. It also is the output of an evaluation

---

[47]Available at https://www.callan.com/research/files/990.pdf.

and selection by prudent fiduciaries of the "best in class" investment choice in a participant investment style. Indeed, since it is the fiduciaries in a plan who ERISA holds to a standard of a prudent financial expert, it is important for fiduciaries to perform that selection role for the exclusive benefit of participants who are not financial experts.

134.    A larger pool of assets in each investment style significantly reduces fees paid by participants. By consolidating duplicative investments of the same investment style into a single investment option, the Plan would then have the ability to command lower-cost investments, such as low-cost institutional share class of the selected mutual fund option.

135.    Fund selections must be the result of a detailed due diligence process that considers factors such as risk, investment return, and expenses of available investment alternatives, and the fiduciary must give "appropriate consideration" to "the role the investment or investment course of action plays . . . in the plan's investment portfolio," 29 C.F.R. §§2550.404a-1(b)(i)-(ii). Fiduciaries cannot discharge their duties "by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker*, 569 F.3d at 711. This removes the benefit of pooling assets consistent with the size of the Plan. Assembling a haphazard lineup of over 78–118 duplicative options, proprietary to the Plan's recordkeepers—and shifting to participants the burden to screen those options—does not reflect a prudent investment selection process.

136.    Within each asset class and investment style deemed appropriate for the participant-directed retirement plan, prudent fiduciaries make a reasoned determination and select a prudent investment option. In contrast to the investment lineup assembled by Defendants, prudent fiduciaries do not select and retain numerous investment options for a single asset class and investment style. When many investment options in a single investment style are plan options, fiduciaries lose the bargaining power to get lower investment management expenses for that style.

137.    Moreover, if a participant puts her assets in each of the funds within a given investment style, as commentators have said they are likely to do,[48] when many actively managed funds are included within the same investment style, this results in those participants effectively having an index return. This is because the investments are spread so broadly over that investment style. Yet the participants will be paying much higher fees for active management than the fees of a passive index fund.

138.    In addition, providing multiple options in a single investment style adds unnecessary complexity to the investment lineup and leads to participant confusion. See The Standard, *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 ("Numerous studies have demonstrated that when people are given too many choices of anything, they lose confidence or make no decision."); Michael

---

[48] Ian Ayres & Quinn Curtiss, *Beyond Diversification: The Pervasive Problem of Excessive Fees and Dominated Funds in 401(k) Plans*, 124 YALE L.J. 1476, 1481 (2015)("It is well established that some investors naively diversify by spreading their plan investments across all fund offerings.").

Liersch, *Choice in Retirement Plans: How Participant Behavior Differs in Plans Offering Advice, Managed Accounts, and Target-Date Investments,* T. ROWE PRICE RETIREMENT RESEARCH, at 2 (Apr. 2009)("Offering too many choices to consumers can lead to decision paralysis, preventing consumers from making decisions.").[49]

139.    Moreover, having many actively managed funds in the Plan within the same investment style results in the Plan effectively having an index fund return even though the plan is paying fees for active management that are much higher than the fees of a passive index fund.

140.    Since 2010, the Plan offered a proliferation of duplicative investments in every major asset class and investment style, including balanced/asset allocation (3–10 options), fixed income and high yield bond (14–18 options), international (8–15 options), large cap domestic equities (14–27 options), mid cap domestic equities (6–11 options), small cap domestic equities (5–7 options), real estate (2 options), money market (2–4 options), and target date investments (2 fund families). Such a dizzying array of duplicative funds in a single investment style violates the well-recognized industry principle that too many choices harm participants and are paralyzing.

141.    For illustration purposes, the Plan's four large cap domestic blend investments as of December 31, 2014, are summarized below and compared to a single lower-cost alternative that was available to the Plan: the large cap blend

---

[49] Available at http://www.behavioralresearch.com/Publications/Choice_in_Retirement_Plans_April_2009.pdf.

Vanguard Institutional Index Fund-Instl. Plus (VIIIX), which mirrors the market and has an expense ratio of 2 bps.

| Large Cap Blend Investments | Assets | Plan Fee | Lower-Cost Alternative Fee | Plan's Excess Cost |
|---|---|---|---|---|
| CREF Stock Account | $753,152,128 | 46 bps | 2 bps | 2200% |
| CREF Equity Index Account | $86,587,630 | 37 bps | 2 bps | 1750% |
| Vanguard Institutional Index Fund-Instl (VINIX) | $120,459,283 | 4 bps | 2 bps | 100% |
| Vanguard Total Stock Market Index Fund-Instl (VITSX) | $64,508,300 | 4 bps | 2 bps | 100% |
| **Total** | **$1,024,707,341** | | | |

142.   With over *$800 million* held in the CREF Stock Account and the CREF Equity Index Account, these large cap blend options were *23 and 18 times* more expensive than the lower-cost Vanguard option with an expense ratio of 2 bps, respectively.



143.    Many other large cap index funds are also available at massively lower costs than the Plan's large cap funds. Had the amounts invested in the Plan's large cap blend options been consolidated into a single large cap blend investment, such as the Vanguard Institutional Index Fund-Instl. Plus, Plan participants would have avoided paying in excess of $3 million in fees for 2014 alone, and many more millions since 2010 to the present and continuing into the future.

144.    Similarly, the Plan offers *eleven* different fixed income investments as of December 31, 2014. These funds are summarized below and compared to a far lower-cost readily available alternative, the Vanguard Total Bond Market Index Fund-Instl Plus (VBMPX) with an expense ratio of 5 bps.

| Fixed Income Investments | Assets | Plan Fee | Lower-Cost Alternative Fee | Plan's Excess Cost |
|---|---|---|---|---|
| CREF Bond Market Fund | $67,681,000 | 44 bps | 5 bps | 780% |
| CREF Inflation-Linked Bond Fund | $35,735,301 | 39 bps | 5 bps | 680% |
| TIAA-CREF Bond Index Fund-Prem (TBIPX) | $8,211,935 | 27 bps | 5 bps | 440% |
| Vanguard Inflation-Protected Securities Fund-Inv (VIPSX) | $15,501,746 | 20 bps | 5 bps | 300% |
| Vanguard Intermediate-Term Bond Index Fund-Inv (VBIIX) | $12,358,006 | 20 bps | 5 bps | 300% |
| Vanguard Intermediate-Term Treasury Fund-Inv (VFITX) | $6,384,162 | 20 bps | 5 bps | 300% |

| Fixed Income Investments | Assets | Plan Fee | Lower-Cost Alternative Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Long-Term Bond Index Fund-Inv (VBLTX) | $5,581,631 | 20 bps | 5 bps | 300% |
| Vanguard Long-Term Investment Grade Bond-Inv (VWESX) | $8,805,651 | 22 bps | 5 bps | 340% |
| Vanguard Short-Term Investment Grade Fund-Inv (VFSTX) | $19,461,893 | 20 bps | 5 bps | 300% |
| Vanguard Total Bond Market Index Fund-Instl (VBTIX) | $41,086,928 | 6 bps | 5 bps | 20% |
| Vanguard Long-Term Treasury Fund-Inv (VUSTX) | $6,569,316 | 20 bps | 5 bps | 300% |
| **Total** | **$227,377,569** | | | |

145.    Had the amounts in the Plan's fixed income investments instead been consolidated into a single fixed income investment, such as the Vanguard Total Bond Market Index Fund-Instl Plus, Plan participants would have saved substantial amounts of their retirement savings, instead of paying excessive and wholly unnecessary fees. Prudent fiduciaries would not have allowed this.

146.    In addition, Defendants even selected and continue to retain multiple passively managed index options in the same investment style. In contrast to an actively-managed fund, in which the investment manager selects stocks or bonds in an attempt to generate investment returns in excess of the fund's benchmark, passively managed index funds simply attempt to replicate a market index, such as the S&P 500, by holding a representative sample of securities in the index. Because

no stock selection or research is needed, index fund fees are substantially lower than an actively managed fund in the same style.

147.    For example, in the large cap blend investment style, Defendants have included up to five separate index funds to mimic the return of the U.S. equity market. Similarly, for fixed income or the intermediate-term bond investment style, as another example, Defendants have included up to four separate index funds.

148.    Since index funds merely hold the same securities in the same (or roughly the same) proportions as the index,[50] having multiple index funds of the same category or investment style in the Plan provides no benefit to participants. As Morningstar CEO Joe Mansueto recently observed, "[b]asic market indexes are virtually interchangeable." Lewis Braham, *Morningstar Announces Free Use of Its Indexes*, Barron's (Nov. 5, 2016).[51] Including multiple similar index funds in the same investment style hurts participants by diluting the Plan's ability to obtain lower rates for a single index fund of that style because the amount of assets in any one such fund is smaller than the aggregate would be in that investment style. Moreover, multiple managers holding stocks that mimic the S&P 500 or a similar index would pick the same stocks in essentially the same proportions as the index. Thus, there is no value in offering separate index funds in the same investment style.

---

[50] Another example of an index is the Dow Jones Industrial Average.
[51] Available at http://www.barrons.com/articles/morningstar-announces-free-use-of-its-indexes-1478322642.

149.    Had Defendants combined hundreds of millions of dollars in Plan assets from duplicative index funds into a single index fund, the Plan would have obtained lower fees and generated higher investment returns, net of fees, and participants would not have lost millions of dollars in retirement assets.

## V.    Defendants retained historically underperforming Plan investments.

150.    The excessive fees in the Plan's investments were not justified by superior investment returns. Defendants' failure to conduct appropriate due diligence in selecting and monitoring the Plan's investments resulted in options being retained in the Plan despite years of historical underperformance compared to superior lower-cost alternatives, causing massive losses to the Plan compared to what those assets would have earned if invested in prudent alternatives.

151.    As of March 31 2016, 45 of the 76 investment options in the Plan for which a benchmark was identified—*nearly 60%* of the Plan's investment options— underperformed their respective benchmarks over the previous 5-year period.[52] These underperforming funds include the following:

| Fund Name | Ticker |
|---|---|
| CREF Bond Market (R3) | QCBMIX |
| CREF Equity Index (R3) | QCEQIX |

---

[52] These results are based on the performance and benchmark for each fund as shown on the Plan's quarterly Plan and Investment Notice, Section II, Part A, available at https://www.tiaa.org/public/pdf/obiee/100321_Plan_Investment_Notice.pdf. No benchmark was reported for the TIAA Traditional Annuity. *See id*. at 19.

| Fund Name | Ticker |
|---|---|
| CREF Global Equities (R3) | QCGLIX |
| CREF Growth (R3) | QCGRIX |
| CREF Inflation-Linked Bond (R3) | QCILIX |
| CREF Money Market (R3) | QCMMIX |
| CREF Social Choice (R3) | QCSCIX |
| CREF Stock (R3) | QCSTIX |
| TIAA Real Estate | QREARX |
| TIAA-CREF Bond Index (Inst) | TBIIX |
| TIAA-CREF High-Yield (Inst) | TIHYX |
| TIAA-CREF Large-Cap Value (Inst) | TRLIX |
| TIAA-CREF Lifecycle Index 2015 (Inst) | TLFIX |
| TIAA-CREF Lifecycle Index 2020 (Inst) | TLWIX |
| TIAA-CREF Lifecycle Index 2025 (Inst) | TLQIX |
| TIAA-CREF Lifecycle Index 2030 (Inst) | TLHIX |
| TIAA-CREF Lifecycle Index 2035 (Inst) | TLYIX |
| TIAA-CREF Lifecycle Index 2040 (Inst) | TLZIX |
| TIAA-CREF Lifecycle Index 2045 (Inst) | TLXIX |
| TIAA-CREF Lifecycle Index 2050 (Inst) | TLLIX |

| Fund Name | Ticker |
|---|---|
| TIAA-CREF Mid-Cap Growth (Inst) | TRPWX |
| TIAA-CREF Mid-Cap Value (Inst) | TIMVX |
| Vanguard Explorer (Inv) | VEXPX |
| Vanguard Extended Market Index (Inv) | VEXMX |
| Vanguard Inflation-Protected Securities (Inv) | VIPSX |
| Vanguard Institutional Index (Inst) | VINIX |
| Vanguard Intermediate-Term Bond Index (Inv) | VBIIX |
| Vanguard Intermediate-Term Treasury (Inv) | VFITX |
| Vanguard Long-Term Bond Index (Inv) | VBLTX |
| Vanguard Long-Term Treasury (Inv) | VUSTX |
| Vanguard Mid Cap Growth (Inv) | VMGRX |
| Vanguard Mid Cap Index (Inv) | VIMSX |
| Vanguard Morgan Growth (Inv) | VMRGX |
| Vanguard Prime Money Market (Inv) | VMMXX |
| Vanguard REIT Index (Inv) | VGSIX |
| Vanguard Selected Value (Inv) | VASVX |
| Vanguard Short-Term Investment-Grade (Inv) | VFSTX |
| Vanguard Small Cap Index (Inv) | NAESX |

| Fund Name | Ticker |
|---|---|
| Vanguard Small Cap Value Index (Inv) | VISVX |
| Vanguard Total Bond Market Index (Inst) | VBTIX |
| Vanguard U.S. Growth (Inv) | VWUSX |
| Vanguard Value Index (Inv) | VIVAX |
| Vanguard Wellington (Inv) | VWELX |
| Vanguard Windsor (Adm) | VWNEX |
| Vanguard Windsor II (Inv) | VWNFX |

152.   Had Defendants conducted a prudent investment review process, many of these options that consistently failed to meet performance objectives would have been eliminated from the Plan or replaced. Defendants' failure to do so caused the Plan substantial losses compared to prudent alternative investments that were available to the Plan. Two funds in particular demonstrate the severe harm to the Plan resulting from Defendants' breaches of fiduciary duties: the CREF Stock Account and TIAA Real Estate Account.

### A.   CREF Stock Account

153.   TIAA-CREF imposed restrictive provisions on the specific annuities that *must* be provided in the Plan. In its fund fact sheets and participant disclosures to the Plan's participants, TIAA-CREF classifies the CREF Stock Account as a domestic equity investment in the large cap blend Morningstar category. For its benefit, TIAA-CREF required that the CREF Stock Account be

offered to Plan participants, in addition to the TIAA Traditional Annuity and the CREF Money Market Account. Instead of controlling each plan option allowed in the Plan, and acting for the sole benefit of the Plan's participants, as ERISA requires, Defendants allowed TIAA-CREF to dictate that the CREF Stock Account would be placed and retained in the Plan. Defendants did so without a prudent process to determine whether there were other prudent alternatives in the exclusive best interest of Plan participants and beneficiaries. TIAA-CREF required the CREF Stock Account to be included in the Plan to drive very substantial amounts of revenue sharing payments to TIAA-CREF for recordkeeping services. The CREF Stock Account paid 24 bps for revenue sharing, which exceeded other TIAA-CREF investments by over 50% (15 bps).

154.   The CREF Stock Account has excessive and unnecessary fees, has consistently underperformed for years, and continues to underperform the benchmark TIAA and Defendants told participants was the proper one, and underperformed lower-cost actively and passively managed investments that were available to the Plan, yet has not been removed from the Plan nor frozen to new investments. The CREF Stock Account is one of the largest investment options in the Plan with over $*750 million* in total assets as of year-end 2014. It has been offered in the Plan throughout the period from 2010 to date. This option has underperformed and continues to underperform its benchmark and lower-cost actively and passively managed investments that were available to the Plan.

155.    As is generally understood in the investment community, passively managed investment options should either be used or, at a minimum, thoroughly analyzed and considered, in efficient markets such as large capitalization U.S. stocks. This is because it is difficult and either unheard of, or extremely unlikely, to find actively managed mutual funds that outperform a passive index, net of fees, particularly on a persistent basis. This extreme unlikelihood is even greater in the large cap market because such companies are the subject of many analysts' coverage, while smaller stocks are not as widely covered by analysts and thus are subject to potential inefficiencies in pricing.

156.    Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 FIN. ANALYSTS J. 7, 8 (Jan./Feb. 1991);[53] Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1915 (2010)("After costs . . . in terms of net returns to investors, active investment must be a negative sum game.").

157.    This is particularly true in the highly efficient large cap market. These efficiencies hinder an active manager's ability to achieve excess returns for investors.

---

[53] Available at http://www.cfapubs.org/doi/pdf/10.2469/faj.v47.n1.7.

> In conclusion, this study of mutual funds does not provide any reason to abandon a belief that securities markets are remarkably efficient. Most investors would be considerably better off by purchasing a low expense index fund, than by trying to select an active fund manager who appears to possess a "hot hand." Since active management generally fails to provide excess returns and tends to generate greater tax burdens for investors, the advantage of passive management holds, a fortiori.

Burton G. Malkiel, *Returns from Investing in Equity Mutual Funds 1971 to 1991*, 50

J. FIN. 549, 571 (1995).[54]

158.    Academic literature overwhelmingly concludes that active managers

consistently underperform the S&P 500 index.

> Active managers themselves provide perhaps the most persuasive case for passive investing. Dozens of studies have examined the performance of mutual funds and other professional-managed assets, and virtually all of them have concluded that, on average, active managers underperform passive benchmarks….The median active fund underperformed the passive index in 12 out of 18 years [for the large-cap fund universe]…The bottom line is that, over most periods, the majority of mutual fund investors would have been better off investing in an S&P 500 Index fund.
>
> ***
>
> Most of the dismal comparisons for active managers are for large-cap domestic managers versus the S&P 500 Index.

Robert C. Jones, *The Active Versus Passive Debate: Perspectives of an Active Quant*,

ACTIVE EQUITY PORTFOLIO MANAGEMENT, at 37, 40, 53 (Frank J. Fabozzi ed., 1998).

159.    Prudent fiduciaries of large defined contribution plans conduct an

analysis to determine whether actively managed funds, particularly large cap, will

outperform their benchmark net of fees. Prudent fiduciaries then make a reasoned

---

[54] Available at http://indeksirahastot.fi/resource/malkiel.pdf.

decision as to whether it is in participants' best interest to offer an actively managed large cap option, with its much higher fees, for the particular investment style and asset class, in light of the higher costs of active management.

160.   Defendants failed to undertake such an analysis, or any analysis, when it allowed the actively managed CREF Stock Account to be included and retained in the Plan. This is particularly true given TIAA-CREF's requirement that the CREF Stock Account be provided in the Plan in order to drive revenue to TIAA-CREF. By allowing the Plan to be bound by this requirement, Defendants failed to conduct an independent evaluation of the prudence of this option, which contradicts every principle of prudent investing because an investment that was no longer prudent could not be removed from the Plan.

161.   Additionally, as detailed above, the 46 bps that the CREF Stock Account charged was comprised of four layers of fees that were each unreasonable compared to the actual services provided by TIAA-CREF to the Plan's participants. Defendants failed to analyze whether these fees were appropriate and reasonable in light of the services provided and given that the Plan invested over *$750 million* in the CREF Stock Account.

162.   Had Defendants engaged in a prudent investment review and monitoring process, it would have determined that the CREF Stock Account would not be expected to outperform the large cap index after fees. That is in fact what occurred.

163.   In participant communications, Defendants and TIAA-CREF identified

the Russell 3000 Index as the appropriate benchmark to evaluate the fund's

investment results, as shown in this excerpt of the Plan and Investment Notice

provided to the Plan's participants:[55]

| Investment Name / *Benchmark* | Morningstar Category | Ticker Symbol | Inception Date |
|---|---|---|---|
| **CREF Stock Account R3** | Large Blend | QCSTIX | 04/24/2015 |
| *Russell 3000 Index* | | | |

164.    The CREF Stock Account did not merely underperform in a single year

or two. Historical performance of the CREF Stock Account has been persistently

poor for many years compared to both available lower-cost index funds and the

Russell 3000 index benchmark. The following performance chart compares the

investment returns of the CREF Stock Account to its Russell 3000 benchmark, as

identified by Defendants and TIAA-CREF, and two other passively managed index

funds in the same investment style, for the one-, five-, and ten-year periods ending

December 31, 2014.[56] For each comparison, the CREF Stock Account dramatically

underperformed the benchmark and index alternatives. The passively managed

index funds used for comparison purposes are the Vanguard Total Stock Market

---

[55] Plan and Investment Notice at 8, available at
https://www.tiaa.org/public/pdf/obiee/100321_Plan_Investment_Notice.pdf.

[56] Performance data provided as of December 31, 2014 to correspond to the most
recent filing of the Plan's Form 5500 with the Department of Labor as of the date of
the original complaint.

Index Fund-Instl Plus (VITPX) and the Vanguard Institutional Index-Instl Plus

(VIIIX). Like the CREF Stock Account, these options are large cap blend

investments.



165.   The CREF Stock Account, with an expense ratio of 46 bps, as of

December 31, 2014, was and is dramatically more expensive than better performing

index alternatives: the Vanguard Total Stock Market Index Fund-Instl Plus (2 bps)

and the Vanguard Institutional Index-Instl Plus (2 bps).

166.   Apart from underperforming passively managed index funds, the fund

also significantly underperformed comparable actively managed funds over the

one-, five- and ten-year periods ending December 31, 2014. These large cap

82

alternatives with similar underlying asset allocations to the CREF Stock Account include the Vanguard Diversified Equity (VDEQX), the Vanguard PRIMECAP-Adm (VPMAX), and the Vanguard Capital Opp.-Adm (VHCAX).



167.   This sustained underperformance went back even further. The CREF Stock Account also had a long history of substantial underperformance compared to

these actively managed alternatives over the one-, five-, and ten-year periods

ending December 31, 2009.[57]



---

[57] Because the Vanguard Diversified Equity Fund's inception date was June 10, 2006, it was excluded from the five- and ten-year periods. For the Vanguard PRIMECAP-Adm and Vanguard Capital Opportunity Fund-Adm, the investment returns of the investor share class for ten-year performance were used because the admiral share class for each of these funds was not offered until November 12, 2001. The return since inception for the Vanguard PRIMECAP-Adm was 3.23%, and for the Vanguard Capital Opportunity Fund-Adm, 5.89%.





168.    Despite the consistent underperformance, the CREF Stock Account, with an expense ratio of 46 bps as of December 31, 2014, was more expensive than better performing actively managed alternatives: the Vanguard Diversified Equity-Inv (40 bps), the Vanguard PRIMECAP-Adm (35 bps), and the Vanguard Capital Opp.-Adm (40 bps).

169.    Apart from this abysmal long-term underperformance of the CREF Stock Account compared to both index funds and actively managed funds, the fund was recognized as imprudent in the industry. In March 2012, an independent investment consultant, AonHewitt, recognized the imprudence of the CREF Stock Account and recommended to its clients that they remove this fund from their retirement plan. AonHewitt, *TIAA-CREF Asset Management*, INBRIEF, at 3 (July 2012). [58] This recommendation was made due to numerous factors, including the historical underperformance, high turnover of asset management executives and portfolio managers, and the fund's over 60 separate underlying investment strategies, greatly reducing the fund's ability to generate excess returns over any substantial length of time. *Id.* at 4–5.

170.    The Supreme Court has recently and unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble v. Edison Int'l,* 135 S. Ct. 1823, 1829 (2015). In contrast to the conduct of a prudent fiduciary, Defendants failed to conduct a prudent process to monitor the CREF Stock Account and failed to remove it or freeze it to new

---

[58] Available at http://system.nevada.edu/Nshe/?LinkServID=82B25D1E-9128-6E45-1094320FC2037740.

investments even though it continued to underperform lower-cost investment alternatives that were available to the Plan.

171.    Prudent fiduciaries of defined contribution plans continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better performing and reasonably priced options. Under the standards used by prudent independent fiduciaries, the CREF Stock Account would have been removed from the Plan.

172.    Defendants retention of the CREF Stock Account caused the Plan to lose over $170 million compared to what the Plan would have earned had the same amount of assets been invested in certain of the actively managed lower-cost alternatives identified in ¶166, or the passively managed lower-cost alternatives identified in ¶165.[59]

**B.    TIAA Real Estate Account**

173.    Defendants selected and continue to retain the TIAA Real Estate Account as an investment options in the Plan. The fund has far greater fees than are reasonable, has historically underperformed, and continues to consistently underperform comparable real estate investment alternatives, including the Vanguard REIT Index I (VGSNX).

---

[59] Plan losses have been brought forward to the present value using the investment returns of the lower-cost alternatives to compensate participants who have not been reimbursed for their losses.

174.   With an expense ratio of 87 bps as of December 31, 2014, the TIAA

Real Estate Account is also over *10 times more* expensive than the Vanguard REIT

Index I, which has an expense ratio of 8 bps.



175.   The TIAA Real Estate Account had a long history of substantial

underperformance relative to the Vanguard REIT Index over the one-, five-, and

ten-year periods ending December 31, 2009.[60] Despite this, Defendants selected and

have retained it in the Plan to date.

---

[60] The return of the investor share class was used for ten-year performance because the institutional share class was not offered until December 2, 2003. The return since inception for the Vanguard REIT Index-I was 5.49%.







176.   This underperformance occurred for years before 2009 and continued thereafter. The TIAA Real Estate Account vastly underperformed the Vanguard REIT Index-I over the one-, five-, and ten-year periods ending December 31, 2014.[61]

---

[61] Performance data provided as of December 31, 2014 to correspond to the most recent filing of the Plan's Form 5500 with the Department of Labor as of the date of the original complaint.



177.   As the Supreme Court unanimously ruled in *Tibble*, prudent fiduciaries of defined contribution plans have a duty to monitor plan investment options on an ongoing basis and replace imprudent investments. *Tibble*, 135 S. Ct. at 1829. Defendants failed to do so and continue to retain the TIAA Real Estate Account as a Plan investment option, despite its continued dramatic underperformance and excessive fees compared to prudent alternatives.

178.   Had Defendants removed the TIAA Real Estate Account and the amounts been invested in the lower-cost and better-performing Vanguard REIT

Index I, Plan participants would not have lost in excess of $16 million of their retirement assets from the fund being retained in the Plan.[62]

## CLASS ACTION ALLEGATIONS

179.   29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

180.   In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of the University of Pennsylvania Matching Plan from August 10, 2010 through the date of judgment, excluding the Defendants.

181.   This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.   The Class includes over 20,000 members and is so large that joinder of all its members is impracticable.

b.   There are questions of law and fact common to this Class because the Defendants owed fiduciary duties to the Plan and to all

---

[62] Plan losses have been brought forward to the present value using the investment returns of the Vanguard REIT Index-I to compensate participants who have not been reimbursed for their losses.

participants and beneficiaries and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breach of duty.

c.      Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

d.      Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.      Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries

regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

182.   A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

183.   Plaintiffs' counsel, counsel, Schlichter, Bogard & Denton LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g). Schlichter, Bogard & Denton has been appointed as class counsel in 17 other ERISA class actions regarding excessive fees in large defined contribution plans. Courts in these cases have

consistently and repeatedly recognized the firm's unparalleled success in the area of

defined contribution excessive fee litigation:

- As Chief Judge Michael J. Reagan of the Southern District of Illinois
  recognized in approving a settlement which was reached on the eve of trial
  after eight years of litigation, resulting in a $62 million monetary recovery
  and very substantial affirmative relief to benefit the Plans, the firm had
  shown "exceptional commitment and perseverance in representing employees
  and retirees seeking to improve their retirement plans," and "demonstrated
  its well-earned reputation as a pioneer and the leader in the field" of 401(k)
  plan excessive fee litigation. *Abbott v. Lockheed Martin Corp.*, No. 06-701,
  2015 U.S.Dist.LEXIS 93206, at *4–5 (S.D.Ill. July 17, 2015). The court
  further recognized that the law firm of "Schlichter, Bogard & Denton has had
  a humongous impact over the entire 401(k) industry, which has benefited
  employees and retirees throughout the entire country by bringing sweeping
  changes to fiduciary practices." *Id.* at *9 (internal quotations omitted).

- Other courts have made similar findings:

  - "It is clear to the Court that the firm of Schlichter, Bogard & Denton is
    preeminent in the field" "and is the only firm which has invested such
    massive resources in this area." *George v. Kraft Foods Global, Inc.*, No.
    08-3799, 2012 U.S.Dist.LEXIS 166816 at 8 (N.D. Ill. June 26, 2012).

  - "As the preeminent firm in 401(k) fee litigation, Schlichter, Bogard &
    Denton has achieved unparalleled results on behalf of its
    clients." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 U.S.Dist.LEXIS
    184622 at 8 (C.D. Ill. Oct. 15, 2013).

  - "Litigating this case against formidable defendants and their
    sophisticated attorneys required Class Counsel to demonstrate
    extraordinary skill and determination." *Beesley v. Int'l Paper Co.*, No.
    06-703, 2014 U.S.Dist.LEXIS 12037 at *8 (S.D. Ill. Jan. 31, 2014). The
    court also emphasized that "the law firm of Schlichter, Bogard &
    Denton is the leader in 401(k) fee litigation." *Id.* at *8 (internal
    quotations omitted).

  - U.S. District Judge Harold Baker of the Central District of Illinois
    acknowledged the significant impact of the firm's work, finding that as
    of 2013, the nationwide "fee reduction attributed to Schlichter, Bogard
    & Denton's fee litigation and the Department of Labor's fee disclosure
    regulations approach *$2.8 billion in annual savings* for American

workers and retirees." *Nolte*, 2013 U.S. Dist. LEXIS 184622, at *6 (emphasis added).

o   U.S. District Judge David Herndon of the Southern District of Illinois recognized the firm's extraordinary contributions to the retirement industry: "Schlichter, Bogard & Denton and lead attorney Jerome Schlichter's diligence and perseverance, while risking vast amounts of time and money, reflect the finest attributes of a private attorney general. *Beesley*, 2014 U.S. Dist. LEXIS 12037, at *8.

o   U.S. District Court Judge G. Patrick Murphy similarly recognized the work of Schlichter, Bogard & Denton as exceptional:

> "Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing many thousands of hours for the benefit of employees and retirees. No case had previously been brought by either the Department of Labor or private attorneys against large employers for excessive fees in a 401(k) plan. Class Counsel performed substantial work[,] investigating the facts, examining documents, and consulting and paying experts to determine whether it was viable. This case has been pending since September 11, 2006. Litigating the case required Class Counsel to be of the highest caliber and committed to the interests of the participants and beneficiaries of the General Dynamics 401(k) Plans."

*Will v. General Dynamics Corp.*, No. 06-698, 2010 U.S.Dist.LEXIS 123349 at 8–9 (S.D.Ill. Nov. 22, 2010).

- Schlichter, Bogard & Denton handled the only full trial of an ERISA excessive fee case, resulting in a $36.9 million judgment for the plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees after trial, the district court concluded that "Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S.Dist.LEXIS 157428 at 10 (W.D. Mo. Nov. 2, 2012). Following remand, the district court again awarded Plaintiffs' attorney's fees, emphasizing the significant contribution Plaintiffs' attorneys have made to ERISA litigation, including educating the Department of Labor and federal courts about the importance of monitoring fees in retirement plans:

> "Of special importance is the significant, national contribution made by the Plaintiffs whose litigation clarified ERISA standards in the context of investment fees. The litigation educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees and separating a fiduciary's corporate interest from its fiduciary obligations."

*Tussey v. ABB, Inc.,* No. 06-4305, 2015 U.S.Dist.LEXIS 164818 at 7–8 (W.D. Mo. Dec. 9, 2015).

- In *Spano v. Boeing Co.*, in approving a settlement reached after nine years of litigation which included $57 million in monetary relief and substantial affirmative relief to benefit participants, the court found that "The law firm Schlichter, Bogard & Denton has significantly improved 401(k) plans across the country by bringing cases such as this one, which have educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees." No. 06-cv-743, Doc. 587, at 5–6 (S.D.Ill. Mar. 31, 2016) (Rosenstengel, J.) (internal quotations omitted).

- Recently, in approving a settlement including $32 million plus significant affirmative relief, Chief Judge William Osteen in *Kruger v. Novant Health, Inc.*, No. 14-208, Doc. 61, at 7–8 (M.D.N.C. Sept. 29, 2016) found that "Class Counsel's efforts have not only resulted in a significant monetary award to the class but have also brought improvement to the manner in which the Plans are operated and managed which will result in participants and retirees receiving significant savings[.]"

- On November 3, 2016, Judge Michael Ponsor of the United States District Court for the District of Massachusetts found that by securing a $30.9 million settlement, Schlichter, Bogard & Denton had achieved an "outstanding result for the class," and "demonstrated extraordinary resourcefulness, skill, efficiency and determination." *Gordan v. Mass Mutual Life Ins., Co.*, No. 14-30184, Doc. 144 at 5 (D. Mass. Nov. 3, 2016).

- Schlichter, Bogard & Denton is also class counsel in and handled *Tibble v. Edison International*, 135 S. Ct. 1823 (2015), the first and only Supreme Court case to address the issue of excessive fees in a defined contribution plan—in which the Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Id.* at 1829. Schlichter, Bogard & Denton successfully petitioned for a writ of certiorari, and obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's

broad recognition of an ongoing fiduciary duty, the *Tibble* decision will affect all ERISA defined contribution plans.

- The firm's work in ERISA excessive fee class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. See, e.g., Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL ST. J. (May 15, 2016);[63] Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014);[64] Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015);[65] Floyd Norris, *What a 401(k) Plan Really Owes Employees*,  N.Y. TIMES (Oct. 16, 2014);[66] Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, WALL ST. J. (Aug. 25, 2015);[67] Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015); [68] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014);[69] Mark Miller*, Are 401(k) Fees Too High? The High-Court May Have an Opinion*, REUTERS (May 1, 2014);[70] Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, BLOOMBERG (Oct. 2, 2014).[71]

## COUNT I

### Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)

### Locking the Plan into CREF Stock Account and TIAA Recordkeeping

---

[63] Available at http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601.

[64] Available at http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[65] Available at http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

[66] Available at http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

[67] Available at http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/.

[68] Available at http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

[69] Available at http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

[70] Available at http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501.

[71] Available at http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal.

184.   Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

185.   Defendants were required to discharge their duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to, Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA.

186.   Defendants were required to independently assess "the prudence of *each* investment option" for the Plan on an ongoing basis, *DiFelice*, 497 F.3d at 423, and to act prudently and solely in the interest of the Plan's participants in deciding whether to maintain a recordkeeping arrangement, DOL Adv. Op. 97-16A. Defendants were also required to remove investments that were no longer prudent for the Plan, as the Supreme Court recently confirmed. *Tibble*, 135 S. Ct. at 1828–29.

187.   By allowing TIAA-CREF to mandate the inclusion of the CREF Stock Account and Money Market Account in the Plan, and to require that it provide recordkeeping for its proprietary options, Defendants committed the Plan to an imprudent arrangement in which certain investments had to be included and could not be removed from the plan *even if they were no longer prudent investments*, and prevented the Plan from using alternative recordkeepers who could provide superior services at a lower cost.  In so doing, Defendants abdicated their duty to independently assess the prudence of each option in the Plan on an ongoing basis,

and to act prudently and solely in the interest of participants in selecting the Plan's recordkeeper. By allowing TIAA-CREF to dictate these terms, Defendants favored the financial interests of TIAA-CREF in receiving a steady stream of revenues from TIAA-CREF's proprietary funds over the interest of participants.

188.    Because Defendants shackled the Plan with the CREF Stock Account and TIAA recordkeeping services without engaging in a reasoned decisionmaking process as to the prudence of those options, Defendants are liable to make good to the Plan all losses resulting from its breach. 29 U.S.C. §1109(a). As described in detail above, the Plan suffered massive losses from the inclusion of the CREF Stock Account in the Plan compared to what those assets would have earned if invested in prudent alternative investments that were available to the Plan, and also suffered losses from paying TIAA recordkeeping fees that far exceeded market rates.

189.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C §1105(a).

## COUNT II

## Prohibited transactions—29 U.S.C. §1106(a)(1)

## Locking the Plan into CREF Stock Account and TIAA Recordkeeping

190.    Plaintiffs restate and incorporate the allegations in the preceding

paragraphs.

191.    Section 1106(a)(1) prohibits transactions between a plan and a "party

in interest," and provides as follows:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a
> transaction, if he knows or should know that such transaction constitutes a
> direct or indirect –
>
> > (A)    sale or exchange, or leasing, of any property between the
> > plan and a party in interest;
> > * * *
> > (C)    furnishing of goods, services, or facilities between the plan
> > and  party in interest;
> > (D)    transfer to, or use by or for the benefit of a party in
> > interest, of any assets of the plan …

29 U.S.C. §1106(a)(1).

192.    Congress defined "party in interest" to encompass "those entities that a

fiduciary might be inclined to favor at the expense of the plan beneficiaries," such as

employers, other fiduciaries, and service providers. *Harris Tr. & Sav. Bank v.*

*Salomon Smith Barney, Inc.,* 530 U.S. 238, 242 (2000); 29 U.S.C. §1002(14)(A)–(C).

As a service provider to the Plan, TIAA-CREF is a party in interest. 29 U.S.C.

§1002(14)(B).

193.    By allowing the Plan to be locked into an unreasonable arrangement

that required the Plan to include the CREF Stock Account and to use TIAA as the

recordkeeper for its proprietary products even though the fund was no longer a

prudent option for the Plan due to its excessive fees and poor performance, and even

though TIAA's recordkeeping fees were unreasonable for the services provided,

Defendants caused the Plan to engage in transactions that it knew or should have known constituted an exchange of property between the Plan and TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plan and TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(C), and a transfer of Plan assets to TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plan paid fees to TIAA-CREF in connection with the Plan's investments in the CREF Stock Account and other proprietary options that paid revenue sharing to TIAA

194.    29 U.S.C. §1109(a), Defendants are liable to restore all losses to the Plan resulting from these prohibited transactions, and to provide restitution of all proceeds of these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

195.    Each Defendant knowingly participated in these transactions, enabled the other Defendants to cause the Plan to engage in these transactions, and knew of these transactions and failed to make any reasonable effort under the circumstances to remedy or discontinue the transactions. Thus, under 29 U.S.C. §1105(a), each Defendant is liable for restoring all the proceeds and losses attributable to these transactions.

## COUNT III

### Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)
### Unreasonable Administrative Fees

196.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

197.    Defendants were required to discharge their duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA.

198.    If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 798–99 (7th Cir. 2011). Similarly, failing to "monitor and control recordkeeping fees" and "paying excessive revenue sharing" as a result of failures to "calculate the amount the Plan was paying … through revenue sharing," to "determine whether [the recordkeeper's] pricing was competitive," and to "leverage the Plan's size to reduce fees," while allowing the "revenue sharing to benefit" a third-party recordkeeper "at the Plan's expense" is a breach of fiduciary duties. *Tussey,* 746 F.3d at 336.

199.    Defendants' process for monitoring and controlling the Plan's recordkeeping fees was a fiduciary breach in that Defendants failed to: monitor the amount of the revenue sharing received by the Plan's recordkeepers, determine if those amounts were competitive or reasonable for the services provided to the Plan, or use the Plan's size to reduce fees or obtain sufficient rebates to the Plan for the excessive fees paid by participants. Moreover, Defendants failed to solicit bids from competing providers on a flat per-participant fee basis. As the Plan's assets grew,

the asset-based revenue sharing payments to the Plan's recordkeepers grew, even though the services provided by the recordkeepers remained the same. This caused the recordkeeping compensation paid to the recordkeepers to exceed a reasonable fee for the services provided. This conduct was a breach of fiduciary duties.

200.    By allowing TIAA-CREF and Vanguard to put their proprietary investments in the Plan without scrutinizing those providers' financial interest in using funds that provided them a steady stream of revenue sharing payments, Defendants failed to act in the exclusive interest of participants.

201.    In contrast to the comprehensive plan reviews conducted by similarly situated 403(b) plan fiduciaries which resulted in consolidation to a single recordkeeper and significant fee reductions, Defendants failed to engage in a timely and reasoned decisionmaking process to determine whether the Plan would similarly benefit from consolidating the Plan's administrative and recordkeeping services under a single provider. Instead, Defendants continue to contract with two separate recordkeepers. This failure to consolidate the recordkeeping services eliminated the Plan's ability to obtain the same services at a lower cost with a single recordkeeper. Defendants' failure to "balance the relevant factors and make a reasoned decision as to the preferred course of action—under circumstances in which a prudent fiduciary would have done so"—and, indeed, *did* so—was a breach of fiduciary duty. *George*, 641 F.3d at 788.

202.    Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

203.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

204.   Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT IV

### Prohibited transactions—29 U.S.C. §1106(a)(1)

### Administrative Services and Fees

205.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

206.   As service providers to the Plan, TIAA-CREF and Vanguard are parties in interest. 29 U.S.C. §1002(14)(B).

207.   By causing the Plan to use TIAA-CREF and Vanguard as the Plan's recordkeepers from year to year, Defendants caused the Plan to engage in transactions that Defendants knew or should have known constituted an exchange of property between the Plan and TIAA-CREF and the Plan and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plan and TIAA-CREF and the Plan and Vanguard prohibited by 29

U.S.C. §1106(a)(1)(C), and a transfer of Plan assets to, or use by or for the benefit of TIAA-CREF and a transfer of Plan assets to, or use by or for the benefit of Vanguard prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plan paid fees to TIAA-CREF and Vanguard directly and in connection with the Plan's investments in funds that paid revenue sharing to TIAA or Vanguard.

208.    Under 29 U.S.C. §1109(a), Defendants are liable to restore all losses to the Plan resulting from these prohibited transactions, and to provide restitution of all proceeds from these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

209.    Each Defendant knowingly participated in these transactions, enabled the other Defendants to cause the Plan to engage in these transactions, and knew of these transactions and failed to make any reasonable effort under the circumstances to remedy or discontinue the transaction. Thus, under 29 U.S.C. §1105(a), each Defendant is liable for restoring all proceeds and losses attributable to these transactions.

## COUNT V

### Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)

### Unreasonable Investment Management Fees,

### Unnecessary Marketing and Distribution (12b-1) Fees

### and Mortality and Expense Risk Fees, and Performance Losses

210.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

106

211.   Defendants are responsible for selecting prudent investment options, ensuring that those options charge only reasonable fees, and taking any other necessary steps to ensure that the Plan's assets are invested prudently. Defendants had a continuing duty to evaluate and monitor the Plan's investments on an ongoing basis and to "remove imprudent ones" within a reasonable time. *Tibble,* 135 S. Ct. at 1829.

212.   These duties required Defendants to independently assess whether each option was a prudent choice for the Plan, and not simply to follow the recordkeepers' fund choices or to allow the recordkeepers to put their entire investment lineups in the Plan's menu. *DiFelice*, 497 F.3d at 423; *see Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 590, 595–96 (8th Cir. 2009).

213.   In making investment decisions, Defendants were required to consider all relevant factors under the circumstances, including without limitation alternative investments that were available to the Plan, the recordkeepers' financial interest in having their proprietary investment products included in the Plan, and whether the higher cost of actively managed funds was justified by a realistic expectation of higher returns. *Braden*, 588 F.3d at 595–96; *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 360 (4th Cir. 2014); 29 C.F.R. § 2550.404a-1(b); Restatement (Third) of Trusts ch. 17, intro. note; *id*. § 90 cmt. h(2).

214.   For years, Defendants retained as Plan investment options mutual funds and insurance company variable annuities with higher expenses and

historically poor performance relative to other investment options that were readily available to the Plan at all relevant times.

215.   Many of these options included unnecessary layers of fees that provided no benefit to participants but significant benefits to TIAA-CREF and Vanguard, including marketing and distribution (12b-1) fees and "mortality and expense risk" fees.

216.   Rather than consolidating the Plan's over 75 investment options into a core lineup in which prudent investments were selected for a given asset class and investment style, as is the case with most defined contribution plans, Defendants retained multiple investment options in each asset class and investment style, thereby depriving the Plan of its ability to qualify for lower cost share classes of certain investments, while violating the well-known principle for fiduciaries that such a high number of investment options causes participant confusion and inaction. In addition, Defendants, as fiduciaries required to operate as prudent financial experts, *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984), Defendants knew or should have known that providing numerous actively managed duplicative funds in the same investment style would produce a "shadow index" return before accounting for much higher-than-index fund fees, thereby resulting in significant underperformance. The Plan's investment offerings included the use of mutual funds and variable annuities with expense ratios far in excess of other options available to the Plan, including lower-cost share classes with the identical investment manager and investments and lower-cost insurance company variable

annuities. A large majority of the Plan's options were the recordkeepers' own proprietary investments. Thus, the use of these funds was tainted by the recordkeepers' financial interest in including these funds in the Plan, which Defendants failed to consider. In so doing, Defendants failed to make Plan investment decisions based solely on the merits of the investment funds and what was in the interest of participants. Defendants therefore failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan. This was a breach of fiduciary duties.

217.   Defendants failed to engage in a prudent process for monitoring the Plan's investments and removing imprudent ones within a reasonable period. This resulted in the Plan continuing to offer excessively expensive funds with inferior historical performance compared to superior low-cost alternatives that were available to the Plan. As of March 31, 2016, *60%* of the Plan's investment options—45 of the 76 options in the Plan—underperformed their respective benchmarks over the previous 5-year period.

218.   <u>CREF Stock Account</u>: Defendants included and retained the CREF Stock Account despite its excessive cost and historical underperformance compared to both passively managed investments and actively managed investments of the benchmark, the Russell 3000 Index, which Defendants and TIAA told participants was the appropriate benchmark.

219.   <u>TIAA Real Estate Account</u>: Defendants included and retained the TIAA Real Estate Account despite its excessive fees and historical underperformance compared to lower-cost real estate investments.

220.   Had Defendants engaged in a prudent investment review process, it would have concluded that these options were causing the Plan to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plan, and thus should be removed from the Plan or, at a minimum, frozen to new investments.

221.   Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

222.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

223.   Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT VI

## Prohibited transactions—29 U.S.C. §1106(a)(1)

### Investment Services and Fees

224.    Plaintiffs restate and incorporate herein the allegations of the preceding paragraphs.

225.    As the Plan's providers of investment services, TIAA-CREF and Vanguard are parties in interest. 29 U.S.C. §1002(14)(B).

226.    By placing investment options in the Plan in investment options managed by TIAA-CREF and Vanguard in which the entirety of the Plan's $3.8 billion in assets were invested, Defendants caused the Plan to engage in transactions that Defendants knew or should have known constituted an exchange of property between the Plan and TIAA-CREF and the Plan and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(A); a direct or indirect furnishing of services between the Plan and TIAA-CREF and the Plan and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(C); and transfers of the Plan's assets to, or use by or for the benefit of TIAA-CREF and transfers of the Plan's assets to, or use by or for the benefit of Vanguard prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plan paid fees to TIAA-CREF and Vanguard in connection with the Plan's investments in TIAA-CREF and Vanguard investment options.

227.    Under 29 U.S.C. §1109(a), Defendants are liable to restore all losses to the Plan resulting from these prohibited transactions, and to provide restitution of all proceeds of these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

228.    Each Defendant knowingly participated in these transactions, enabled the other Defendants to cause the Plan to engage in these transactions, and knew of these transactions and failed to make any reasonable effort under the circumstances to remedy or discontinue the transaction. Thus, under 29 U.S.C. §1105(a), each Defendant is liable for restoring all proceeds and losses attributable to these transactions.

## COUNT VII

## Failure to Monitor Fiduciaries

229.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

230.    This Count alleges breach of fiduciary duties against the University of Pennsylvania.

231.    The University of Pennsylvania has the responsibility to control and manage the operation and administration of the Plan, including the selection of Plan service providers, with all powers necessary to enable it to properly carry out such responsibilities.

232.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

233.    To the extent any of the University of Pennsylvania's fiduciary responsibilities were delegated to another fiduciary, including the Investment Committee and the Plan Administrator, the University of Pennsylvania's

monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

234.   The University of Pennsylvania breached its fiduciary monitoring duties by, among other things:

a.   failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of its appointees' imprudent actions and omissions with respect to the Plan;

b.   failing to monitor its appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and investment management fees and consistently underperforming Plan investments in violation of ERISA;

c.   failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plan's administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plan's recordkeeper and the amount of any revenue sharing payments; a process to prevent the recordkeeper from receiving revenue sharing that would increase the recordkeeper's compensation to unreasonable levels even though the services provided remained the same; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan;

d.      failing to ensure that the monitored fiduciaries considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plan's investments; and

e.      failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments, all to the detriment of Plan participants' retirement savings.

235.    As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses. Had the University of Pennsylvania discharged its fiduciary monitoring duties prudently as described above, the Plan would not have suffered these losses. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, and the Plaintiffs and the other Class members, lost tens of millions of dollars of their retirement savings.

## JURY TRIAL DEMANDED

236.    Pursuant to Fed.R.Civ.P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and declare that the Defendants have breached their fiduciary duties as described above;

- find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

- determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

- order the Defendants to pay the amount equaling all sums received by the conflicted recordkeepers as a result of recordkeeping and investment management fees

- order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under §1109(a);

- remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive or otherwise in violation of ERISA;

- reform the Plan to include only prudent investments;

- reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

- require the fiduciaries to select investments and service providers based solely on the merits of those selections, and avoid bundling

funds or products serving the interests of the recordkeepers and other service providers;

- certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter, Bogard & Denton LLP as Class Counsel;

- award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- order the payment of interest to the extent it is allowed by law; and

- grant other equitable or remedial relief as the Court deems appropriate.

November 21, 2016

Respectfully submitted,

David M. Promisloff (ID# 200971)
PROFY PROMISLOFF & CIARLANTO, P.C.
Joseph M. Profy (ID# 77141)
Jeffrey J. Ciralanto (ID#205838)
100 N. 22nd Street, Unit 105
Philadelphia, PA 19103
Phone: (215) 259-5156
Fax: (215) 600-2642
david@prolawpa.com
profy@prolawpa.com
ciarlanto@prolawpa.com

Local Counsel for Plaintiffs

SCHLICHTER, BOGARD & DENTON, LLP
Jerome J. Schlichter, MO No. 32225*
Michael A. Wolff, MO No. 38207*
Troy A. Doles, MO No. 47958*
Heather Lea, MO No. 49872*
Kurt C. Struckhoff, MO No. 61873*
Stephen M. Hoeplinger, MA No. 676219*

116

100 South Fourth Street, Ste. 1200
St. Louis, MO 63102
Phone: (314) 621-6115
Fax: (314) 621-5934
  *Admitted *Pro Hac Vice*

Lead Counsel for Plaintiffs