## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JENNIFER SWEDA, et al.,

     *Plaintiffs,*

  v.

THE UNIVERSITY OF PENNSYLVANIA, et al.,

     *Defendants.*

No. 2:16-cv-04329-GEKP

### PLAINTIFFS' [PROPOSED] NOTICE OF SUPPLEMENTAL AUTHORITIES FURTHER SUPPORTING DENIAL OF MOTION TO DISMISS [DOC. 33]

Plaintiffs submit this notice to inform the Court of five recent decisions denying motions to dismiss similar ERISA fiduciary breach claims regarding excessive fees in large defined contribution plans,[1] and two additional decisions regarding ERISA's statute of limitations.[2] Plaintiffs believe that these decisions may be helpful to the Court in resolving Defendants' motion to dismiss (Doc. 33), because they address issues and arguments similar to those raised in the parties' briefing on the pending motion. In particular:

1. The Third Circuit recently reiterated that ERISA's "actual knowledge" limitations period "requires a showing that plaintiffs actually knew not only of the events that occurred which constitute the breach or violation but also that those events supported a claim of breach of fiduciary duty or violation under ERISA." *Kwasny*, 2017 U.S.App.LEXIS 5883, at *7 (citation omitted). This requires proof "that the *person bringing suit*" had actual knowledge. *Id.* at *9 & n.31 (quoting *Landwehr v. DuPree*, 72 F.3d 726, 732 (9th Cir. 1995))(emphasis by *Kwasny*).

---

[1] *Johnson v. Fujitsu Tech. & Bus. of Am. Inc.*, No. 16-3698, Doc. 107 at 4–5, 7–8 (N.D.Cal. Apr. 11, 2017)(Ex. 1); *Main v. Am. Airlines, Inc.*, No. 16-473, Doc. 100 at 9–10 (N.D.Tex. Mar. 31, 2017)(Ex. 2); *Bell v. Pension Comm. of Ath Holding Co.,* No. 15-2062, 2017 U.S.Dist.LEXIS 42107, at *11–14, 16–17, 21–25 (S.D.Ind. Mar. 23, 2017)(Ex. 3); *Troudt v. Oracle Corp.,* No. 16-175, 2017 U.S. Dist.LEXIS 41344, at *3–5 & nn.4–5 (D.Colo. March 22, 2017)(Ex. 4); *Terraza v. Safeway Inc.*, No. 16-3994, 2017 U.S.Dist.LEXIS 35732, at *2, 9–10, 16–18, 22–23, 38–39, 50, 57–58 (N.D.Cal. Mar. 13, 2017)(Ex. 5).

[2] *Sec'y U.S. DOL v. Kwasny*, ___ F.3d ___, No. 16-1872, 2017 U.S.App.LEXIS 5883, at *7–10 & n.31 (3d Cir. Apr. 5, 2017)(Ex. 6); *Wildman v. Am. Century Servs., LLC*, No. 16-737, 2017 U.S.Dist.LEXIS 31699, at *12–15 (W.D.Mo. Feb. 27, 2017)(Ex. 7).

Because the plaintiff was the Secretary of Labor, firm employees' knowledge of the violation was irrelevant. *Id.* at *9. Under *Kwasny*, Penn's outside materials are insufficient to establish that the named Plaintiffs had actual knowledge of prohibited transactions. Doc. 36 at 46–47; *cf.* Doc. 33-2 at 38.

In *Wildman*, the court found that each improper payment to a service provider constitutes a new prohibited transaction, and hence a new claim. 2017 U.S.Dist.LEXIS 31699, at *12–15 (citing *Tibble v. Edison Int'l*, 135 S.Ct. 1823, 1828–29 (2015), and other cases). *Wildman* further supports Plaintiffs' position that Count I and the prohibited transaction counts are not time-barred, because Penn had an ongoing duty to discontinue imprudent arrangements and prohibited transactions, no matter when they began. *See* Doc. 36 at 25, 47–48 & n.41; *cf.* Doc. 33-2 at 35, 37; Doc. 39 at 21–24.

2. In the cases in which motions to dismiss were denied, the defendants relied on *Renfro v. Unisys Corp.*, 671 F.3d 314 (3d Cir. 2011), and similar decisions in *Hecker*, *Loomis*, and *Tibble I*,[3] to argue they could not be liable because the fees of the plans' funds fell within a "range" of expense ratios that was comparable to *Renfro*, and thus purportedly "reasonable as a matter of law." *Terraza*, 2017 U.S.Dist.LEXIS 35732, at *40; *Fujitsu*, Doc. 85-3 at 5 (Ex. 8);[4] *Bell*, 2017 U.S.Dist.LEXIS 42107, at *8–9; *Troudt*, Doc. 36 at 11–14 (Ex. 9).[5] The courts rejected this argument, for reasons this Court should find persuasive. *See Terraza*, 2017 U.S.Dist.LEXIS 35732, at *40–48 (discussing "several infirmities" in argument).

In *Bell*, a district court within the Seventh Circuit found that the Seventh Circuit decisions in

---

[3] *Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009); *Loomis v. Exelon Corp.*, 658 F.3d 667 (7th Cir. 2011); *Tibble v. Edison Int'l*, 729 F.3d 1110 (9th Cir. 2013), *vacated*, 135 S.Ct. 1823 (2015).

[4] "Doc." page references refer to the page numbers shown on the ECF header.

[5] The same law firm that represents Defendants here represents the defendants in *Troudt*, and one of the defendants in *Fujitsu* (Shepherd Kaplan). Plaintiffs' counsel, Schlichter, Bogard & Denton, LLP, also represents the plaintiffs in *Troudt* and *Bell*.

*Hecker* and *Loomis* were not controlling where plaintiffs alleged that defendants used retail-class mutual funds instead of available lower-cost institutional-class shares of the same funds, because "[n]either court addressed whether a defendant violates their fiduciary duty in selecting high-cost investment options where *identical* investment options are available at a lower-cost." *Bell*, 2017 U.S.Dist.LEXIS 42107, at *4, 11. Similarly, *Terraza*, *Fujitsu*, and *Main* found that plaintiffs stated claims based on allegations that fiduciaries failed to obtain identical lower-cost versions of funds that were already in their plans. *Terraza*, 2017 U.S.Dist.LEXIS 35732, at *39–40; *Fujitsu*, Doc. 107 at 2; *Main*, Doc. 100 at 9. Accordingly, these decisions further support Plaintiffs' argument that the *Renfro* line of cases did not address allegations like Plaintiffs' here, showing that for 58 specific mutual funds,[6] Penn included a higher-cost share class instead of an *identical* lower-cost share class of the same fund. Doc. 36 at 8–9, 25–32.

Because *Troudt*, *Bell*, *Fujitsu*, and *Terraza* did not involve "self-dealing" or "kickbacks," these decisions also refute Penn's argument that such allegations are required to state a fiduciary breach claim. *See* Doc. 39 at 13–14 & nn. 9–10; *cf. Troudt*, 2017 U.S. Dist. LEXIS 41344, at *4 n.5 (rejecting argument "that an allegation of some additional nefarious motive on the part of the fiduciary is a necessary — as opposed to a merely sufficient — precondition to this claim."); *Bell*, 2017 U.S.Dist.LEXIS 42107, at *9; *Fujitsu*, Doc. 85-3 at 6, 10–11 & nn.10–11 (Ex. 8).[7]

*Terraza* found a plausible breach of the duty of loyalty based on allegations that Safeway

---

[6] The Amended Complaint identifies a total of *71* lower-cost share classes that were available for these 58 funds, because certain funds such as the Vanguard Emerging Markets Stock Index Fund and Vanguard Total Bond Market Index Fund had more than one available lower-cost share class. AC ¶128, Doc. 27 at 56–64. Therefore, Plaintiffs' allegation that Penn included 58 funds for which a lower-cost share class was available does not involve "double or triple" counting. *Cf.* Doc. 39 at 11 n.5.

[7] While the plan sponsor in *Fujitsu* allegedly received $100,000 per year from the plan (Doc. 107 at 2:19–20), the other defendant (Shepherd Kaplan) emphasized that it was not the subject of any such allegations (Doc. 85-3 at 6:3–6, 10:18–11:17). And while the defendant in *Main* had a financial interest in including certain funds, the court analyzed that issue under the duty of loyalty. Doc. 100 at 6–8. The conflict was not the basis of the court's finding that plaintiffs stated a *prudence* claim. *Id.* at 8–10.

allowed the recordkeeper to influence Safeway's decision to invest in the recordkeeper's proprietary funds. 2017 U.S.Dist.LEXIS 35732, at *22–23. Plaintiffs' allegations here are similar. Doc. 36 at 17, 21–22, 27, 36, 39.

3. *Bell*, *Troudt*, and *Terraza* also denied motions to dismiss claims for excessive administrative fees paid through revenue sharing. *Bell*, 2017 U.S.Dist.LEXIS 42107, at *11–14 (plaintiffs stated claim that based on allegations that "Defendants failed to solicit competitive bids from vendors on a flat participant fee" and to prudently monitor the recordkeeper's revenue sharing compensation); *Troudt*, 2017 U.S.Dist.LEXIS 41344, at *3–4 & n.4 (unlike *Hecker*, plaintiffs did "not allege merely that revenue sharing per se violates ERISA … but rather that defendants failed to monitor the fees paid to the administrator to ensure their continuing reasonableness as plan assets increased."); *Terraza*, 2017 U.S.Dist.LEXIS 35732, at *51, 55–58.

These decisions further support Plaintiffs' similar arguments here. Doc. 36 at 38–43.

April 27, 2017

Respectfully submitted,

/s/ *Jerome J. Schlichter*
SCHLICHTER, BOGARD & DENTON, LLP
Jerome J. Schlichter, MO No. 32225*
Michael A. Wolff, MO No. 38207*
100 South Fourth Street, Ste. 1200
St. Louis, MO 63102
Phone: (314) 621-6115, Fax: (314) 621-5934
  * admitted *Pro Hac Vice*

*Lead Counsel for Plaintiffs*

David Promisloff (ID# 200971)
PROFY, PROMISLOFF & CIARLANTO, P.C.
100 N. 22nd Street, Unit 105
Philadelphia, PA 19103
Phone: (215) 259-5156
Fax: (215) 600-2642
david@prolawpa.com

*Local Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Jerome J. Schlichter, hereby certify that on this 27th day of April, 2017, I caused a true and correct copy of the foregoing Plaintiffs' [Proposed] Notice of Supplemental Authorities Further Supporting Denial of Motion to Dismiss to be served by ECF upon the following counsel of record for Defendants:

Christopher Boran (christopher.boran@morganlewis.com)
Michael L. Banks (mbanks@morganlewis.com)
Brian T. Ortelere (bortelere@morganlewis.com)

*/s/ Jerome J. Schlichter*
Jerome J. Schlichter

1

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT

8                          NORTHERN DISTRICT OF CALIFORNIA

9

10    JERRY JOHNSON, et al.,
                                                Case No. 16-cv-03698 NC
11              Plaintiffs,
                                                **ORDER DENYING MOTIONS TO**
12         v.                                   **DISMISS**

13    FUJITSU TECHNOLOGY AND                    Re: Dkt. Nos. 71, 72
      BUSINESS OF AMERICA, INC., et al.,
14
                Defendants.
15

16         In this ERISA retirement plan case, former Fujitsu employees accuse Fujitsu and a

17    plan administrator, Shepherd Kaplan, of breaching their fiduciary duties by making

18    imprudent investments.  Defendants each move to dismiss the claims in the case, arguing

19    that they acted prudently given their knowledge at the time, and that plaintiffs can only

20    seek recovery for three years worth of claims.

21         The Court finds that defendants' arguments challenge the facts of plaintiffs'

22    complaint, thus they are better suited for summary judgment.  Because the Court declines

23    to take "judicial notice" of the extensive plan documentation both parties provides, the

24    Court limits its review to whether the facts alleged in the complaint, when taken as true,

25    survive the plausibility standard on a motion to dismiss.  The Court finds that the

26    complaint is sufficiently pled and thus DENIES both motions to dismiss.

27    //

28

      Case No. 16-cv-03698 NC

                                                                      **EXHIBIT 1**

United States District Court
Northern District of California

United States District Court
Northern District of California

## I.    BACKGROUND

Plaintiffs are current and former participants in the Fujitsu Group Defined Contribution and 401(k) Plan.  Dkt. No. 68, First Amended Complaint ("FAC") ¶¶ 18-25.  The Plan is an employee pension benefit plan, which covers eligible employees of Fujitsu and its various affiliates.  FAC ¶¶ 27, 31.  The Plan has had over $1 billion in assets during the relevant time period.  FAC ¶ 33.

The Plan Administrative Committee and its members, one of the named defendants, is designated as an administrator of the plan.  FAC ¶ 34.  Additionally, the plan names the Investment Committee as a fiduciary.  FAC ¶ 38.  Defendant Fujitsu Technology and Business of America, Inc. is the plan sponsor as of March 1, 2014.  FAC ¶¶ 40, 41.  Until July 31, 2015, defendant Shepherd Kaplan LLC was designated by the Plan as the Named Investment Fiduciary.  FAC ¶ 47.  Individual defendants Pete Apor, Belinda Bellamy, and Sunita Bicchieri are Fujitsu employees responsible for the administration and operation of the Plan.  FAC ¶¶ 44-46.

Plaintiffs allege that the Fujitsu/Shepherd Kaplan plan was the most expensive "mega plan" in the country in 2013 and 2014, with expenses three times higher than average for similarly-sized plans with over $1 billion in assets.  FAC ¶¶ 9, 81.  Recordkeeping expenses were five to ten times higher than fees for similarly-sized plans during the period in question.  FAC ¶¶ 84-94.  Fujitsu approved substantial payments over $100,000 per year to itself for overseeing the plan.  FAC ¶ 95.  Plaintiffs allege that Fujitsu failed to obtain the least expensive share class of the mutual funds offered within the plan.  FAC ¶¶ 96-99, 120.  In addition, Fujitsu failed to investigate or consider other investment alternatives, even though the mutual funds in the plan were up to 35 times more expensive than comparable funds in the same investment style.  FAC ¶¶ 11-12.

As to Shepherd Kaplan, plaintiffs allege that Fujitsu mismanaged the Plan's target-date funds by retaining SK to design those funds, and by allowing SK to populate the Plan with target-date funds that were imprudent in light of their cost, performance, and underlying investments.  FAC ¶¶ 128-143.

1    Plaintiffs filed this class action lawsuit on June 30, 2016.  Dkt. No. 1.  After an

2  initial round of briefing on motions to dismiss, plaintiffs amended the complaint.  Dkt. No.

3  68.  Included with the complaint is the Plan document, Exh. A, the April 2012 Plan

4  amendment, Exh. B., a further amendment, Exh. C, and the Plan Trust Agreement, Exh. D.

5  Defendants now move to dismiss the second amended complaint (Fujitsu defendants'

6  motion to dismiss is at docket number 71; Shepherd Kaplan's motion to dismiss is at

7  docket number 72).  The Court held a hearing on the motions on February 1, 2017.

8    All parties have consented to the jurisdiction of a magistrate judge.  Dkt. Nos. 12,

9  32, 34.

10  **II.   LEGAL STANDARD**

11    A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the legal

12  sufficiency of a complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  On a

13  motion to dismiss, all allegations of material fact are taken as true and construed in the

14  light most favorable to the non-movant.  *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-

15  38 (9th Cir. 1996).  The Court, however, need not accept as true "allegations that are

16  merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re*

17  *Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). Although a complaint need

18  not allege detailed factual allegations, it must contain sufficient factual matter, accepted as

19  true, to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*,

20  550 U.S. 544, 570 (2007).  A claim is facially plausible when it "allows the court to draw

21  the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft*

22  *v. Iqbal*, 556 U.S. 662, 678 (2009).

23    If a court grants a motion to dismiss, leave to amend should be granted unless the

24  pleading could not possibly be cured by the allegation of other facts.  *Lopez v. Smith*, 203

25  F.3d 1122, 1127 (9th Cir. 2000).

26  ///

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

## III. DISCUSSION

The Court considers both motions to dismiss together.  Fujitsu argues that (1) the statute of limitations should be 3 years; (2) plaintiffs lack standing to allege claims regarding investment options that they did not choose; (3) plaintiffs fail to plausibly allege claims for breach of fiduciary duty and failure to monitor.  Dkt. No. 71.  Shepherd Kaplan argues that plaintiffs fail to plausibly allege claims for breach of the duties of loyalty and prudence, and that Shepherd Kaplan cannot be held liable for claims after July 31, 2015.  Dkt. No. 72.

The parties attach additional evidence to their briefing, but the Court DENIES the requests for judicial notice.  The Court will only consider the material contained with the First Amended Complaint.

### A.   Statute of Limitations

Fujitsu first argues that the statute of limitations bars plaintiffs' claims before June 20, 2013.  Title 29 U.S.C. § 1113 provides that the statute of limitations for an ERISA breach of fiduciary duty claim is "(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation."

Defendants argue that the three-year statute of limitations should apply because "[t]he statute of limitations is triggered by the [plaintiffs'] knowledge of the transaction that constituted the alleged violation, not by their knowledge of the law." *Blanton v. Anzalone*, 760 F.2d 989, 992 (9th Cir. 1985).  Defendants point to plaintiffs' citation to the Form 5500s in the complaint as evidence of plaintiffs' actual knowledge.  However, the complaint alleges that "Plaintiffs' counsel began an investigation of the Plan in late 2015. Plaintiffs did not review any of the documents cited in this Amended Complaint or any of the information contained therein—including all studies, mutual fund data, and Form 5500s cited herein—until after this investigation had begun."  FAC ¶ 145.

The Court notes that the "inquiry into plaintiffs' actual knowledge is entirely

1   factual, requiring examination of the record." *Ziegler v. Connecticut Gen. Life Ins. Co.*,

2   916 F.2d 548, 552 (9th Cir. 1990).  At this stage, the Court must take all facts alleged in

3   the complaint as true.  The Court declines to make the factual finding that plaintiffs must

4   or could have known of the transaction at issue on the date of the issuance of the relevant

5   Form 5500.  Plaintiffs may proceed with the claims under the six-year statute of

6   limitations.

7   **B.     Lack of Standing/Class Action Under Rule 12(b)(1)**

8       The Fujitsu defendants' second challenge is to plaintiffs' standing on investment

9   options which they did not invest.  A Rule 12(b)(1) motion challenges subject matter

10  jurisdiction, including a plaintiff's standing to sue, and the Court takes the allegations in

11  the complaint as true.  *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).  The court

12  must determine whether a lack of federal jurisdiction appears from the face of the

13  complaint itself.  *Thornhill Publ'g Co. v. General Tel. Elec.*, 594 F.2d 730, 733 (9th Cir.

14  1979).  "A party invoking the federal court's jurisdiction has the burden of proving the

15  actual existence of subject matter jurisdiction."  *Thompson v. McCombe*, 99 F.3d 352, 353

16  (9th Cir. 1996).

17      "Whether a party has a sufficient stake in an otherwise justiciable controversy to

18  obtain judicial resolution of that controversy is what has traditionally been referred to as

19  the question of standing to sue."  *Sierra Club v. Morton*, 405 U.S. 727, 731-32 (1972).

20  Standing under Article III of the Constitution has three basic elements: (1) an "injury in

21  fact," which is neither conjectural nor hypothetical; (2) causation, such that a causal

22  connection between the alleged injury and offensive conduct is established; and (3)

23  redressability, or a likelihood that the injury will be redressed by a favorable decision.

24  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

25      The Court agrees with plaintiffs' citation to *Melendres v. Arpaio*, 784 F.3d 1254,

26  1261-62 (9th Cir. 2015) which adopted the "class certification approach" to standing in a

27  class action case.   "The 'class certification approach,' on the other hand, holds that once

28  the named plaintiff demonstrates her individual standing to bring a claim, the standing

United States District Court
Northern District of California

Case No. 16-cv-03698 NC                5

1  inquiry is concluded, and the court proceeds to consider whether the Rule 23(a)

2  prerequisites for class certification have been met." *Id.*  Here, defendants do not dispute

3  that plaintiffs have standing to bring their own claims under ERISA, or that other

4  individuals in the putative class did invest in the other options.  Thus, whether the named

5  plaintiffs are appropriate class representatives will be resolved at the class certification

6  stage.

7  **C.  Breach of Fiduciary Duty and Failure to Monitor Claims as to Fujitsu**

8  Finally, the Fujitsu defendants argue that plaintiffs failed to plausibly plead the

9  substance of their claim—that Fujitsu breached its fiduciary duties or that it failed to

10  monitor Shepherd Kaplan.  Fujitsu argues that plaintiffs' claims must fail as a matter of

11  law because nothing alleged in the complaint rises to the level of imprudence or a failure

12  of a fiduciary duty.

13  "Section 1104(a)(1) of ERISA imposes three general duties on pension plan

14  fiduciaries.  "A fiduciary within the meaning of ERISA must be someone acting in the

15  capacity of manager, administrator, or financial adviser to a plan."  *Pegram v. Herdrich*,

16  530 U.S. 211, 222 (2000).  Here, the parties do not dispute that all defendants qualify as

17  fiduciaries.  Those three general duties are that fiduciaries must 1) discharge their duties

18  with 'prudence'; 2) diversify investments to 'minimize the risk of large losses'; and 3) act

19  'solely in the interest of the participants' and for the 'exclusive purpose' of providing

20  benefits to those participants."  *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090,

21  1093-94 (9th Cir. 2004).

22  "ERISA also expressly prohibits certain transactions where the potential for abuse

23  is particularly acute."  *Id.* at 1094.  For example, Section 1106 of ERISA forbids a

24  fiduciary from engaging in a transaction that the fiduciary "knows or should know" is a

25  transaction with a party in interest.  29 U.S.C. § 1106(a).  "In order to protect . . . the

26  interests of participants in employee benefit plans and their beneficiaries, ERISA also

27  imposes standards of conduct, responsibility, and obligation for fiduciaries of employee

28  benefit plans.  These standards include duties of loyalty and care, as well as a prohibition

Case No. 16-cv-03698 NC          6

United States District Court
Northern District of California

1   on self-dealing." *Johnson v. Couturier*, 572 F.3d 1067, 1076 (9th Cir. 2009) (internal

2   quotations and citations omitted).

3        Included in these obligations is the "continuing duty to monitor trust investments

4   and remove imprudent ones." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015).

5   "Implicit within the duty to select and retain fiduciaries is a duty to monitor their

6   performance." *Solis v. Webb*, 931 F. Supp. 2d 936, 953 (N.D. Cal. 2012)

7        Here, plaintiffs allege that Fujitstu breached its fiduciary duties by (1) failing to

8   engage in a prudent process to monitor the Plan's recordkeeping expenses, and failing to

9   investigate and negotiate reasonable recordkeeping fees; (2) failing to monitor all fees

10  being paid to the Plan's service providers such as recordkeeping fees, to ensure the Plan's

11  service providers were not receiving compensation that exceeded the reasonable value of

12  their services; (3) failing to investigate the availability of lower-cost share classes and

13  failing to utilize a process to determine whether the higher-cost share classes were

14  necessary to pay the Plan's recordkeeping or other administrative expenses; (4) failing to

15  implement and employ a process to control the Plan's investment management expenses in

16  the selection and monitoring of the Plan's investment options and in the design and

17  implementation of the Plan's custom target date funds; (5) imprudently designing the

18  Plan's custom target date funds and utilizing inappropriate and speculative investments in

19  the process of implementing the funds; and (6) failing to promptly remove imprudent

20  investments and the target-date funds more broadly when it was apparent that each was

21  imprudent.  FAC ¶ 157.

22       In addition, plaintiffs allege that Fujitsu failed to monitor Shepherd Kaplan by (1)

23  failing to monitor and evaluate the performance of their appointees or to have a system in

24  place for doing so, standing idly by as the Plan suffered enormous losses as a result of the

25  appointees' imprudent actions and omissions with respect to the Plan; (2) failing to

26  monitor their appointees' fiduciary processes, which would have alerted a prudent

27  fiduciary to the breaches of fiduciary duties described herein in violation of ERISA; and

28  (3) failing to remove appointees whose performance was inadequate in that they continued

United States District Court
Northern District of California

1   to maintain imprudent, excessively costly, and poorly performing investments within the

2   Plan, or in that they caused the plan to pay excessive administrative fees, all to the

3   detriment of the Plan and Plan participants' retirement savings.  FAC ¶ 170.

4          The Court is not persuaded by defendants' arguments that plaintiffs' allegations

5   must fail as a matter of law.  The Court has reviewed the case law and arguments and

6   concludes that plaintiffs' allegations are within the realm of plausible allegations.

7      **D.     Breach of Duties of Prudence and Loyalty Claims as to Shepherd Kaplan**

8          In *Pegram* and *Tibble*, the Supreme Court emphasized that ERISA incorporates

9   common law principles of trusts, including the duty of loyalty and prudence a fiduciary

10  owes to the plan's beneficiaries.  *Pegram*, 530 U.S. at 224; *Tibble*, 135 S. Ct. at 1828.  The

11  duty of loyalty requires a trustee to administer the trust solely in the interest of the

12  beneficiaries.  *Pegram*, 530 U.S. at 224.  As noted above, the duty of prudence requires

13  that the trustee "invest and manage trust assets as a prudent investor would"; that is, by

14  "exercis[ing] reasonable care, skill, and caution," and by "reevaluat[ing] the trust's

15  investments periodically as conditions change."  *Tibble v. Edison Int'l*, 843 F.3d 1187,

16  1197 (9th Cir. 2016).  "Additionally, pursuant to the Restatement (Third) of Trusts, a

17  trustee is to 'incur only costs that are reasonable in amount and appropriate to the

18  investment responsibilities of the trusteeship.'"  *Id.*

19         As noted above, the Court finds that the facts as alleged are sufficient to establish a

20  plausible claim that defendants breached the duties of prudence and loyalty.  Specifically,

21  plaintiffs allege that (1) the Fujitsu/Shepherd Kaplan plan was the most expensive "mega

22  plan" in the country in 2013 and 2014, with expenses three times higher than average for

23  similarly-sized plans with over $1 billion in assets, and (2) recordkeeping expenses were

24  five to ten times higher than fees for similarly-sized plans during the period in question.

25  On these facts alone, the Court can draw a plausible inference that defendants failed to act

26  prudently.

27     **E.     Duration of Shepherd Kaplan Liability**

28         Shepherd Kaplan argues that its liability should conclude when it was terminated as

United States District Court
Northern District of California

1    the plan administrator on July 31, 2015.  Additionally, Shepherd Kaplan argues that it was

2    not engaged as a plan administrator until 2012, although plaintiffs' complaint alleges that

3    the start date was sometime in 2011.  As the complaint alleges that Shepherd Kaplan's

4    breach continues to harm the Plan, the Court does not find that limiting liability is

5    appropriate at this stage.

6    **IV.   CONCLUSION**

7         The Court finds that plaintiffs have adequately pled the causes of action for breach

8    of fiduciary duty as to both Fujitsu defendants and Shepherd Kaplan.  The motions to

9    dismiss are DENIED.  Because the Court did not consider materials outside the complaint,

10   the Court DENIES defendants' motion to file a response to plaintiffs' objections to

11   evidence.  Dkt. No. 91.

12        Defendants must answer the complaint within 14 days.  The Court sets a further

13   case management conference on May 3, 2017, at 10:00 a.m. in Courtroom 5.  The parties

14   must submit a case management statement seven days prior, including a proposed case

15   schedule.

16        **IT IS SO ORDERED.**

17

18   Dated:  April 11, 2017                    _____

19                                             NATHANAEL M. COUSINS
                                               United States Magistrate Judge

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

Case No. 16-cv-03698 NC                   9

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| WHITNEY MAIN, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 4:16-CV-00473-O |
| | § | |
| AMERICAN AIRLINES INC., et al., | § | |
| | § | |
| Defendants. | § | |

## <u>ORDER</u>

Before the Court is Defendants American Airlines Inc., the Pension Asset Administration Committee, the Benefits Strategy Committee, the Pension Benefits Administration Committee, and the Employee Benefits Committee's Motion to Dismiss (ECF No. 37). The Motion has been fully briefed and is ripe for review. Having considered the pleadings, briefing, and applicable law, the Court finds that the Motion should be **GRANTED in part** and **DENIED in part**.

## I. Background

The following background information is largely taken from Plaintiffs' Second Amended Complaint (ECF No. 57).[1] Plaintiffs bring this putative class-action suit under the Employee Retirement Income Security Act of 1974 ("ERISA"). 2d Am. Compl. 1, ECF No. 57. Plaintiffs assert this claim individually and on behalf of the American Airlines, Inc. 401(k) Plan (formerly known as $uper $aver, a 401(k) Capital Accumulation Plan for Employees of Participating AMR Corporation Subsidiaries) (the "Plan"). Plaintiffs allege that Defendants violated their fiduciary duties of loyalty and prudence imposed by ERISA. *See* 29 U.S.C. § 1104(a)(1).

---

[1] Although the Second Amended Complaint was filed after Defendants' Motion to Dismiss, the parties agree that the Court may consider the Motion without further briefing. *See* Corrected Stipulation Regarding Filing of Second Amended Complaint, ECF No. 56.

**EXHIBIT 2**

The Plan is an "employee pension benefit plan" as defined by 29 U.S.C. § 1002(2)(A) and is a "defined contribution plan" as defined by 29 U.S.C. § 1002(34). This type of defined-contribution plan allows employees to invest a percentage of their earnings on a pre-tax basis, with the employer often matching a certain percentage of those contributions.

Plaintiffs allege that American Airlines is a "plan sponsor" as defined by 29 U.S.C. § 1002(16)(B) and that American Airlines is a subsidiary of Airlines Group, Inc., formerly known as AMR Corp. Plaintiffs also allege that American Airlines was a named fiduciary under 29 U.S.C. § 1102(a). Plaintiffs further allege that the Pension Asset Administration Committee ("PAAC") was named fiduciary under 29 U.S.C. § 1102(a) during much of the relevant time period. Plaintiffs next allege that the Benefits Strategy Committee ("BSC") was a fiduciary under 29 U.S.C. § 1002(21)(A) because it was "responsible for approving material amendments to the Plan, and appointing the members of the PAAC and PBAC." Second Amended Compl. ¶ 25, ECF No. 57. Plaintiffs allege that the Pension Benefit Administration Committee ("PBAC") is a fiduciary under 29 U.S.C. § 1002(21)(A) because it was responsible for the "general operation of the Plan and for the selection of administrative service providers." *Id.* ¶ 26. Plaintiffs also allege that the Employee Benefits Committee ("EBC") is a named fiduciary under 29 U.S.C. § 1102(a) and a fiduciary under 29 U.S.C. § 1002(21)(A). Lastly, Plaintiffs allege that American Beacon is an "investment manager" of the Plan as defined by 29 U.S.C. § 1002(38) and a functional fiduciary under 29 U.S.C. § 1002(21)(A).

Plaintiffs contend that American Airlines had authority to appoint the Plan's fiduciaries. American Airlines' CEO appointed the members of the BSC, who would then appoint the PAAC and the PBAC. According to the Second Amended Complaint, American Airlines had the authority

to modify the Plan's management structure at all times. Under this authority, American Airlines amended the Plan to give control to the EBC.

The core of Plaintiffs' claims relate to the use of American Beacon Funds in the Plan. AMR Corp., American Airlines' parent company, created a line of mutual funds that were managed by another subsidiary of AMR Corp. This fund manager was later renamed American Beacon Advisors, Inc. in 2005. These mutual funds were then known as American Beacon Funds.

AMR Corp. sold American Beacon Advisors, Inc. in 2008 to Lighthouse Holdings, Inc. As a part of this deal, AMR Corp. received an equity stake in Lighthouse Holdings, Inc. Plaintiffs contend that this sale was premised on American Airlines continued use of American Beacon Funds in the Plan. Although American Airlines employed an independent third party to approve the continued use of American Beacon Funds in the Plan, Plaintiffs allege that this was done merely to "whitewash" American Airlines' actions.

Plaintiffs claim that Defendants breached their fiduciary duties because a prudent fiduciary would not retain the American Beacon Funds because (1) American Beacon Funds were more expensive than similar alternatives; (2) American Beacon Funds underperformed compared to other similar investments; and (3) American Beacon Funds were not included in other 401(k) plans. Plaintiffs also allege that Defendants breached their duty of loyalty by not removing the overly expensive and underperforming American Beacon Funds.

In 2015, Lighthouse Holdings, Inc. sold its interest in American Beacon Advisors, Inc. According to Plaintiffs, this eliminated any financial interest American Airlines had in the Plan's use of American Beacon Funds. Then, later in 2015, the Plan's fiduciaries removed the American Beacon Funds. And shortly thereafter, the American Beacon Funds ceased to exist because, according to Plaintiffs, they were marketplace failures that prudent investors would not choose.

Plaintiffs also bring a claim for failure to monitor fiduciaries against American Airlines and the BSC. According to the Plaintiffs, American Airlines and the BSC were responsible for appointing members of the PBAC, the PAAC, and the EBC, and thus had a duty to monitor the performance of those fiduciaries.

Defendants American Airlines Inc., the Pension Asset Administration Committee, the Benefits Strategy Committee, the Pension Benefits Administration Committee, and the Employee Benefits Committee now bring this Motion, seeking to have all of Plaintiffs' claims dismissed.

## II.    Legal Standard

Federal Rule of Civil Procedure 8(a) requires a claim for relief to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 does not require detailed factual allegations, but "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). If a plaintiff fails to satisfy Rule 8(a), the defendant may file a motion to dismiss the plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6).

To defeat a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely

consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In reviewing a Rule 12(b)(6) motion, the Court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). The Court is not bound to accept legal conclusions as true, and only a complaint that states a plausible claim for relief survives a motion to dismiss. *Iqbal*, 556 U.S. at 678–79. When there are well-pleaded factual allegations, the Court assumes their veracity and then determines whether they plausibly give rise to an entitlement to relief. *Id.*

"Generally, a court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (citations omitted); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A court may also consider documents that a defendant attaches to a motion to dismiss if they are referred to in the plaintiff's complaint and are central to the plaintiff's claims. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000).

## III.    Plaintiffs' Motion to Strike

Defendants request that the Court take judicial notice of Exhibits A–AA. *See* Defs.' App., ECF No. 39. Plaintiffs move to strike Exhibits D, E, and I through AA. The Fifth Circuit has said that a court may consider:

> documents attached to a motion to dismiss that are referred to in the plaintiff's complaint and are central to the plaintiff's claim. We may also consider the contents of relevant public disclosure documents which (1) are required to be filed with the SEC, and (2) are actually filed with the SEC. Such documents should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents.

*Kopp v. Klein*, 722 F.3d 327, 333 (5th Cir. 2013) (internal citations and quotations omitted). Accordingly, the Court declines to strike the contested exhibits, and will consider them to determine what statements are contained within those documents. Of course, at this stage of the proceedings all facts will be viewed in a light most favorably to the plaintiff.

## IV.    Analysis

Plaintiffs contend that Defendants breached their fiduciary duties. Under ERISA, fiduciaries have both a duty of loyalty and a duty of prudence. *Kujanek v. Houston Poly Bag I, Ltd.*, 658 F.3d 483, 487 (5th Cir. 2011).

### A.    Defendants' Arguments for Dismissal of Claims Based on Duty of Loyalty

"ERISA's duty of loyalty is 'the highest known to the law.'" *Brussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 294 (5th Cir. 2000) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)). "[T]he common law of trusts . . . informs our interpretation of ERISA's fiduciary duties." *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 253 n.4 (2008). The common law of trusts requires the "trustee to administer the trust solely in the interest of the beneficiaries." *Pegram v. Herdrich*, 530 U.S. 211, 224 (2000) (quoting 2A A. Scott & W. Fracther, Trusts § 170, p. 311 (4th ed. 1987)). Under ERISA, the fiduciaries' "decisions must be made with an eye single to the interests of the participants and beneficiaries." *Donovan*, 680 F.2d at 271.

Defendants argue that Plaintiffs have failed to set forth a valid theory of disloyalty because (1) an independent third party reviewed and approved the continued use of American Beacon Funds after American Beacon Advisors was sold to Lighthouse Holdings, Inc.; (2) Department of Labor regulations allow plan investments managed by the plan sponsor itself; and (3) the Plan did not include all American Beacon Funds and, in fact, not all American Beacon Funds were sold after Lighthouse Holdings, Inc. sold American Beacon Advisors. *See* Defs.' Br. 5–9, ECF No. 38.

Defendants argue that the use of an independent third party fiduciary establishes that they faithfully conducted themselves. *Id.* at 5. Plaintiff's Second Amended Complaint, however, alleges in a conclusory manner that the independent party "did not render a truly independent opinion, and was hired with an implicit understanding that its role was to make the agreement look legitimate." 2d Am. Compl. 30 n.3, ECF No. 57. A conclusory statement does not allege facts that would defeat a 12(b)(6) motion.

Plaintiffs do factually allege that the independent fiduciary was not involved after the sale of American Beacon Advisors to Lighthouse Holdings, Inc., and so, even if the independent third party did conduct a faithful assessment, Plaintiffs' allegations that Defendants continued to retain American Beacon Funds after the sale was complete cannot be mitigated by the use of an independent fiduciary at the time of American Beacon Advisor's sale. In other words, Plaintiffs argue Defendants would have breached their duty of loyalty by retaining American Beacon Funds after the American Beacon Advisors sale was complete and after the independent fiduciary ceased to be involved. *See* Pls.' Br. 12, ECF No. 44. To say at this stage in the litigation that engaging a third party fiduciary establishes that Defendants acted loyally during the entire period of time that Plaintiffs complain of would require the Court to draw an impermissible inference against Plaintiffs. Accordingly, the Court does not find that dismissal is warranted on this basis at this time.

Next, Defendants argue that, because a plan is permitted to invest in options that the plan's sponsors have a connection to, it makes no sense to infer disloyalty when plans do so. Defs.' Br. 7, ECF No. 38. While it is true that federal regulations allow such investments, *see* 42 Fed. Reg. 18734, 18735 (Apr. 8, 1977), this exemption only applies to claims under 29 U.S.C. § 1108(a). And although federal regulations allow these exemptions, it does not relieve Defendants of their

fiduciary duties. *See* 42 Fed. Reg. 18,734 (1977). Defendants argue, though, that because these practices are allowed it is illogical to infer disloyalty from them. But that is not the whole of Plaintiffs' allegations. Plaintiffs allege not only that Defendants chose affiliated investment options but also that those investment options either charged higher fees than similar options or that those options were underperforming and that Defendants failed to investigate the availability of cheaper alternatives. Taking these allegations as a whole, Plaintiffs have plausibly alleged that Defendants were not acting with an "eye single to the interests of the participants and beneficiaries." *Donovan*, 680 F.2d at 271. Accordingly, the Court does not believe dismissal on this basis is warranted at this stage. *See Urakhchin v. Allianz Asset Management of America, LP*, 2016 WL 4508117, at *7 (C.D. Cal. Aug. 5, 2016) (reaching similar conclusion).

Lastly, Defendants argue that American Beacon Funds were included in the Plan on their merits, and they also offer an alternative explanation for why the Plan dropped the American Beacon Funds after Lighthouse Holdings, Inc. sold American Beacon Advisors. Agreeing with Defendants would require the Court to draw inferences against Plaintiffs which is not permitted at this stage. Accordingly, the Court does not believe dismissal is warranted on this basis.

### B.   Defendants' Arguments for Dismissal of Claims Based on Duty of Prudence

Defendants argue that none of Plaintiffs' three imprudence theories can support a valid claim. ERISA requires that fiduciaries act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). "[U]nder trust law, a fiduciary normally has a continuing duty of some kind to monitor investments and remove imprudent ones." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828–29 (2015). The prudence standard normally focuses on the fiduciary's conduct in making

investments decisions, and not on the results. *Pension Benefits Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013). But when the alleged facts do not 'directly address[ ] the process by which the Plan was managed,' a claim alleging a breach of fiduciary duty may still survive a motion to dismiss if the court, based on circumstantial factual allegations, may reasonably 'infer from what is alleged that the process was flawed.'" *Id.* at 718 (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009)). To survive a motion to dismiss, a plaintiff may "allege facts sufficient to raise a plausible inference that . . . a superior alternative investment was readily apparent such that an adequate investigation would have uncovered that alternative." *Id.* at 719.

First, Plaintiffs allege that Defendants were imprudent by including American Beacon index funds that were more expensive than nearly identical index fund alternatives. For example, Plaintiffs allege that the Plan included American Beacon S&P 500 Index Fund, which charged fees seven times higher than an identical Vanguard fund.[2] Defendants argue that they had no duty to seek out the cheapest possible index funds. Defendants cite *Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009) and *Braden* for this proposition. But in applying *Braden*, courts have denied motions to dismiss where plaintiffs alleged that the defendants failed to consider lower cost funds with identical styles and stocks. *See*, *e.g.*, *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 476 (M.D.N.C. Sept. 17, 2015). Thus, the Court, while drawing all reasonable inferences in favor of Plaintiffs, concludes Plaintiffs have plausibly stated a claim. Accordingly, dismissal is not warranted.

---

[2] Defendants argue that Vanguard funds were not available to the Plan. Plaintiffs disagree with that assertion. For the Court to agree with Defendants would require the Court to rely on materials not appropriate at this stage in the litigation. For the purposes of this motion, the Court accepts as true Plaintiffs' allegations that the Plan could have invested in Vanguard funds.

Second, Plaintiffs allege that Defendants were imprudent by retaining poor-performing actively managed funds, specifically the American Beacon Short-Term Bond Fund, the American Beacon Large-Cap Growth Fund, and the American Beacon Treasury Inflation Protected Securities Fund. Defendants rely on a number of materials outside the pleadings to argue why the inclusion of these three funds was not imprudent. And while the Court may take judicial notice of those materials, it may not rely on the parties' opinion about what the proper inferences should be drawn from them. "Rule 8 does not require a plaintiff to plead facts tending to rebut all possible lawful explanations for a defendant's conduct." *Braden*, 588 F.3d at 596. Accordingly, the Court finds that dismissal is not warranted at this time.

Next, Plaintiffs argue that "Defendants breached their duty of prudence by failing to consider low-cost separate accounts and collective trusts as alternatives to mutual funds." Pls.' Br. 21, ECF No. 44. Defendants argue that it is not imprudent to offer mutual funds, instead of separate accounts or collective trusts, in the Plan. Defs.' Br. 21, ECF No. 38. The Seventh Circuit has held that offering mutual funds instead of other lower cost alternatives is not imprudent. *See generally Loomis v. Exelon Corp.*, 658 F.3d 667 (7th Cir. 2011). While it does not appear the Fifth Circuit has addressed this question, the Court agrees with the reasoning of the Seventh Circuit. Defendants have not breached their duty of prudence by offering mutual funds and failing to consider alternatives. Accordingly, Defendants' Motion is granted to the extent that Count I relies on the argument that Defendants breached their duty of prudence by not considering alternatives to mutual funds.

### C.      Defendants' Argument for Dismissal for Failure to Allege Fiduciary Status

Defendants argue that Count I should at least be dismissed as to American Airlines, the PBAC, and the BSC because under ERISA a person is only a fiduciary "to the extent" that he or she was performing a fiduciary function.

> In every case charging breach of ERISA fiduciary duty, then, the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint.

*Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). Defendants argue that Plaintiffs have failed to allege sufficient facts to hold American Airlines, the PBAC, and the BSC liable as fiduciaries. "It is typically premature to determine a defendant's fiduciary status at the motion to dismiss stage of the proceedings." *In re Elec. Data Sys. Corp. "ERISA" Litig.*, 305 F. Supp. 2d 658, 665 (E.D. Tex. 2004). "A person or entity that has the power to appoint, retain and/or remove a plan fiduciary from his position has discretionary authority or control over the management or administration of a plan and is a fiduciary to the extent that he or it exercises that power." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 552 (S.D. Tex. 2003). Plaintiffs have alleged that these defendants were either named fiduciaries or had control over management of the Plan. Accordingly, the Court finds that is dismissal is not appropriate at this stage.

### D.    Defendants' Arguments to Dismiss Failure to Monitor Claim

Defendants also move to dismiss Count II. They argue that the Fifth Circuit has never recognized a duty to monitor claim, and even if such claim exists, Plaintiffs have failed to allege sufficient facts to support the claim. In a footnote, the Fifth Circuit stated that it had never recognized a duty to monitor claim. *Perez v. Bruister*, 823 F.3d 250, 260 n.10 (5th Cir. 2016). Even so, other circuits have recognized the claim. *See e.g.*, *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1466 n.10 (4th Cir. 1996); *Howell v. Motorola, Inc.*, 633 F.3d 552, 573 (7th Cir. 2011).

And, Plaintiffs have adequately alleged sufficient facts to support a duty to monitor claim against American Airlines and the BSC. Plaintiffs allege that these two defendants breached their fiduciary duties by:

> (a) Failing to monitor and evaluate the performance of the Plan's fiduciaries or have a system in place for doing so, standing idly by as the Plan suffered enormous losses as a result of the other Defendants' imprudent actions and omissions;

> (b) failing to monitor the processes by which Plan investments were evaluated, which would have alerted a prudent fiduciary to the preferential treatment the Plan's fiduciaries were giving to American Beacon-affiliated mutual funds in their process of selecting and monitoring the Plan's investments; the fiduciaries' failure to investigate the availability of lower-cost separate account and collective trust vehicles; and the failure to investigate in a timely fashion the availability of lower-cost alternatives to the American Beacon index funds held by the Plan;

> (c) failing to remove fiduciaries whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

2d Am. Compl. 60–61, ECF No. 57. This sufficiently alleges a claim. *See Urakhchin*, 2016 WL 4507117, at *7 (declining to dismiss failure to monitor claims based on similar allegations). Accordingly, Defendants' Motion is denied as to this claim.[3]

## V.     Conclusion

For the foregoing reasons, the Defendants' Motion to Dismiss is **GRANTED** to the extent that Count I relies on the claim that Defendants were imprudent for not considering low-cost alternatives to mutual funds, and the Motion is **DENIED** as to the other claims.

**SO ORDERED** on this **31st day of March, 2017.**

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

---

[3] The parties should submit briefing on whether this claim is cognizable in the Fifth Circuit.

 Neutral

As of: April 25, 2017 8:05 PM Z

# Bell v. Pension Comm. of ATH Holding Co.

United States District Court for the Southern District of Indiana, Indianapolis Division

March 23, 2017, Decided; March 23, 2017, Filed

Case No. 1:15-cv-02062-TWP-MPB

**Reporter**

2017 U.S. Dist. LEXIS 42107 *

MARY BELL, JANICE GRIDER, CINDY PROKISH, JOHN HOFFMAN, and PAMELA LEINONEN, individually and as representatives of a class of similarly situated persons of the Anthem 401(k) Plan (formerly the WellPoint 401(k) Retirement Savings Plan), Plaintiffs, v. PENSION COMMITTEE OF ATH HOLDING COMPANY, LLC, ATH HOLDING COMPANY, LLC, BOARD OF DIRECTORS OF ATH HOLDING COMPANY, LLC, JOHN DOES 1-40, Defendants.

**Prior History:** Bell v. Pension Comm. of ATH Holding Co., LLC, 2016 U.S. Dist. LEXIS 100148 (S.D. Ind., Aug. 1, 2016)

## Core Terms

recordkeeping, fiduciary, Plaintiffs', options, participants, monitor, fiduciary duty, actual knowledge, motion to dismiss, breach of fiduciary duty, stable, breached, prudent, money market fund, mutual fund, allegations, untimely, investments, requests, ratios, funds, administrative fees, restructuring, lower-cost, selecting, dollars, bids, flat, plaintiff asserted, plan administrator

**Counsel:** **[*1]** For MARY BELL, JANICE GRIDER, CINDY PROKISH, individually and as representatives of a class of similarly situated persons of the Anthem 401(k) Plan (formerly the WellPoint 401(k) Retirement Savings Plan), Plaintiffs: Heather Lea, Jerome J. Schlichter, Kurt C. Struckhoff, Michael A. Wolff, Troy A. Doles, PRO HAC VICE, SCHLICHTER, BOGARD & DENTON, LLP, St. Louis, MO; James Redd, SCHLICHTER BOGARD & DENTON LLP, St. Louis,

MO.

For JOHN HOFFMAN, Plaintiff: James Redd, SCHLICHTER BOGARD & DENTON LLP, St. Louis, MO; Jerome J. Schlichter, PRO HAC VICE, SCHLICHTER, BOGARD & DENTON, LLP, St. Louis, MO.

For PENSION COMMITTEE OF ATH HOLDING COMPANY, LLC, Defendant: Ada W. Dolph, SEYFARTH SHAW LLP, Chicago, IL; Ian Hugh Morrison, SEYFARTH SHAW LLP (Chicago), Chicago, IL.

For ATH HOLDING COMPANY, LLC, BOARD OF DIRECTORS OF ATH HOLDING COMPANY, LLC, Defendants: Ada W. Dolph, SEYFARTH SHAW LLP, Chicago, IL.

JOHN DOES 1-40, Defendant, Pro se.

**Judges:** TANYA WALTON PRATT, UNITED STATES DISTRICT JUDGE.

**Opinion by:** TANYA WALTON PRATT

## Opinion

### ENTRY ON MOTION TO DISMISS

Before the Court is a Motion to Dismiss filed by Defendants ATH Holding Company, LLC ("ATH"), ATH's Board of Directors ("Board"), and ATH's Pension Committee ("Pension Committee") **[*2]** (collectively, "Defendants"), pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants are fiduciaries of

**EXHIBIT 3**

the Anthem 401(k) Plan[1] ("Plan"). On March 16, 2016, Plaintiffs Mary Bell, Janice Grider, Cindy Prokish, John Hoffman, and Pamela Leinonen, individually and as representatives of a class of similarly situated persons of the Plan (collectively, "Plaintiffs"), filed an Amended Complaint against the Defendants under the Employee Retirement Income Security Act ("ERISA"), alleging breach of fiduciary duty for unreasonable investment management fees, breach of fiduciary duty for unreasonable administrative fees, breach of fiduciary duty for failure to evaluate and monitor the Plan's investments, failure to monitor fiduciaries, and refusal to supply requested information. (Filing No. 23.) Defendants now seek to dismiss Plaintiffs' Amended Complaint as meritless, untimely, and inadequately pled. (Filing No. 37.) For the following reasons, the Court **grants in part and denies in part** Defendants' Motion to Dismiss.

## I. BACKGROUND

The following facts are undisputed. The Plan is a defined contribution plan within the meaning of ERISA. *See* 29 U.S.C. § 1002(34). The Plan is sponsored by ATH and, as of December 31, 2014, is one of the largest 401(k) [*3] plans in the United States. It provides retirement income for employees of ATH and any direct or indirect subsidiary of the company that has been offered the Plan. The retirement benefits are limited to the value of an employee's account, which depends upon employee and employer contributions, as well as investment options' fees and expenses. Plaintiffs are current or former participants of the Plan.

The Pension Committee serves as the Plan's administrator and is responsible for selecting, monitoring, and removing Plan investment options available to participants. As of December 31, 2014, Defendants offered twenty-six investment options, including: eleven Vanguard mutual funds[2], twelve

Vanguard target date funds, two non-Vanguard mutual funds[3], and an Anthem, Inc. common stock fund. (Filing No. 23 at 8-9.) In connection with the administration of the Plan, the fiduciaries hired the Vanguard Group, Inc. ("Vanguard") to serve as the record keeper to the Plan. Vanguard's duty is to keep track of each individual participant's account, contributions, distributions, gains and losses, as well as handling communications with participants. Vanguard's recordkeeping fees are paid from the Plan's [*4] assets.

On July 22, 2013, to lower expense ratios, the Plan restructured the investments offered to participants and replaced the higher-cost share classes with their lower-cost versions. (Filing No. 23 at 13-14.) For instance, prior to restructuring, the Plan's two non-Vanguard mutual fund options—the Artisan Mid Cap Value Fund and the Touchstone Sands Capital Select Growth Fund—amounted to 120 bps[4] (1.2%), and 103 bps (1.03%), respectively. After the Plan's restructuring, the price of the two non-Vanguard mutual fund options decreased to 95 bps (.95%) and 79 bps (.79%), respectively. The Plan also changed the handling of fees. Previously, participants were charged approximately eighty to ninety-four dollars annually to compensate Vanguard's recordkeeping fees. As of September 30, 2013, the recordkeeping fees billed at a flat rate of forty-two dollars per participant per year for anyone with an account balance over $1,000.00. Participants with an account balance under $1,000.00 did not pay a recordkeeping fee.

On October 5 and October 27, 2015, approximately two years after Defendants restructured the Plan, Plaintiffs sent letters requesting Plan information from the Pension Committee. [*5] The Pension Committee, however, refused to accept Plaintiffs' letters and the letters were returned to Plaintiffs' counsel. Thereafter, on March 16, 2016, Plaintiffs filed a five count Amended Complaint alleging, from December 29, 2009 through July 22, 2013, Defendants breached their fiduciary duties under ERISA. Under Count I of the Amended Complaint, Plaintiffs assert that Defendants breached their fiduciary duty by causing the Plan to pay unreasonable investment management expenses in

---

[1] Before December 2, 2014, the Plan was known as the WellPoint 401(k) Retirement Savings Plan.

[2] 1) Vanguard Prime Money Market Fund; 2) Vanguard Institutional Index Fund; 3) Vanguard Total Bond Market Index Fund; 4) Vanguard Wellington Fund; 5) Vanguard Total International Stock Index Fund; 6) Vanguard PRIMECAP Fund; 7) Vanguard Extended Market Index Fund; 8) Vanguard Windsor II Fund; 9) Vanguard Explorer Fund; 10) Vanguard Inflation-Protected Securities Fund; 11) Vanguard International Growth.

[3] 1) Artisan Midcap Value Fund and 2) Touchstone Sands Capital Select Growth Fund.

[4] "Bps" refers to basis points. One hundred basis points is 1.0%.

Bell v. Pension Comm. of ATH Holding Co.

violation of 29 U.S.C. § 1104(a)(1)(A), (B). Count II states that Defendants breached their fiduciary duty by causing the Plan to pay unreasonable administrative expenses. Count III alleges that Defendants breached their fiduciary duty by providing a money market investment, while failing to prudently consider a stable value fund. Count IV asserts that Defendants failed to properly monitor and remove fiduciaries. Lastly, Count V states that Defendants failed to supply Plan information upon request in violation of 29 U.S.C. §1132(c)(1). (Filing No. 23.)

Defendants now move to dismiss Plaintiffs' Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), asserting that Plaintiffs' claims are meritless, untimely, and inadequately pled. (Filing No. 37.)

## II. LEGAL ANALYSIS

Federal Rule of Civil Procedure 12(b)(6) authorizes [*6] a defendant to move to dismiss a complaint that fails to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When deciding a motion to dismiss under Rule 12(b)(6), the court construes the complaint in the light most favorable to the plaintiff, accepts all factual allegations as true, and draws all reasonable inferences in favor of the plaintiff. Tamayo v. Blagojevich, 526 F.3d 1074, 1081 (7th Cir. 2008). However, courts "are not obliged to accept as true legal conclusions or unsupported conclusions of fact." Hickey v. O'Bannon, 287 F.3d 656, 658 (7th Cir. 2002).

While a complaint need not include detailed factual allegations, a plaintiff has the obligation to provide the factual grounds supporting his entitlement to relief; and neither bare legal conclusions nor a formulaic recitation of the elements of a cause of action will suffice in meeting this obligation. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Stated differently, the complaint must include "enough facts to state a claim to relief that is plausible on its face." Hecker v. Deere & Co., 556 F.3d 575, 580 (7th Cir. 2009) (citation and quotation marks omitted). To be facially plausible, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (citing Twombly, 550 U.S. at 556).

## III. ERISA FIDUCIARY STANDARDS

ERISA imposes general standards of loyalty and prudence that require fiduciaries to act solely [*7] in the interest of plan participants and to exercise their duties with the "care, skill, prudence, and diligence" of an objectively prudent person. 29 U.S.C. § 1104(a)(1). Section 1104 specifically states:

> a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—[]for the exclusive purpose of: **(i)** providing benefits to participants and their beneficiaries; and **(ii)** defraying reasonable expenses of administering the plan;...with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

29 U.S.C. § 1104(a)(1)(A), (B). Additionally, § 1105(a) provides that one fiduciary may be liable for breaches of fiduciary duty committed by another fiduciary under specified circumstances.

Although ERISA normally imposes a fiduciary duty, the statute provides a safe harbor and modifies that rule for plans that provide for individual accounts and allows a participant or beneficiary "to exercise control over the assets in his account." 29 U.S.C. § 1104(c)(1). In order for the safe harbor to apply, the participant must: 1) have the right to exercise [*8] independent control over the assets; 2) be able to choose from an array of investment options; and 3) be given or have the opportunity to obtain "sufficient information to make informed decisions with regard to investment alternatives available under the plan." Hecker v. Deere & Co., 556 F.3d 575, 587 (7th Cir. 2009) (quoting 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)).

## IV. DISCUSSION

Defendants move to dismiss Plaintiffs' Amended Complaint, contending that Plaintiffs failed to state a claim upon which relief can be granted. Defendants also assert that Plaintiffs' claims are untimely. The Court will address each issue in turn.

### A. Failure to State a Claim.

Bell v. Pension Comm. of ATH Holding Co.

**1. Count I: Unreasonable Investment Management Fees**.

Under Count I, Plaintiffs assert that Defendants breached their fiduciary duty by selecting and retaining Plan investment options with excessively high fees instead of choosing identical lower-cost investment options that were available during the relevant period. Defendants assert that they did not breach their fiduciary duty because the Plan offered an array of different investments with an acceptable range of fees. Defendants rely on *Hecker* and *Loomis* when contending that the Seventh Circuit has clearly and repeatedly found that a fiduciary's duty is limited to offering choices **[*9]** across the fee spectrum to participants and that duty does not require Defendants to achieve cost optimization. *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009) (affirming district court's ruling that defendants did not breach their fiduciary duty because "nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund"); *Loomis v. Exelon Corp.*, 658 F.3d 667, 674 (7th Cir. 2011) (affirming district court's dismissal of plaintiffs' breach of fiduciary duty claim where defendant offered "high-expense, high-risk, and potentially high-return funds, together with low-expense index funds [], and low-expense, low-risk, modest-return bond funds" and left the choice to the participants). Defendants also assert that Plaintiffs failed to raise a single allegation suggesting that Defendants engaged in any self-dealing or disloyal action favoring their own interests over the interests of the participants and beneficiaries. Defendants contend they acted prudently and there is a lawful explanation for the high investment option fee; specifically, prior to implementing a flat administrative fee, participants with larger balances paid a higher share for the fees than those with a lower balance, and Plaintiff's failed to allege this decision was imprudent.

In response, **[*10]** Plaintiffs contend that Defendants' reliance on *Hecker* and *Loomis* is misplaced because Plaintiffs do not claim any problem with the "array" of Plan investment options offered by Defendants, but take issue only with the cost of the investment options. Plaintiffs rely on *Tibble* when arguing that Defendants breached their fiduciary duty because, from December 29, 2009 through July 22, 2013, Defendants provided investment options at a higher cost when the same

investment options were available at a lower cost. *See Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828-29, 191 L. Ed. 2d 795 (2015) ("a fiduciary normally has a continuing duty of some kind to monitor investments and remove imprudent ones"); *see also Howell v. Motorola, Inc.*, 633 F.3d 552, 567 (7th Cir. 2011) ("[i]t is the fiduciary's responsibility...to screen investment alternatives and to ensure that imprudent options are not offered to plan participants"); *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 796 (7th Cir. 2011) ("a fiduciary's failure to exercise his or her discretion—i.e., to balance the relevant factors and make a reasoned decision as to the preferred course of action— under circumstances in which a prudent fiduciary would have done so is a breach of the prudent man standard of care"). Plaintiffs also assert that *Hecker* is irrelevant to this case because the safe harbor does not protect Defendants from a breach of **[*11]** fiduciary duty claim simply because Defendants provided an array of investment options. *See Howell*, 633 F.3d at 567 ("the selection of plan investment options and the decision to continue offering a particular investment vehicle are acts to which fiduciary duties attach, and that the safe harbor is not available for such acts").

The Court agrees the Defendants' reliance on *Hecker* and *Loomis* is misplaced. In both *Hecker* and *Loomis*, plaintiffs generally asserted that defendants violated their fiduciary duty by not offering certain investment options and selecting investment options with excessive fees. *Hecker*, 556 F.3d at 586; *Loomis*, 658 F.3d at 674. Neither court addressed whether a defendant violates their fiduciary duty in selecting high-cost investment options where *identical* investment options are available at a lower-cost. Accordingly, the allegations set forth are sufficient to survive a motion to dismiss, and Defendants' Motion to dismiss Count I **denied**.

**2. Count II: Unreasonable Administrative Fees**.

Under Count II, Plaintiffs argue that Defendants breached their fiduciary duty because, prior to restructuring, Defendants failed to solicit competitive bids from vendors on a flat participant fee and failed to monitor recordkeeping compensation to **[*12]** ensure that the Plan's record keeper received only reasonable compensation. Plaintiffs assert that a reasonable compensation for recordkeeping is a flat fee of thirty dollars per participant. Defendants contend the Court

should dismiss Count II because Plaintiffs failed to make any factual allegations that the recordkeeping fees are the result of any type of self-dealing. Defendants argue that Plaintiffs also failed to plead any facts to support the claim that a reasonable recordkeeping fee for the Plan would have been thirty dollars per participant or that there were other vendors equally capable of providing recordkeeping services for the Plan at that lower cost. They assert that without these facts, Plaintiffs' claim is nothing more than a conclusory allegation that the Plan's recordkeeping fees were unreasonable because they were higher than what Plaintiffs thought they should be.

In response, Plaintiffs argue that prudent fiduciaries engage in a competitive bidding process on a regular basis to ensure recordkeeping fees remain reasonable; however, Defendants failed to engage in competitive bidding. Defendants allowed Vanguard to receive compensation through asset-based revenue [*13] sharing payments from the Plan's mutual funds and when the Plan's assets increased, so did Vanguard's recordkeeping fees. Plaintiffs argue Defendants' failure to prudently monitor Vanguard's compensation to ensure that Vanguard's fees did not exceed a reasonable fee for recordkeeping services, amounts to a breach of fiduciary duty. Plaintiffs assert, however, that they cannot and should not be required at the pleading stage to name a vendor that could have provided services for the Plan at a significantly lower cost or to support their allegation that a reasonable fee for the Plan would have been a thirty dollar flat rate fee.

The Court finds that Plaintiffs were not required to allege that the recordkeeping fees were the result of any type of self-dealing, but were required to assert only that Defendants failed to act with prudence under §1104 when failing to solicit bids and to monitor and control recordkeeping fees. *See* 29 U.S.C. § 1104(a)(1)(A), (B). The Court concludes that Plaintiffs' allegations under Count III are sufficient to state a claim for relief. *See George*, 641 F.3d at 798-99 (Seventh Circuit reversing district court's grant of summary judgment to defendants on the issue of recordkeeping fees, and finding that defendants were [*14] not necessarily prudent in relying on the advice of consultants in lieu of soliciting bids from record keepers); *see also Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) (affirming district court's conclusion that fiduciaries breached their fiduciary

duties by "by failing diligently to investigate the [record keeper] and monitor Plan recordkeeping"). Accordingly, Defendants' Motion to Dismiss Count II for failure to state a claim is **denied**.

### 3. Count III: Failure to Consider the Use of a Stable Value Fund Instead of a Money Market Fund.

Under Count III, Plaintiffs allege the Defendants breached their fiduciary duty by providing and maintaining the Vanguard Prime Money Market Fund, while failing to prudently consider and make a reasoned decision regarding whether to use a stable value fund. Defendants argue that Plaintiffs' claim fails because ERISA does not require a fiduciary to offer participants a specific investment type or even a particular mix of investment vehicles. Defendants contend that a fiduciary must offer only a menu of investment options and the composition of the menu is left to the fiduciaries. *See Loomis*, 658 F.3d at 674; *Hecker*, 556 F.3d at 586. Because participants had an array of choices across the risk spectrum, Defendants argue they cannot be faulted for [*15] offering a money market fund as a low-risk, low-return investment option instead of a higher-risk, higher-return stable value fund. Defendants also contend that Plaintiffs failed to allege that the money market fund was mismanaged or that Defendants offered the money market fund as a result of self-dealing.

The Court first notes, and the parties agree, that Defendants did not have a duty to absolutely provide a stable value fund instead of a money market fund. The issue is whether Defendants considered a stable value fund option and came to a reasoned decision for continuing to provide the money market fund instead. Plaintiffs argue that Defendants breached their fiduciary duty because an average stable value fund has dramatically outperformed the Plan's money market fund, but despite the advantages, Defendants failed to provide a stable value fund. Plaintiffs also contend that, had Defendants considered a stable value fund and weighed the benefits, Defendants would have removed the Plan's money market fund and provided a stable value fund. The Court concludes that Plaintiffs' assertion is conclusory and is not enough to state a claim. Although a complaint need not include detailed [*16] factual allegations, a plaintiff has the obligation to provide the factual grounds supporting his entitlement to relief; and neither bare legal conclusions

nor a formulaic recitation of the elements of a cause of action will suffice in meeting this obligation. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Accordingly, as pled, Defendants' Motion to Dismiss Count III is **granted**.

### 4. Count IV: Failure to Monitor Fiduciaries.

Count IV asserts that Defendants are responsible for monitoring and removing fiduciaries, specifically members of the Pension Committee. Plaintiffs argue that Defendants breached their fiduciary monitoring duties by, among other things, failing to ensure that the monitored fiduciaries: 1) had a process for evaluating the Plan's administrative fees to ensure that the fees are reasonable; 2) considered comparable investment options, including lower-cost share classes of the identical mutual funds, that charged lower fees than the Plan's mutual fund; and 3) removed appointees who continued to maintain imprudent, excessive-cost investments and an option that did not keep up with inflation. Both parties agree that Count IV is entirely derivative of the underlying breach of fiduciary duty claims outlined in Counts [*17] I through III.

For the reasons stated above with respect to Counts I and II, the Court declines to dismiss Plaintiffs' failure to monitor claims regarding the consideration of low-cost, identical mutual funds and the evaluation of recordkeeping fees. The Court, however, dismisses Plaintiffs' failure to monitor claim as it relates to their contention that Defendants should have offered and considered a stable value fund. Accordingly, Defendants' Motion to dismiss Count IV is **granted in part and denied in part**.

### 5. Count V: Refusal to Supply Requested Information.

Count V states that Defendants violated ERISA because the Plan Administrator—i.e., the Pension Committee—failed to supply Plan information upon request. Under 29 U.S.C. § 1024, "[t]he administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary[] plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4). An administrator may be liable to a participant or beneficiary in the amount of up to $100.00 a day for failure or refusal to comply with a request for the [*18] latest copies of plan documents within thirty days after such request. 29 U.S.C. § 1132(c)(1).

Defendants argue that the Court should dismiss Count V because Plaintiffs allege only that they sent two requests to the Pension Committee, who refused the requests upon delivery, but Plaintiffs failed to allege that the Pension Committee ever received their requests. *See Jacobs v. Xerox Corp. Long Term Disability Income Plan*, 520 F. Supp. 2d 1022, 1042 (N.D. Ill. 2007) (holding "imposing a penalty on the Plan Administrator when he did not receive the request for documents would appear to be at odds with the Seventh Circuit's guidance that the purpose of Section 1132(c) is not so much to punish as it is to induce plan administrators to comply with the notice requirements of ERISA"); *Romero v. SmithKline Beecham*, 309 F.3d 113, 119-20 (3d Cir. 2002) ("section 502(c)(1) requires actual receipt by the administrator... it is unlikely that Congress wanted to impose a civil penalty on a person who has not engaged in any wrongful conduct").

In response, Plaintiffs contend that when looking at the plain text of § 1132(c)(1), "receipt" is not an element of Plaintiffs' claim under Count V. *See Kerr v. Charles F. Vatterott & Co.*, 184 F.3d 938, 947 (8th Cir. 1999) (holding the statute does not require receipt and "there is a general rebuttable presumption that a properly mailed document is received"). Plaintiffs also rely on *Kerr* when arguing that Defendants' defense to the statutory penalty succeeds [*19] only if the defense is due to factors "reasonably beyond the control" of the Pension Committee. *See Kerr*, 184 F.3d at 947-48 (quoting 29 U.S.C. § 1132(c)(1) "Any administrator ... who fails or refuses to comply with a request for any information [under § 1024(b)(4)] ... '(unless such failure or refusal results from matters reasonably beyond the control of the administrator)' may be liable for a discretionary penalty"). Plaintiffs argue that the Pension Committee deliberately refused to accept two requests from Plaintiffs' attorneys, which does not amount to "matters reasonably beyond the control of the" Pension Committee.

The Court finds that Defendants' reliance on *Jacob* and *Romero* is misplaced. In *Jacob*, the plan administrator did not receive the request for information because the

Bell v. Pension Comm. of ATH Holding Co.

request was sent to the wrong address. Similarly, in *Romero*, the plaintiffs sent a request to a representative other than the plan administrator and two months later the plan administrator provided the plan information. The court in *Romero* reasoned that "the 30—day period should not begin to run until the request is actually received [] by the administrator... [to provide] adequate protection for an administrator in a situation in which a request for information [*20] is not delivered or sent directly to the administrator." *Romero*, 309 F.3d at 120. Neither case bears on Plaintiffs' contention that they twice directed requests for information to the Pension Committee at the address provided by Defendants and the Pension Committee deliberately refused to accept both requests. Accordingly, because Plaintiffs allege that the Pension Committee refused to accept the requests and Defendants do not allege that that failure was beyond the control of the Pension Committee, Defendants' Motion to dismiss Count V **denied**. *See* 29 U.S.C. § 1132(c)(1) (an administrator may be liable to a participant or beneficiary in the amount of up to $100.00 a day for failure or refusal to comply with a request for the latest copies of plan documents within thirty days after such request, "unless such failure or refusal results from matters reasonably beyond the control of the administrator").

**B. Untimely**.

Under ERISA, a breach of fiduciary duty complaint is timely if filed no more than six years after "the date of the last action which constituted a part of the breach or violation" or "in the case of an omission the latest date on which the fiduciary could have cured the breach or violation." 29 U.S.C. § 1113(1). However, no action may be [*21] commenced "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation." 29 U.S.C. § 1113(2). The Seventh Circuit defines "actual knowledge" as "knowledge of 'the essential facts of the transaction or conduct constituting the violation,'" with the caveat that "it is 'not necessary for a potential plaintiff to have knowledge of every last detail of a transaction, or knowledge of its illegality.'" *Fish v. GreatBanc Trust Co.*, 749 F.3d 671, 679 (7th Cir. 2014) (quoting *Rush v. Martin Petersen Co.*, 83 F.3d 894, 896 (7th Cir.1996)).

Defendants argue that Counts I-IV of the Amended Complaint are untimely. Because Plaintiffs' allegations

under Count III fail to state a claim, the Court will discuss only Defendants' arguments regarding Counts I, II, and IV.

**1. Count I: Unreasonable Investment Management Fees**.

Defendants argue Count I was filed untimely because Plaintiffs had actual knowledge since August 2012 that the Pension Committee selected investment options with excessive expense ratios and that lower-cost funds were available. Defendants contend that, in August 2012, it issued a "Plan Information" document to all participants that included a table clearly outlining the expense ratios for the Plan's various investment options. Defendants argue that the document disclosed: 1) the [*22] mutual funds offered in the Plan included both institutional and investor share classes; 2) the investor shares had higher expense ratios than the institutional shares, even for other index funds; and 3) many of the funds offered through the Plan were invested investor shares.

In response, Plaintiffs rely on *Fish* when arguing that their claim under Count I is not time barred because they did not have actual knowledge of Defendants' procedures three years prior to filing their Complaint. *See* *Fish, 749 F.3d at 681* ("a plaintiff asserting a process-based claim under § 1104, § 1106(a), or both does not have actual knowledge of the procedural breach of fiduciary duties unless and until she has actual knowledge of the procedures used or not used by the fiduciary"). Plaintiffs contend that the mere fact that Defendants disclosed the Plan's investment option fees to all participants does not provide participants with actual knowledge that Defendants could have provided a lower cost alternative, nor does it apprise participants of the process Defendants undertook to decide the higher-cost versions of those investments.

The Court agrees with Plaintiffs and finds that the essential fact under Count I that would commence the three-year [*23] statute of limitations is Plaintiffs' knowledge of identical lower-cost alternatives. Count I is not time barred because, although the Plan Information document discloses the nature of the investment options offered, it did not disclose that identical lower cost alternatives were available. Accordingly, Plaintiffs did not have actual knowledge of Defendants' breach of fiduciary duty in 2012 and dismissal on this basis in not warranted.

Bell v. Pension Comm. of ATH Holding Co.

## 2. Count II: Unreasonable Administrative Fees.

Defendants also contend that Count II is untimely because Plaintiffs had actual knowledge of the Plan's recordkeeping fees since 2011. Defendants argue that Plaintiffs had actual knowledge because, prior to the Plan's restructuring in 2013, the recordkeeping fees were bundled with the investment fees for each fund as part of the expense ratio and, since 2011, Plan documents reported the expense ratios. Defendants assert that because the amount charged for recordkeeping was fully disclosed in a publicly filed report in October 2011, Plaintiffs had all the information they needed to allege that the Plan's recordkeeping fees were unreasonable and excessive in October 2011.

In response, Plaintiffs argue that Count [*24] II is a process-based claim and Plaintiffs currently do not have enough knowledge of Defendants' process for negotiating and monitoring the Plan's recordkeeping fees to specifically plead the defects. *See* *Fish*, 749 F.3d at 681. Plaintiffs also allege that the information Defendants disclosed in their annual reports did not provide Plaintiffs with actual knowledge that the Plan's recordkeeping fees were excessive. Plaintiffs contend that the Plan provided only the expense ratio and did not provide the actual fee amounts that Vanguard received.

The Court declines to find that Plaintiffs' claim under Count II is untimely, despite Defendants' contention that the Plan Information document provided Plaintiffs with actual knowledge of the essential facts underlying Plaintiffs' claim that recordkeeping fees were unreasonable. The Court finds that, under Count II, Plaintiffs contend not only that the actual dollar amount for recordkeeping fees is excessive, but assert that the fees are unreasonable because Defendants failed to solicit competitive bids from vendors on a flat participant fee and failed to monitor recordkeeping compensation to ensure that Vanguard received only reasonable compensation. *See* *Fish*, 749 F.3d at 681 ("to trigger [*25] the 'actual knowledge' statute of limitations clock under § 1113(2) for a process-based claim, the plaintiffs 'must have been aware of the process utilized by [the fiduciary] in order to have had actual knowledge of the resulting breach of fiduciary duty") (citations omitted). Accordingly, because Defendants do not allege that Plaintiffs had actual knowledge of Defendants' solicitation and monitoring process,

Defendants' Motion on this issue is **denied**.

## 3. Count IV: Unreasonable Administrative Fees.

As previously discussed, because Count IV is entirely derivative of the underlying breach of fiduciary duty claims outlined in the Amended Complaint, the Court finds that Plaintiffs' failure to monitor claims regarding Counts I and II are timely. Accordingly, Defendants' Motion on this bases is **denied**.

## V. CONCLUSION

For the above reasons, the Court **GRANTS in part and DENIES in part** Defendants' Motion to Dismiss. (Filing No.37.) Counts I, II, and V survive Defendants' Motion to Dismiss. Count III fails to state a claim upon which relief can be granted, and is **dismissed**. Accordingly, because Count IV is derivative of Counts I through III, the Court **dismisses** Count IV only to the extent that it relies on [*26] Count III. The Court concludes, however, that the dismissals should be with **without prejudice**. Fed. R., Civ. P. 15 directs that courts should "freely" grant leave to amend a pleading "when justice so Fed. R. Civ. P. 15(a)(2). If in fact, Plaintiffs' can plead sufficient facts to support their assertion that Defendants failed to prudently consider whether to use a stable value fund, they are granted leave to file a Second Amended Complaint regarding Count III and the dismissed portion of Count IV, within **fourteen (14) days** of the date of this Entry.

**SO ORDERED**.

Date: 3/23/2017

/s/ Tanya Walton Pratt

TANYA WALTON PRATT, JUDGE

United States District Court

Southern District of Indiana

 Neutral

As of: April 25, 2017 8:02 PM Z

# Troudt v. Oracle Corp.

United States District Court for the District of Colorado

March 22, 2017, Decided; March 22, 2017, Filed

Civil Action No. 1:16-cv-00175-REB-CBS

**Reporter**

2017 U.S. Dist. LEXIS 41344 *

DEBORAH TROUDT, BRAD STAUF, SUSAN CUTSFORTH, WAYNE SELTZER, MICHAEL HARKIN, MIRIAM WAGNER, and MICHAEL FOY, individually and as representatives of a class of plan participants, on behalf of the Oracle Corporation 401(k) Savings and Investment Plan, Plaintiffs, v. ORACLE CORPORATION, ORACLE CORPORATION 401(K) COMMITTEE, and JOHN DOES 1-20. Defendants.

**Prior History:** Troudt v. Oracle Corp., 2017 U.S. Dist. LEXIS 22194 (D. Colo., Feb. 16, 2017)

## Core Terms

recommendation, Defendants', fiduciary, allegations, motion to dismiss, revenue sharing

**Counsel:** **[*1]** For Deborah Troudt, Brad Stauf, Susan Cutsforth, Wayne Seltzer, Michael Harkin, Miriam Wagner, Michael Foy individually and as representatives of a class of plan participants, on behalf of the Oracle Corporation 401(k) Savings and Investment Plan, Plaintiffs: Heather Lea, James Redd, Kurt Charles Struckhoff, Michael Armin Wolff, Troy Andrew Doles, Jerome Joseph Schlichter, Schlichter Bogard and Denton, LLP, St. Louis, MO.

For Oracle Corporation, Oracle Corporation 401(k) Committee, Defendants: Brian T. Ortelere, LEAD ATTORNEY, Jeremy P. Blumenfeld, Morgan Lewis - Bockius, LLP-Philadelphia, Philadelphia, PA; Christopher Joseph Boran, Morgan Lewis - Bockius, LLP-Chicago, Chicago, IL; William Craig Berger, Brownstein Hyatt Farber Schreck, LLP-Denver, Denver, CO.

**Judges:** Robert E. Blackburn, United States District Judge.

**Opinion by:** Robert E. Blackburn

## Opinion

### ORDER OVERRULING OBJECTIONS TO AND ADOPTING RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

**Blackburn, J.**

The matters before me are (1) the magistrate judge's **Recommendation Regarding Defendants' Superseding Motion To Dismiss the Complaint** [#63],[1] filed February 16, 2017; and (2) **Defendants' Objections to Report and Recommendation [#63]** [#65], filed March 2, 2017. **[*2]** I overrule the objections, approve and adopt the recommendation, and deny the underlying motion to dismiss.

As required by 28 U.S.C. § 636(b), I have reviewed *de novo* all portions of the recommendation to which objections have been filed. I have considered carefully the recommendation; the objections and the response thereto; the underlying motion, response, and reply, as well as the parties' submissions of supplemental authorities; the complaint to which the motion is directed; and all applicable caselaw.

---

[1] "[#63]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's case management and electronic case filing system (CM/ECF). I use this convention throughout this order.

**EXHIBIT 4**

Troudt v. Oracle Corp.

It is clear from both the recommendation and the magistrate judge's comments to the parties at the hearing on the motion (*see Transcript* [#64], filed February 27, 2017),[2] that he believed this case to be extraordinarily close and exceptionally context-specific. My own thorough *de novo* review of the allegations of the complaint, the competing arguments, and the conflicting legal authorities in this area confirms that characterization, in spades.[3]

In general, therefore, caution is indicated. While context is important in the vetting of any complaint, *see Gee v. Pacheco, 627 F.3d 1178, 1185 (10th Cir. 2010)*, the Supreme Court specifically has endorsed a "careful, context-sensitive scrutiny of a complaint's allegations" in ERISA cases. *Fifth Third Bancorp v. Dudenhoeffer, __ U.S. __, 134 S. Ct. 2459, 2470, 189 L.Ed.2d 457 (2014)*. Even the authorities [*3] on which defendants rely in support of their motion to dismiss suggest caution in proceeding in a case of this nature on a barren factual record. *See, e.g., Tibble v. Edison International, 729 F.3d 1110, 1135 (9th Cir. 2013)* (there are "simply too many relevant considerations" for a "bright-line approach to prudence to be tenable"), *vacated*, 135 S. Ct. 1823, 191 L. Ed. 2d 795 (2015); *Hecker v. Deere & Co., 569 F.3d 708, 711 (7th Cir. 2009)* (court's decision "was tethered closely" to the facts), *cert. denied*, 558 U.S. 1148, 130 S.Ct. 1141, 175 L. Ed. 2d 973 (2010) (emphases in original). Other federal courts have found likewise. *See, e.g., Tussey v. ABB, Inc., 746 F.3d 327, 336 (8th Cir.)*, *cert. denied*, 135 S.Ct. 477, 190 L. Ed. 2d 358 (2014); *Lorenz v. Safeway, Inc., 2017 U.S. Dist. LEXIS 35731, 2017 WL 952883 at *10 (N.D. Cal. March 13, 2017); Board of Trustees of Southern California IBEW-NECA Defined Contribution Plan v. Bank of New York Mellon Corp., 2011 U.S. Dist. LEXIS 142367, 2011 WL 6130831 at *3 (S.D.N.Y. Dec. 9, 2011)* (slip op.);

Heeding those admonitions, the court cannot adopt defendants' proposal to dismiss Count I of the complaint on the theory that the plan's fee structure fell within a presumptively reasonable range of expense ratios.[4] *See Lorenz, 2017 U.S. Dist. LEXIS 35731, 2017 WL 952883 at *10* (rejecting approach which "would effectively carve out a presumption of prudence for expense ratios that fell within a certain range" and thus "immunize an investment from scrutiny" based on that consideration alone). Contrary to defendants' arguments, the question is not "whether a revenue-sharing model is within the range of reasonable choices a fiduciary might make" (**Obj.** at 10), but whether *this* revenue sharing arrangement was reasonable under all the circumstances. *See Hecker, 569 F.3d at 711* (narrow issue court determined, in granting 12(b)(6) [*4] motion, was whether "*this* complaint, alleging that [the employer] chose *this* package of funds . . . failed to state a claim upon which relief can be granted") (emphases in original). That determination must account for all the factors which informed the fiduciaries' decisionmaking,[5]

---

[2] The hearing initially was set to consider oral arguments on the motion. However, the magistrate judge forestalled further argument, noting that, in preparing for the hearing, he had come to the conclusions now set forth in his recommendation and saw no benefit in further argument.

[3] Similarly, the sheer number of lengthy documents defendants append to their motion (the majority of which the magistrate nevertheless considered) suggests the particularly fact-intensive nature of the inquiry.

[4] More fundamentally, "in *Hecker*, there was no argument that the administrative fees were not reasonable." *Spano v. The Boeing Co., 125 F.Supp.3d 848, 866 (S.D. Ill. 2014)*. *See also George v. Kraft Foods Global, Inc., 674 F.Supp.2d 1031, 1048, n.17 (N.D. Ill. 2009)* ("[A]t a fundamental level, Hecker says nothing regarding the duty a fiduciary holds with respect to a 401(k) investment plan's administrative services fees."). Plaintiffs here, by contrast, do not allege merely that revenue sharing *per se* violates ERISA, which has been found insufficient to state a claim under ERISA, *see Tibble, 729 F.3d at 1135; White v. Chevron Corp., 2016 U.S. Dist. LEXIS 115875, 2016 WL 4502808 at *14 (N.D. Cal. Aug. 29, 2016)*, but rather that defendants failed to monitor the fees paid to the administrator to ensure their continuing reasonableness as plan assets increased (**Compl.** ¶¶ 58-63 at 18-20). *See Lorenz, 2017 U.S. Dist. LEXIS 35731, 2017 WL 952883 at *13* (noting that "responsible plan fiduciaries must assure that the compensation the plan pays directly or indirectly . . . for services is reasonable, taking into account the services provided to the plan as well as all fees or compensation received by [the service provider] in connection with the investment of plan assets, including any revenue sharing.'") (quoting **Employee Benefits Security Administration of the U.S. Department of Labor**, Advisory Opinion 2013-03A (July 3, 2013)) (internal quotation marks omitted; alterations in original).

[5] Nor am I wholly convinced that an allegation of some additional nefarious motive on the part of the fiduciary is a necessary — as opposed to a merely sufficient — precondition to this claim. *See Braden, 588 F.3d at 596* (ERISA fiduciaries' decisionmaking process may be "tainted by *failure of effort, competence, or loyalty*") (emphasis added). To the extent plaintiffs are required to plead some "plus" factor in connection with their revenue sharing allegations, the allegations of the complaint permit a reasonable inference that this

Troudt v. Oracle Corp.

not all of which are presently known to plaintiffs based, allegedly, on their wrongful failure to disclose such information. (**See Compl**. ¶ 59 at 18-19.) **See Braden v. Wal-Mart Stores, Inc.**, 588 F.3d 585, 598 (8th Cir. 2009) ("No matter how clever or diligent, ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences.").

Nor do I find the allegations comprising Count II of the complaint insufficient to state a plausible claim for breach of fiduciary duty in the selection of particular allegedly imprudent investments. Although defendants insist this claim is based impermissibly on nothing more than hindsight, **see Pension Benefit Guaranty Corp. v. Morgan Stanley Investment Management, Inc.**, 712 F.3d 705, 718 (2nd Cir. 2013), plaintiffs allege two of the funds had inadequate performance histories to warrant investment in them at all (**see Compl** [*5] . ¶ 65 at 21, ¶ 69 at 23; ¶ 71 at 25).[6] **See Pension Benefit Guaranty Corp.**, 712 F.3d at 719. The third is alleged to have greatly underperformed its benchmark in four out of five years before it was removed from the plan. (**Compl**. ¶¶ 66-67 at 21-22.) **See Lorenz**, 2017 U.S. Dist. LEXIS 35731, 2017 WL 952883 at *9.) These allegations are sufficient to suggest a lack of prudence in the selection of the first two funds and in the retention of the third. **See Allen v. GreatBanc Trust Co.**, 835 F.3d 670, 678 (7th Cir. 2016). Moreover, and here again, plaintiffs allege they were not privy to the process by which defendants selected investment options, which both explains their inability to plead with more factual specificity and underscores the necessity for discovery. (**Compl**. ¶ 75 at 26-27.)[7] **See Braden**, 588 F.3d at 596.

---

method of compensating the plan administrator drove up the costs in a way that was completely untethered from the value of the services provided. (**See Compl**. ¶ 60 at 19-19 & n.2.) **See Tibble, 729 F.3d at 1136**.

[6] Defendants' brief and underdeveloped argument that plaintiffs lack standing to challenge the plan's investment in one of the funds because none of them were invested in that fund is premised on evidentiary material (**see Def. Motion App.**, Exh. I) which the magistrate judge properly refused to consider (**see Recommendation** at 8).

[7] For this same reason, defendants' argument that plaintiffs "do not allege any specific facts regarding Oracle's actual process for monitoring the Committee" (**Def. Motion** at 21) is not fatal at this juncture. Otherwise, because (as defendants acknowledge) Count III is derivative of the breach of fiduciary duty claims pled in Counts I

Defendants' arguments for dismissal of Count IV are likewise untenable. Their suggestion that this claim must fail because the complaint fails to show the compensation paid to Fidelity was unreasonable relies on an exemption under ERISA constituting an affirmative defense which plaintiffs have no burden to disprove. **See Braden**, 588 F.3d at 601-03. Defendants' further argument that revenue sharing payments are not plan "assets" ignores the plain language of the statute, which is not so limited. **See** 29 U.S.C. § 1106(a)(1)(A) & (C) (**See also supra**, n. 6.) Nor is this claim plainly time-barred, [*6] as plaintiffs properly have alleged they did not have actual knowledge of the allegedly prohibited transactions.[8] (**See Compl**. ¶¶ 73-75 at 26-27.) **See International Union of Electronic, Electric, Salaried, Machine and Furniture Workers, AFL-CIO v. Murata Erie North America, Inc.**, 980 F.2d 889, 900 (3rd Cir. 1992).

I therefore concur with the magistrate judge's conclusion that the allegations of the complaint are sufficient to state plausible claims which should not be dismissed at this early juncture. Moreover, prudential considerations — which the magistrate judge presciently discussed at the hearing (**see Transcript** at 20 [#64], filed February 27, 2017) — further counsel against dismissal in a case as close as this one. Specifically, this putative class action has now been pending more than a year. No pretrial deadlines have been set, pending resolution of the instant motion. (**See Scheduling Order** ¶ 9.a. at 15-16 [#40], filed April 6, 2016.)[9] Because there thus is no deadline to amend the pleadings, I would be hard-pressed to deny any request to amend which plaintiffs might make were their present complaint dismissed. **See Fed. R. Civ. P.** 15(a)(2). The only possible basis on which leave to amend might be denied would be futility,[10] **see Minter v. Prime Equipment Co.**, 451 F.3d

---

and II, it also survives dismissal for now.

[8] Likewise, plaintiffs plainly have alleged facts sufficient to support a plausible inference that the statute of limitations should be tolled. (**See Compl**. ¶¶ 73-75 at 26-27.) **See** 29 U.S.C. § 1113; **Fulghum v. Embarq Corp.**, 785 F.3d 395, 415 (10th Cir. 2015).

[9] Perforce, no trial dates have been established either.

[10] Plaintiffs plainly could not be accused of undue delay in seeking amendment, **see Minter v. Prime Equipment Co.**, 451 F.3d 1196, 1207-08 (10th Cir. 2006), nor is there any apparent basis to conclude that defendants have been unduly prejudiced, since this case essentially has been stalled, **see Bylin v. Billings**, 568 F.3d 1224,

Troudt v. Oracle Corp.

1196, 1206 (10th Cir. 2006), but that inquiry would simply return the court to the fact-intensive, context-specific analysis which makes [*7] dismissal of the instant complaint inappropriate. Such a tautological exercise is inimical to the overarching purpose of the Federal Rules of Civil Procedure: the "just, speedy, and inexpensive determination of every action and proceeding." **Fed. R. Civ. P.** 1.

For these reasons, the court approves and adopts the magistrate judge's recommendation as an order of the court. Defendants' motion to dismiss accordingly is denied.

**THEREFORE, IT IS ORDERED** as follows:

1. That the objections stated in **Defendants' Objections to Report and Recommendation [#63]** [#65], filed March 2, 2017, are overruled;

2. That the **Recommendation Regarding Defendants' Superseding Motion To Dismiss the Complaint** [#63], filed February 27, 2017, is approved and adopted as an order of this court; and

3. That **Defendants' Superseding Motion To Dismiss the Complaint** [#36], filed March 29, 2016, is denied.

Dated March 22, 2017, at Denver, Colorado.

**BY THE COURT:**

/s/ Robert E. Blackburn

Robert E. Blackburn

United States District Judge

---

1230 (10th Cir. 2009), *cert. denied*, **559 U.S. 936, 130 S.Ct. 1506, 176 L. Ed. 2d 110 (2010)**.



Neutral

As of: April 25, 2017 8:09 PM Z

# Terraza v. Safeway Inc.

United States District Court for the Northern District of California

March 13, 2017, Decided; March 13, 2017, Filed

Case No.16-cv-03994-JST

**Reporter**

2017 U.S. Dist. LEXIS 35732 *

MARIA KARLA TERRAZA, Plaintiff, v. SAFEWAY INC., et al., Defendants.

**Prior History:** Lorenz v. Safeway, Inc., 2017 U.S. Dist. LEXIS 35731 (N.D. Cal., Mar. 13, 2017)

## Core Terms

alleges, options, fiduciary, record-keeper, ratio, funds, investments, services, fiduciary duty, disclosures, revenue sharing, disclose, trusts, mutual fund, expenses, plausibly, imprudent, managed, participants, regulation, plan participant, requirements, portfolio, annual, claim for breach, notices, courts, defendants breached, diversify, motion to dismiss

**Counsel:** [*1] For Maria Karla Terraza, Individually and On Behalf of the Safeway 401(k) Plan, Plaintiff: Kolin Tang, LEAD ATTORNEY, Ronald Scott Kravitz, Shepherd, Finkelman, Miller & Shah, LLP, San Francisco, CA; James Edward Miller, Shepherd, Finkelman, Miller and Shah, LLP, Chester, CT; Laurie Rubinow, PRO HAC VICE, Shepherd Finkelman Miller & Shah, LLP, Chester, CT; Monique Olivier, Duckworth Peters Lebowitz Olivier LLP, San Francisco, CA; Nathan Curtis Zipperian, Shepherd Finkleman Miller & Shah, LLC, Fort Lauderdale, FL; Sahag Majarian, II, Law Office of Sahag Majarian II, Tarzana, CA.

For Safeway Inc., Benefit Plans Committee Safeway Inc., n/k/a Albertsons Companies Retirement Benefit Plans Committee, Defendants: R. Bradford Huss, LEAD ATTORNEY, Angel Lin Garrett, Dylan Daniel Rudolph, Trucker Huss, APC, San Francisco, CA;

Joseph Charles Faucher, Trucker & Huss, A Professional Corporation, San Francisco, CA..

For Dennis M. Lorenz, Interested Party: Jason H. Kim, Schneider Wallace Cottrell Konecky Wotkyns, Emeryville, CA.

**Judges:** JON S. TIGAR, United States District Judge.

**Opinion by:** JON S. TIGAR

## Opinion

### ORDER DENYING MOTION TO DISMISS

Re: ECF No. 46

Before the Court is Defendant's motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. ECF No. 46. [*2] The Court will deny the motion.

### I. BACKGROUND

For the purpose of deciding this motion, the Court accepts as true the following allegations from Plaintiffs First Amended Complaint, ECF No. 37. See Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).

### A. Parties

Plaintiff Maria Karla Terraza was a participant in Safeway's 401(k) plan ("the Plan"). ECF No 37 ¶ 7. Defendants Safeway, Inc. and Safeway Benefit Plans Committee (collectively "Safeway Defendants") sponsor and administer the Plan, respectively. Id. ¶¶ 8-9.

**EXHIBIT 5**

Defendants, Does 1-10, are members of the Benefit Plans Committee. Id. ¶ 10.

## B. Recordkeepers

JP Morgan Retirement Plan Services was the record-keeper for the Plan until September 2014. ECF No. 54-1 at 8. At that point, Great-West Financial RPS LLC d/b/a Empower Retirement ("Great-West") acquired JP Morgan Retirement Plan Services and began to provide recordkeeping services to the Plan. ECF No. 54-1 at 20. In July 2016, Vanguard became the new record-keeper for the Plan. ECF No. 47-16.

## C. Master Services Agreement

Pursuant to the master services agreement, which was executed in January 2009, the Plan agreed to compensate the record-keeper through a "Contingent Per Participant Fee" of $67 per year. ECF No. 47-17 at 22. This fee was [*3] lowered to $65 per year in 2011. ECF No. 47-18 (amendment to master services agreement).

Under this arrangement, the record-keeper would initially receive a percentage of the fees charged for each investment as a credit toward record-keeping services. ECF No. 47-17 at 22, 30.[1] If the service fees that the record-keeper received for a particular quarter fell below one-quarter of the annual per-participant fee, Safeway was required to "make a lump sum payment to [the record-keeper] ... in an amount equal to the difference between the foregoing amount and the amount of the actual annual service fees received by [the record-keeper]." Id. at 22. Conversely, "[i]n the event the annual service fees received by [the record-keeper] exceed $65.00 per Participant at the end of the Plan Year, [the record-keeper] shall accumulate accruals under the Plan Expense Arrangement ("PEA") in accordance with the terms and conditions of the PEA Addendum to the Agreement." ECF No. 47-18 at 2-3; see also ECF No. 47-17 at 42 ("Accruals will be calculated and attributed to the PEA at the end of each calendar quarter for all service fees received by [the record-keeper] related to . . . investments in the Plan in excess of the [*4] applicable Contingent Per Participant Fee . . .").

The excess funds in the PEA account, which was created and maintained by the record-keeper, could only be used at the direction of the Safeway Defendants to reasonably compensate third-party service providers, in accordance with ERISA. ECF No. 47-17 at 38-40. The PEA addendum provides that any accruals in the PEA account "expire at 3:00 p.m. Central Time on the last business day, as determined by JPMorgan RPS, of each subsequent Plan Year, or upon the termination of the Agreement or this Addendum." ECF No. 47-17 at 38. The addendum does not explain what happens to the expired funds. See id.

The Defendants and the record-keeper entered into an amendment on November 1, 2013 to create an "ERISA spending account" to replace the PEA. ECF No. 47-19 at 2. Pursuant to that amendment, if revenue-sharing fees exceed the annual per-participant fee at the end of the year they will be attributed to the ERISA spending account. Id. The ERISA spending account addendum materially differs from its PEA predecessor because (1) the accruals do not expire and (2) it provides that "[i]n the event Plan Sponsor does not exhaust the Account [*5] for a given calendar quarter, Plan Sponsor may allocate such eligible unused amounts, held in the Account to Participant accounts." Id. at 5.

## D. The Plan's Investment Options

During the relevant time period, the Plan offered a menu of between eighteen and twenty-two investment options to help eligible Safeway employees save for retirement. ECF No. 37 ¶¶ 14, 18. Those options consisted of mutual funds, separately managed accounts, Safeway common stock,[2] common collective trusts, and a stable value fund.

According to Terraza's complaint, "[m]utual funds are publicly-traded investment vehicles consisting of a pool of funds collected from many investors for the purpose of investing in a portfolio of equities, bonds, and other securities." Id. ¶ 19. In addition, because mutual funds

---

[1] Where a record-keeper recovers administrative costs from Plan participants in this way—that is, by assessing asset-based fees against the various investment options—it is sometimes referred to as asset-based revenue sharing. White v. Chevron Corp., No. 16-CV-0793-PJH, 2016 U.S. Dist. LEXIS 115875, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016).

[2] The Plan stopped offering Safeway common stock as an investment option on January 30, 2015. Id. ¶ 21.

Terraza v. Safeway Inc.

are registered with the Securities and Exchange Commission ("SEC"), they "are subject to SEC regulation, and are required to provide certain investment and financial disclosures and information in the form of a prospectus." Id. As of December 31, 2014, four of the Plan's sixteen investment options were mutual funds. Id. ¶¶ 36-39.

Unlike mutual funds, which are pooled, separately managed accounts ("SMAs") offer a portfolio of [*6] assets that is unique to the individual investor and that is managed by a professional investment firm. Investopedia, http://www.investopedia.com/articles/mutualfund/08/managed-separate-account.asp . Although these investment firms operate under the purview of the SEC, SMAs do not issue registered prospectuses. Id. As of December 31, 2014, two of the Plan's sixteen investment options were SMAs. ECF No. 37 ¶ 36-39.

Common trusts, which are operated by banks or trust companies, "group assets from individuals and organizations to develop a larger, diversified portfolio." Investopedia, http://www.investopedia.com/terms/c/collective-investment-fund.asp . "The primary objective of a collective fund is, through economies of scale, to lower costs with a combination of profit-sharing funds and pensions." Id. "By combining different fiduciary assets in a single account, the bank is typically able to substantially decrease its operational and administrative expenses." Id. Common trusts, like SMAs, are not subject to SEC regulation. Id. As of December 31, 2014, nine of the Plan's sixteen investment options were common trusts, and "over *a third* of the Plan's $1.9 billion in assets were placed in the opaque Common Trusts." ECF No. 37 ¶ 36-39, 42 (emphasis in original). When combined, common trusts and SMAs accounted for over forty-eight percent [*7] of the Plan's assets as of December 31, 2014. Id. ¶ 42. The Plan's default retirement investment options, the JP Morgan Chase Bank target date funds, were common trusts. Id. ¶ 43; ECF No. 47-13 at 12.

Lastly, the Plan offered the Interest Income Fund, which is a stable value fund. ECF No. 37 ¶ 23. A stable value fund is "a managed portfolio of highly rated corporate or government, short-term and intermediate-term bonds with a principal protection wrapper provided by a life insurance company." Investopedia, http://www.investopedia.com/terms/s/stable-value-fund.asp .

**E. Participant Disclosure Notices**

The Plan provided Participant Disclosure Notices to Plan participants throughout the relevant time period. ECF Nos. 47-10, 47-11, 47-12, 47-13, 47-14.

Those notices disclose that "[e]ach investment has a fee associated with it to cover the cost of managing the investments." ECF No. 47-13 at 5. They go on to explain that "[t]he fee is generally taken as a percentage of money invested and is shown as a gross expense ratio," which "is shown as a percentage of assets in the fund and reduces the rate of return of the fund." Id. The notices explain that "[t]hese fees cover the cost of administering and servicing the plan, which could include recordkeeping, auditing, legal [*8] and trustee/custodial expenses." Id. The notices also provide that "J.P. Morgan Retirement Plan Services LLC and its affiliates and agents may receive compensation with respect to plan investments, including, but not limited to, sub-transfer agent, recordkeeper, shareholder servicing, 12b-1 or other revenue-sharing fees." ECF No. 47-10 at 5; see also ECF No. 47-13 at 13 ("GWFS Equities, Inc., or one or more of its affiliates, including Great-West Financial Retirement Plan Services, LLC, may receive a fee from the investment option provider for providing certain recordkeeping, distribution and administrative services."). The notices list the gross expense ratio next to each individual investment option. See, e.g., ECF No. 47-13 at 7-9. During the relevant time period, the expense ratios for all of the Plan's investment options ranged from .15 - 1.42. See ECF Nos. 47-10, 47-11, 47-12, 47-13, 47-14.

**F. 2013-2014 Financial Statement**

According to the 2013-2014 financial statement for the Plan, "[p]ayment for Plan administrative expenses is paid in part by the investment funds based on revenue sharing agreements between the Plan and the investment funds." Id. That statement discloses the amount of [*9] administrative fees paid to JP Morgan Retirement Plan Services for its recordkeeping services as $759,556 in 2014 and $1,144,220 in 2013. ECF No. 54-1 at 20.

The 2013-2014 financial statement also discloses that

Terraza v. Safeway Inc.

"[t]he Master Trust investments at December 31, 2014, include a mutual fund with a year-end fair value of $157.3 million that the Master Trust has a 65.2% beneficial ownership of the outstanding institutional shares." ECF No. 54-1 at 10. The statement does not disclose which mutual fund is associated with this "concentration[] of risk." Id.

## G. The Amended Complaint

Terraza filed her initial complaint in this Court on July 14, 2016. ECF No. 1. This Court subsequently related this action to another action pending in this district, Dennis M. Lorenz v. Safeway, Inc., et al., Case No. 16-cv-04903, which asserts similar claims. ECF No. 35.

In her amended complaint, Terraza asserts two claims against the Safeway 401(K) Plan's fiduciaries under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq. See Amended Complaint, ECF No. 37. First, she alleges that, between July 14, 2010 and July 28, 2016, the Safeway Defendants breached their fiduciary duties under ERISA by: (1) allowing for the payment [*10] of grossly excessive fees; (2) offering a disproportionate number of non-transparent investment options in the form of common trusts and separately priced and poorly performing investment options; (4) failing to offer a diversified investment portfolio that included a complement of passively managed funds; (5) failing to accurately disclose information to Plan participants about fees, including revenue-sharing fees made to service providers like JP Morgan Retirement Plan Services and Great-West; (6) failing to accurately disclose information about the level of risk associated with certain investment options;and (7) allowing the Plan's relationship with JP Morgan Chase Bank, the trustee of the Plan, to inappropriately influence the Plan's investment options. ECF No. 37. In the alternative, to the extent that any of the Defendants are not deemed a fiduciary or co-fiduciary under ERISA, Terraza asserts a claim for knowing breach of trust. Id. ¶¶ 82-84.

## II. JURISDICTION

The Court has subject matter jurisdiction over Plaintiff's claims under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because this action arises under the laws of the United States.

## III. REQUEST FOR JUDICIAL NOTICE

The [*11] Safeway Defendants request that the Court take judicial notice of several Plan-related documents from the relevant time period, including the 2005 restatement of the Plan with amendments, the summary plan descriptions, Form 5500 filings submitted to the Department of Labor, participant fee disclosure notices, the master services agreement between Safeway and JP Morgan Retirement Plan Services, and two amendments to the master services agreement. ECF No. 48. In addition, the Safeway Defendants request that the Court take judicial notice of the definitions of separately managed accounts and collective investment trusts from the Investopedia website, as well as the definition of spread from the Stable Value Investment Association website. Id.

Pursuant to Federal Rule of Evidence 201(b), "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." The Court may also "consider materials incorporated into the complaint," where "the complaint necessarily relies upon a document or the contents of the document are [*12] alleged in a complaint, the document's authenticity is not in question and there are no disputed issues as to the document's relevance." Coto Settlement v. Eisenberg, 593 F.3d 1031, 1038 (9th Cir. 2010). This is true even if the plaintiff does not explicitly allege the contents of that document in the complaint. Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005). The Court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2).

The Court takes judicial notice of the Plan-related documents because the Plaintiff's complaint incorporates each of those documents by reference, the complaint necessarily relies on those documents, and neither party questions their authenticity or relevance. Courts routinely take judicial notice of ERISA plan documents like those at issue here. See, e.g., Watkins v. Citigroup Ret. Sys., No. 15-CV-731 DMS (NLS), 2015 U.S. Dist. LEXIS 173062, 2015 WL 9581838, at *2 (S.D. Cal. Dec. 30, 2015) (taking judicial notice of a pension plan); Almont Ambulatory Surgery Ctr., LLC v.

UnitedHealth Grp., Inc., 99 F. Supp. 3d 1110, 1126 (C.D. Cal. 2015) (taking judicial notice of Form 5500 filings).

In addition, the Court takes judicial notice of the definitions of various investment terms, which are publicly available on the Investopedia website and the Stable Value Investment Association website. Plaintiff does not oppose this request or otherwise contend that the documents are inaccurate. Perkins v. LinkedIn Corp., 53 F. Supp. 3d 1190, 1204-06 (N.D. Cal. 2014) (taking judicial notice of publicly [*13] accessible websites).

## IV. MOTION TO DISMISS

The Defendants move to dismiss Terraza's complaint for failure to state a claim pursuant to Rule 12(b)(6).[3] ECF No. 46. They argue that Terraza's claims are untimely, that she fails to plausibly allege a claim for breach of fiduciary duty, and that the derivative knowing breach of trust claim also fails. Id.

### A. Legal Standard for Motion to Dismiss under Rule 12(b)(6)

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." While a complaint need not contain detailed factual allegations, facts pleaded by a plaintiff need be "enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter that, when accepted as true, states a claim that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. While this standard is not a probability requirement, "where a complaint pleads facts that are merely consistent with a defendant's liability, [*14] it stops short of the line

between possibility and plausibility of entitlement to relief." Id. (internal quotation marks omitted). In determining whether a plaintiff has met this plausibility standard, the Court must accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the plaintiff. Knievel v. ESPN, 393 F.3d 1068, 1072 (9th Cir. 2005).

## B. Timeliness

ERISA requires that an action be commenced within (1) "six years after . . . the date of the last action which constituted a part of the breach or violation, or . . . in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or (2) "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation," whichever is earlier. 29 U.S.C. § 1113. The timeliness analysis therefore hinges on when the alleged breach or violation occurred and when the plaintiff had actual knowledge of the breach or violation. Ziegler v. Connecticut Gen. Life Ins. Co., 916 F.2d 548, 550 (9th Cir. 1990).

The Defendants argue that Terraza's claims pertaining to three of the challenged investment options are barred by the six-year statute of repose because the Defendants added those investment options to the Plan before 2010. ECF No. 46 at 14-15. They further argue [*15] that Terraza's claims relating to the allegedly opaque investment options are barred by the three-year statute of limitations because Plaintiff had actual knowledge that the SEC registration requirements did not apply to those funds by 2012 at the latest. Id. at 15-16. Both arguments fail.

First, the alleged breach of fiduciary duty is not limited to the Defendants' initial selection of the challenged funds. "[A] fiduciary normally has a continuing duty of some kind to monitor investments and remove imprudent ones" that "exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." Tibble v. Edison Int'l, 135 S. Ct. 1823, 1828-29, 191 L. Ed. 2d 795 (2015). As a result, where the plaintiff "allege[s] that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones," the claim is timely "so long as the alleged breach of the continuing duty occurred within six years of suit." Tibble, 135 S. Ct. at 1828-29. Here, Terraza alleges that

---

[3] The Defendants in the related case, Lorenz v. Safeway, Inc. et al., Case No. 16-cv-04903, filed a motion to dismiss that addresses overlapping factual and legal issues. Portions of this order are identical to portions of the order in that case.

Terraza v. Safeway Inc.

the Defendants acted imprudently by continuing to offer underperforming investment options with excessive fees until at least 2015, just one year before Terraza filed suit. Therefore, those claims are timely even though three of the investment options were initially added to the **[\*16]** Plan before 2010.

Defendants cite the Ninth Circuit's decision in Tibble on remand to support their argument that Terraza's claims are time-barred to the extent they challenge investment options that were initially selected for inclusion in the Plan more than six years before she filed suit. ECF No. 46 at 14-15. But in that case the Ninth Circuit acknowledged that "the Supreme Court reversed our decision concerning the statute of limitations, holding that regardless of when an investment was initially selected, 'a fiduciary's allegedly imprudent retention of an investment' is an event that triggers a new statute of limitations period." Tibble v. Edison Int'l, 843 F.3d 1187, 1192 (9th Cir. 2016) (quoting Tibble, 135 S. Ct. at 1826, 1828-29). The Ninth Circuit went on to explain that, pursuant to the Supreme Court's decision in Tibble, "only a 'breach or violation,' not an original investment decision, need occur to start the six-year statutory period." Id. at 1193. Therefore, the Ninth Circuit's decision in Tibble on remand defeats, rather than helps, the Defendants' argument regarding the six-year statute of repose.

Second, knowledge that the SEC registration requirements did not apply to the allegedly opaque investment options, on its own, does not constitute actual knowledge of the breach **[\*17]** of fiduciary duty alleged here. Because a breach of the duty of prudence "hinge[s] on infirmities in the selection process for investment" and a failure to investigate alternatives, "[w]hen beneficiaries claim the fiduciary made an *imprudent* investment, actual knowledge of the breach [will] usually require some knowledge of how the fiduciary selected the investment." Tibble I, 729 F.3d at 1121 (internal quotation marks omitted) (emphasis in original). Defendants do not argue that Terraza has any such knowledge here, and Terraza affirmatively alleges that she did not have such knowledge until shortly before this lawsuit was filed. ECF No. 37 ¶ 35.

Defendants try to distinguish Tibble I by arguing that actual knowledge of the fiduciaries' decision-making process is not material to Terraza's claim because she "appears to be claiming that under no circumstances is it appropriate for an ERISA fiduciary to offer common trusts and separately managed accounts because they are not bound by SEC registration and prospectus requirements." ECF No. 46 at 16. This argument mischaracterizes Terraza's claims. Her complaint does not challenge the Defendants' decision to include the collective trusts and separately managed accounts solely on **[\*18]** the ground that they were not subject to the prospectus and SEC registration requirements. Rather, it challenges the Defendants' decision to include those options when viewed in light of their expense, their performance, and the investment portfolio as a whole. ECF No. 37 ¶¶ 4, 39, 42 (alleging that the Defendants "breached their fiduciary duties under ERISA by selecting and retaining opaque, high-cost, and poor-performing investments instead of other available and more prudent alternative investments" and that the Plan offered an overconcentration of these opaque investment options). These allegations go to the prudence of the Defendants' underlying decision-making process, and Tibble is therefore not distinguishable on this ground.

## C. Breach of Fiduciary Duty Claim

ERISA Section 404(a)(1) imposes the following duties on plan fiduciaries: the duty of loyalty, the duty of prudence, the duty to diversify the investments, and the duty to act in accordance with the documents and instruments governing the plan. 29 U.S.C. § 1104(a)(1). Terraza alleges that the Defendants breached the first three of these duties. ECF No. 37 ¶ 79.

In accordance with the duty of loyalty, "a fiduciary shall discharge his duties with respect to a plan solely **[\*19]** in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries[ ] and defraying reasonable expenses of administering the plan." Id. § 1104(a)(1)(A); White v. Chevron Corp., No. 16-CV-0793-PJH, 2016 U.S. Dist. LEXIS 115875, 2016 WL 4502808, at \*4 (N.D. Cal. Aug. 29, 2016). As defined in the Restatement (Third) of Trusts, which is helpful in "determining the contours of an ERISA fiduciary's duty," Tibble v. Edison Int'l, 135 S. Ct. 1823, 1828, 191 L. Ed. 2d 795 (2015), the duty of loyalty prohibits trustees from "engaging in transactions that involve self-dealing or that otherwise involve or create a conflict between the trustee's fiduciary duties and personal interests." Restatement (Third) of Trusts § 78 (2007).

Terraza v. Safeway Inc.

ERISA also requires that a pension plan fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Under this "prudent person" standard, courts must determine "whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." Donovan v. Mazzola, 716 F.2d 1226, 1232 (9th Cir. 1983). The prudence analysis **[\*20]** "focus[es] on a fiduciary's conduct in arriving at an investment decision, not on its results." In re Unisys Sav. Plan Litig., 74 F.3d 420, 434 (3d Cir. 1996). "Because the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts, the appropriate inquiry will necessarily be context specific." Fifth Third Bancorp v. Dudenhoeffer, 134 S. Ct. 2459, 2471, 189 L. Ed. 2d 457 (2014) (quoting 29 U.S.C. § 1104(a)(1)(B)). This duty of prudence extends to both the initial selection of an investment and the continuous monitoring of investments to remove imprudent ones. Tibble v. Edison Int'l, 135 S. Ct. 1823, 1828-29, 191 L. Ed. 2d 795 (2015).

Plan fiduciaries also have a duty to "diversify[] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." 29 U.S.C. § 1104(a)(1)(C). "As a general proposition, ERISA's duty to diversify prohibits a fiduciary from investing disproportionately in a particular investment or enterprise." In re Unisys Sav. Plan Litig., 74 F.3d 420, 438 (3d Cir. 1996). "The degree of investment concentration that would violate this requirement to diversify cannot be stated as a fixed percentage, because a fiduciary must consider the facts and circumstances of each case." Metzler v. Graham, 112 F.3d 207, 209 (5th Cir. 1997) (quoting H.R.Rep. No. 1280, 93d Cong., 2d Sess. (1974), reprinted in 1974 U.S.Code Cong. & Admin. News 5038, 5084-85 (Conference report at 304). "To establish a violation, a plaintiff must demonstrate that the **[\*21]** portfolio is not diversified 'on its face.'" Id. (quoting H.R. Rep. No. 93-1280 at 5084)

To state a claim for breach of fiduciary duty, a complaint does not need to contain factual allegations that refer directly to the fiduciary's knowledge, methods, or investigations at the relevant times. Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 718 (2d Cir. 2013). Even in the absence of such direct allegations, the court may be able to reasonably infer from the circumstantial factual allegations that the fiduciary's decision-making process was flawed. Id. (quoting Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 596 (8th Cir. 2009)). After all, "the circumstances surrounding alleged breaches of fiduciary duty may frequently defy particularized identification at the pleading stage." Concha v. London, 62 F.3d 1493, 1503 (9th Cir. 1995) ("Where a fiduciary exercises discretionary control over a plan, and assumes the responsibilities that this control entails, the victim of his misconduct often will not, at the time he files his complaint, be in a position to describe with particularity the events constituting the alleged misconduct.").

The Court now turns to the allegations in Terraza's complaint to determine whether she has plausibly stated a claim for breach of fiduciary duty.

## 1. Loyalty-Based Allegations

Defendants argue that, although the complaint includes prudence-based allegations, **[\*22]** it "alleges no facts suggesting that Defendants violated the distinct duty of loyalty." ECF No. 46 at 17. They point to cases where courts in this district have dismissed claims based on a breach of the duty of loyalty where the complaint failed to present separate allegations regarding the duty of loyalty. See Romero v. Nokia, Inc., No. C 12-6260 PJH, 2013 U.S. Dist. LEXIS 149166, 2013 WL 5692324, at *5 (N.D. Cal. Oct. 15, 2013); White, 2016 U.S. Dist. LEXIS 115875, 2016 WL 4502808, at *4-5.

Unlike the plaintiffs in Romero and White, whose duty of loyalty claims "hinge[d] entirely on the prudence-based allegations," Terraza's complaint includes separate loyalty-based allegations. Romero, 2013 U.S. Dist. LEXIS 149166, 2013 WL 5692324 at *5; see also White, 2016 U.S. Dist. LEXIS 115875, 2016 WL 4502808 at *5 ("[T]he complaint pleads no facts sufficient to raise a plausible inference that defendants took any of the actions alleged for the purpose of benefitting themselves or a third-party entity . . . at the expense of the Plan participants, or that they acted under any actual or perceived conflict of interest in

Terraza v. Safeway Inc.

administering the Plan."). For example, Terraza alleges that "Defendants tasked the trustee [JP Morgan Chase Bank] with confirming the value of its own Common Trusts, an obviously profound conflict-of-interest which is especially dangerous, as these Common Trusts are unregistered and not publicly [*23] traded." ECF No. 37 ¶ 69. In addition, she alleges that, according to the 2013-2014 financial statement, "[c]ertain Plan investments are managed or *significantly influenced* by J.P. Morgan Chase Bank N.A., trustee of the Plan." Id. ¶ 51 (emphasis in original). Based on this disclosure, she alleges that this "relationship and influence inappropriately affected and compromised the Plan's investment options." Id. ¶ 52. She further alleges that "JPMCB has a notorious history of engaging in unlawful product-steering practices to influence its customers to invest in its own proprietary funds and, upon information and belief, JPMCB engaged in the same or similar practices with respect to the Plan, and Defendants allowed those practices to occur without addressing or remedying them." Id.

These allegations plausibly suggest that the Safeway Defendants breached their duty of loyalty by allowing the Plan's trustee to make Plan-related decisions that were not in the best interests of Plan participants.

**2. Duty to Disclose**

Consistent with its duty of loyalty, a plan fiduciary must disclose material investment information to Plan participants. Washington v. Bert Bell/Pete Rozelle NFL Ret. Plan, 504 F.3d 818, 823-24 (9th Cir. 2007). "Information is material if there is a substantial likelihood that [*24] nondisclosure 'would mislead an adequately informed decision regarding benefits to which she might be entitled.'" Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 599 (8th Cir. 2009) (quoting Krohn v. Huron Mem'l Hosp., 173 F.3d 542, 551 (6th Cir. 1999)); see also Washington, 504 F.3d at 824 (citing Krohn, 173 F.3d at 547). "Materiality is a fact intensive issue which can be decided as a matter of law only if no reasonable trier of fact could disagree." Braden, 588 F.3d at 599.

In 2011, the Department of Labor issued a regulation that outlines the disclosure requirements that ERISA Plan administrators must follow to comply with their fiduciary duties. See 29 C.F.R. § 2550.404a-5. Pursuant to that regulation, the Plan administrator "must take steps to ensure . . . that such participants and beneficiaries, on a regular and periodic basis, are made aware of their rights and responsibilities with respect to the investment of assets held in, or contributed to, their accounts and are provided sufficient information regarding the plan, including fees and expenses attendant thereto, to make informed decisions with regard to the management of their individual accounts." Id. § 2550.404a-5(a). The information provided in such disclosures must be "complete and accurate." Id. § 2550.404a-5(b). Specifically, the Plan administrator must provide to each Plan participant "an explanation of any fees and expenses [*25] for general plan administrative services (e.g., legal, accounting, recordkeeping), which may be charged against the individual accounts of participants and beneficiaries . . . " Id. § 2550.404a-5(c)(2)(i)(A). The Plan administrator is also required to disclose investment-related information to participants, including performance data, benchmarks, and fee and expense information. Id. § 2550.404a-5(d).

Terraza alleges that the Defendants breached their fiduciary duties by failing to fully and accurately disclose information to Plan participants about expenses, fees and risks. ECF No. 37 ¶¶ 44-59. With respect to expenses, she alleges that "all that Defendants disclosed to participants was the gross expense ratio of any given investment option without detailing the layered fees that existed within these largely unregistered products, the amount of revenue sharing being paid to the Plan's service provider . . . , the purpose of such revenue sharing payments and whether the amount related in any manner to the services being rendered to the Plan and/or the actual entities receiving the revenue sharing payments." Id. She also alleges that the Defendants "fail[ed] to disclose that certain portions of those investment fees may be paid to the [*26] recordkeeper or the trustee as revenue sharing." Id.[4] She claims that "[t]his lack of clarity renders a determination of the true and full nature of the expenses or fees being

---

[4] She further contends that, "putting aside the undisclosed or indiscernible fees, the disclosed fees are grossly excessive in light of the size and bargaining power of the Plan." Id. ¶¶ 55, 48, 50. The Court addresses these allegations, *infra*, in Parts IV.C.4. (excessive fees) and IV.C.5 (revenue-sharing payments).

charged and incurred nearly impossible, and precludes participants from making informed decisions regarding their investments." Id.

Defendants respond that "all the information required under applicable [Department of Labor] regulations regarding the fees, expenses and investment performance of the Plan's investment options and revenue sharing arrangements were provided in the annual Participant Disclosure Notices." ECF No. 46 at 20. They further argue that "[i]nformation regarding the fees paid to service providers (i.e. direct and indirect compensation) is also reported in the Plan's Forms 5500 which are available to the public on the DOL's website." Id. at 20-21.

With respect to investment fees and revenue sharing payments, the judicially-noticed disclosures that the Defendants provided to Plan participants during the relevant time period comply with the Department of Labor's regulation. See ECF Nos. 47-10, 47-11, 47-12, 47-13, 47-14. First, the Participant Disclosure Notices provide that "[e]ach investment has a fee associated with it to [*27] cover the cost of managing the investments." ECF No. 47-13 at 5. They go on to explain that "[t]he fee is generally taken as a percentage of money invested and is shown as a gross expense ratio," which "is shown as a percentage of assets in the fund and reduces the rate of return of the fund." Id. The notices also list the gross expense ratio associated with each individual investment option. See, e.g., ECF No. 47-13 at 7-9. The notices explain that "[t]hese fees cover the cost of administering and servicing the plan, which could include recordkeeping, auditing, legal and trustee/custodial expenses." ECF No. 47-13 at 5. And the notices explicitly provide that "J.P. Morgan Retirement Plan Services LLC and its affiliates and agents may receive compensation with respect to plan investments, including, but not limited to, sub-transfer agent, recordkeeper, shareholder servicing, 12b-1 or other revenue-sharing fees." ECF No. 47-10 at 5; see also ECF No. 47-13 at 13 ("GWFS Equities, Inc., or one or more of its affiliates, including Great-West Financial Retirement Plan Services, LLC, may receive a fee from the investment option provider for providing certain recordkeeping, distribution and administrative [*28] services."). The actual fees paid to record-keepers, both direct and indirect, were also disclosed in the Plan's Form 5500s, which are available to the public on the

Department of Labor's website. See ECF Nos. 47-4, 47-5, 47-6, 47-7, 47-8, 47-9. Therefore, Terraza's allegations that the Defendants failed to adequately disclose investment fees and revenue sharing payments to the record-keeper are rendered implausible by the judicially-noticed disclosures. See Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir. 2003) (explaining that the court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint") (quoting Steckman v. Hart Brewing, Inc., 143 F.3d 1293, 1295-96 (9th Cir. 1998)).

Nor are fiduciaries are required to disclose the "breakdown" of the gross expense ratio associated with each investment option—e.g., the percentage of the total fee that ultimately goes to the trustee as opposed to the record-keeper. ECF No. 53 at 9, 17, n. 17; ECF No. 37 ¶¶ 44, 48, 50. The Department of Labor regulation simply requires that fiduciaries disclose "[t]he total annual operating expenses of the investment expressed as a percentage (i.e., expense ratio) . . ." 29 C.F.R. § 2550.404a-5(d)(1)(iv)(A).[5] As the Seventh Circuit explained in Hecker, "[t]he total fee, not the internal, post-collection distribution [*29] of the fee, is the critical figure for someone interested in the cost of including a certain investment in her portfolio and the net value of that investment." Hecker v. Deere & Co., 556 F.3d 575, 585-86 (7th Cir. 2009). Information regarding "[t]he later distribution of the fees . . . is not information the participants needed to know to keep from acting to their detriment," and "thus not material." Id. Because "the participants were told about the total fees imposed by the various funds, and the participants were free to direct their dollars to lower-cost funds if that was what they wished to do," the fiduciaries in Hecker had not breached their duty to disclose in this respect. Id. The same is true here.

---

[5] Terraza cites to a provision that tells fiduciaries how to "calculate[]" the "total annual operating expenses," but that provision does not alter what must otherwise be disclosed to plan participants under § 2550.404a-5(d)(1)(iv)(A). See 29 C.F.R. § 2550.404a-5(h)(5); ECF No. 53 at 18, n. 17. The Department of Labor's final rule adopting the regulation confirms that "such a breakdown is not necessary, or particularly useful, to participants and beneficiaries; the final rule therefore also allows for 'aggregate' disclosure of administrative expenses, as proposed." Fiduciary Requirements for Disclosure in Participant-Directed Individual Account Plans, 75 FR 64910-01, n. 8.

Terraza argues that "compliance with 29 C.F.R. § 2550.404a-5 does not automatically mean that a fiduciary satisfies its general duty to disclose." ECF No. 53 at 17. However, the regulation explicitly provides that "[c]ompliance with paragraphs (c) and (d) of this section will satisfy the duty to make the regular and periodic disclosures described in paragraph (a) of this section, provided that the information contained in such disclosures is complete and accurate." 29 C.F.R. § 2550.404a-5(b). In turn, paragraph (a) references this duty to disclose in the context of the broader fiduciary duties of loyalty and prudence. Id. § 2550.404a-5(a). Moreover, the Department [*30] of Labor's final rule adopting the regulation states that the regulation "establishes uniform, basic disclosures for such participants and beneficiaries." Fiduciary Requirements for Disclosure in Participant-Directed Individual Account Plans, 75 FR 64910-01 at 64910. Therefore, the text of the regulation itself, as well as the Department of Labor's guidance regarding the regulation, suggest that a fiduciary satisfies its duties of prudence and loyalty if it complies with the regulation's disclosure requirements.[6]

In sum, the Defendants' disclosures with respect to fees, expenses, and revenue sharing payments comply with the Department of Labor's regulation on their face and are "complete and accurate," and Terraza fails to allege any extraordinary circumstances that would require additional disclosures. Therefore, she has failed to plausibly allege that the Defendants breached their fiduciary duties with respect to these disclosures.

Terraza does, however, plausibly allege that the Defendants failed to disclose other material information to Plan participants. For example, she alleges that the fiduciaries' characterization of the JP Morgan target date funds as "passive" is misleading because those funds

"combine both actively managed and indexed strategies." ECF No. 37 ¶ 53. She [*31] further alleges that "[t]here was no meaningful information supplied to Plan participants regarding Safeway's common stock fund . . . such as whether an investment manager was appointed [and] the use or availability of short-term holdings." Id. ¶ 59. With respect to risk, she alleges that the 2013-2014 financial statement disclosed a "concentration of risk" without identifying the mutual fund associated with that risk. Id. ¶ 58. As a result, she alleges, "it is impossible to determine if inclusion of that mutual fund unbalances the risk allocation of the Plan's investment options as a whole, and participants were not fully informed of that investment option's risk . . ." Id. Finally, she alleges that the fiduciaries failed to disclose "the exact nature, extent, and identity of investment options 'significantly influenced' by JPMCB." Id. ¶ 52. These detailed factual allegations plausibly suggest that the fiduciaries failed to disclose "complete and accurate" information regarding certain investment options and conflicts, thus breaching their duty of loyalty to Plan participants. See Braden, 588 F.3d at 600 ("ERISA's duty of loyalty may require a fiduciary to disclose latent conflicts of interest which affect participants' [*32] ability to make informed decisions about their benefits."). And the Court cannot conclude as a matter of law that this information would not be material to a reasonable employee when making an informed investment decision. Washington, 504 F.3d at 824; Braden, 588 F.3d at 599.

Terraza has plausibly alleged that the Defendants breached their duty of loyalty by failing to disclose material information to Plan participants.

### 3. Overconcentration of Opaque Investment Options

Plaintiff alleges that the Defendants breached their fiduciary duties by offering a disproportionate number of non-transparent investment options in the form of common trusts and separately managed accounts. ECF No. 37 ¶¶ 36-39. She alleges that "nine of the 15 riskier investment options were opaque Common Trust vehicles, with two of the remaining six options non-transparent SMAs." Id. ¶ 30. She further alleges that, "as of December 31, 2014, over *a third* of the Plan's $1.9 billion in assets were placed in the opaque Common Trusts and over *48%* were placed in Common Trusts or SMAs." Id. ¶ 42. She notes in her complaint that these

---

[6] Terraza points to a footnote in a Department of Labor's final rule adopting the regulation, which provides that "there may be extraordinary situations when fiduciaries will have a disclosure obligation beyond those addressed by the final rule." Fiduciary Requirements for Disclosure in Participant-Directed Individual Account Plans, 75 FR 64910-01, n. 17. The footnote cites fraud as an example of the kind of extraordinary situation that would impose additional disclosure obligations. Id. But Terraza does not allege any such "extraordinary" circumstances here that would impose additional disclosure obligations above and beyond those imposed by the regulation.

investment options "are not required to file a prospectus or registration statement with the SEC." Id. at 13, n. 2, 3.

Defendants argue that the inclusion of common [*33] trusts and separately managed accounts does not constitute "a *per se* ERISA violation" and that Terraza has failed to allege facts that would otherwise suggest imprudence in this regard. ECF No. 46 at 19. They further argue that "the claims in the FAC boil down to nothing more than an argument that because SMAs and common trusts are not subject to prospectus and SEC registration requirements, they are inferior to mutual funds and therefore imprudent." Id.

The Court agrees with the Defendants. Although these investment vehicles are not subject to certain SEC requirements, courts have recognized that common trusts and SMAs offer "numerous benefits to Plan participants over retail mutual funds." White v. Chevron Corp., No. 16-CV-0793-PJH, 2016 U.S. Dist. LEXIS 115875, 2016 WL 4502808, at *9 (N.D. Cal. Aug. 29, 2016). And Terraza fails to cite a single case holding that fiduciaries breach their duty of prudence by offering a disproportionate number of these investment vehicles in their plans. In fact, one court recently rejected a similar theory, finding that "[t]he concentration of mutual funds in the [plan], without more, does not support a finding that [the defendants] breached their fiduciary duties under ERISA." Rosen v. Prudential Ret. Ins. & Annuity Co., No. 3:15-CV-1839 (VAB), 2016 U.S. Dist. LEXIS 180567, 2016 WL 7494320, at *15 (D. Conn. Dec. 30, 2016) (rejecting [*34] plaintiffs' argument that the defendants breached their fiduciary duties by offering sixteen investment options, fourteen of which were mutual funds). Although Terraza alleges that the Defendants here acted imprudently by offering an overconcentration of common trusts and SMAs at the expense of mutual funds, her theory fails for the same reasons.

Terraza's allegations regarding the overconcentration of opaque investment options offered by the Plan fail to support her claim for breach of fiduciary duty.

### 4. Excessive Fees

Next, Terraza alleges that the Defendants breached their fiduciary duties by offering "excessively priced and poorly performing investment options." ECF No. 37 ¶

40. She alleges that "Defendants offered investments in the Plan that had grossly excessive fees by any objective standard (and paid correspondingly excessive fees to the Plan's service provider . . . for recordkeeping and related services)." Id. ¶ 17. She further alleges that "[t]hese fees are, on their face, unreasonable in many instances and often are multiple times higher than the amounts they should be (when compared to the expense ratios that would be associated with typical mutual fund share classes held in retirement [*35] plan assets of the same or similar size of the Safeway Plan), based upon the market and negotiating power of the Plan at the time that these investment options were offered." Id. ¶ 60. Specifically, Terraza challenges the decision to include the following investment options based on their excessive fees: the SSgA S&P 500 Index NL-A Common Trust (gross expense ratio of .16 percent); the Interest Income Fund (gross expense ratio of .25%); the JP Morgan target date funds (gross expense ratio between .47 percent and .50 percent); the PIMCO Bond Fund SMA (gross expense ratio of .46 percent); the Dodge & Cox Stock Mutual Fund (gross expense ratio of .52 percent); Wells Fargo Advantage Large Cap Growth-Inst Mutual Fund (gross expense ratio of .79 percent); and RS Small Cap Value Portfolio SMA (gross expense ratio of .89 percent). Id. ¶¶ 60-68. Terraza alleges that these investment options all charged higher expense ratios than, and underperformed relative to, comparable options offered by Vanguard during the relevant period. Id. She further alleges that the total plan cost was two to three times more expensive than the average for plans of a similar size. Id. ¶ 31.

The Defendants' failure [*36] to offer the investment option with the lowest expense ratio is not enough, on its own, to plausibly state a claim for breach of the duty of prudence. As the Seventh Circuit has repeatedly explained, "[t]he fact that it is possible that some other funds might have had even lower ratios is beside the point; nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)." Hecker v. Deere & Co., 556 F.3d 575, 586 (7th Cir. 2009); Loomis v. Exelon Corp., 658 F.3d 667, 670 (7th Cir. 2011) (quoting Hecker, 556 F.3d at 586). The Ninth Circuit has agreed with this approach, noting that "[t]here are simply too many relevant considerations for a fiduciary, for that type of bright-line approach to prudence to be tenable." Tibble v. Edison

Int'l, 729 F.3d 1110, 1135 (9th Cir. 2013), vacated on other grounds, 135 S. Ct. 1823, 191 L. Ed. 2d 795 (2015). Courts in this district have similarly cautioned that "[i]t is inappropriate to compare distinct investment vehicles solely by cost, since their essential features differ so significantly." See, e.g., White v. Chevron Corp., No. 16-CV-0793-PJH, 2016 U.S. Dist. LEXIS 115875, 2016 WL 4502808, at *12 (N.D. Cal. Aug. 29, 2016). Therefore, the Court cannot reasonably infer from the fee differential on its own that the Defendants acted imprudently in selecting the challenged funds.

However, Terraza alleges more than that, and the remaining allegations in the complaint create a plausible [*37] inference that the Defendants' decision-making process was flawed. See Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 601, n.7 (8th Cir. 2009) (noting that, although "a bare allegation that cheaper alternative investments exist in the marketplace" is not sufficient on its own to state a claim for a breach of fiduciary duty under ERISA, a court ruling on a motion to dismiss must rest its conclusions "on the totality of the specific allegations in [the] case"). For example, she alleges that, "during the pertinent period, almost all of the investment options . . . underperformed compared to their benchmark." Id. ¶ 60. While it is true that "we judge a fiduciary's actions based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight," St. Vincent, 712 F.3d at 716 (internal citations and quotation marks omitted), a fiduciary also "has a continuing duty of some kind to monitor investments and remove imprudent ones" that "exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." Tibble, 135 S. Ct. at 1828-29. And Terraza alleges that "[a]ll of this information [regarding the challenged funds' underperformance] was known and/or available to Defendants each and every year during the pertinent period [*38] when they maintained this costly and unreasonable investment option in the Plan." Id. ¶¶ 61-68. Terraza also alleges a potential reason why the Defendants might have selected and retained at least some of these relatively expensive and underperforming investment options: at the time the Plan selected the JP Morgan target date funds, JP Morgan Chase Bank was trustee of the Plan, JP Morgan Retirement Plan Services was record-keeper for the Plan, and the 2013-2014 financial disclosures state that "[c]ertain plain

investments are managed or *significantly influenced* by J.P. Morgan Chase Bank N.A." Id. ¶ 51 (emphasis in original). Terraza further alleges that this "relationship and influence inappropriately affected and compromised the Plan's investment options." Id. ¶ 52. When viewed collectively, the Court can reasonably infer from these allegations that the Defendants engaged in a flawed decision-making process by selecting and retaining the challenged investment options. See Braden, 588 F.3d at 596-98 (holding that the plaintiff stated a claim for breach of fiduciary duty where he alleged that the Plan offered funds that charged higher fees than available alternatives, that underperformed during the relevant time period, [*39] and that were included in the Plan because of improper influence by the Plan's trustee).

The Court also notes that, at least with respect to one of the investment options offered by the Plan, the *only* difference between the option that was offered and the option that allegedly should have been offered was price. With respect to the JP Morgan target date funds, Terraza alleges that "Defendants did not even secure the least expensive share class available, despite the Safeway Plan's size (making the least expensive share class easily available)." ECF No. 37 ¶ 63. She points out that "[t]he Plan offered the C20 share class, which, as of March 31, 2016, had an expense ratio of either 45 or 46 basis points (.45% or .46%)," even though the Plan qualified for both the CF share class (which charged 25 or 26 basis points) and the CF10 share class (which charged 35 or 36 basis points) based on its size. Id. Defendants concede in their briefing that the plaintiff in Braden made a similar allegation and that, in those circumstances, "there was no distinction whatsoever, *other than price*, between the funds actually offered and the funds that [the] plaintiff in *Braden* alleged should have been offered." [*40] ECF No. 56 at 11. The same is true here: Terraza alleges that the Defendants could have offered the exact same investment option for a lower price based on the Plan's size. The Court can reasonably infer from this allegation that the Defendants acted imprudently by selecting the more expensive option, all else being equal.

Although the Defendants may ultimately persuade the Court that they had legitimate reasons to select the challenged investment options, and thus did not act imprudently, Terraza has satisfied her burden at this stage of the litigation by alleging facts from which the

Terraza v. Safeway Inc.

Court can reasonably infer that the Defendants' decision-making process was flawed. See Braden, 588 F.3d at 596 (holding that, although the defendants "could have chosen funds with higher fees for various reasons," "Rule 8 does not require a plaintiff to plead facts tending to rebut all possible lawful explanations for a defendant's conduct").

Defendants argue that the challenged expense ratios are nonetheless within a range that other courts have found to be "reasonable as a matter of law." ECF No. 46 at 23. This argument suffers from several infirmities.

First, this approach would effectively carve out a presumption of prudence for [*41] expense ratios that fell within a certain range. But the Supreme Court has rejected presumptions of prudence in the ERISA pleading context, advocating instead for "careful, context-sensitive scrutiny of a complaint's allegations" as a means to "divide the plausible sheep from the meritless goats." Fifth Third Bancorp v. Dudenhoeffer, 134 S. Ct. 2459, 2470, 189 L. Ed. 2d 457 (2014). The Ninth Circuit has similarly rejected a "bright-line approach to prudence" that hinges exclusively on cost, noting that "[t]here are simply too many relevant considerations for a fiduciary" for that approach to be tenable. See Tibble I, 729 F.3d at 1135. Even the Defendants argue elsewhere in their briefing that cost should not be dispositive of the prudence inquiry. ECF No. 46 at 23 ("[P]rice is not the only factor.") (emphasis in original). But they cannot have their cake and eat it, too. Just as the plaintiff cannot plausibly allege a breach of fiduciary duty by simply pointing to the cost of the challenged investment in isolation, the defendants cannot defeat a claim for breach of fiduciary duty by doing the same thing. In other words, the prudence inquiry is "fact intensive." Tussey, 746 F.3d at 336. And, because it involves the application of a reasonableness standard, "[r]arely will such a determination be appropriate on a motion for summary judgment," [*42] let alone a motion to dismiss. Bd. of Trustees of S. California IBEW-NECA Defined Contribution Plan v. Bank of N.Y. Mellon Corp., No. 09 CIV. 6273 RMB, 2011 WL 6130831, at *3 (S.D.N.Y. Dec. 9, 2011). The Court therefore refuses to adopt an approach that would immunize an investment from scrutiny simply because its expense ratio fell within a certain range.

The Ninth Circuit's decision in Tibble I is consistent with this fact intensive approach to the prudence inquiry. There, the Ninth Circuit affirmed the district court's *summary judgment* order, not a dismissal under Rule 12(b)(6). Tibble v. Edison Int'l ("Tibble I"), 729 F.3d 1110, 1135 (9th Cir. 2013), vacated on other grounds, 135 S. Ct. 1823, 191 L. Ed. 2d 795 (2015). In deciding to grant the defendant's motion for summary judgment, the district court below had relied on a wealth of evidence to assess whether the inclusion of the challenged fund was prudent, including expert testimony regarding whether the alternative investment option was an appropriate comparator. See Tibble v. Edison Int'l, 639 F. Supp. 2d 1074, 1115 (C.D. Cal. 2009), aff'd, 711 F.3d 1061 (9th Cir. 2013), and aff'd, 729 F.3d 1110 (9th Cir. 2013), and aff'd, 820 F.3d 1041 (9th Cir. 2016), and vacated and remanded on other grounds, 843 F.3d 1187 (9th Cir. 2016). The district court ultimately concluded that "Plaintiffs [had] not identified any evidence" to suggest that "the retail mutual funds that were actually chosen for inclusion [*43] in the Plan underperformed as compared to other retail mutual funds that were available on the market." Id. at 1116. On appeal, the Ninth Circuit referenced the lower court's post-trial findings of fact, and then went on to note, "[n]or is the particular expense ratio range [of .03 to two percent] out of the ordinary enough to make the funds imprudent." Tibble I, 729 F.3d 1110, 1135. This sentence, when viewed in its context and in light of the procedural posture of the case, does not suggest that an investment is necessarily prudent as a matter of law just because its expense ratio falls within a particular range. Rather, the Ninth Circuit was simply noting, after relying primarily on the district court's extensive post-trial findings of fact, that the challenged expense ratios were not so excessive on their face that they could create a triable issue regarding breach of fiduciary duty absent any other evidence that would otherwise suggest imprudence.

Unlike the district court in Tibble I, this Court is not being asked to decide whether the evidence sufficiently backs up Terraza's claims at this early stage in the litigation. Rather, it must accept those allegations as true and construe any inferences reasonably flowing from [*44] those allegations in the light most favorable to her. As explained above, Terraza's complaint, when read as a whole, plausibly alleges that the Defendants acted imprudently by offering the challenged investment options. Tibble I is therefore distinguishable.

The out-of-circuit cases that the Defendants rely on are also distinguishable because they involved challenges to the overall range of investment options offered in the portfolio as a whole, rather than a challenge to the fiduciary's decision to include a particular investment option. For example, the plaintiffs in Renfro challenged the "plan's mix and range of investment options," not "the prudence of the inclusion of any particular investment option." Renfro v. Unisys Corp., 671 F.3d 314, 325-28 (3d Cir. 2011) (dismissing the plaintiffs' claim because the plan offered "a reasonable range of investment options with a variety of risk profiles and fee rates," including an expense ratio range between .1 percent to 1.21 percent). Given the nature of the plaintiffs' claim, the Renfro court framed its holding in the following way: "[T]he range of investment options and the characteristics of those included options—including the risk profiles, investment strategies, and associated fees—are highly [*45] relevant and readily ascertainable facts against which the plausibility of *claims challenging the overall composition of a plan's mix and range of investment options* should be measured." Id. at 327 (emphasis added). The plaintiffs in Hecker similarly challenged "the fee distribution," alleging that the fiduciaries "offered *only* investment options with excessively high fees." Hecker v. Deere & Co., 556 F.3d 575, 584-85 (7th Cir. 2009) (emphasis added) (dismissing plaintiffs' claim because "the undisputed facts leave no room for doubt that the Deere Plans offered a sufficient mix of investments for their participants," including a "wide range of expense ratios" between .07 percent and just over one percent). Later, in Loomis, the Seventh Circuit characterized its holding in Hecker in the following way: "We held that as a matter of law that was an acceptable array of investment options." Loomis v. Exelon Corp., 658 F.3d 667, 670 (7th Cir. 2011). In other words, those courts held that the *range* of expense ratios offered was reasonable, not that a fiduciary's decision to include an investment option that has an expense ratio within that range is always reasonable as a matter of law.

In contrast, Terraza's allegations regarding excessive fees challenges the inclusion of specific investment options. As a result, [*46] the overall expense ratio range is less relevant in this case. "Under ERISA, the prudence of investments or classes of investments offered by a plan must be judged individually." Langbecker v. Elec. Data Sys. Corp., 476 F.3d 299, 325

(5th Cir. 2007) (citing In re Unisys Sav. Plan Litig., 74 F.3d 420, 438-41 (3d Cir. 1996)). In other words, "a fiduciary must initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants." DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 423 (4th Cir. 2007) (emphasis in original). While it is true that, consistent with "modern portfolio theory," fiduciaries must also give appropriate consideration to "the role [an] investment or investment course of action plays in that portion of the plan's investment portfolio," courts have cautioned that, "[s]tanding alone, [modern portfolio theory] cannot provide a defense to the claimed breach of the 'prudent [person]' duties . . . " Id. (quoting 29 C.F.R. § 2550-404a-1). Therefore, the Defendants cannot point to the prudence of the portfolio as a whole to evade their duty of prudence with respect to the challenged investment options.

Moreover, to the extent Hecker and its progeny are relevant, they are nonetheless distinguishable on another ground: Safeway's Plan offered a much narrower range of investment options and higher minimum expense ratios. According to the annual participant fee disclosure [*47] notices, the Plan offered a total of eighteen to twenty-two investment options during the relevant time period, with expense ratios that ranged from .15 percent to 1.42 percent. ECF Nos. 47-10, 47-11, 47-12, 47-13, 47-14. This limited menu of options pales in comparison to the over 2,500 mutual funds offered by the plan in Hecker and the seventy-three options offered by the plan in Renfro. Hecker, 556 F.3d at 578; Renfro, 671 F.3d at 318. With respect to the number of investment options offered, this case is more analogous to Braden, where the plan offered just thirteen investment options. Braden, 588 F.3d at 589. There, the court concluded that "[t]he far narrower range of investment options available in this case makes more plausible the claim that this Plan was imprudently managed." Id. at 596, n. 6. The lowest expense ratio offered during the relevant time period, .15 percent, is also higher than the lowest expense ratios offered by the plans at issue in the Hecker line of cases. Hecker, 556 F.3d at 581 (minimum expense ratio of .07 percent); Loomis, 658 F.3d at 669 (minimum expense ratio of .03 percent); Renfro, 671 F.3d at 319 (minimum expense ratio of .1 percent).

The Hecker line of cases is distinguishable for yet

another reason. See Tussey, 746 F.3d at 336 (noting that the courts in Hecker, Loomis, and Renfro "carefully limited their decisions to the facts presented"). [*48] The Eighth Circuit has distinguished Hecker and its progeny where the complaint includes "allegations of wrongdoing with respect to fees." Id. ("The facts of this case, unlike the cited cases, involve significant allegations of wrongdoing, including allegations that [the fiduciaries] used revenue sharing to benefit [the fiduciaries] and [the record-keeper] at the Plan's expense."). Like the plaintiffs in Braden and Tussey, Terraza alleges that the fiduciaries engaged in wrongdoing by unreasonably compensating the Plan's record-keeper through revenue sharing payments. ECF No. 37 ¶¶ 4, 44-48, 55. She also alleges that the fiduciaries erred by allowing the Plan's trustee to improperly "influence[]" the investment options offered by the Plan. Id. ¶ 51. These allegations further support Terraza's claim that the fiduciaries breached their duties to the Plan.

Finally, lacking support from the federal circuit courts, the Defendants point to a decision from a court in this district, White v. Chevron Corp., No. 16-CV-0793-PJH, 2016 U.S. Dist. LEXIS 115875, 2016 WL 4502808, at *1 (N.D. Cal. Aug. 29, 2016). The analogy to that case fails for the same reasons. As an initial matter, it is unclear whether that case dealt with a challenge to the overall investment lineup, the inclusion [*49] of particular funds, or some combination of the two. Id. 2016 U.S. Dist. LEXIS 115875, [WL] at *8, *12 ("This cause of action challenges the defendants' decisions with regard to the selection and maintenance of the Plan's mix and range of investment options. . . . [w]hile plaintiffs appear to be challenging the entire lineup of funds, the challenge is primarily based on speculation that the Plan fiduciaries "could have" provided lower-cost versions of the funds, . . ."). In any event, the White court relied on Hecker and its progeny for the proposition that "[t]he breadth of investments and range of fees the Plan offered participants fits well within the spectrum that other courts have held to be reasonable as a matter of law." 2016 U.S. Dist. LEXIS 115875, [WL] at * 11.[7] The court concluded that "the Plan fiduciaries

provided a diverse mix of investment options and expense ratios for participants." Id. As explained above, the breadth and range of investment options is less relevant here because, unlike the plaintiff in White, Terraza does not challenge the overall range of fees offered. Moreover, to the extent the overall range is relevant to Terraza's claim regarding the inclusion of the challenged funds, the plan at issue in White offered thirty-one investment options, almost one-third [*50] more than the maximum number of options offered by Safeway's Plan, and the lowest expense ratio offered by the plan in White was just .05 percent, compared to the .15 percent minimum expense ratio offered here. Id. 2016 U.S. Dist. LEXIS 115875, [WL] at *2, *11. White is also distinguishable because there were no allegations of wrongdoing. Id. For all of these reasons, the White court concluded that the claims at issue there were "more akin to the claims that failed in Loomis, Renfro, and Hecker." 2016 U.S. Dist. LEXIS 115875, []WL at *12.

In sum, this case is more analogous to the Braden line of cases than the Hecker line. The Defendants argue that, when viewed in isolation, each of Terraza's allegations do not plausibly suggest a flawed decision-making process. However, "the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." Braden, 588 F.3d at 594 (citing Vila v. Inter—Am. Inv. Corp., 570 F.3d 274, 285, 386 U.S. App. D.C. 364 (D.C. Cir. 2009)). When read in this way, and when construed in the light most favorable to her, Terraza's allegations plausibly suggest that the Defendants acted imprudently in selecting and retaining the challenged investment options.

## 5. Revenue Sharing Payments

Terraza alleges throughout her complaint that the Defendants breached their fiduciary duties by [*51] allowing the Plan to pay "grossly excessive" and "unreasonable" revenue sharing payments to the trustee and record-keeper. ECF No. 37 ¶¶ 4, 44-48, 55.

Revenue sharing arrangements are not per se prohibited under ERISA. See White, 2016 U.S. Dist. LEXIS 115875, 2016 WL 4502808 at *14 (rejecting "plaintiffs' conclusory assertion that fees under a revenue-sharing

---

[7] Notably, the White court granted the plaintiff leave to amend the complaint, suggesting that the challenged expense ratios were not actually per se reasonable as a matter of law. 2016 U.S. Dist. LEXIS 115875, at *19. If they were, any amendment would have been futile.

arrangement are necessarily excessive and unreasonable" as "without support"); Rosen v. Prudential Ret. Ins. & Annuity Co., No. 3:15-CV-1839 (VAB), 2016 WL 7494320, at *10 (D. Conn. Dec. 30, 2016) ("Plaintiffs' allegations that Prudential engaged in revenue sharing, without more, do not state a claim for a violation of ERISA.").[8] However, the Employee Benefits Security Administration of the United States Department of Labor has opined that, to comply with their fiduciary duties under ERISA, "the responsible plan fiduciaries must assure that the compensation the plan pays directly or indirectly to [the service provider] for services is reasonable, taking into account the services provided to the plan as well as all fees or compensation received by [the service provider] in connection with the investment of plan assets, including any revenue sharing." Employee Benefits Security Administration of the U.S. Department of Labor, Advisory Opinion 2013-03A [*52] (July 3, 2013).

Terraza alleges that, because the 2013-2014 financial statement provides that "[p]articipants are charged $3.00 quarterly to cover the administrative costs of the [P]lan," any additional fees paid to the trustee or record-keeper via revenue sharing payments above and beyond this amount are "by definition, excessive and unreasonable." ECF No. 37 ¶ 46; ECF No. 53 at 20.[9] Courts have denied motions to dismiss claims for breach of fiduciary duty where the plaintiff made similar allegations. See, e.g., Santomenno v. Transamerica Life Ins. Co., No. CV 12-02782 DDP MANX, 2013 U.S. Dist. LEXIS 22354, 2013 WL 603901, at *3, *10 (C.D. Cal. Feb. 19, 2013) (holding that plaintiffs had stated a claim for breach of fiduciary duty where they alleged that the revenue sharing payments to the third-party service provider were excessive because "the underlying mutual funds' investment management fees covered all of the necessary investment management/advisory services needed for the mutual fund") (internal quotation marks omitted).

The Defendants dispute the factual premise upon which Terraza's allegations regarding excessive revenue sharing payments is based, arguing that, "although revenue sharing payments were made from the investment options to the Plan's recordkeeper, the amount of compensation JPM [*53] received in exchange for the services it provided was capped at a flat per participant fee of $67," which was lowered to $65 in 2011. ECF No. 46 at 21. As a result, they argue, Terraza has failed to allege facts that plausibly suggest misconduct. Id. at 21-22.

Although the Court construes all allegations in the complaint as true when ruling on a motion to dismiss, it is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir. 2003) (quoting Steckman v. Hart Brewing, Inc., 143 F.3d 1293, 1295-96 (9th Cir. 1998)). Therefore, the Court also considers the extent, if any, to which the judicially-noticed documents contradict Terraza's allegations or otherwise render them implausible.

Some aspects of the master services agreement support the Defendants' compensation theory. In that document, Safeway agreed to compensate JP Morgan Retirement Planning Services, and later Great-West, for their record-keeping services through an annual "Contingent Per Participant Fee." ECF No.47-17 at 22. Under this arrangement, the record-keeper would initially be "compensated from . . . the service fees or other compensation paid to [the record-keeper] with respect to the Plan's investment options." Id. That is, the record-keeper would [*54] receive a percentage of the fees charged for each investment as a credit toward record-keeping services. Id. at 30. This is what Terraza refers to as the revenue-sharing payments. However, the agreement goes on to provide that these payments were simply used to offset the annual per-participant fee: If the service fees that the record-keeper received for a particular quarter fell below one-quarter of the annual per-participant fee, Safeway was required to "make a lump sum payment to [the record-keeper] ... in an amount equal to the difference between the foregoing amount and the amount of the actual annual service fees received by [the record-keeper]." Id. at 22. Conversely, "[i]n the event the annual service fees received by [the record-keeper] exceed $65.00 per Participant at the end

---

[8] In fact, courts have noted that revenue sharing is a "common and acceptable investment industry practice[] that frequently inure[s] to the benefit of ERISA plans." Tussey, 746 F.3d at 336 (internal quotation marks omitted).

[9] The "Administrative fees" section of the Participant Fee Disclosures similarly provides that the $3 quarterly fee "cover[s] the administrative costs of the plan," including "recordkeeping, auditing, legal and trustee/custodial expenses." ECF No. 47-14 at 5.

Terraza v. Safeway Inc.

of the Plan Year, [the record-keeper] shall accumulate accruals under the Plan Expense Arrangement ("PEA") in accordance with the terms and conditions of the PEA Addendum to the Agreement." Id. at 22, 42 ("Accruals will be calculated and attributed to the PEA at the end of each calendar quarter for all service fees received by [the record-keeper] related to . . . investments in the Plan in excess of the applicable Contingent Per Participant [*55] Fee . . ."). The excess funds in the PEA account could only be used at the direction of the Defendants to reasonably compensate third-party service providers, in accordance with ERISA. Id. at 38-40. Notably, the Defendants expressly chose the "Contingent Per Participant Fee" option in lieu of a "No Recordkeeping Fee" option, under which the record-keeper would have been compensated "solely from . . . the service fees or other compensation paid or credited to [the record-keeper] with respect to the Plan's investment options"—that is, a true revenue sharing compensation arrangement. Id. at 22-23. These provisions suggest that the record-keepers' compensation was capped at the $65 or $67 annual per participant fee, and therefore that Terraza must allege that this fee, and not the asset-based fees associated with particular investment options, was itself unreasonable or excessive to state a claim for breach of fiduciary duty on this ground.

However, Terraza points out that there is at least one provision in the master services agreement that plausibly supports her compensation theory—i.e., that the record-keeper received some compensation in excess of the per-participant fee. ECF No. 53 at 19.[10] The PEA addendum [*56] provides that any accruals in the PEA account "expire at 3:00 p.m. Central Time on the last business day, as determined by JPMorgan RPS, of each

subsequent Plan Year, or upon the termination of the Agreement or this Addendum." ECF No. 47-17 at 38. The addendum does not explain what happens to the expired funds. See id. But, because the record-keeper (i.e., JP Morgan Retirement Plan Services) maintains the PEA account, it is plausible that any expired funds go to the record-keeper. See id. Such an arrangement would also explain why the Defendants and the record-keeper entered into an amendment on November 1, 2013 to create an "ERISA spending account" to replace the PEA. ECF No. 47-19 at 2. Pursuant to that amendment, if revenue-sharing fees exceed the annual per-participant fee at the end of the year they will be attributed to the ERISA spending account. Id. The ERISA spending account addendum materially differs from its PEA predecessor because (1) the accruals do not expire and (2) it provides that "[i]n the event Plan Sponsor does not exhaust the Account for a given calendar quarter, Plan Sponsor may allocate such eligible unused amounts, held in the Account to Participant accounts." [*57] Id. at 5. Terraza persuasively argues that such an amendment would have been unnecessary if there were never any unused accruals in the PEA in the years prior.

The Court therefore concludes that the judicially noticed documents do not refute Terraza's allegations regarding revenue-sharing payments or otherwise render them implausible. They do, however, create a factual dispute that cannot be resolved on a motion to dismiss. Terraza has plausibly alleged that the Defendants allowed the Plan to compensate the record-keeper through revenue-sharing payments that exceeded the underlying administrative fees that were supposed to cover all necessary services, thus resulting in unreasonable compensation and a breach of fiduciary duty. See Santomenno, 2013 U.S. Dist. LEXIS 22354, 2013 WL 603901, at *3, *10. Although the Defendants may ultimately defeat Terraza's theory of unreasonable compensation by showing that they were not actually compensated in excess of the per-participant fee, or that their compensation was otherwise reasonable, the Court cannot resolve this factual issue at this stage of the litigation. This is especially true because Terraza has not yet had the benefit of discovery, and therefore lacks inside information regarding the Defendants' decision-making [*58] process and the compensation actually provided to the record-keepers.

**6. Duty to Diversify Investments**

---

[10] In their reply, Defendants argue that the Court may not consider this argument because it "improperly centers on contentions that do not even appear in the [First Amended Complaint] itself" and the purpose of a motion to dismiss is to test the sufficiency of the complaint. ECF No. 56 at 16. This argument fails. The Court may consider judicially-noticed materials incorporated into the complaint on a motion to dismiss without converting it into a motion for summary judgment. United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003) (citing Moore's Federal Practice § 12.34 (3d ed. 1999)). Indeed, the Defendants invited the Court to do so in this case by requesting that the Court take judicial notice of the master services agreement and then arguing that the Plaintiff's allegations were implausible in light of that document. ECF No. 48.

Terraza v. Safeway Inc.

Although the complaint is otherwise very detailed, only a couple of allegations relate to the distinct duty to diversify. Plaintiff alleges that the Plan's investment options "were exceptionally limited in number and virtually lacking in the necessary complement of passively managed mutual funds or other investments to make the Plan's investment portfolio appropriately diversified based upon any reasoned fiduciary review." ECF No. 37 ¶ 40-41. She further alleges that passively-managed funds generally provide better returns than actively-managed funds. Id.

These conclusory allegations fail to state a claim for breach of the duty to diversify investments. See St. Vincent, 712 F.3d at 724 (affirming Rule 12(b)(6) dismissal of claims based on duty to diversify because plaintiff "[did] not support its diversification claim with factual allegations sufficient to elevate it from the realm of mere 'legal conclusions'") (quoting Iqbal, 556 U.S. at 679)). And courts have rejected the notion that offering a majority of actively-managed investment options constitutes a breach of fiduciary duty. See Taylor v. United Techs. Corp., No. 3:06CV1494(WWE), 2009 U.S. Dist. LEXIS 19059, 2009 WL 535779, at *10 (D. Conn. Mar. 3, 2009), aff'd, 354 F. App'x 525 (2d Cir. 2009) (rejecting [*59] the plaintiff's argument that the defendants breached their fiduciary duties where ten of the sixteen investment options offered by the plan were actively-managed and plaintiff claimed that actively-managed funds generally underperform passively-managed funds).

Terraza has failed to plausibly allege that the Defendants breached their duty to diversify.

**D. Knowing Breach of Trust**

Defendants move to dismiss Terraza's claim for knowing breach of trust because it is derivative of her deficient claim for breach of fiduciary duty. ECF No. 46 at 31. Because Terraza has stated a claim for breach of fiduciary duty, as explained above, the Court denies the motion to dismiss her derivative claim for knowing breach of trust.

**CONCLUSION**

The Court denies the motion to dismiss Terraza's complaint.

IT IS SO ORDERED.

Dated: March 13, 2017

/s/ Jon S. Tigar

JON S. TIGAR

United States District Judge

---

**End of Document**

 Neutral
As of: April 27, 2017 9:52 PM Z

# Sec'y United States Dep't of Labor v. Kwasny

United States Court of Appeals for the Third Circuit

November 7, 2016, Submitted Pursuant to Third Circuit L.A.R. 34.1(a); April 5, 2017, Opinion Filed

No. 16-1872

**Reporter**

2017 U.S. App. LEXIS 5883 *; 853 F.3d 87

SECRETARY UNITED STATES DEPARTMENT OF LABOR v. RICHARD J. KWASNY; KWASNY AND REILLY, P.C.; KWASNY AND REILLY 401(K) PROFIT SHARING PLAN, Richard J. Kwasny, Appellant

**Prior History:** [*1] On Appeal from the United States District Court for the Eastern District of Pennsylvania. (District Court No. 2-14-cv-04286). District Judge: The Honorable Eduardo C. Robreno.

Perez v. Kwasny, 159 F. Supp. 3d 565, 2016 U.S. Dist. LEXIS 15511 (E.D. Pa., 2016)

## Core Terms

summary judgment, withheld, contributions, employees, actual knowledge, fiduciary, claim preclusion, declaration, offset, deposited, requires, privity, summary judgment motion, statute of limitations, employee contribution, issue preclusion, substantiate, admissions, appeals, genuine, issues, funds

## Case Summary

### Overview

HOLDINGS: [1]-Summary judgment based primarily on facts deemed admitted under Fed. R. Civ. P. 36(b) by a trustee of a retirement plan governed by the Employee Retirement and Income Security Act of 1974 was proper, absent an appeal from the order deeming the issues admitted; [2]-The admissions and a former bookkeeper's declaration established that the trustee had

misused employee contributions in violation of fiduciary duties under 29 U.S.C.S. §§ 1103, 1104(a)(1)(A), (B), 1106(a)(1), (b)(1), 1109(a) by commingling the funds with general assets and failing to contribute funds; [3]-The action was timely under 29 U.S.C.S. § 1113 because the government's investigation began within the limitations period, even if some employees knew of the wrongdoing earlier; [4]-A judgment for a former employee had no res judicata effect in the government's action; however, an offset might be appropriate.

**Outcome**

Affirmed in part and remanded.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

**HN1**[ ] Review of a district court's grant of summary judgment is plenary. Accordingly, the appellate court applies the same standard as the district court.

Civil Procedure > Judgments > Summary Judgment > Entitlement as Matter of Law

**HN2**[ ] Summary judgment is appropriate where, construing all evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The court's function is not to weigh the evidence and determine the truth of

**EXHIBIT 6**

Sec'y United States Dep't of Labor v. Kwasny

the matter but to determine whether there is a genuine issue for trial.

Civil Procedure > ... > Methods of Discovery > Requests for Admissions > Effect of Admissions

**HN3**[⤓] Matters deemed admitted due to a party's failure to respond to requests for admission are conclusively established under Fed. R. Civ. P. 36(b) and may support a summary judgment motion. Rule 36(b) is intended to narrow the triable issues in the case. An admission is therefore an unassailable statement of fact and is binding on the non-responsive party unless withdrawn or amended.

Business & Corporate Compliance > ... > ERISA > Fiduciaries > Fiduciary Responsibilities

Business & Corporate Compliance > ... > Fiduciaries > Fiduciary Liability > Personal Liability

**HN4**[⤓] Trustees of a retirement plan governed by the Employee Retirement and Income Security Act of 1974 (such as a 401(k) plan) have the following duties: (1) ensure that plan assets are held in a trust account under 29 U.S.C.S. § 1103; (2) act solely in the interest of the plan participants and their beneficiaries under 29 U.S.C.S. § 1104(a)(1)(A); (3) act prudently under § 1104(a)(1)(B); (4) prevent the plan from engaging in a direct or indirect transfer of plan assets for the benefit or use of a party in interest under 29 U.S.C.S. § 1106(a)(1); and (5) refrain from dealing with the plan's assets for the fiduciary's own interest under § 1106(b)(1). Breach of these duties results in a violation and may trigger restitution or injunctive relief. 29 U.S.C.S. § 1109(a). Plan funds protected under the statute include money withheld from employees' paychecks for purposes of the benefit plan but not yet delivered to the benefit plan. 29 C.F.R. § 2510.3-102. The plan's trustees are jointly and severally liable for money that is withheld but misdirected from a plan.

Civil Procedure > ... > Summary Judgment > Burdens of

Proof > Nonmovant Persuasion & Proof

**HN5**[⤓] Neither a desire to cross-examine an affiant nor an unspecified hope of undermining his or her credibility suffices to avert summary judgment.

Pensions & Benefits Law > ... > Civil Litigation > Causes of Action > Breach of Fiduciary Duty

Pensions & Benefits Law > ERISA > Civil Litigation > Statute of Limitations

**HN6**[⤓] Actions for breach of fiduciary duty may not be brought under the Employee Retirement and Income Security Act of 1974 (ERISA) after the earlier of (1) six years after the date of the last action which constituted a part of the breach or violation; or (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation. 29 U.S.C.S. § 1113. Put simply, Section 1113 creates a general six year statute of limitations, shortened to three years in cases where the plaintiff has actual knowledge. Actual knowledge requires a showing that the plaintiffs actually knew not only of the events that occurred which constitute the breach or violation but also that those events supported a claim of breach of fiduciary duty or violation under ERISA.

Pensions & Benefits Law > ERISA > Civil Litigation > Statute of Limitations

**HN7**[⤓] The limitations period in an ERISA action begins to run on the date that the person bringing suit learns of the breach or violation.

Civil Procedure > Judgments > Summary Judgment > Burdens of Proof

Civil Procedure > ... > Summary Judgment > Supporting Materials > Affidavits

Civil Procedure > ... > Summary Judgment > Opposing Materials > Accompanying Documentation

**HN8**[⤓] In order to satisfy the standard for summary judgment an affiant must ordinarily set forth facts, rather than opinions or conclusions. An affidavit that is

Sec'y United States Dep't of Labor v. Kwasny

essentially conclusory and lacking in specific facts is inadequate to satisfy the movant or non-movant's burden.

Pensions & Benefits Law > ERISA > Civil Litigation > Statute of Limitations

**HN9**[⬇] Actual knowledge, for purposes of 29 U.S.C.S. § 1113, requires that a plaintiff have actual knowledge of all material facts necessary to understand that some claim exists.

Civil Procedure > Judgments > Preclusion of Judgments > Res Judicata

Civil Procedure > ... > Preclusion of Judgments > Estoppel > Collateral Estoppel

**HN10**[⬇] Res judicata includes the legal concepts of claim preclusion and issue preclusion. Claim preclusion prevents the relitigation of identical cases, whereas issue preclusion prevents the relitigation of discrete issues.

Civil Procedure > ... > Preclusion of Judgments > Full Faith & Credit > Full Faith & Credit Statutes

**HN11**[⬇] The preclusive effect of a state court judgment in a subsequent federal lawsuit is determined by the Full Faith and Credit Statute, 28 U.S.C.S. § 1738. The statute provides that state judicial proceedings shall have the same full faith and credit in every court within the United States as they have by law or usage in the courts of such state from which they are taken. The statute has been interpreted by the Supreme Court to require federal courts to look to state law to determine the preclusive effect of a prior state judgment.

Civil Procedure > Judgments > Preclusion of Judgments > Res Judicata

**HN12**[⬇] Under Pennsylvania law, claim preclusion requires privity between the parties in the previous case and the current suit. In its broadest sense, privity is a mutual or successive relationships to the same right of

property, or such an identification of interest of one person with another as to represent the same legal right.

Pensions & Benefits Law > ERISA > Civil Litigation

Civil Procedure > Judgments > Preclusion of Judgments > Res Judicata

**HN13**[⬇] When the United States Secretary of Labor brings a suit under the Employee Retirement and Income Security Act of 1974 (ERISA), the government seeks to vindicate broader interests than those of the employees. The Secretary's interests also include the reinforcement of public confidence in a private pension system and supervising the enforcement of the ERISA statute, which ensures the financial stability of billions of dollars of assets which in turn have a monumental effect on not only the Treasury of the United States, but on the national economy and commerce as well. A private litigant cannot represent these interests. Accordingly, the Secretary of Labor is not bound by the results reached by private litigants in ERISA suits. Under ERISA's statutory framework, private plaintiffs do not adequately represent, and are not charged with representing, the broader national public interests represented by the Secretary in ERISA suits. Because the Secretary's interest in maintaining the integrity of, and public confidence in, the pension system is broader than the interests of private litigants, in ERISA suits, the Secretary is not in privity with private litigants and is therefore not bound by the results reached by private litigation.

**Counsel:** Richard J. Kwasny, Yardley, PA, Attorney for Appellant.

Leonard H. Gerson, Thomas Tso, United States Department of Labor, Office of the Solicitor, Washington, DC, Attorneys for Appellee.

**Judges:** Before: McKEE and RESTREPO, Circuit Judges; HORNAK, District Judge.[*]

**Opinion by:** McKEE

_____

[*] Honorable Mark R. Hornak, District Judge for the United States District Court for the Western District of Pennsylvania, sitting by designation.

# Opinion

OPINION OF THE COURT

McKEE, *Circuit Judge*.

Richard Kwasny appeals the District Court's order granting summary judgment in favor of the Secretary of Labor and denying his cross-motion for summary judgment. Because the record shows no genuine issue of disputed fact regarding Kwasny's violation of the Employee Retirement and Income Security Act of 1974 ("ERISA") by directing employee 401(k) contributions into his Firm's general assets, we hold that the District Court did not err in granting summary judgment. We will therefore affirm, but remand for a determination of whether the judgment against Kwasny should be offset by a previous Pennsylvania state court judgment entered against Kwasny for the same misdirected employee contributions.

## I

Richard Kwasny is a former **[\*2]** managing partner of the now-dissolved law firm Kwasny & Reilly, P.C. (the "Firm"). While Kwasny was a partner at the Firm, the Firm established a 401(k) Profit Sharing Plan (the "Plan") for its employees, and Kwasny was named as a trustee and fiduciary of the Plan.[1] Between September of 2007 and November of 2009, the Plan sustained losses in the amount of $40,416.30[2] because Plan contributions withdrawn from employees' paychecks were commingled with the Firm's assets and were not deposited into the Plan.

In 2011, the Secretary of Labor received a substantiated complaint from a Plan member, which triggered an investigation. The Secretary eventually filed this action to recover the lost funds, remove Kwasny as trustee and fiduciary of the Plan, and enjoin Kwasny from acting as a plan fiduciary in the future. The Secretary and Kwasny thereafter filed cross motions for summary judgment. The District Court granted the Secretary's motion for summary judgment and denied Kwasny's. Kwasny

---

[1] Under ERISA, a trustee who exercises control respecting the management or disposition of Plan assets is also a fiduciary. 29 U.S.C. § 1002(21)(A).

[2] $40,416.30 was never forwarded to the Plan and $2,099.06 was forwarded late and without interest.

appeals.

## II

The District Court had jurisdiction pursuant to 29 U.S.C. § 1132(e). We have jurisdiction under 28 U.S.C. § 1291. **HN1**[⬆] Our review of a District Court's grant of summary judgment is plenary.[3] Accordingly, we apply the same standard as the District **[\*3]** Court.[4] **HN2**[⬆] Summary judgment is appropriate where, construing all evidence in the light most favorable to the nonmoving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[5] Our function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[6]

## III

We must first decide whether the District Court correctly found that Kwasny violated the Employee Retirement and Income Security Act of 1974 ("ERISA") by directing employee 401(k) contributions into the firm's general assets. Next, we must determine whether the District Court erred in denying Kwasny's motion for summary judgment based on his affirmative defenses.

## A

The District Court's grant of the Secretary's motion for summary judgment was based primarily on facts deemed admitted under Federal Rule of Civil Procedure 36(b).[7] Kwasny never sought to amend or withdraw the admissions, even upon invitation by the District Court.[8] Kwasny likewise does not appeal the order deeming the issues admitted. In addition to Kwasny's admissions, the District Court relied on testimony by the Firm's former

---

[3] *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015).

[4] *Id.*

[5] Fed. R. Civ. P. 56(a); *see also Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015).

[6] *Santini*, 795 F.3d at 416.

[7] *Perez v. Kwasny*, 159 F. Supp. 3d 565, 569 (E.D. Pa. 2016).

[8] *Id.* at 568 n.5.

Sec'y United States Dep't of Labor v. Kwasny

bookkeeper, Kathleen Meske.[9] Kwasny's evidence, **[*4]** on the other hand, consists only of his own declaration, which he claims creates a genuine issue of material fact.

**HN3**[⬆]] Matters deemed admitted due to a party's failure to respond to requests for admission are "conclusively established" under Federal Rule of Civil Procedure 36(b),[10] and may support a summary judgment motion.[11] Rule 36(b) is intended to narrow the triable issues in the case.[12] An admission is therefore an "unassailable statement of fact"[13] and is binding on the non-responsive party unless withdrawn or amended.[14] Because Kwasny did not appeal the District Court's order deeming the issues admitted, the admissions continue to bind him in this appeal.[15] Accordingly, the District Court was correct to treat Kwasny's admissions as established fact.

Kwasny's admissions and Meske's declaration together establish a prima facie case of an ERISA violation. Under ERISA, **HN4**[⬆]] trustees of an ERISA retirement plan (such as a 401(k) plan) have the following duties: (1) ensure that plan assets are held in a trust account,[16] (2) act solely in the interest of the plan participants and their beneficiaries,[17] (3) act prudently,[18] (4) prevent the plan from engaging in a direct or indirect transfer of plan assets for the benefit or use of a party in interest,[19] and **[*5]** (5) refrain from dealing with the plan's assets for the fiduciary's own interest.[20] Breach of these duties results in a violation and may trigger restitution or injunctive relief.[21] Plan funds protected under the statute include money withheld from employees' paychecks for purposes of the benefit plan but not yet delivered to the benefit plan.[22] The Plan's trustees are jointly and severally liable for money that is withheld but misdirected from a plan.[23]

Here, the record establishes that: (1) "Between January 2007 and December 2007 Richard Kwasny was a trustee of the Plan," (2) "Between September 7, 2007 and November 13, 2009, $41,936.73 was withheld from employee compensation but not deposited into the Plan,"[24] (3) "Richard Kwasny directed that employee withholdings intended for deposit into the Plan be commingled with the general assets of the Firm," (4) "Richard Kwasny directed that the employee withholdings intended for deposit into the Plan be used for the benefit of the Firm, and (5) "Richard Kwasny was responsible for determining if payroll checks and contribution checks were issued . . . between January 2007 and December 2009."[25] Additionally, the Firm's bookkeeper, Kathleen Meske, declared **[*6]** that Kwasny instructed her to send the employee

---

[9] _Id._ at 570.

[10] Fed. R. Civ. P. 36(b).

[11] _Anchorage Assocs. v. Virgin Islands Bd. of Tax Review_, 922 F.2d 168, 176 n.7 (3d Cir. 1990).

[12] Fed. R. Civ. Proc. 36(b).

[13] _Langer v. Monarch Life Ins. Co._, 966 F.2d 786, 803 (3d Cir. 1992) (quoting _Airco Indus. Gases, Inc. v. Teamsters Health & Welfare Pension Fund_, 850 F.2d 1028, 1037 (3d Cir. 1988)).

[14] _Airco Indus. Gases, Inc._, 850 F.2d at 1035-37 ("The new provisions give an admission a conclusively binding effect . . . unless the admission is withdrawn or amended.") (quoting Fed. R. Civ. P. 36 advisory committee's note).

[15] _See_ _State Nat'l Ins. Co. v. Cty. of Camden_, 824 F.3d 399, 404 (3d Cir. 2016) ("If an appeal is taken only from a specified judgment, this Court does not exercise jurisdiction to review other judgments that were not specified or 'fairly inferred' by the Notice.").

[16] 29 U.S.C. § 1103.

[17] § 1104(a)(1)(A).

[18] § 1104(a)(1)(B).

[19] § 1106(a)(1).

[20] § 1106(b)(1).

[21] § 1109(a).

[22] 29 C.F.R. § 2510.3-102 ("[T]he assets of the plan include amounts . . . that a participant or beneficiary pays to an employer, or amounts that a participant has withheld from his wages by an employer, for contribution or repayment of a participant loan to the plan . . . .").

[23] _Struble v. N.J. Brewery Emps.' Welfare Trust Fund_, 732 F.2d 325, 332 (3d Cir. 1984) ("These cases do not require, however, that the plaintiff name _all_ of the trustees as defendants. It is a well-established principle of trust law that multiple trustees who are at fault may be held jointly and severally liable.").

[24] Kwasny is deemed to have admitted that $41,936.73 was withheld in employee contributions, but the Secretary alleges that only $40,416.30 was withheld and not repaid into the Plan.

[25] J.A. at 117-18.

contribution checks to the Plan asset custodian only after he paid employee wages, Kwasny himself, and the Firm's outstanding bills. In sum, the facts establish that Kwasny, a Plan trustee, used withheld employee contributions—protected Plan funds under ERISA—for the benefit of himself and the Firm in violation of his fiduciary duties.

Kwasny argues that Meske's declaration should be ignored because she was not privy to all conversations among the partners, and unbeknownst to Meske, the partners could have decided not to accept a paycheck and therefore did not have funds to contribute to the 401(k). However, the possibility that the firm partners may have properly failed to contribute funds is irrelevant. The ERISA violation is prefaced on Kwasny's directing employee contributions to be withheld from the employees' paychecks, not the partners'. Similarly, Kwasny's assertion that he was not the only trustee of the Firm and was therefore not solely responsible for Plan assets is irrelevant because, as we have already noted, trustee liability is joint and several.[26] Moreover, the fact that Kwasny was not permitted to cross-examine Meske is [*7] irrelevant for summary judgment purposes.[27] We therefore conclude that the District Court's grant of summary judgment in favor of the Secretary was correct.

B

We also agree with the District Court's conclusion that Kwasny is not entitled to summary judgment based on either of the two defenses he raises on appeal: (1) statute of limitations, and (2) res judicata.

*1. Statute of Limitations*

HN6[↑] Actions such as this one for breach of fiduciary duty may not be brought under ERISA after the earlier of "(1) six years . . . after the date of the last action which constituted a part of the breach or violation . . . or (2) "three years after the earliest date on which

the plaintiff had actual knowledge of the breach or violation."[28] Put simply, Section 1113 creates "a general six year statute of limitations, shortened to three years in cases where the plaintiff has actual knowledge."[29] Actual knowledge "requires a showing that plaintiffs actually knew not only of the events that occurred which constitute the breach or violation but also that those events supported a claim of breach of fiduciary duty or violation under ERISA."[30]

Kwasny asserts the statute of limitations has expired because Firm employees and the Department [*8] of Labor had actual knowledge of the withholdings before 2011, and therefore, the Secretary's 2014 suit is barred. Kwasny relies on the following statements from his declaration:

- Firm employees were aware that their contributions were not being deposited into the Plan as early as 2007 because it was widely known and documented in monthly statements to employees.
- A Department of Labor investigator examined all the Firm's Plan books and records at some point in 2010 in response to a complaint by Larry Haft, a previous employee of the Firm.
- The Employee Benefits Security Administration (EBSA) received complaint calls in 2006 and 2010 regarding the failure to remit employee contributions to a 401(k) plan.

The Secretary's evidence consists of the declarations of two EBSA employees: Trudy Logan from the EBSA regional office and the regional director Norman Jackson. Logan declared that EBSA received complaints in 2006 and 2010 but the callers submitted no evidence to substantiate their claims, and they did not identify the Plan at issue here. It was not until Fall 2011 that EBSA received a complaint that included substantiating evidence and sufficiently identified the Plan to allow it to [*9] be referred for enforcement. Consistent with Logan's declaration, Jackson declared that there was no investigation into the Firm's Plan contributions before

---

[26] *Struble*, 732 F.2d at 332.

[27] *Schiavone Constr. Co. v. Time, Inc.*, 847 F.2d 1069, 1084 (3d Cir. 1988)) HN5[↑] ] ("[N]either a desire to cross-examine an affiant nor an unspecified hope of undermining his or her credibility suffices to avert summary judgment." (quoting *Nat'l Union Fire Ins. Co. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir.1983)))

[28] 29 U.S.C. § 1113.

[29] *Kurz v. Phila. Elec. Co.*, 96 F.3d 1544, 1551 (3d Cir. 1996).

[30] *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 787 (3d Cir. 2001) (quoting *Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers, AFL-CIO v. Murata Erie N. Am., Inc.*, 980 F.2d 889, 900 (3d Cir. 1992)).

November 2011.

We conclude that the District Court correctly held that Kwasny's evidence creates no genuine issue of material fact regarding whether the Secretary's suit was brought within the statute of limitations. As the District Court correctly noted, whether or not Firm employees were aware of violations is legally irrelevant because the plaintiff in this case is the Secretary of Labor, not the Firm employees.[31] Likewise, we agree with the District Court that Kwasny's self-serving declaration stating that someone from the Department of Labor examined the Firm's books at some unspecified time in 2010 is insufficient to create a triable issue of fact without personal knowledge or facts to substantiate the assertion.[32]

Lastly, we agree that as a matter of law, the 2006 and 2010 EBSA complaint calls do not establish that the Secretary had actual knowledge of the ERISA violation. **HN9**[⬆] Actual knowledge "requires that a plaintiff have actual knowledge of all material facts necessary to understand that some claim exists." [*10][33] Logan declared that EBSA had no knowledge that the Plan was implicated by the complaints until 2011. Additionally, EBSA had no knowledge of the specific facts that made up the violation because no evidence was submitted to substantiate the complaints in 2006 or 2010. Accordingly, the District Court was correct in concluding that the 2006 and 2010 phone calls to EBSA are insufficient to establish the Secretary's actual knowledge of the ERISA claim against Kwasny.

For all of these reasons, we hold that the District Court was correct to conclude that Kwasny's statute of limitations defense does not prevent an entry of summary judgment in favor of the Secretary.

---

[31] *See Landwehr v. DuPree*, 72 F.3d 726, 732 (9th Cir. 1995) **HN7**[⬆] ("[T]he limitations period in an ERISA action begins to run on the date that the *person bringing suit* learns of the breach or violation.") (emphasis added).

[32] *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002) **HN8**[⬆] ("In order to satisfy the standard for summary judgment the affiant must ordinarily set forth facts, rather than opinions or conclusions. An affidavit that is essentially conclusory and lacking in specific facts is inadequate to satisfy the movant or non-movant's burden.") (internal quotation marks and brackets omitted).

[33] *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1177 (3d Cir. 1992).

## 2. Res Judicata

**HN10**[⬆] Res judicata includes the legal concepts of claim preclusion and issue preclusion. Claim preclusion prevents the relitigation of identical cases, whereas issue preclusion prevents the relitigation of discrete issues.[34] Here, Kwasny is only arguing claim preclusion as a defense.[35]

**HN11**[⬆] The preclusive effect of a state court judgment in a subsequent federal lawsuit is determined by the Full Faith and Credit Statute.[36] The statute provides that state judicial proceedings "shall have the same full faith and credit [*11] in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken."[37] The statute has been interpreted by the Supreme Court to require federal courts to look to state law to determine the preclusive effect of a prior state judgment.[38] Accordingly, we must look to Pennsylvania law on claim preclusion to determine whether it applies in this case.

**HN12**[⬆] Under Pennsylvania law, claim preclusion requires privity between the parties in the previous case and the current suit.[39] In its broadest sense, privity is a

---

[34] *R & J Holding Co. v. Redevelopment Auth. of Cty. of Montgomery*, 670 F.3d 420, 426-27, 429 (3d Cir. 2011).

[35] Though Kwasny references issue preclusion in his brief, he does not outline how the doctrine applies to this case. Indeed, because the previous judgment was not in Kwasny's favor, any issues actually litigated would not have been decided in his favor and would not advance his case here. Even so, under Pennsylvania law, like claim preclusion, issue preclusion requires privity between the parties, so the result here is the same. *See Metro. Edison Co. v. Pa. Pub. Util. Comm'n*, 767 F.3d 335, 351 (3d Cir. 2014), *cert. denied*, **135 S. Ct. 2372, 192 L. Ed. 2d 144 (2015)** (outlining the requirements of issue preclusion under Pennsylvania law as including "privity with a party in the prior case").

[36] *Metro. Edison Co.*, 767 F.3d at 350.

[37] 28 U.S.C. § 1738.

[38] *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380-81, 105 S. Ct. 1327, 84 L. Ed. 2d 274 (1985).

[39] *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 276 (3d Cir. 2014), *cert. denied sub nom. Allston v. Lower Merion Sch. Dist.*, **135 S. Ct. 1738, 191 L. Ed. 2d 702 (2015)** (outlining the requirements of claim preclusion as (1) a final judgment on the

"mutual or successive relationships to the same right of property, or such an identification of interest of one person with another to represent the same legal right."[40]

First, Kwasny argues that the Secretary is precluded from bringing its claim against him because a former employee of the Firm, Larry Haft, obtained a judgment from Bucks County Court of Common Pleas based, in part, on withheld employee 401(k) contributions. It is true that the Secretary's suit seeks monetary recovery to vindicate the rights of all Firm employees (including Haft) for Kwasny's withheld employee 401(k) contributions. But [*12] HN13[↑] when the Secretary of Labor brings an ERISA suit, the government seeks to vindicate broader interests than those of the employees. As the Court of Appeals for the Seventh Circuit has noted, the Secretary's interests also include "the reinforcement of public confidence in a private pension system" and "supervising the enforcement of the ERISA statute," which "ensure[s] the financial stability of billions of dollars of assets which in turn have a monumental effect on not only the Treasury of the United States, but on the national economy and commerce as well."[41] A private litigant cannot represent these interests. Accordingly, the Court of Appeals for the Seventh Circuit and a number of appellate courts have held that the Secretary of Labor is not bound by the results reached by private litigants in ERISA suits.[42]

We agree with our sister circuit courts of appeals that under ERISA's statutory framework, "private plaintiffs do not adequately represent, and are not charged with representing, the broader national public interests represented by the Secretary" in ERISA suits.[43] Because

the Secretary's interest in maintaining the integrity of, and public confidence in, the pension system is broader than [*13] the interests of private litigants, we conclude that in ERISA suits, the Secretary is not in privity with private litigants and is therefore not bound by the results reached by private litigation. Accordingly, we agree with the District Court's conclusion that the Haft judgement does not preclude the Secretary from bringing suit.

Kwasny also argues that, at the very least, the judgment in this case should be offset by the judgment awarded Haft in the previous litigation. The Secretary agrees that such an offset may be appropriate if the previous judgment was to recover withheld employee 401(k) contributions.[44] The District Court concluded, however, that the judgment in this case should not be offset because the Bucks County judgment dated August 29, 2012 references only punitive damages and "Kwasny does not provide any other signed court order indicating any other award against him."[45] This conclusion is only partially correct. While it is true that the August 29th order awards Haft punitive damages against Kwasny in the amount of $32,677.15, Haft also obtained a default judgment against Kwasny on November 28, 2011, in the amount of $80,435.85. This amount appears to have been calculated [*14] including compensation for "401K payments withheld from plaintiff's wages . . . never deposited in to the 401K plan."[46] It is unclear from the appellate record whether an offset of the Secretary's judgement is appropriate in this case. We will therefore direct the District Court to consider the issue on remand.

IV

For the reasons set forth above, we will affirm the District Court's grant of the Secretary's motion for summary judgment except as to the amount of the judgment. We remand the matter for a determination as to whether the amount of the judgment should be offset

---

merits, (2) the same parties or their privities, and (3) a subsequent suit based on the same cause of action).

[40] *Greenway Ctr., Inc. v. Essex Ins. Co.,* 475 F.3d 139, 149 (3d Cir. 2007) (quoting *Ammon v. McCloskey,* 440 Pa. Super. 251, 655 A.2d 549 (Pa. Super. Ct. 1995)).

[41] *Sec'y of Labor v. Fitzsimmons,* 805 F.2d 682, 687-92 (7th Cir. 1986) (en banc).

[42] *Id.; Wilmington Shipping Co. v. New England Life Ins. Co.,* 496 F.3d 326, 340 (4th Cir. 2007); *Donovan v. Cunningham,* 716 F.2d 1455, 1462 (5th Cir. 1983); *Herman v. S.C. Nat. Bank,* 140 F.3d 1413, 1424 (11th Cir. 1998).

[43] *Herman,* 140 F.3d at 1424.

[44] *See Beck v. Levering,* 947 F.2d 639, 642 (2d Cir. 1991) (holding that offset of a judgment obtained by the Secretary of Labor is only appropriate when private plaintiffs actually recover concurrent judgments).

[45] *Perez,* 159 F. Supp. 3d at 574.

[46] J.A. at 79.

Sec'y United States Dep't of Labor v. Kwasny

by the Bucks County default judgment.

---

**End of Document**

 Neutral

As of: April 25, 2017 8:18 PM Z

# Wildman v. Am. Century Servs., LLC

United States District Court for the Western District of Missouri, Western Division

February 27, 2017, Decided; February 27, 2017, Filed

No. 4:16-CV-00737-DGK

**Reporter**

2017 U.S. Dist. LEXIS 31699 *

STEVE WILDMAN and JON BORCHERDING, individually and as representatives of a class of similarly situated persons, and ON BEHALF OF THE AMERICAN CENTURY RETIREMENT PLAN, Plaintiffs, v. AMERICAN CENTURY SERVICES, LLC, THE AMERICAN CENTURY RETIREMENT PLAN RETIREMENT COMMITTEE, AMERICAN CENTURY INVESTMENT MANAGEMENT, INC., AMERICAN CENTURY COMPANIES, INC., CHRISTOPHER BOUFFARD, BRADLEY C. CLOVERDYKE, JOHN A. LEIS, TINA S. USSERY-FRANKLIN, MARGARET E. VAN WAGONER, GUDRUN S. NEUMANN, JULIE A. SMITH, MARGIE A. MORRISON, CHAT COWHERD, DIANE GALLAGHER, AND JOHN DOES 1-20, Defendants.

**Prior History:** Wildman v. Am. Century Servs., LLC, 2017 U.S. Dist. LEXIS 31698 (W.D. Mo., Feb. 27, 2017)

## Core Terms

fiduciary, summary judgment, severance, rights, breached, weighs, new claim, Retirement, benefits, waive, fiduciary duty, participants, days

**Counsel:** [*1] For Steve Wildman, individually and as representatives of a class of similarly situated persons, and on behalf of the American Century Retirement Plan, Plaintiff: Jennifer K Lee, LEAD ATTORNEY, PRO HAC VICE, Nichols Kaster, Minneapolis, MN; Michael F Brady, LEAD ATTORNEY, Brady & Associates Law Office, Overland Park, KS; Carl F. Engstrom, Jacob T. Schutz, PRO HAC VICE, Minneapolis, MN; Kai H

Richter, PRO HAC VICE, Nichols Kaster PLLP, Minneapolis, MN; Mark A. Kistler, Brady and Associates, Overland Park, KS.

For Jon Borcherding, individually and as representatives of a class of similarly situated persons, and on behalf of the American Century Retirement Plan, Plaintiff: Michael F Brady, LEAD ATTORNEY, Brady & Associates Law Office, Overland Park, KS; Carl F. Engstrom, Jacob T. Schutz, PRO HAC VICE, Minneapolis, MN; Kai H Richter, PRO HAC VICE, Nichols Kaster PLLP, Minneapolis, MN; Mark A. Kistler, Brady and Associates, Overland Park, KS.

For American Century Services, LLC, American Century Retirement Plan Retirement Committee, American Century Companies, Inc., Christopher Bouffard, Bradley C Cloverdyke, John A Leis, Tina S Ussery-Franklin, Margaret E Van Wagoner, Gudrun S Neumann, Julie [*2] A Smith, Margie A Morrison, John Does 1-20, American Century Investment Management, Inc., Defendants: Samuel J Rubin, LEAD ATTORNEY; W. Perry Brandt, LEAD ATTORNEY, Bryan Cave, LLP-KCMO, Kansas City, MO; Alison V. Douglass, Dave Rosenberg, James O. Fleckner, PRO HAC VICE, Goodwin Procter LLP, Boston, MA.

For Chat Cowherd, Diane Gallagher, Defendants: Samuel J Rubin, LEAD ATTORNEY; W. Perry Brandt, LEAD ATTORNEY, Bryan Cave, LLP-KCMO, Kansas City, MO.

**Judges:** GREG KAYS, CHIEF UNITED STATES DISTRICT JUDGE.

**Opinion by:** GREG KAYS

**EXHIBIT 7**

# Opinion

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This case involves claims for breach of fiduciary duty brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. Plaintiffs Steve Wildman ("Wildman") and Jon Borcherding ("Borcherding"), participants in the American Century Retirement Plan (the "Plan") established by American Century Investment Management, Inc. ("ACIM"), bring this suit, on their own behalf, and on behalf of a proposed class of participants in the Plan, against Defendants American Century Services, LLC ("ACS"), the American Century Retirement Plan Retirement Committee (the "Committee"), ACIM, American Century Companies, [*3] Inc. ("American Century"), and past and present members of the Committee,[1] seeking damages and declaratory and injunctive relief. Plaintiffs claim Defendants breached their fiduciary duties and engaged in prohibited transactions in violation of ERISA. Defendants argue Plaintiffs are contractually barred from bringing this action because they signed a waiver releasing all claims against Defendants.

Now before the Court is Defendants' motion for summary judgment (Doc. 19). Finding Defendants have not shown they are entitled to judgment as a matter of law, summary judgment is GRANTED in part and DENIED in part.

## Undisputed Material Facts[2]

### A. Plaintiffs

Wildman is a former employee of American Century. He has a Bachelor of Science degree and a Master of Business Administration degree. The last position he held at American Century was information technology specialist. Wildman began participating in the Plan in 2005 and continues to participate. In 2008, Wildman was laid off and received a severance package that included a $17,300 payment, a prorated bonus, company-paid Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") benefits, and career transition services. In return, he signed [*4] an agreement waiving all claims against American Century. American Century gave Wildman forty-five (45) days to consider the terms of the agreement.

Borcherding is also a former employee of American Century. He has a Bachelor of Arts degree and a graduate degree in public administration. The last position he held at American Century was account services representative. Borcherding participated in the Plan from 1996 to 2012. In 2012, Borcherding was laid off and received a severance package that included a $13,824 payment, company-paid COBRA benefits, and career transition services. In return, he signed an agreement waiving all claims against American Century. American Century gave Borcherding twenty-one (21) days to consider the terms of the agreement.

### B. Severance Agreements

Under the severance agreements ("Agreements"), Wildman and Borcherding agreed to release American Century and its subsidiaries from any claim of any kind that arose on or before the date of the agreement. The agreements are nearly identical. The relevant portion states:

> In consideration of the receipt of the Severance Benefits . . . I do hereby **release and forever waive all rights I may have to assert claims or bring** [*5] **lawsuits against the Company** and each of their respective officers, directors, and employees including, but not limited to:
> all claims relating to my employment, the termination of my employment, salary, bonus or other compensation, sick leave, vacation pay, personal leave time or other benefits, including those claims based on a breach of an oral or written employment contract, whether such contract was express or implied;
>
> all rights and claims that may be asserted under any

---

[1] The members named are: Christopher Bouffard, Bradley C. Cloverdyke, John A. Leis, Tina S. Ussery-Franklin, Margaret E. Van Wagoner, Gudrun S. Neumann, Julie A. Smith, Margie A. Morrison, Chat Cowherd, Diane Gallagher, and unknown fiduciary defendants 1-10 (collectively "Committee Members").

[2] The Court excluded asserted facts that were immaterial to the resolution of the pending motion, asserted facts that were not properly supported by admissible evidence, legal conclusions, and argument presented as an assertion of fact.

city ordinance or state or federal law, including without limitation, those relating to employment discrimination or retaliation including, but not limited to, those claims under the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964, as amended, the Americans With Disabilities Act, the Family and Medical Leave Act, the Employee Retirement Income Security Act of 1974, as amended, the Consolidated Omnibus Budget Reconciliation Act, 42 U.S.C. §§ 1981, 1983 and 1985, the Missouri Human Rights Act[3], the Missouri Service Letter Statute, Workers' Compensation Laws, and other similar federal, state, and local laws, ordinances or executive orders for the protection of employees against discrimination; and

. . .

1. I have **[*6]** carefully read this Agreement and that its contents have been fully explained to me;
. . .
4. I was advised by this Agreement of my right to consult advisors, including attorneys, about the contents of this Agreement;
5. After due consideration and consultation, I signed this Agreement voluntarily without duress;

6. By signing this Agreement I understand that **I do not waive any rights or claims that may arise after the date the Agreement** is executed[.]

Def.'s Br. Ex. 1 at 5-7, Ex. 3 at 24-26 (Doc 20-1) (emphasis added).

## C. The Plan

The Plan is a defined contribution, "401k"[4] plan that allows participants to contribute a percentage of their pre-tax earnings and invest their contributions in one or more investment options. Since 2010, the Plan's designated investment options are a limited selection of American Century mutual funds, American Century collective investment trusts, and American Century Companies Inc. Class C common stock.

---

[3] Borcherding's Agreement also bars claims under the City of Kansas City, Missouri's, equivalent of the Missouri Human Rights Act.

[4] The Plan is a "employee pension benefit plan" and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(2)(A), (34).

Two Defendants have primary responsibility for administering the Plan, ACS, and the Committee. ACS administers the Plan by controlling and managing the operations of the Plan. The Committee administers the Plan by selecting and monitoring the investment options **[*7]** in the Plan.

## Summary Judgment Standard

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). A party who moves for summary judgment bears the burden of showing that there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Once the moving party has satisfied his or her initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts" in order to establish a genuine issue of fact sufficient to warrant trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)). But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* (quoting *Ricci v. DeStefano*, 557 U.S. 557, 585, 129 S. Ct. 2658, 174 L. Ed. 2d 490 (2009)).

## Discussion

The Amended Complaint alleges five counts, all ERISA violations. Count I asserts ACS, ACIM, the Committee, and the Committee Members (collectively "Fiduciary Defendants"), breached their duty of loyalty and prudence in violation of 29 U.S.C. § 1104(a)(1)(A)-(B). Count II alleges ACS breached its duty to monitor ACIM, **[*8]** the Committee, and Committee members who allegedly caused losses to the Plan. Counts III and IV allege Defendants American Century, ACIM, and ACS engaged in prohibited transactions in violation of

29 U.S.C. § 1106(a)(1) and (b). Count V is a claim for other equitable relief based on ill-gotten proceeds, 29 U.S.C. § 1132(a)(3).

Defendants argue they are entitled to summary judgment because Plaintiffs released their right to assert claims against American Century. Defendants bear the burden of establishing the affirmative defense that Plaintiffs waived their ERISA claims. *See Day v. Toman*, 266 F.3d 831, 836 (8th Cir. 2001) (finding release is an affirmative defense); *Perrin v. Papa John's Int'l, Inc.*, 114 F. Supp. 3d 707, 720 (E.D. Mo. 2015) ("a defendant therefore bears the burden of proof with respect to its affirmative defenses"). To prevail, Defendants must show: (1) the waivers are valid; and (2) Plaintiffs' claims are within the scope of the waivers.

### I. The waiver of claims in the severance agreements is generally valid.

Employees may release ERISA claims against their employers in exchange for severance benefits. *Leavitt v. Nw. Bell Tel. Co.*, 921 F.2d 160, 162 (8th Cir. 1990). The release must be knowing and voluntary. *Id.* To determine whether a release is knowing and voluntary, courts consider the totality of the circumstances by evaluating nine factors: (1) the employee's education and business experience; [*9] (2) the employee's input in negotiating the terms of the agreement; (3) the clarity of the release language; (4) the time the employee had to consider the release before signing it; (5) whether the employee read the release and considered its terms; (6) whether the employee knew his rights under the agreement; (7) whether the employee was given an opportunity to consult with an attorney before signing the release; (8) whether the employee received adequate consideration for the release; and (9) whether the release was induced by the employer's improper conduct. *Id.* A release may be valid even if only some of the *Leavitt* factors are satisfied. *Groska v. N. States Power Co. Pension Plan*, No. 05-114 (JNE/FLN), 2007 U.S. Dist. LEXIS 71081, 2007 WL 2791119, at *8 (D. Minn. Sept. 24, 2007).

In this case, the Court finds the factors weigh in favor of finding the waiver is valid and enforceable against both Wildman and Borcherding. Considering the first factor, both Wildman and Borcherding are highly educated, each with two college degrees. *See Werb v. ReliaStar Life Ins. Co.*, No. 08-CV-5126 PJS/JJG, 2010 U.S. Dist. LEXIS 84627, 2010 WL 3269974, at *12-13 (D. Minn. Aug. 17, 2010) (finding plaintiff's bachelor's degree and a master's degree in business weighed in favor of finding release valid). Additionally, Wildman has experience in business given he has a master's degree in business administration. *See id.*; *Groska*, 2007 U.S. Dist. LEXIS 71081, 2007 WL 2791119, at *8 (finding plaintiff [*10] had adequate experience in business given she had completed MBA coursework). The second factor weighs in favor of Plaintiffs because neither had input in negotiating the terms of their Agreement. The third factor weighs in favor of Defendants because the language of the release is understandable; it unambiguously releases American Century of all liability for claims arising prior to the execution of the agreement. Turning to the fourth factor, both Plaintiffs had ample time to consider the release; Wildman received forty-five (45) days and Borcherding received twenty-one (21) days. *See Groska*, 2007 U.S. Dist. LEXIS 71081, 2007 WL 2791119, at *8 (finding fifteen (15) days to consider the release adequate); *Mange v. Petrolite Corp.*, 960 F. Supp. 206, 209-10 (E.D. Mo. 1997), *aff'd*, 135 F.3d 570 (8th Cir. 1998) (finding six (6) weeks to consider release adequate). The fifth and sixth factors also weigh in favor of Defendants. The Agreements state the signor has "carefully read this Agreement" and that it was "fully explained," inferring the Plaintiffs each read and considered the terms of the release and knew their rights under the Agreement. The seventh factor weighs in favor of Defendants. The Agreement states the signor was advised "to consult advisors, including attorneys, about the contents of this Agreement." Additionally, as previously [*11] stated, each Plaintiff received several weeks to consider their Agreement providing time to consult with advisors if the Plaintiffs had desired. The eighth factor weighs in favor of Defendants. Both Plaintiffs' severance benefit packages provided adequate consideration for the agreement. *See Werb*, 2010 U.S. Dist. LEXIS 84627, 2010 WL 3269974, at *12-13 (finding $65,000 in consideration was adequate); *Groska*, 2007 U.S. Dist. LEXIS 71081, 2007 WL 2791119, at *8 (finding ten month severance benefit package was adequate consideration). The last factor is neutral, there are no facts suggesting either Plaintiff was induced to sign the agreement by any improper conduct from American Century.

Wildman v. Am. Century Servs., LLC

Thus, under the totality of the circumstances, the Court holds both Wildman and Borcherding entered into their Agreements knowingly and voluntarily.

## II. Plaintiffs' claims arose after they executed the Agreements.

The Agreements expressly state Plaintiffs "release and forever waive all rights . . . to assert claims or bring lawsuits against [American Century]." The Agreements then carve out an exception for "claims that may arise after the date the Agreement is executed." The Court finds Plaintiffs' claims arose after executing their Agreements and, therefore, are not within the scope of the release.

The duties of a fiduciary [*12] are ongoing, and a cause of action arises under ERISA each time the fiduciary breaches its duty. *See Tibble v. Edison Intern.*, 135 S. Ct. 1823, 1828-29, 191 L. Ed. 2d 795 (2015) (holding a fiduciary has a continuing duty to monitor investments and remove imprudent ones). Each failure to exercise the duties of loyalty and prudence is a new breach and consequently, a new claim. *Boeckman, v. A.G. Edwards, Inc.*, 461 F. Supp. 2d 801, 814-15 (S.D. Ill. 2006) ("In light of the continuing duty of prudence imposed on plan fiduciaries by ERISA, each failure to exercise prudence constitutes a new breach of the duty, that is to say, a new claim. Thus, allegations that, following the execution of the release, [defendant] continued to breach its fiduciary duty by continuing to pay excessive fees to mutual funds represent new, prospective claims not in existence when the release was executed."). *See also Moore v. Comcast Corp.*, 268 F.R.D. 530, 534-37 (E.D. Pa. 2010) (finding "'ERISA imposes a continuing duty to review and liquidate improvident investments'" and that the breach of that duty creates a "continuing wrong" that is "continually arising anew") (quoting *Morrissey v. Curran*, 567 F.2d 546, 549 (2d Cir. 1977)).

Likewise, each time a prohibited transaction occurs, a new claim arises. *See NYSA—ILA Med. & Clinical Servs. Fund v. Catucci*, 60 F. Supp. 2d 194, 199-200 (S.D.N.Y. 1999) (each improper payment of ERISA plan assets to a third party was a distinct action that supported a new breach of fiduciary duty claim); *Dole v. Formica*, No. C87-2955, 1991 U.S. Dist. LEXIS 19743, 1991 WL 317040, at *8 (N.D. Ohio Sept. 30, 1991) (finding recurring breaches, [*13] not just one initial

breach with continuing effects, where a plan paid excessive administrative fees for years and holding each time a fiduciary made an improper payment with plan assets, "the [plan] [was] harmed and a new cause of action arose."). *See also Russell v. Harman Int'l Indus., Inc.*, 945 F. Supp. 2d 68 (D.D.C. 2013) (a claim for breach of the duty of prudence "is available when the fiduciary makes the imprudent investment.").

Under the "continuing duty" standard, a new claim arose each time Defendants breached their duty to the Plan. Plaintiffs argue since June 30, 2010, Defendants have committed ongoing breaches of their fiduciary duty by using a disloyal and imprudent process to manage the Plan. For example, Plaintiffs claim less expensive R6 shares became available in July 2013, but that the fiduciaries did not move Plan assets to this share class until August 2014, causing a loss to the Plan each day the assets remained in the more expense share class. Additionally, Plaintiffs claim the fiduciaries continue to retain the International Bond fund even though it underperforms against its benchmark. Plaintiffs also claim Defendants failed to investigate the recordkeeping costs paid to JPMorgan RPS, recordkeeper until 2013, and continues to [*14] fail to investigate the costs paid to Schwab RS, the current recordkeeper.

Defendants argue Plaintiffs' claims arose when the claims "were available as a matter of law" which, according to Defendants, is when the challenged activity first occurred, citing *Russell v. Harman Int'l Indus., Inc.* Using this standard, Defendants claim Plaintiffs' claims arose when Defendants made use of American Century funds within the Plan, which was prior to the execution of Plaintiffs' Agreements. Defendants also focus on "whether plaintiff had sufficient constructive knowledge" of the potential claim when they signed their Agreements, citing to *Fair v. Int'l Flavors & Fragrances, Inc.*, 905 F.2d 1114, 1116-17 (7th Cir. 1990) and *Lund v. Citizens Financial Group, Inc.*, No. CV 97-183-M, 1999 U.S. Dist. LEXIS 22590, 1999 WL 814341, *15 (D.N.H. Sept. 30, 1999). The cases cited by Defendants are factually distinct from this case in that in each of those cases the plaintiffs alleged a particular one-time action by the defendant caused the breach of fiduciary duty. In *Russell*, the defendant made false and misleading statements. In *Fair* and *Lund*, the defendant miscalculated retirement benefits. But, here, the Plaintiffs allege ongoing breaches of duty in the

Wildman v. Am. Century Servs., LLC

continued management of the Plan's investment lineup.

Each alleged breach of the duty of loyalty or prudence [**15**] results in a new claim. Likewise, each alleged prohibited transaction results in a new claim. Plaintiffs' Amended Complaint encompasses all of those claims from June 30, 2010, to present. Wildman signed his agreement on June 9, 2008, so all claims presented arose after his Agreement became effective. Borcherding signed his agreement on July 19, 2012, so his claims are limited to those occurring after that date.[5] Therefore, the motion is DENIED as to Wildman's claims. The motion is DENIED as to Borcherding's claims that arose after July 19, 2012, and GRANTED as to Borcherding's claims that arose on or before July 19, 2012.

**Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment (Doc. 19) is GRANTED in part and DENIED in part.

**IT IS SO ORDERED**.

Date: February 27, 2017

/s/ Greg Kays

GREG KAYS, CHIEF JUDGE

UNITED STATES DISTRICT COURT

---

End of Document

---

[5] The Court makes no determination of whether this limitation affects Borcherding's ability to serve as a class representative.

1   MORGAN, LEWIS & BOCKIUS LLP
    Roberta H. Vespremi, Bar No. 225067
2   roberta.vespremi@morganlewis.com
    One Market Street, Spear Street Tower
3   San Francisco, CA  94105-1596
    Tel:    +1.415.442.1000
4   Fax:    +1.415.442.1001

5   MORGAN, LEWIS & BOCKIUS LLP
    Brian T. Ortelere (pro hac vice)
6   brian.ortelere@morganlewis.com
    Jeremy P. Blumenfeld (pro hac vice)
7   jeremy.blumenfeld@morganlewis.com
    1701 Market Street
8   Philadelphia, PA 19103-2921
    Tel:    +1.215.963.5000
9   Fax:    +1.215.963.5001

10  MORGAN, LEWIS & BOCKIUS LLP
    Deborah S. Davidson (pro hac vice)
11  deborah.davidson@morganlewis.com
    77 W. Wacker Drive, Fifth Floor
12  Chicago, IL 60601-5094
    Tel:    +1.312.324.1000
13  Fax:    +1.312.324.1001

14  SHEPHERD KAPLAN LLC
    Christopher D. Browne (pro hac vice)
15  cbrowne@sk-llc.com
    125 Summer Street
16  Boston, MA 02210
    Tel:    +1.617.896.1689
17  Fax:    +1.617.896.1650

18  Attorneys for Defendant
    SHEPHERD KAPLAN LLC
19
                     UNITED STATES DISTRICT COURT
20                   NORTHERN DISTRICT OF CALIFORNIA
                          SAN JOSE DIVISION

21  JERRY JOHNSON, et al.,                    Case No. 16-cv-3698-NC

22              Plaintiff,                     **DEFENDANT SHEPHERD KAPLAN
                                               LLC'S REPLY IN SUPPORT OF ITS
23        vs.                                  MOTION TO DISMISS**

24  FUJITSU TECHNOLOGY AND BUSINESS            Hearing Date:    February 1, 2017
    ASSOCIATION OF AMERICA, INC., et al.,      Time:            1:00 p.m.
25                                             Courtroom:       7 – 4th Floor
                Defendants.                    Magistrate Judge Nathanael Cousins
26
                                               Complaint Filed:   June 30, 2016
27

28  **REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED**

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
CHICAGO                                        **DEFENDANT SHEPHERD KAPLAN LLC'S REPLY IN
                                               SUPPORT OF ITS MOTION TO DISMISS**

                                               **EXHIBIT 8**

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | CORRECTIONS TO MISSTATEMENTS IN THE FAC AND OPPOSITION | 3 |
| III. | ARGUMENT | 4 |
|  | A. The Investments In The Plan Lineup Do Not Support An Inference That SK Used A Flawed Process By In Selecting Them. | 4 |
|  | 1. The Use Of Retail Share Class Investments Alone Does Not Support An Inference Of Imprudent Process Even Where Institutional Share Classes Were Available | 5 |
|  | 2. ERISA Fee And Expense Claims That Survived Motions To Dismiss Included Allegations Of Financial Conflict Of Interest, Absent Here | 6 |
|  | 3. SK Had No Obligation To Choose Only Low Cost Index Funds | 7 |
|  | B. The Relative Expenses Of The Plan Compared to Similar Plans Are Irrelevant | 9 |
|  | C. SK Is Not Liable For Any Matters Over Which It Did Not Have Fiduciary Authority | 10 |
|  | 1. SK Is Not Liable For Actions Occurring When It Was Not A Fiduciary | 10 |
|  | 2. The Record Shows That The Administrative Committee, Not SK, Had Fiduciary Responsibility Regarding Administrative Costs | 11 |
| IV. | CONCLUSION | 13 |

DEFENDANT SHEPHERD KAPLAN
LLC'S REPLY IN SUPPORT OF ITS
MOTION TO DISMISS

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Aguilar v. Melkonian Enters., Inc.,*
 No. 1:05-cv-00032, 2006 WL 3199074 (E.D. Cal. Nov. 3, 2006).................................................9

*Asturias v. Nationstar Mortg. LLC,*
 No. 15-cv-03861, 2016 WL 368095 (N.D. Cal. Jan. 29, 2016)................................................13

*Bhatia v. Dischino,*
 No. CIV.A. 3:09-CV-1086B, 2010 WL 1236406 (N.D. Tex. Mar. 30, 2010)............................2

*Braden v. Wal-Mart Stores, Inc.,*
 588 F.3d 585 (8th Cir. 2009).....................................................................................................7

*California v.  Continental Ins. Co.,*
 55 Cal. 4th 186 (2012)...........................................................................................................12

*CSA 401(k) Plan v. Pension Plan Prof's, Inc.,*
 195 F.3d 1135 (9th Cir. 1999).................................................................................................12

*Gipson v. Wells Fargo & Co.,*
 No. 08-4546, 2009 WL 702004 (D. Minn. Mar. 13, 2009) ......................................................7

*Gov. Computer Sales, Inc. v. Dell Mktg.,*
 199 F. App'x 636 (9th Cir. 2006) ............................................................................................2

*Harris Tr. & Sav. Bank v. John Hancock Mut. Life Ins. Co.,*
 302 F.3d 18 (2d Cir. 2002)....................................................................................................11

*Hecker v. Deere & Co,*
 556 F.3d 575 (7th Cir. 2009)...............................................................................................1, 8

*Ing Inv. Plan Servs. v. Solberg,*
 No. 09-CV-01517-WDM-MJW, 2010 WL 582347 (D. Colo. Feb. 16, 2010) ...........................2

*Krueger v. Ameriprise Fin., Inc.,*
 No. 11-cv-02781, 2012 WL 5873825 (D. Minn. Nov. 20, 2012) ..............................................6

*Loomis v. Exelon Corp.,*
 658 F.3d 667 (7th Cir. 2011).........................................................................................2, 5, 8, 9

*Mertens v. Hewitt Assocs.,*
 508 U.S. 248 (1993).............................................................................................................2, 10

*Moreno v. Deutsche Bank Ams. Holding Corp.,*
 No. 15-Civ-9936, 2016 WL 5957307 (S.D.N.Y. Oct. 13, 2016)................................................6

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT SHEPHERD KAPLAN
LLC'S REPLY IN SUPPORT OF ITS
MOTION TO DISMISS

1

### TABLE OF AUTHORITIES
(continued)

2

**Page**

3

*Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley*
4     *Inv. Mgmt., Inc. ("St. Vincent"),*
    712 F.3d 705 (2d Cir. 2013)............................................................................................... 4

5

*Quan v. Computer Scis. Corp.,*
6     623 F.3d 870 (9th Cir. 2010) ............................................................................................. 9

7

*Renfro v. Unisys Corp.,*
    671 F.3d 314 (3d Cir. 2011)................................................................................... 1, 5, 7, 8

8

*Rosen v. Prudential Ret. Ins. & Annuity Co.,*
9     No. 3:15-cv-1839, 2016 WL 7494320 (D. Conn. Dec. 30, 2016) ............................... 9

*Sprewell v. Golden St. Warriors,*
10     266 F.3d 979 (9th Cir. 2001).............................................................................................. 4

11

*Tibble v. Edison Int'l ("Tibble III"),*
12     729 F.3d 1110 (9th Cir. 2013) .............................................................................. 1, 2, 9, 10

13

*Tibble v. Edison Int'l ("Tibble V"),*
    No. 10-56406, 2016 WL 7321373 (9th Cir. Dec. 16, 2016) ...................................... 1

14

*Tibble v. Edison Int'l ("Tibble I"),*
15     639 F. Supp. 2d 1074 (C.D. Cal. 2009)...................................................................... 7, 8

16

*Toohey v. Wyndham Worldwide Corp. Health & Welfare Plan,*
    727 F. Supp. 2d 978 (D. Or. 2010) ................................................................................ 12

17

*Urakchin v. Allianz Asset Mgmt. Corp. of Am., L.P.,*
18     No. SACV-15-1614, 2016 WL 4507117 (C.D. Cal. Aug. 5, 2016)............................ 6

19

*White v. Chevron Corp.,*
    No. 16-CV-0793-PJH, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016)................ 1, 8, 9

20

**Statutes**

21

29 U.S.C. § 1002(21)(A)........................................................................................................ 2, 10

22

**Rules**

23

Fed. R. Civ. P. 8(a).................................................................................................................... 11

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

**DEFENDANT SHEPHERD KAPLAN
LLC'S REPLY IN SUPPORT OF ITS
MOTION TO DISMISS**

I.      **<u>INTRODUCTION</u>**

Predicated on misstatements of law and distortions of the very documents attached to the First Amended Complaint ("FAC"), Plaintiffs' Opposition fails to establish a basis for allowing their claims to proceed.  First, Plaintiffs emphasize the holding in *Tibble v. Edison Int'l* ("*Tibble V*"), No. 10-56406, 2016 WL 7321373 (9th Cir. Dec. 16, 2016), that where a fiduciary's process for investment selection failed to "even consider[] or evaluate[] the different share classes" of investments, selection of retail share classes may support a claim for breach of fiduciary duty where cheaper corresponding institutional share classes were available.  *Id*. at *2.  The Opposition points to the inclusion of retail share class investments in the Plan and then concludes that SK failed to consider corresponding institutional share classes of those investments.  However, "the mere inclusion of a fund with an expense ratio that is higher than that of the lowest share class . . . standing alone, is insufficient to state a claim that [a fiduciary] imprudently failed to consider lower cost options."  *White v. Chevron Corp.*, No. 16-CV-0793-PJH, 2016 WL 4502808, at *11 (N.D. Cal. Aug. 29, 2016).  Moreover, in this case the Plan Recordkeeping Contract and the Fund Platform (which is part of the Recordkeeping Contract) show that different share classes were considered *and that the Fujitsu Plan was in the lowest cost share class* for the four funds Plaintiffs challenge, ███████████████████████████████████████

████████████

Second, Plaintiffs' more general fiduciary breach claims fail under the undisturbed holding in *Tibble v. Edison Int'l* ("*Tibble III*"), 729 F.3d 1110, 1135 (9th Cir. 2013), *vac'd on other grounds by* 135 S. Ct. 1823 (2015), which joined with every other U.S. Court of Appeals that addressed the issue in holding that there is no breach of fiduciary duty where a retirement plan offers a reasonable range of investment options and expenses from which plan participants are free to choose.  *See Renfro v. Unisys Corp.*, 671 F.3d 314, 327-28 (3d Cir. 2011); *Hecker v. Deere & Co*, 556 F.3d 575, 586 (7th Cir. 2009).  The Plan here offered participants at least five investment options with fees of 0.09% or lower.  The fact that the Plan also gave participants a

DEFENDANT SHEPHERD KAPLAN
LLC'S REPLY IN SUPPORT OF ITS
MOTION TO DISMISS

1   choice to invest in other, more expensive, actively managed options cannot state a claim.  *See*

2   *Loomis v. Exelon Corp.*, 658 F.3d 667, 671 (7th Cir. 2011).

3        Third, but not surprising in light of the above, the excessive fee cases cited by Plaintiffs

4   involved a defendant fiduciary offering proprietary funds or otherwise affected by a financial

5   conflict of interest.  *See* cases cited in note 10, *infra*.  Here, there are no facts alleged suggesting

6   that SK had a financial interest in the investment options or any other conflict of interest.

7        Lastly, federal law is unequivocal that ERISA "allocates liability for plan-related

8   misdeeds in proportion to respective actors' power to control and prevent the misdeeds."  *Mertens*

9   *v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993); *Tibble III*, 729 F.3d at 1124-25; *see also* 29 U.S.C. §

10  1002(21)(A).  As made clear in the Plan, the Plan's Annual Reports (IRS Forms 5500), and the

11  Recordkeeping Contract, Fujitsu was the Plan Administrator for the Plan and it (through the

12  Administrative Committee) selected the service providers, signed the contract with New York

13  Life Investment Management ("NYLIM"), and ███████████████████████

14  ████████████████████████████████████ (Dkt. 68-1 at 40; Dkt. 72-4 at 1;

15  Declaration of Heath Miller ("Miller Decl.") Ex. 1 at 7).[1]

16

17  ---

    [1] The Court may properly consider the NYLIM Recordkeeping Contract and related Fund
    Platform, which are integral to Plaintiffs' claims.  *Gov. Computer Sales, Inc. v. Dell Mktg.*, 199 F.

18  App'x 636, 638 (9th Cir. 2006).  Plaintiffs allege that NYLIM was the Plan's recordkeeper (FAC
    ¶ 78), thus the Recordkeeping Contract with NYLIM is central to their claims.  Plaintiffs further

19  assert allegations throughout the FAC about the administrative and recordkeeping fees paid by the
    Plan and the payment structure of those fees.  For instance, Plaintiffs allege that "[t]he Plan uses a

20  combination of these methods: a portion of administrative expenses are paid directly from Plan
    assets, and a portion of these expenses are paid out of the investment expenses charged by the

21  mutual funds within the Plan."  (FAC ¶ 69).  The NYLIM Recordkeeping Contract addresses
    ████████████████████████████████████████████████████████

22  ████████████████████ (*See* Miller Decl., Ex. 1).  The contract's incorporated Fund

23  Platform lists the Plan's investment options and ██████████████████. (*See* Miller Decl.
    Exs. 2 & 3).  As such, these documents are Plan documents and have been incorporated by

24  reference, and the Court can consider them in ruling on SK's Motion to Dismiss.  *See Ing Inv.
    Plan Servs. v. Solberg*, No. 09-CV-01517-WDM-MJW, 2010 WL 582347, at *1 n.1 (D. Colo.

25  Feb. 16, 2010) ("Because the plan documents and relevant service agreements are central to the
    claims and are referred to in the Complaint, I consider them to be incorporated in the pleadings

26  and by referencing them do not convert the motion to a motion for summary judgment."); *Bhatia
    v. Dischino*, No. CIV.A. 3:09-CV-1086B, 2010 WL 1236406, at *4 (N.D. Tex. Mar. 30, 2010)

27  ("Plaintiffs make several references to their reasons for hiring Pension Strategies and the duties
    they expected Pension Strategies to perform.  Accordingly, the Pension Strategies, LLC Service

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
CHICAGO

2

DEFENDANT SHEPHERD KAPLAN
LLC'S REPLY IN SUPPORT OF ITS
MOTION TO DISMISS

## II.   CORRECTIONS TO MISSTATEMENTS IN THE FAC AND OPPOSITION

The FAC estimates the Plan paid over $10 million in fees in 2013 and 2014, and as a result was more expensive than comparable retirement plans.  (FAC ¶¶ 80-81).  Footnote 26 in Plaintiffs' Opposition to Fujitsu's motion to dismiss explains the basis for those allegations.  That footnote – and all of the factual allegations premised on it – are contradicted by Plan documents that are attached to the FAC as well as other documents central to Plaintiffs' claims that they neglected to attach.  Specifically, Plaintiffs explain in footnote 26 that they "estimated total compensation by *totaling* two distinct categories of payments" – both "direct" compensation and "indirect" "revenue sharing compensation available from mutual funds." (Dkt. 76 at 16 n.26) (emphasis added).  Plaintiffs "therefore allege that the recordkeeper was compensated in the aggregate amount of direct compensation and *estimated indirect compensation*." (*Id.*) (emphasis added).   This allegation, however, is contrary to Plan documents, which provide that revenue sharing will be paid to the Plan itself, and not to service providers.[2]  The Plan's Recordkeeping Contract with NYLIM states that NYLIM ██████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ (Miller Decl. Ex. 1 at 6).[3] ████████████████████████████████████████████

---

Agreement Letter is likewise indirectly referenced throughout the Complaint and central to Plaintiffs' claims against Pension Strategies.  As such, the Court will additionally consider the Service Agreement Letter in analyzing Pension Strategies' Motion to Dismiss.").  In their Opposition, Plaintiffs rely heavily on *Tibble V*, which was issued after SK filed its Motion to Dismiss the FAC.  As such, SK did not have the opportunity to present argument or appropriate Rule 12 documents addressing *Tibble V* in its Opening Brief.  In light of Plaintiffs' characterization of this new case in their Opposition, these new exhibits are appropriately considered when ruling on SK's Motion to Dismiss.

[2] The Plan document provides that the Plan, not Fujitsu or any other entity, is obligated to pay Plan expenses.  (*See* Dkt. 68-1 § 8.6(a)).  Hence, contrary to the conclusory allegations in the FAC, neither SK nor Fujitsu benefited from the use of any investment in the Plan lineup.  To the extent revenue sharing paid to the Plan was in turn used to defray Plan expenses, that worked to the benefit of the Plan Trust Fund, and Plan participants, including Plaintiffs.

[3] ████████████████████████████████████████████ ████████████████████████████████████ (*Id.* at 6).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
CHICAGO

**DEFENDANT SHEPHERD KAPLAN LLC'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS**

1 ████████████████████████████████████████████████████

2 ███████████████████████.[4]

3     Plaintiffs' allegations about the cost of the Fujitsu Plan—all of which are based on their

4 estimated double-counted fees—cannot survive or be accepted as true in the face of contrary Plan

5 documents.  *See Sprewell v. Golden St. Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  And once

6 that fundamental fact is accounted for, Plaintiffs' claims all fail as a matter of law.

7 **III.   ARGUMENT**

8     "Rules 8 and 12(b)(6) of the Federal Rules of Civil Procedure . . . help to prevent

9 settlement extortion – using discovery to impose asymmetric costs on defendants to force a

10 settlement advantageous to the plaintiff regardless of the merits of his suit."  *See Pension Benefit*

11 *Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt., Inc.*

12 ("*St. Vincent*"), 712 F.3d 705, 719 (2d Cir. 2013) (internal quotation  marks omitted).  For these

13 reasons, "the price of entry, even to discovery, is for the plaintiff to allege a *factual* predicate

14 concrete enough to warrant further proceedings, which may be costly and burdensome."  *Id.*

15 (citation omitted).  The FAC does not provide this required factual predicate, and the Court

16 should apply Rule 12(b)(6) to spare the Plan fiduciaries the costs and burdens of associated

17 discovery.

18     **A.   The Investments In The Plan Lineup Do Not Support An Inference That SK Used A Flawed Process By In Selecting Them.[5]**

19

20     As Plaintiffs concede in their Opposition, the allegations of the FAC do not "directly

21 address[] the process by which the Plan was managed."  *St. Vincent*, 719 F.3d at 718; Dkt. 77 at 3,

22 6.  Therefore, to state a plausible claim, the FAC must furnish "circumstantial factual allegations"

23

24 ───────────────────

25 [4] These funds were to be used first to pay any direct expenses of the Plan and then ████████████████████████████████████

26 (*Id.* at 6-7).

27 [5] Plaintiffs offer little to salvage their claim regarding the LifeCycle Funds, other than re-asserting the allegations of the FAC and attempting to distinguish the case law cited in SK's Opening Brief.

28 Accordingly, SK's reply focuses on Plaintiffs' other claims.

1   that permit the court "to infer from what is alleged that the process was flawed." *St. Vincent*, 719

2   F.3d at 718.  The allegations of the FAC are insufficient to allow such an inference.

3             **1.**       **The Use Of Retail Share Class Investments Alone Does Not Support**

4                        **An Inference Of Imprudent Process Even Where Institutional Share Classes Were Available.**

5        Plaintiffs argue that *Tibble V* precludes dismissal of their challenge to the offering of retail

6   class share mutual funds.  They are mistaken.  First, "the mere inclusion of a fund with an

7   expense ratio that is higher than that of the lowest share class . . . standing alone, is insufficient to

8   state a claim that [a fiduciary] failed to consider lower cost options." *White*, 2016 WL 4502808,

9   at *11.[6]  *See also Renfro*, 671 F.3d at 327-28 (rejecting virtually identical claims to those alleged

10  here in the face of virtually identical allegations);[7] *Loomis*, 658 F.3d at 669-70 (same).[8]

11       Second, for the four specific funds Plaintiffs claim were available in a lower cost

12  institutional share class (FAC ¶¶ 105, 106), Plaintiffs' math ignores the revenue sharing that was

13  returned to the Plan pursuant to the Recordkeeping Contract with NYLIM:

---

14  [6] Plaintiffs attempt to distinguish *White* by arguing that the overall plan expenses in *White* were

15  lower than the overall plan expenses alleged in this case.  But Chief Judge Hamilton did not even

16  mention the overall expense levels of the retirement plan in holding that that an inference of imprudent process does not follow from the use of higher-cost share classes, or anywhere else in

17  her decision granting Chevron's motion to dismiss.  *See generally White*, 2016 WL 4502808. Plaintiffs' effort to distinguish *White* ignores the actual reasoning of the Court's decision.

18  [7] Indeed in *Renfro*, plaintiffs alleged that 71 out of the 73 investment options were "high priced

19  retail mutual funds and/or other plan investment options . . . as opposed to less expensive institutional share classes of the same or similar mutual funds."  Second Am. Compl. ¶ 50(I),

20  Dkt. 73, *Renfro v. Unisys Corp.*, No. 07-cv-2098, 2010 WL 1688540 (E.D. Pa. Apr. 26, 2010). The *Renfro* plaintiffs presented similar share class arguments to the Third Circuit, which were

21  rejected.  Br. for Appellants & App. Volume I of III (Pages A1-A20) at 11, Dkt. 003110278876, *Renfro v. Unisys Corp.*, No. 10-2447, 671 F.3d 314 (3d Cir. 2011) ("[I]n each investment

22  category for which Defendants selected Fidelity investments, the Plan vastly overpaid in fees relative to institutional-level alternatives could have selected").

23  [8] In *Loomis*, plaintiffs alleged that all of the Exelon plan's 24 mutual fund offerings were "high

24  priced retail mutual funds . . . as opposed to less expensive institutional share classes of the same or similar mutual funds . . ., which are available to large institutional investors like the Plan at a

25  substantially lower cost than retail mutual funds."  First Am. Compl. ¶ 39(h), Dkt. 128, *Loomis v. Exelon Corp.*, No. 06-cv-04900, 2009 WL 4667092 (N.D. Ill. Dec. 9, 2009).  The *Loomis*

26  plaintiffs asserted similar share class arguments to the Seventh Circuit, which rejected them.  Br.

27  & App. of Pls.-Appellants at 19, Dkt. 13, *Loomis v. Exelon Corp.*, No. 09-4081, 658 F.3d 667 (7th Cir. 2011) ("Defendants did not . . . select lower-cost institutional-class investment options

28  for the Plan.  Instead, they selected the same retail mutual fund fees").

MORGAN, LEWIS &
BUCKIUS LLP
ATTORNEYS AT LAW
CHICAGO

5

**DEFENDANT SHEPHERD KAPLAN
LLC'S REPLY IN SUPPORT OF ITS
MOTION TO DISMISS**

| (A) Fund | (B) Alleged Plan Share Class Fee in the Amended Complaint | (C) | (D) | (E) Fee Alleged For Alternative Share Class in Amended Complaint | (F) |
|---|---|---|---|---|---|
| Amana Growth | 1.1% | ▮ | ▮ | 0.87% | ▮ |
| First Eagle Overseas | 1.15% | ▮ | ▮ | 0.90 | ▮ |
| Neuberger Berman Genesis Tr. | 1.11% | ▮ | ▮ | 0.85% | ▮ |
| AMG TimesSquare Mid Cap Growth | 1.24% | ▮ | ▮ | 1.04% | ▮ |

(*See* FAC ¶¶ 105, 106; Miller Decl. Ex. 1 at 6-7; Miller Decl. Ex. 3).[9]  Taking the Plan documents and Plaintiffs' allegations together, the Plan *was* in the share class providing the lowest net cost for each of the funds Plaintiffs challenge.  Plaintiffs cannot "reasonably infer" (FAC ¶ 108) from this that SK's process was a breach of fiduciary duty.  To the contrary, the only reasonable inference is that the process for selecting funds – including the share class that was the best for the Plan – was a reasonable and prudent one.

> ## 2. ERISA Fee And Expense Claims That Survived Motions To Dismiss Included Allegations Of Financial Conflict Of Interest, Absent Here.

The fee cases Plaintiffs cite that survived Rule 12 motions involved defendant fiduciaries with financial conflicts of interest because the mutual fund fees at issue were paid *to the fiduciaries*,[10] or where there were allegations of kickbacks.[11]  There were similar allegations in

---

[9] ████████████████████████████████████████████

[10] *See Urakchin v. Allianz Asset Mgmt. Corp. of Am., L.P.*, No. SACV-15-1614, 2016 WL 4507117, at *7 (C.D. Cal. Aug. 5, 2016) (Allianz defendants "selected Allianz-affiliated investment options to benefit the Allianz family"); *Moreno v. Deutsche Bank Ams. Holding Corp.*, No. 15-Civ-9936, 2016 WL 5957307, at *6 (S.D.N.Y. Oct. 13, 2016) ("Defendants stood to benefit from the alleged excessive fees because [their affiliates] were paid investment management fees by [the disputed] proprietary funds."); *Krueger v. Ameriprise Fin., Inc.*, No. 11-cv-02781, 2012 WL 5873825, at *3 (D. Minn. Nov. 20, 2012) ("Plaintiffs claim Ameriprise used the retirement assets of [its] employees to seed new and untested mutual funds . . . thus increasing

DEFENDANT SHEPHERD KAPLAN
LLC'S REPLY IN SUPPORT OF ITS
MOTION TO DISMISS

1   *Tibble.  See Tibble v. Edison Int'l* ("*Tibble I*"), 639 F. Supp. 2d 1074, 1096 (C.D. Cal. 2009)

2   (noting that the plan document provided that "[t]he cost of the administration of the Plan will be

3   paid by [SCE]," the plan sponsor); Second Am. Compl. ¶¶ 32, 42, 56, Dkt. 116, *Tibble v. Edison*

4   *Int'l*, No. 07-cv-05359, 639 F. Supp. 2d 1074 (C.D. Cal. 2009) (alleging that plan sponsor

5   invested plan assets in high-cost investments offering revenue sharing that would defray plan

6   administrative expenses and benefit the plan sponsor by concomitantly reducing its payment

7   obligations to the plan).

8           Here, in contrast, the FAC alleges no facts to substantiate any financial conflict of interest

9   on the part of SK (or Fujitsu, for that matter).  Unlike in *Tibble*, moreover, the Plan document

10  provides that the Plan (not Fujitsu or anyone else) is obligated to pay Plan expenses, so any

11  reduction in Plan expenses would benefit the Plan and its participants, rather than Plan

12  fiduciaries.  (*See* Dkt. 68-1 § 8.6(a)).  The FAC offers no factual allegations of any kind to

13  support its conclusory allegation that SK benefited from the selection of particular investments.

14  Nor are there any allegations of kickbacks, which is precisely the basis on which the Third Circuit

15  in *Renfro* distinguished the *Braden* decision on which Plaintiffs rely.  *See Renfro*, 671 F.3d at 327

16  ("Unlike the pleadings in *Braden*, plaintiffs have not contended there was any concealed kickback

17  scheme . . . as the quid pro quo for inclusion of particular unaffiliated mutual funds.").

18          **3.      SK Had No Obligation To Choose Only Low Cost Index Funds.**

19          Plaintiffs argue that the selection of actively managed investment funds rather than

20  passively managed funds was a breach of SK's "duty to 'minimize costs.'"  (Dkt. 77 at 10) (citing

21  *Tibble V*, 2016 WL 7321373, at *8).  However, cost does not override every other consideration

22  in investment selection.  If plan fiduciaries were obligated to only select the lowest cost

23  investments, then all 401(k) plans would be invested exclusively in the same few low cost index

24  ───────────────────────

25  profits for . . . Ameriprise."); *Gipson v. Wells Fargo & Co.*, No. 08-4546, 2009 WL 702004, at *1
    (D. Minn. Mar. 13, 2009) ("Plaintiffs contend that the plan impermissibly invested in mutual

26  funds managed by Wells Fargo affiliate Wells Fargo Fund Management.").

27  [11]  *See, e.g. Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 590 (8th Cir. 2009) (disputed mutual
    fund investments were retained because of "kickbacks paid by the mutual fund companies in

28  exchange for inclusion of their funds in the Plan.").

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
CHICAGO

**DEFENDANT SHEPHERD KAPLAN
LLC'S REPLY IN SUPPORT OF ITS
MOTION TO DISMISS**

1   funds.  That is not what ERISA requires.  *See White*, 2016 WL 4502808, at *10 ("Fiduciaries

2   have latitude to value investment features other than price (and, indeed, are required to do so).").

3   While the Plan here offered precisely the low cost index funds that Plaintiffs advocate, ERISA

4   does not prohibit also offering other more expensive investment options to participants who want

5   them.

6           To the extent Plaintiffs allege generally that the fees for some of the Plan's investment

7   options were too high because other mutual funds offered investments with lower fees, that type

8   of claim was squarely rejected in *Hecker*, *Renfro*, *Loomis*, *Tibble I*, and *White*.  *See, e.g.*, *Hecker*,

9   556 F.3d at 586 ("[N]othing in ERISA requires [a] fiduciary to scour the market to find and offer

10  the cheapest possible fund (which might, of course, be plagued by other problems).").  The

11  principle articulated in each of these decisions applies equally here: fiduciaries satisfy their duties

12  by "offer[ing] participants meaningful choices about how to invest their retirement savings[,]"

13  which includes evaluating "the range of investment options and the characteristics of those

14  included options—including the risk profiles, investment strategies, and associated fees."  *E.g.*,

15  *Renfro*, 671 F.3d at 327.[12]

16          The Plan here offered participants at least five passively managed index investment

17  options with fees of 0.09% or lower.  (Dkt. 72 at 6.)  And similar to another excessive fee

18  complaint that was recently dismissed:

19              Plaintiffs do not discuss these lower-cost options in any depth in their
                opposition briefs, and the Amended Complaint does not include any facts
20              suggesting that the inclusion of these lower-cost passively-managed
                mutual funds and index funds are insufficient alternatives to the funds
21              with allegedly excessive fees.  The inclusion of these lower-cost
                alternatives undermines Plaintiffs' assertions that [defendants] breached
22              their fiduciary duties by charging excessive fees.

23

24   *Rosen v. Prudential Ret. Ins. & Annuity Co.*, No. 3:15-cv-1839, 2016 WL 7494320, at *15 (D.

25   Conn. Dec. 30, 2016) (citation omitted).  Thus, participants concerned about cost over other

26   _____
     [12] Plaintiffs try to dismiss or distinguish the appellate court decisions cited in SK's Opening Brief,
27   but the *Loomis* decision explains precisely what *Hecker* did and what was intended:  "By offering
     a wide range of options, *Hecker* held, Deere's plan complied with ERISA's fiduciary duties."
28   *Loomis*, 658 F.3d at 670.  The same was true in *Renfro*, *Loomis*, and *White*, and here too.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
CHICAGO

8

DEFENDANT SHEPHERD KAPLAN
LLC'S REPLY IN SUPPORT OF ITS
MOTION TO DISMISS

1    factors could select from an array of low cost stock and bond index funds with different risk and

2    return characteristics.  (Dkt. 72 at 6-7).  The fact that the Plan also gave participants a choice (if

3    they wanted) to invest in a wide range of other, more expensive actively managed options cannot

4    state a claim for fiduciary breach.  *Loomis*, 658 F.3d at 671.

5            Moreover, contrary to Plaintiffs' suggestion (Dkt. 77 at 12), the FAC's claims based on

6    investment expense also fail because a range of investment options between .03% and 2.0%, such

7    as the Plan's range between .03% and 1.75%, is the type of prudent range of expenses described

8    in *Tibble III*, 729 F.3d at 1135, and *White*, 2016 WL 4502808, at *11.

9        **B.      The Relative Expenses Of The Plan Compared to Similar Plans Are
                    Irrelevant.**

10           Plaintiffs focus heavily on the relative expenses of the Plan compared to similar retirement

11   plans, and argue that no case has analyzed breach of fiduciary duty claims related to a retirement

12   plan that was more expensive than comparable plans.  This hurts, not helps, Plaintiffs' position.

13           First, no case has treated relative plan expense as relevant to fiduciary liability because

14   fiduciary liability turns not on outcome, but on process.  *See Aguilar v. Melkonian Enters., Inc.*,

15   No. 1:05-cv-00032, 2006 WL 3199074, at *6 (E.D. Cal. Nov. 3, 2006) ("The prudent person

16   standard normally focuses on the process the fiduciary undertakes . . . rather than . . . hindsight.");

17   *Quan v. Computer Scis. Corp.*, 623 F.3d 870, 885 (9th Cir. 2010); *White*, 2016 WL 4502808, at

18   *8.  Judging fiduciary process according to outcomes related to relative plan expenses would turn

19   this rule on its head and improperly impose fiduciary liability based on hindsight comparison of a

20   plan's expenses relative to other retirement plans.

21           Second, Plaintiffs' Plan cost analysis is based on Plaintiffs' estimate of "indirect

22   compensation" (i.e., revenue sharing), even though the Recordkeeping Agreement makes clear

23   that ███████████████████████████████.  *See supra* at 5-6.  Such "facts" are not

24   actually facts and cannot be accepted as true even under Rule 12.

25           Furthermore, Plaintiffs' argument would open the floodgates of litigation and effectively

26   impose liability on any plan that was not the lowest cost plan simply because someone else was

27   able to do it more cheaply.  Whenever there are two or more plans with different costs, some

28

**DEFENDANT SHEPHERD KAPLAN
LLC'S REPLY IN SUPPORT OF ITS
MOTION TO DISMISS**

1    plans by definition will be above average cost, and one will always be the most expensive.  That,

2    however, is not sufficient to create the inference of a fiduciary breach.  The Court should decline

3    to adopt Plaintiffs' novel theory of fiduciary liability.[13]

4         **C.    SK Is Not Liable For Any Matters Over Which It Did Not Have Fiduciary
                  Authority.**

5

6         ERISA "allocates liability for plan-related misdeeds in proportion to respective actors'

7    power to control and prevent the misdeeds."  *Mertens*, 508 U.S. at 262; *Tibble III*, 729 F.3d at

8    1124-25; *see also* 29 U.S.C. § 1002(21)(A).  Nevertheless, Plaintiffs insist that SK is responsible

9    for investment-related matters occurring both before and after its tenure as Named Investment

10   Fiduciary for the Plan, when it was not a fiduciary and had no power to control or prevent any

11   actions with respect to the Plan.  In addition, Plaintiffs suggest SK is somehow responsible for the

12   Plan's administrative expenses, over which SK never had any authority or control.  These

13   arguments are meritless.

14         **1.    SK Is Not Liable For Actions Occurring When It Was Not A
                   Fiduciary.**

15

16        Plaintiffs cannot seriously argue that SK had any power to control or prevent any

17   misdeeds with respect to the Plan before it was hired to provide advisory services to the Plan.

18   The most they offer is a conclusory allegation that there exists some vague "uncertainty" with

19   respect to when SK's engagement with Fujitsu began.  Any such "uncertainty" was created by the

20   imprecision of the FAC itself, which alleges SK's service to the Plan began in "late 2011" but

21   also attaches Plan documents that identify a start date in 2012.  The burden is on Plaintiffs to

22   provide a short and plain statement of their claim, free of intentional vagueness or ambiguity.  *See*

23   Fed. R. Civ. P. 8(a).  This Court should not reward Plaintiffs for their defective FAC by

24   _____

25   [13] Plaintiffs' argument characterizing the overall expenses of the Plan as atypical misleadingly
     conflates the investment-related expenses of the Plan, over which SK had discretionary authority
26   as Named Investment Fiduciary, together with the administrative expenses of the Plan, over
     which SK never had any authority.  Thus, the "total expenses of the Plan" referenced in the
27   Opposition are not only irrelevant to the question of whether the range of *investment expenses*
     was reasonable or "out of the ordinary," but impermissibly have the effect of holding SK
28   responsible, in its capacity as Named Investment Fiduciary, for non-investment Plan expenses
     outside its fiduciary authority.  *See Mertens*, 508 U.S. at 262; *Tibble III*, 729 F.3d at 1124-25.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
CHICAGO

10

**DEFENDANT SHEPHERD KAPLAN
LLC'S REPLY IN SUPPORT OF ITS
MOTION TO DISMISS**

1   permitting them to pursue claims beyond the outer bounds of their own allegations concerning

2   when SK had fiduciary authority with respect to the Plan.

3          The same is true for any alleged misdeeds with respect to the Plan that occurred after SK

4   ceased serving as a fiduciary in 2015.  Plaintiffs' suggestion that SK should be liable in perpetuity

5   for any losses to the Plan that they believe to be connected to any actions SK took as fiduciary is

6   contrary to the rule established by *Mertens*.  Moreover, Plaintiffs' theory of fiduciary liability

7   would also have the effect of turning SK into a guarantor of a later investment fiduciary's work

8   where litigants such as Plaintiffs ascribe issues on a later fiduciary's watch to SK.

9               **2.**     **The Record Shows That The Administrative Committee, Not SK, Had**
10                   **Fiduciary Responsibility Regarding Administrative Costs.**

11         "[A] person may be an ERISA fiduciary with respect to certain matters but not others, for

12   he has that status only 'to the extent' he has or exercises that described authority or

13   responsibility."  *Harris Tr. & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3d 18, 28 (2d

14   Cir. 2002).  Plaintiffs suggest that SK's investment-related responsibilities somehow translated

15   into discretion or authority over administrative matters, such as selecting service providers to the

16   Plan and their compensation.  The Plan documents (and the FAC's allegations) confirm that they

17   are wrong.  The Plan allocates responsibility to the Administrative Committee to "administer the

18   plan in those respects unrelated to investment" including hiring service providers and determining

19   their compensation.  (Dkt. 68-1 § 8.1).  The FAC itself alleges that "the Administrative

20   Committee was obligated to ensure that the Plan was making prudent use of all available revenue

21   sharing, and for ensuring that the recordkeeper's compensation and other service providers'

22   compensation was reasonable, taking into account the availability of revenue sharing money."

23   (FAC ¶ 35).  In contrast, the Plan documents designate SK as "the named fiduciary with respect

24   to investment of Plan assets."  (Dkt. 68-1 § 8.2; *see also* FAC ¶ 47 (alleging that SK was

25   responsible for selecting asset classes and investments, quarterly monitoring and reporting

26   concerning Plan investments, removing Plan investments when warranted, and identifying,

27   managing, accounting for, and recapturing costs and expenses associated with investments)).

28

**DEFENDANT SHEPHERD KAPLAN
LLC'S REPLY IN SUPPORT OF ITS
MOTION TO DISMISS**

1       Plaintiffs point to "concessions" from fund management fees as an example of costs and

2   expenses associated with investments for which SK had responsibility (Dkt. 77 at 21), but this

3   responsibility existed at the investment level, not the administrative level.  (Dkt. 68-1 § 8.2(f)).  In

4   other words, in selecting investments and negotiating investment terms, SK was responsible for

5   negotiating reasonable terms.  However, once that was done, SK's role as an investment fiduciary

6   ended and the Administrative Committee's role in determining how Plan assets would be spent,

7   and the compensation of service providers, began.  Fujitsu was the Plan Administrator for the

8   Plan and it (through the Administrative Committee) selected the service providers (including SK),

9   signed the Recordkeeping Contract with NYLIM, and had the ███████████████

10  ██████████████████████████████████████ (Dkt. 72-4 at 1, 6; Miller

11  Decl. Ex. 1 at 7, 10).

12      Plaintiffs' effort to ignore the context in which the word "concessions" appears in the

13  Plan, among the duties of SK in selecting investments as Named Investment Fiduciary, is

14  insufficient to expand the scope of SK's actual responsibilities.  This Court should look to

15  principles of contract law in interpreting the Plan, *Toohey v. Wyndham Worldwide Corp. Health*

16  *& Welfare Plan*, 727 F. Supp. 2d 978, 986 (D. Or. 2010), which require consideration of the

17  investment-related context surrounding the term "concessions" in the Plan documents.  *See*

18  *California v. Continental Ins. Co.*, 55 Cal. 4th 186, 195 (2012).  To the extent the FAC alleges

19  that revenue sharing monies derived from Plan investments were imprudently spent on excessive

20  service provider costs, SK had no power to control how those monies were spent, and has no

21  attendant fiduciary liability.  *See CSA 401(k) Plan v. Pension Plan Prof's, Inc.*, 195 F.3d 1135,

22  1140 (9th Cir. 1999) (holding defendant not liable as administrative fiduciary where it "lacked

23  discretionary authority or control over the management and administration of the Plan").

24  Conclusory allegations in the FAC that SK's investment selections and the Administrative

25  Committee's decisions regarding service providers and their compensation were "interrelated

26  causes" of losses to the Plan do not change this result.  *See Asturias v. Nationstar Mortg. LLC*,

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
CHICAGO

12

**DEFENDANT SHEPHERD KAPLAN
LLC'S REPLY IN SUPPORT OF ITS
MOTION TO DISMISS**

1    No. 15-cv-03861, 2016 WL 368095, at *3 (N.D. Cal. Jan. 29, 2016) (dismissing claim where

2    "[t]he only averment that addresses causation is extremely conclusory").

3    **IV.    <u>CONCLUSION</u>**

4          For the foregoing reasons, this Court should grant SK's Motion to Dismiss in its entirety.

5

6    Dated: January 11, 2017                      MORGAN, LEWIS & BOCKIUS LLP

7

8                                           By:  */s/ Jeremy P. Blumenfeld*
                                                Jeremy P. Blumenfeld
9                                               Attorney for Defendant
                                                SHEPHERD KAPLAN LLC
10

11

12

13   DB1/ 90340457.1

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
CHICAGO

13

**DEFENDANT SHEPHERD KAPLAN
LLC'S REPLY IN SUPPORT OF ITS
MOTION TO DISMISS**

**EXHIBIT 9**

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No.  1:16-cv-00175-REB-CBS**

DEBORAH TROUDT,
BRAD STAUF,
SUSAN CUTSFORTH,
WAYNE SELTZER,
MICHAEL HARKIN,
MIRIAM WAGNER, and
MICHAEL FOY,
individually and as representatives of a class of plan participants,
on behalf of the Oracle Corporation 401(k) Savings and Investment Plan

       Plaintiffs,

v.

ORACLE CORPORATION,
ORACLE CORPORATION 401(K) COMMITTEE, and
JOHN DOES 1-20

       Defendants.

---

### DEFENDANTS' SUPERSEDING MOTION TO DISMISS THE COMPLAINT

---

Defendants Oracle Corporation and the Oracle 401(k) Committee ("Committee") respectfully submit, pursuant to Rules 12(b)(6) and 12(b)(1), this Superseding Motion to Dismiss the Complaint ("Motion").  In light of the Court's March 29, 2016 Minute Order granting defendants leave to file a motion to dismiss in excess of 15 pages, this Motion supersedes defendants' Partial Motion to Dismiss Counts I, III, and IV of the Complaint filed on March 28, 2016 (Dkt. # 32).

### INTRODUCTION

Plaintiffs are seven participants in the Oracle 401(k) Savings and Investment Plan ("Plan") who allege that Oracle and the Committee violated ERISA by allowing the

Plan to overpay for recordkeeping services and because three of the Plan's 32 investment options underperformed.  At first blush, plaintiffs' claims resemble those their lawyers have made in numerous of other suits across the country.  Thus, in four separate Counts, plaintiffs allege defendants violated ERISA by failing to monitor the Plan's recordkeeping and trustee expenses (Count I); maintaining three underperforming investment options in the Plan (Count II); failing to monitor other Plan fiduciaries allegedly responsible for conduct alleged in Counts I and II (Count III); and committing ERISA "prohibited transactions" (Count IV).

Despite the familiar theories, plaintiffs' Complaint is critically different than any other their lawyers have filed and presents an even better case for dismissal than similar "ERISA-fee" complaints Circuit courts have repeatedly rejected.  For example, plaintiffs here do not challenge the overall expense ratios charged by the Plan's investment options, tacitly conceding they were reasonable.  They likewise do not allege (nor can they) that defendants imprudently selected "retail" mutual funds when lower-cost "institutional" funds were available.  Plaintiffs also do not allege (nor can they) that defendants failed to include low-cost, passively-managed funds offered by companies like Vanguard.  Nor do plaintiffs complain (nor can they) that defendants failed to offer separate-account or commingled-trust investments in the Plan.  In short, the Oracle Plan is impervious to the numerous criticisms plaintiffs' counsel has employed to try and support ERISA-fee claims in their other cases.

So they are left to nit-pick.  Focusing on the way dollars are apportioned by third parties only *after* being invested in some of the Plan's investment options, plaintiffs

complain primarily about "revenue sharing."  When a retirement plan invests in a mutual fund, the fund will often share with the plan's recordkeeper a portion of its fees.  The reason for this is simple: the plan's recordkeeper relieves the mutual fund of costly recordkeeping responsibilities with respect to the many plan-participant investors.  Thus, much like a contractor paying a sub-contractor, the mutual fund compensates the recordkeeper for the value of services the mutual fund would ordinarily have to perform itself.  Revenue sharing is perfectly lawful.  Nevertheless, plaintiffs complain that Fidelity earned more in revenue-sharing than it reasonably could have received if the Plan paid for its services directly by charging each participant a flat fee.  This theory fails.

First, three Circuit courts have affirmed the dismissal of similar ERISA-fee claims. Those cases teach that, regardless of revenue sharing, fiduciaries satisfy their obligations under ERISA by providing participants with a wide range of reasonably-priced investment options. The Plan here falls squarely within those precedents.  Not only does it offer participants 32 investment options spanning the risk-return spectrum, but the options' gross expense ratios ranged from just 0.02% to 1.16%.  Moreover, participants can access thousands of additional investment options through the Plan's brokerage window.  Hence, this case presents even stronger grounds for dismissal than in those noted above.

Second, precisely because they cannot credibly challenge the reasonableness of the overall fees charged by the Plans' investment funds, plaintiffs focus on the decision by some of those funds to share a fraction of their reasonable fees with Fidelity. Defendants, however, had no control over those decisions.  Rather, any revenue

sharing a mutual fund pays Fidelity is determined by the fund itself—*not the defendants*—and, regardless, such payments are not plan assets under ERISA.  Simply put, defendants cannot be held liable for the perfectly lawful practice of revenue sharing merely because plaintiffs believe the mutual funds overpaid.

Third, plaintiffs' core contention that defendants failed to monitor Fidelity's compensation is baseless.  Not only do plaintiffs make no factual allegations about defendants' monitoring activities, but numerous amendments to the Trust Agreement between the Plan and Fidelity contradict any plausible inference that defendants were asleep at the switch.  To identify just one of the many actions taken to reduce the Plan's expenses, the Committee obtained rebates from Fidelity which resulted in Fidelity paying millions of dollars to the Plan and, ultimately, Plan participants. These and other facts established by documents referenced in the Complaint or central to its claims render implausible plaintiffs' conclusory allegations that defendants failed to prudently and loyally monitor Fidelity's fees.

The Complaint's other claims, alleged in Counts II-IV, likewise fail.  Count II alleges that three of the Plan's 32 investment options underperformed during the alleged class period.  But plaintiffs lack standing to pursue this claim with respect to one of the three funds and, regardless, offer nothing but impermissible hindsight to support their claims concerning all three funds.  Count III, meanwhile, is wholly conclusory and wholly derivative of the defective claims asserted in Counts I and II.  Finally, Count IV not only fails to plausibly allege requisite elements needed to support a prohibited transaction claim, it is time-barred.

## BACKGROUND

### I.      The Oracle Corporation 401(k) Savings and Investment Plan.

Oracle is a global computer technology company that employs more than 130,000 employees (¶ 6).[1]  Oracle offers employees the opportunity to invest for retirement through the Plan, which is a "defined contribution plan" under ERISA (¶ 10).  The Plan has over 65,000 participants and $12 billion in assets (¶ 11).  Plan participants may invest in among 32 core investment options, spanning the risk-return spectrum. (¶ 20; Ex. A, 2015 Fee Disclosure, at pp. 6-14; Ex. B, 2014 Ann. Rpt., at pp. 295-300.)[2]  These include 11 mutual funds, 16 collective trusts, four separate-account funds (including a stable value option), and the Oracle stock fund.  (Ex. B at pp. 295-300.)  As of July 2015, the gross expense ratios for these funds ranged from 0.02% to 1.16%.[3]  (Ex. A at pp. 6-14.)  In addition, participants can access thousands of other investments through the Plan's brokerage window.  (Ex. B at p. 295 (referencing "Brokerage Link").)

### II.      Fidelity is the Plan's Recordkeeper and Trustee.

Fidelity is the Plan's recordkeeper and trustee (¶¶ 17-18).  Its services include, *inter alia*, effecting participants' investment transactions, tracking participant account

---

[1] Citations to the Complaint are indicated throughout as "(¶ __)".

[2] In ruling on a Rule 12(b)(6) motion, the Court may consider documents incorporated into the Complaint by reference, matters subject to judicial notice, and those documents integral to the Complaint.  *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  Thus, the Court may consider the Plan documents, the Trust Agreement, legally-mandated plan-participant disclosures, and other similar documents referenced in or central to the Complaint, as well as the Plan's publicly-filed annual reports and other publicly-available information.  *See, e.g.*, *Walden v. Metro. Life Ins. Co. of Am., Inc.*, 75 F. Supp. 3d 1320, 1322-23 & n.2 (D. Colo. 2014); *In re Sprint Corp. ERISA Litig.*, 388 F. Supp. 2d 1207, 1217 (D. Kan. 2004).  Such documents are attached to this Motion as Exhibits A-H and J-L.

[3] The gross expense ratio is the total cost of managing the mutual fund; the net expense ratio is the amount investors actually pay after waivers or rebates. Expense ratios are expressed as a percentage of total assets invested (*e.g.*, 0.75%).  *See Hecker v. Deere & Co.*, 556 F.3d 575, 578 (7th Cir. 2009), *reh'g denied*, 569 F.3d 708 (7th Cir. 2009).

holdings and balances, mapping new participants into the Plan in connection with Oracle's corporate acquisitions, processing contributions to the Plan, valuing Plan assets, transferring and distributing funds, regulatory compliance, providing customer service to Plan participants, issuing quarterly statements and other communications, maintaining a Plan website, and providing investor-education services to participants. (Ex. C, Trust Agmt. § 6 and Scheds. A-M.)

Fidelity is paid through "revenue sharing" it receives from a handful of the Plan's mutual funds.  Mutual funds are available to the public and have tens of thousands of shareholders, for which the mutual fund is responsible for providing recordkeeping services (*e.g.*, managing balances, mailing statements, prospectuses, and other documents, transferring and distributing funds).  (*See* ¶ 54.)  Mutual fund companies cover the substantial cost of these services through a portion of the expense ratio they charge investors.  (*Id.*)  However, when a 401(k) plan invests in a mutual fund, the fund manager does not have to keep records for the plan-participant investors; instead, the plan's recordkeeper performs those duties (¶¶ 54-55).  Thus, mutual funds often share with the recordkeeper a portion of the expense ratio they receive from plan-participant investors.  *See Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 907-09 (7th Cir. 2013).  In short, "revenue sharing" reflects the value to the mutual fund of the recordkeeping services it would ordinarily perform itself.  *Id.*

## III.    Defendants Monitored and Reduced Administrative Expenses.

The Committee monitored the Plan's administrative expenses and acted to reduce them in various ways over the years, including those summarized below.

**Institutional Share Class Investments.**  Failure to select low-cost "institutional" class mutual funds—as opposed to higher-cost "retail" funds—is a common complaint plaintiffs' counsel here levels against plan fiduciaries.[4]  They make no such complaint here.  In fact, the Plan offers only "institutional" funds and, on at least six occasions since 2008, the Committee transitioned to even lower-cost options.  In June 2010, for example, the Plan converted two existing Vanguard funds from "Institutional" to lower-cost "Institutional Plus" shares.  (Ex. C, Amend. 13.)  The Committee did the same with another Vanguard fund in April 2013.  (*Id.*, Amend. 22.)  Then, in September 2013, it converted all Vanguard Target Retirement date collective trusts from the inexpensive "Trust I" option to the even lower-cost "Trust Plus" option.[5]  (*Id.*, Amend. 24.)  The Committee also removed investment options in favor of lower-cost alternatives offered by different fund managers.  (*See, e.g.*, *id.*, Amends. 18, 19.)

**Separate Accounts and Collective Trusts.**  Plaintiffs' counsel here also regularly faults plan fiduciaries for failing to offer separate-account and commingled-trust investments, because they reduce administrative expenses.[6]  Plaintiffs make no such criticisms here, however, because the Plan has offered both separate accounts and commingled trusts for years.  Indeed, the Vanguard Target Retirement funds, offered through the Plan since June 2010, are collective trusts.  (Ex. C, Amend. 13.)

---

[4]  *See, e.g.*, *Renfro v. Unisys Corp.*, 671 F.3d 314, 319-20 (3d Cir. 2011); *Loomis v. Exelon Corp.*, 658 F.3d 667, 671-72 (7th Cir. 2011); *Hecker*, 556 F.3d at 586; *Pledger v. Reliance Trust Co., et al.*, No. 1:15-cv-4444-MHC, Dkt. 1 (Compl.) ¶¶ 77-83 (N.D. Ga. Dec. 22, 2015).

[5]  Plaintiffs' counsel here has sued other plan fiduciaries for failing to make this same conversion.  *See, e.g.*, *Pledger*, No. 1:15-cv-4444-MHC, Dkt. 1 (Compl.) ¶¶ 108-109.

[6]  *See, e.g.*, *Bowers v. BB&T Corp.*, No. 1:15-cv-732, Dkt. 34 (Am. Compl.) ¶¶ 71-83 (M.D.N.C. Dec. 1, 2015); *Pledger*, No. 1:15-cv-4444-MHC, Dkt. 1 (Compl.) ¶¶ 93-112.

The Committee also converted at least three different mutual fund offerings into separate-account offerings during the alleged class period.  (*Id*., Amends. 19, 22, 28.) As plaintiffs' own counsel has previously recognized, the use of separate accounts and collective trusts is consistent with prudent and loyal plan administration.[7]

**Non-Proprietary Mutual Funds.**  Plaintiffs' counsel also frequently challenges the use of proprietary investments offered by the plan's recordkeeper, maintaining that the inclusion of such funds increases fees and reflects an abdication of fiduciary responsibility.[8] Such allegations are absent here, because the Committee systematically removed Fidelity mutual funds from the Plan, often replacing them with the same Vanguard funds plaintiffs' counsel has elsewhere endorsed.[9]

In June 2010, for example, the Plan replaced the lineup of Fidelity target-date retirement funds with comparable Vanguard funds.  (Ex. C, Amend. 13.)  This move reduced the expense ratios for participants selecting these funds by up to 75 basis points.  The Fidelity Freedom Fund prospectus from May 2010 shows expense ratios ranging from 0.50% to 0.84%, with the 2020 and 2030 funds carrying expense ratios of 0.74% and 0.79% respectively.[10]  The Vanguard Target Retirement 2020 and 2030

---

[7] Indeed, plaintiffs' counsel has alleged elsewhere that a prudent plan fiduciary offers target retirement date funds as collective trusts rather than mutual funds, including the *same* Vanguard target date funds the Plan offered here.  *See, e.g., Bowers*, No. 1:15-cv-732, Dkt. 34 (Am. Compl.) ¶¶ 81-83; *Pledger*, No. 1:15-cv-4444-MHC, Dkt. 1 (Compl.) ¶¶ 88-89, 108-09.

[8] *See, e.g., Hecker*, 556 F.3d at 583-85; *Renfro*, 671 F.3d at 326-27; *see also, e.g., Bowers*, No. 1:15-cv-732, Dkt. 34 (Am. Compl.) ¶¶ 33-43; *Pledger*, No. 1:15-cv-4444-MHC, Dkt. 1 (Compl.) ¶¶ 75, 113-126.

[9] *See, e.g., Bowers*, No. 1:15-cv-732, Dkt. 34 (Am. Compl.) ¶¶ 69-70; *Pledger*, No. 1:15-cv-4444-MHC, Dkt. 1 (Compl.) ¶¶ 89-91.

[10] *See* Ex. D, Prospectus, Fidelity Freedom Funds, at pp. 17, 23.

Trust I options, meanwhile, charged just 0.09%.[11]   (*See also, e.g.*, Ex. C, Amend. 14 (replacing another Fidelity fund with a lower-cost Vanguard fund).)

**Rebates and Fee Reductions from Fidelity.**   The Committee also repeatedly obtained for the Plan rebates and fee reductions from Fidelity, which were used to offset other Plan expenses and ultimately reallocated to Plan participants.   (*See, e.g., id.*, Amends. 4, 17, 21, 23, 27, 32.)   The rebates from Fidelity reached their peak in 2012 and 2013, when it paid the Plan $4.4 million and $5.5 million, respectively.   (*Id.*, Amends. 21, 23.)   A large portion of these payments were allocated to participants' individual accounts.   (*See, e.g., id.*, Amend. 21; Ex. G, 2014 Memo to Participants.)

The Committee also obtained reductions in Fidelity's fees.   For example, the Committee secured Fidelity's agreement to waive certain direct fees, including for all services related to Oracle company stock and for performing the Plan's non-discrimination testing.   (*Id.*, Amend. 4.)   Fidelity also agreed to waive all fees associated with making minimum required distributions.   (*Id.*, Amend. 8.)

In addition, the Committee imposed strict performance standards on Fidelity, which, if not met, resulted in further reductions in Fidelity's fees.   (Ex. C., Amend. 25 and Sched. Q.)   Fidelity is required to measure these standards monthly and report scores to the Committee quarterly for monitoring.   These standards place as much as $180,000 of Fidelity's annual fees at risk.   (*Id.*)

---

[11] *See* Ex. E, Fact Sheet, Vanguard Target Retirement 2020 Trust I; Ex. F, Fact Sheet Vanguard Target Retirement 2030 Trust.   Historical expense ratios for these funds also is available at:
https://www3.troweprice.com/rws/rps/public/assets/internalffs/VFT20.pdf
https://www3.troweprice.com/rws/rps/public/assets/internalffs/VFT30.pdf

**LEGAL STANDARDS**

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The allegations must include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2008). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and the well-pleaded facts must allow the Court to infer more than the mere possibility of misconduct. *Id.* Further, because the Plan here grants the fiduciaries discretion to interpret the Plan and make final and binding determinations (Ex. H, Plan, §§ 11.6, 11.7(a), 11.8), their conduct should be reviewed only for an abuse of discretion. *See, e.g.*, *Tussey v. ABB, Inc.*, 746 F.3d 327, 333-35 & n.6 (8th Cir. 2014) (collecting cases). This standard applies to a range of discretionary fiduciary decisions, including selecting and monitoring investment options and fees. *Id.* at 335. In sum, plaintiffs state a claim only if their non-conclusory factual allegations plausibly demonstrate that defendants abused their discretion. *Id.*

**ARGUMENT**

**I.    Plaintiffs' Excessive-Fee Claim in Count I Fails.**

Unlike every other complaint plaintiffs' counsel here has filed against retirement plan fiduciaries, plaintiffs do not allege that the overall cost of any Plan investment option was excessive. Nor do they allege defendants failed to offer institutional class mutual funds, separate accounts or collective trusts, or passively-managed funds from companies like Vanguard. This is so because defendants did *all* of those prudent

things.  By the same token, plaintiffs do not allege defendants offered only proprietary investment funds or that Fidelity received "kickbacks" for including certain investment options in the Plan.  This is because defendants did *none* of those things.  In short, defendants took the very same actions plaintiffs' own counsel has repeatedly identified as proof of prudent and loyal fiduciary conduct, while eschewing those other actions courts have found questionable.

Nevertheless, in Count I, plaintiffs contend that the revenue sharing Fidelity received from a handful of the Plan's mutual funds exceeded the amount necessary to cover the actual cost of providing recordkeeping services.  From this narrow toehold, plaintiffs allege that the Court must infer that defendants failed to prudently and loyally monitor the Plan's expenses.  Plaintiffs are mistaken.

### A.    The Plan Offers an Array of Investments Charging Low Fees.

In the absence of at least *some* of the allegations listed above, defendants have found no case holding that a 401(k) plan fiduciary violated ERISA by offering participants some investment options that pay revenue sharing—which is all plaintiffs allege here.  To the contrary, the Third, Seventh, and Ninth Circuits have held that, regardless of revenue sharing, fiduciaries satisfy ERISA by offering participants an array of investment options charging a reasonable range of expense ratios.  *See Tibble v. Edison Int'l*, 729 F.3d 1110, 1135 (9th Cir. 2013), *vacated on other grounds*, 135 S. Ct. 1823 (2015); *Renfro*, 671 F.3d at 327; *Loomis*, 658 F.3d at 671-73; *Hecker*, 556 F.3d at 584-85.  The circumstances here present an even *stronger* case for dismissal than in the above cases, as discussed below.

In *Renfro*, the Third Circuit affirmed the Rule 12(b)(6) dismissal of ERISA-fee claims where the plan offered 73 investment options with expense ratios ranging from 0.10% to 1.21%.  671 F.3d at 327-28.  Like the Oracle Plan, the plan in *Renfro* used Fidelity as its trustee and recordkeeper.  *Id.* at 318-19.  Unlike the Oracle Plan, however, the trust agreement in *Renfro* required that any additional plan investments had to be proprietary Fidelity funds.  *Id.* at 318-19.  Moreover, of the 73 options, 67 were "retail" mutual funds, which charged greater fees than the "institutional" funds the plan could have offered instead (and which the Oracle Plan offers).  *Id.* at 319.  As here, plaintiffs also alleged that using asset-based revenue sharing, as opposed to a flat, per-participant fee, was impermissible.  *Id.* at 326.

The Third Circuit rejected these claims, reasoning that the plan offered a "reasonable mix and range of investment options" and thus "plaintiffs' factual allegations . . . [did] not plausibly support [their] claims."  *Id.* at 327-28.  With regard to revenue sharing in particular, the Third Circuit emphasized that (as here) plaintiffs had not alleged "any sort of concealed kickback scheme relating to fee payments made to [Fidelity] as the quid pro quo for inclusion of particular unaffiliated mutual funds."  *Id.*

Similarly, in *Hecker*, the Seventh Circuit rejected ERISA-fee claims where the plan at issue offered 26 core investment options with expense ratios ranging from 0.07% to "just over 1%."  556 F.3d at 587.  As in *Renfro*, Fidelity was the trustee and recordkeeper, and the plans' investments options included 23 proprietary funds offered by Fidelity.  *Id.* at 578-79.  Moreover, every option was a retail fund as opposed to a lower-cost institutional fund; the plans used asset-based revenue sharing, rather than a

flat, per-participant fee; and plaintiffs claimed the plan's fund offerings paid excessive undisclosed revenue sharing to Fidelity.  *Id.*

The Seventh Circuit affirmed the Rule 12(b)(6) dismissal of plaintiffs' claims.  In doing so, the court recognized that the plaintiffs' "case depend[ed] on the proposition that there is something wrong, for ERISA purposes," with revenue sharing between Fidelity and the plan's investment funds.  *Id.* at 585.  The Seventh Circuit then unequivocally held that revenue sharing "*violates no statute or regulation.*"  *Id.* at 585 (emphasis added).  As the court explained, revenue sharing does not increase the overall cost (*i.e.*, the expense ratio) of an investment fund, and thus it is immaterial to participant investors.  *Id.* at 585-86.  To the contrary, "[t]he total [investment] fee" *before revenue sharing* "is the critical figure for someone interested in the cost of including a certain investment in her portfolio and the net value of that investment[.]"  *Id.* at 586.

Two years later, the Seventh Circuit again affirmed the dismissal of ERISA-fee claims in *Loomis*, emphasizing that the plan offered 32 investment options with expense ratios ranging from 0.03% to 0.96%.  658 F.3d at 669-70.  In an opinion authored by Judge Easterbrook, the court reasoned as follows:  "Exelon offered participants a menu that includes high-expense, high-risk, and potentially high-return funds, together with low-expense index funds that track the market, and low-expense, low-risk, modest-return bond funds.  It has left choice to the people who have the most interest in the outcome, and it cannot be faulted for doing this."  *Id.* at 673-74.

Finally and most recently, in *Tibble* the Ninth Circuit agreed with the Third and Seventh Circuits, affirming summary judgment in favor of plan fiduciaries where the plan

included 40 mutual funds with expense ratios ranging from 0.03% to 2.0%. 729 F.3d at 1135. The Ninth Circuit, like the Third and Seventh Circuits before it, rejected plaintiffs' challenge to revenue sharing, reasoning that nothing in ERISA precludes such arrangements, and holding that the range of expense ratios and investment options among the funds was sufficient to satisfy the fiduciaries' obligations. *Id.* at 1135.

Although the Tenth Circuit has not spoken to these issues, this case presents no grounds for deviating from the above precedents. The Plan offers 32 core investment options with gross expense ratios ranging from just 0.02% to 1.16%—indeed, the vast majority are below 1.0%. *Supra* at 5. The Plan likewise offers investments spanning the risk-return spectrum, including several plaintiffs' own counsel has endorsed in other lawsuits. *See id.* 5-8. Moreover, as in *Hecker*, 556 F.3d at 586, participants can access thousands of additional investment options through the Plan's brokerage window. *Supra* at 5. In short, the Plan is even more favorable to participants than those three Circuit courts have concluded defeat claims like those plaintiffs allege here. This Court should follow those precedents and dismiss Count I.

### B.     Plaintiffs Implausibly Allege Defendants Failed to Monitor Expenses.

Relying almost exclusively on the existence of revenue sharing, plaintiffs ask the Court to infer that defendants "failed to engage in a prudent and loyal process" for monitoring Fidelity's compensation for recordkeeping and trustee services (¶¶ 83-84). Documents central to the Complaint further negate the plausibility of this claim.

**First**, to state a claim that the process defendants used to retain Fidelity and monitor its compensation was imprudent or disloyal, plaintiffs must allege some plausible facts about what that process actually entailed and the scope and value of the

services Fidelity provided.  *See Hecker*, 569 F.3d at 711 (noting the critical absence and importance of such allegations).  But plaintiffs make no such allegations.  Instead, they offer only the generic assertions that defendants (1) failed to solicit bids from some other providers; and (2) allowed Fidelity to be paid through revenue sharing, rather than instituting a flat, per-participant fee.

As to the first allegation, nothing in ERISA requires fiduciaries to solicit bids through a formal request for proposal or "RFP."   Here, the Trust Agreement, as amended numerous times, shows that defendants actively obtained fee reductions, moved to lower-cost share classes which reduced administrative expenses, added separate accounts and collective trusts which further reduced administrative fees, and obtained millions of dollars in rebates from Fidelity.  *Supra* at 6-9.  These actions render implausible plaintiffs' conclusory allegation that the "process" for monitoring the Plan's expenses was imprudent or that another service provider, unfamiliar with the Oracle Plan, could have provided cheaper, equivalent services.

As to the second allegation, neither courts nor DOL require ERISA plans to impose flat, per-participant fees. To the contrary, courts hold that revenue sharing "violates no statute or regulation," *Hecker*, 556 F.3d at 585, and have dismissed claims that participants "should have paid per-participant fees" instead, *Renfro*, 671 F.3d at 327-28.  As Judge Easterbrook put it, "it isn't clear why participants would view a [flat] fee as a gain.  A flat-fee structure might be beneficial for participants with the largest balances, but, for younger employees and others with small investment balances, a

[flat] fee could work out to be more, per dollar under management, than a fee between 0.03% and 0.96% of the account balance." *Loomis*, 658 F.3d at 672.[12]

**Second**, plaintiffs claim the process for monitoring Fidelity's compensation must have been imprudent or disloyal because Fidelity allegedly received excessive compensation through revenue sharing. Not only is revenue sharing perfectly lawful, but whether or not a mutual fund pays revenue sharing is determined by the mutual fund itself—*not the plan fiduciaries*. Thus, in the language of ERISA, revenue sharing payments are not "plan assets" over which defendants have control or bear concomitant fiduciary responsibility. *See* 29 U.S.C. § 1101(b)(1) (providing that when a plan exchanges money for mutual fund shares, the money paid the mutual fund is no longer a plan asset); *Hecker*, 556 F.3d at 584 (recognizing the same and explaining further, "[o]nce the fees are collected from the mutual fund's assets and transferred to one of the Fidelity entities, they become Fidelity's assets—again, not the assets of the [p]lans."); *see also Loomis*, 658 F.3d at 671 ("Fiduciary duties under ERISA are limited to a requirement of honest and prudent management of the *[plan] assets that* are *under the administrator's control*." (emphasis added)).

Even were the Court to look past the Complaint's other deficiencies, plaintiffs do not plausibly allege that a reasonable per-participant fee for recordkeeping is $25 (¶ 60). For example, plaintiffs allege no facts establishing the range of recordkeeping fees available in the market, nor do they allege facts showing the fees typically charged

---

[12] Moreover, because the Plan (1) offered a range of investments charging varying fees and (2) only some of those options paid revenue sharing, "the participants were free to direct their dollars to lower-cost [non-revenue sharing] funds if that was what they wished to do." *Hecker*, 556 F.3d at 585; *see also* 29 U.S.C. § 1104(c); *Hecker*, 556 F.3d at 587-90 (discussing § 1104(c)).

to a plan "of like character and with like aims" as the Oracle Plan.   29 U.S.C. § 1104(a)(1)(B).   Indeed, plaintiffs offer no basis whatsoever for their conclusion that $25 was the maximum reasonable amount to pay, and without some benchmark "maximum" against which to compare the Plan's fees, plaintiffs have provided no well-pled allegation from which the Court can plausibly conclude Fidelity's fees were too high.   *See Laboy v. Bd. of Trustees of Bldg. Serv. 32 BJ SRSP*, 2012 WL 701397, at *3 (S.D.N.Y. Mar. 6, 2012) (plaintiff "provides the amounts of these expenses, but he fails to compare them to those of comparable funds").[13]

**Third,** all else aside, the amendments to the Trust Agreement throughout the proposed class period render implausible plaintiffs' conclusory allegations of an imprudent or disloyal "process."   As discussed, the Committee took the very same actions plaintiffs' own counsel has previously identified as proof of a prudent fiduciary process.   This conclusion is even clearer when viewed in light of the "circumstances then prevailing," as this Court must.   29 U.S.C. § 1104(a)(1)(B).   During the alleged class period, no fewer than three Circuit courts instructed that revenue sharing was entirely permissible and that the critical factor for fiduciaries was offering an array of

---

[13] Plaintiffs also allege that, as the Plan's assets grew, so too did the revenue sharing payments to Fidelity, "even though the services provided by Fidelity remained the same to this Plan, and the number of participants in the Plan had increased only slightly."   (¶ 84; *see also* ¶ 62.)   This conclusion is unsubstantiated and directly contradicts admissions elsewhere that Oracle acquired Sun Microsystems during the proposed class period, leading to the addition of thousands of employees—the Plan grew more than 50% over the period, from roughly 40,000 to over 60,000 participants, and its assets went from $3.6 billion to over $11 billion (¶¶ 60, 62).   Plaintiffs' suggestion that this "only slightly" increased the number of Plan participants and that the services Fidelity provided "remained the same" is not just implausible, it is absurd.   Indeed, plaintiffs include no allegations concerning the actual recordkeeping services Fidelity provided during the proposed period, how those services changed over that time, or how those services compare to whatever services they believe the Plan could have obtained at a lower cost.

investment options charging a reasonable range of expense ratios, so that participants can select funds with the risk and fee profiles that best suit their needs.  *Supra* at 11-14.

The Oracle Plan satisfied these requirements in spades. Indeed, defendants went above and beyond the requirements of the law "then prevailing" by not only taking the very same actions plaintiffs' counsel here has recognized as being consistent with a prudent and loyal fiduciary process, *see supra* at 5-8, but also by securing millions of dollars in rebates and fee reductions from Fidelity throughout the alleged class period, *see supra* at 9.

In sum, plaintiffs point only to the fact of revenue sharing itself and some unexplained arithmetic to draw the implausible inference that the Plan fiduciaries failed to monitor the Plan's recordkeeping and trustee expenses.  Not only is this inference unsupported by well-pled factual allegations, but it is belied by the numerous steps the Committee took to reduce the Plan's expenses and provide participants a wide range of reasonably-priced investments.  Indeed, the Committee did virtually everything plaintiffs' own attorneys have elsewhere argued prudent fiduciaries should do.  If this Complaint states a plausible claim, it is difficult to imagine any retirement plan with funds that pay revenue sharing which plaintiffs could not challenge, survive a motion to dismiss, and force costly discovery.  Because plaintiffs allege no plausible inference of wrongdoing under ERISA, Count I should be dismissed.

## II.    Plaintiffs' Imprudent-Investment Claims in Count II Fail.

Plaintiffs also claim defendants imprudently selected and retained three investment options offered under the Plan: (1) the TCM Small-Mid Cap Growth Fund;

(2) the Artisan Small Cap Value Fund; and (3) the PIMCO Inflation Response Multi-Asset Fund.  (¶¶ 64-71, 88-91.)  This claim fails, too.

As a preliminary matter, none of the plaintiffs invested in the PIMCO fund and, thus, they lack constitutional standing to pursue—and the Court lacks jurisdiction to adjudicate—Count II with respect to that particular investment.  (Ex. I, Decl. of Donald Reich.)[14]  *See, e.g.*, *Taveras v. UBS AG*, 612 F. App'x 27, 29 (2d Cir. 2015). Accordingly, that portion of Count II should be dismissed under Rule 12(b)(1).

Regardless, plaintiffs' allegations in Count II are predicated entirely, and impermissibly, on hindsight.  *See Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt., Inc.*, 712 F.3d 705, 718 (2d Cir. 2013) (a plaintiff must allege "nonconclusory factual content raising a plausible inference of misconduct [that] does not rely on 'the vantage point of hindsight'").  Because a fiduciary's conduct must be assessed under the "circumstances then prevailing," 29 U.S.C. § 1104(a)(1)(B), "the ultimate outcome of an investment is not proof of imprudence," *DeBruyne v. Equitable Life Assurance Soc'y*, 920 F.2d 457, 465 (7th Cir. 1990).

Here, poor performance is the crux of plaintiffs' challenges (¶¶ 64-71).  As to the Artisan fund, plaintiffs allege only that it "underperformed its benchmark 4 out of the most recent 5 years" (¶ 66).  For the TCM and PIMCO funds, plaintiffs allege that they underperformed and were added to the Plan without "adequate performance history" (¶¶ 69, 71).  But plaintiffs offer nothing "that, if proved, would show that an adequate

---

[14] *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995) (when considering a Rule 12(b)(1) motion for lack of subject matter jurisdiction, a court may consider matters outside the pleadings and "has wide discretion to allow affidavits, other documents, and [may even hold] a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)").

investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." *PBGC*, 712 F.3d at 718. For instance, plaintiffs do not allege defendants selected these funds for impermissible reasons, such as to enrich themselves. Nor do they identify the underlying *reasons* why defendants should have known these funds would underperform at any particular time, such as a change in investment philosophy, risk profile, or market conditions. Rather, by focusing on these funds' eventual underperformance relative to certain market indices, these claims depend upon the very sort of hindsight analysis that cannot state a claim for breach of fiduciary duty. *See PBGC*, 712 F.3d at 722-23; *Leber v. Citigroup 401(k) Plan Inv. Comm.*, 2015 WL 5244660, at *9 (S.D.N.Y. Sept. 8, 2015) (plaintiffs "do not raise a plausible inference that a prudent fiduciary would have found those Funds to be 'so plainly risky' as to render the investments in them imprudent").

Further, plaintiffs' assertion that "Defendants failed to engage in a prudent process for the selection and retention of Plan investment options" (¶ 89) is devoid of any supporting factual allegations sufficient to raise a plausible inference of misconduct. For example, plaintiffs do not allege that the Committee failed to meet regularly, review existing investments, consider whether to maintain or change the investment lineup, or otherwise monitor these funds. In fact, as with plaintiffs' excessive-fee claims, the Complaint and underlying documents confirm just the opposite: the Committee frequently acted to offer a wider variety of investment options at lower costs, and the Plan's investment lineup changed several times—*including to remove the TCM and Artisan funds in 2013 and 2015*, respectively. (Ex. C, Amends. 22, 30.) In other words,

the Committee's monitoring process led to the removal of the very funds plaintiffs claim were imprudent.  Plaintiffs' attempt to second-guess the *timing* of those decisions based on 20/20 hindsight should be rejected.

**III.     Plaintiffs' Failure-to-Monitor Claim in Count III Fails.**

Plaintiffs next try to pin liability on Oracle for failing to adequately "monitor" whether the Committee "had a prudent process in place" for evaluating Plan investments and expenses (¶¶ 92-98). This claim depends entirely on plaintiffs' allegations that *other* fiduciaries breached their duties.  Plaintiffs do not allege any specific facts regarding Oracle's actual process for monitoring the Committee or how they believe it was deficient.  Plaintiffs thus provide no factual allegations to "nudge their claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570; *see also Romero v. Nokia, Inc.*, 2013 WL 5692324, at *5 (N.D. Cal. Oct. 15, 2013).

Moreover, Count III is derivative of plaintiffs' other fiduciary breach claims and thus requires "an antecedent [breach] to be viable."  *In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*, 763 F. Supp. 2d 423, 580-81 (S.D.N.Y. 2011); *see also In re Chesapeake Energy Corp. 2012 ERISA Class Litig.*, 2013 WL 5596908, at *12 (W.D. Okla. Oct. 11, 2013).  Because plaintiffs fail to state a claim in Counts I and II, the Court should likewise dismiss Count III for this additional reason.

**IV.     Plaintiffs' Prohibited Transaction Claims in Count IV Fail.**

Count IV alleges defendants caused the Plan to engage in "prohibited transactions" between the Plan and a "party in interest" in violation of 29 U.S.C. § 1106(a).  Plaintiffs allege two bases for this claim:  (1) the Plan retained Fidelity to provide Plan services; and (2) the Plan "utilize[d] imprudent and unreasonably

expensive mutual funds and investments as Plan investment options."   (¶¶ 100-102.) These claims are unsupported and untimely.

Because plaintiffs concede the services Fidelity provided were "necessary" to the Plan (¶ 48), ERISA's prohibited transaction rules are inapplicable unless Fidelity was paid "more than reasonable compensation" for those services.  29 U.S.C. § 1108(b)(2). As discussed, plaintiffs have not plausibly alleged Fidelity was overpaid for recordkeeping or trustee services, and thus their claims directed at the Fidelity "transactions" fail for this threshold reason.  *See, e.g.*, *Leber*, 2010 WL 935442, at *10; *Mehling v. N.Y. Life Ins. Co.*, 163 F. Supp. 2d 502, 510-11 (E.D. Pa. 2001).

Plaintiffs' claim also fails because it is predicated on their contention that revenue-sharing payments mutual funds made to Fidelity constituted prohibited "exchange[s]" of property or "transfer[s]" of Plan assets.  29 U.S.C. §§ 1106(a)(1)(A), (C).   However, as discussed *supra* at 16, revenue sharing payments are not Plan "property" or Plan "assets."  *See, e.g.*, 29 U.S.C. § 1101(b)(1); *Hecker*, 556 F.3d at 584. Accordingly, Fidelity's receipt of revenue sharing is not a "transaction" under 29 U.S.C. § 1106(a), and thus plaintiffs' claim fails for this reason too.

 As for plaintiffs' claim directed at the Plan's mutual funds (¶ 102), it ignores that ERISA only prohibits certain transactions between a plan and a "party in interest."  29 U.S.C. § 1106(a).  Because a mutual fund is *not a party in interest*, Count IV fails for this additional reason.  *See* 29 U.S.C. § 1002(21)(B) (providing that investment in a mutual fund does not render the mutual fund company "a party in interest"); *see also IATSE*

*Local 33 Section 401(k) Plan Bd. of Trs. V. Bullock*, 2008 WL 4838490, at *5-6 (C.D. Cal. Nov. 5, 2008).[15]

Finally, plaintiffs' prohibited transaction claims are untimely.  ERISA requires that a participant bring suit "within three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation."  29 U.S.C. § 1113(2).  Here, plaintiffs obtained actual knowledge that Fidelity was retained to provide Plan services more than three years before they filed their Complaint on January 22, 2016, through various disclosures Oracle was statutorily required to provide all Plan participants.  (*See, e.g.*, Ex. J, 2012 Summary Plan Description, at pp. 2, 4, 5, 10, 11, 12, 17, 31, 32; Ex. K, 2012 Participant Fee Disclosure, at p. 1.)  These same materials alerted plaintiffs to the Plan's mutual funds and their expense ratios.   (*See, e.g.*, Ex. K at pp. 7-15.) Accordingly, Count IV should be dismissed for the additional reason that plaintiffs had actual knowledge of the challenged "transactions" before January 22, 2013.[16]

**V.      Any Alleged Breaches Before January 22, 2010 are Time-Barred.**

Beyond the three-year limitation period discussed above, ERISA imposes a six-year statute of repose for claims of breach of fiduciary duty.  29 U.S.C. § 1113(1).  The only exception to this repose period is "in the case of fraud or concealment."  § 1113(2).

---

[15] This claim also fails because the Complaint contains no allegations whatsoever that any particular investment in the Plan charged unreasonable fees.  Perhaps this random assertion, which appears for the first and only time in paragraph 102 of the Complaint, is the errant result of plaintiffs' counsel cutting-and-pasting from their numerous other complaints filed in other courts.

[16] *See, e.g.*, *Brown v. Am. Life Holdings, Inc.*, 190 F.3d 856, 859 (8th Cir. 1999) ("[T]he nature of the alleged breach is critical to the actual knowledge issue.  For example, if the fiduciary made an *illegal* investment—in ERISA terminology, *engaged in a prohibited transaction*—knowledge of the transaction would be actual knowledge of the breach.") (second emphasis added); *Krueger v. Ameriprise Fin., Inc.*, 2014 WL 1117018, at *10-11 (D. Minn. Mar. 20, 2014) ("[B]ecause the fact and nature of an allegedly prohibited revenue-sharing arrangement had been disclosed more than three years prior to the plaintiff filing his lawsuit, the claim was time-barred) (citing *Zang v. Paychex, Inc.*, 728 F. Supp. 2d 261, 267 (W.D.N.Y. 2010); *Figas v. Wells Fargo & Co.*, 2010 WL 2943155, at *2 (D. Minn. Apr. 6, 2010).

Here, plaintiffs allege defendants "concealed" compensation to Fidelity by disclosing the Plan's brokerage window investments in the aggregate, as opposed to disclosing the holdings in *each* of the thousands of investments accessed through the brokerage window (¶¶ 72-75).  Had plaintiffs done their research, however, they would know that defendants' disclosure was perfectly appropriate: "Participant-directed brokerage account assets [may be] reported in the *aggregate*" and "should be treated *as one asset* held for investment purposes," except in rare circumstances not present or alleged here.[17]  Thus, because the Complaint contains no plausible allegations of "fraud or concealment," plaintiffs' claims should be dismissed to the extent they allege fiduciary breaches occurring before January 22, 2010.

## CONCLUSION

For the reasons discussed above, defendants respectfully request the Court dismiss the Complaint with prejudice.

---

[17] Ex. L, 2013 Form 5500 Instructions (emphasis added); DOL PWBA Office of Regs. & Interps. Advisor Ltr. (Dec. 12, 2011), *available at* www.dol.gov/ebsa/programs/ori/advisory2001/saxonlet.htm.

Respectfully submitted,

by:  *s/ Christopher J. Boran*

William C. Berger                          Christopher J. Boran
Sarah M. Stettner                         Matthew A. Russell
BROWNSTEIN HYATT FARBER                    MORGAN, LEWIS & BOCKIUS LLP
SCHRECK, LLP                               77 W. Wacker Dr., Fifth Floor
410 Seventeenth Street, Suite 2200         Chicago, IL 60601
Denver, CO 80202                           Phone:  (312) 324-1000
Phone:  (303) 223-1100                     Fax:      (312) 324-1001
Fax:  (303) 223-1111                       christopher.boran@morganlewis.com
bberger@bhfs.com,                          matthew.russell@morganlewis.com
sstettner@bhfs.com
                                           Brian T. Ortelere
                                           Jeremy P. Blumenfeld
                                           MORGAN, LEWIS & BOCKIUS LLP
                                           1701 Market Street
                                           Philadelphia, PA 19103-2921
                                           Phone:   (215) 963-5150
                                           Fax:        (215) 963-5000
                                           jeremy.blumenfeld@morganlewis.com
                                           brian.ortelere@morganlewis.com

*Attorneys for Oracle Corporation and Oracle Corporation 401(k) Committee*

**CERTIFICATION OF SERVICE**

I hereby certify that on the 29th day of March, 2016, I electronically filed the

foregoing document with the Clerk of Court using the CM/ECF system, which will send

notification of such filing to all parties and counsel of record.


  /s/ Christopher J. Boran