**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JENNIFER SWEDA et al.,** | : | **CIVIL ACTION** |
| *Plaintiffs*, | : | |
| | : | |
| **v.** | : | |
| | : | |
| **THE UNIVERSITY OF** | : | **NO. 16-4329** |
| **PENNSYLVANIA and JACK HEUER,** | : | |
| *Defendants*. | : | |

# <u>M E M O R A N D U M</u>

PRATTER, J.                                                                                   SEPTEMBER 21, 2017

A group of University of Pennsylvania Matching Plan participants and beneficiaries bring this ERISA action against the University of Pennsylvania and Jack Heuer, Penn's Vice President of Human Resources. The Plan participants allege that Defendants enabled third-party service providers—here, TIAA-CREF and Vanguard—to collect excessive fees, increased costs by including duplicative investments in the Plan, and retained underperforming funds in the Plan. Plaintiffs claim this violated two provisions of the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq* ("ERISA"). First, they claim a breach of fiduciary duties, in violation of 29 U.S.C. § 1104(a)(1) (Counts I, III, V and VII[1]). Second, they claim the contracts with TIAA-CREF and Vanguard were prohibited transactions, in violation of 29 U.S.C. § 1106(a)(1) (Counts II, IV and VI).

---

[1] Count VII is styled as "failure to monitor fiduciaries" in violation of 29 U.S.C. § 1104(a)(1). Given that the plaintiffs did not press this argument in their briefings, or dispute the defense contention that this was simply duplicative of the breach of fiduciary duty claims, Count VII will be treated as incorporated into Counts I, III, and V.

The Penn parties urge dismissal of the complaint, arguing that the Third Circuit Court of Appeals' decision in *Renfro v. Unisys Corp.*, 671 F.3d 314 (3d Cir. 2011), controls and demands dismissal of the breach of fiduciary duties claims (Counts I, III, and V), and that the prohibited transaction claims (Counts II, IV, and VI) are duplicative of the breach claims. For the following reasons, the Court grants the motion as to all counts.

## BACKGROUND[2]

The Plan participants bring this action, individually and as representatives of a purported class, as beneficiaries in the University of Pennsylvania Matching Plan ("Plan"), against the University of Pennsylvania and its Vice President of Human Resources, for breach of fiduciary duties under 29 U.S.C. § 1132(a)(2). They allege three main failures of the defendants. First, they claim that the defendants breached their fiduciary duty by "locking in" Plan investment options into two investment companies. Amended Complaint, ¶¶ 184-95 (*hereinafter* "Am. Compl."). Second, they claim that the administrative services and fees were unreasonably high due to the defendants' failure to seek competitive bids to decrease administrative costs. Am. Compl. ¶¶ 196-209. Third, they argue that the fiduciaries charged unnecessary fees while the portfolio underperformed. Am. Compl. ¶¶ 210-28. Plaintiffs seek to certify a class encompassing all participants and beneficiaries of the Plan from August 10, 2010, through the date of judgment, excluding the defendants. Am. Compl. ¶ 237.

## I.    Defendants' § 403(b) Program

Defendants' § 403(b) Plan is a defined contribution, individual account, employee pension benefit plan as defined under 29 U.S.C. §§ 1002(2)(A) and (34) that provides for retirement income benefits for certain employees of the University of Pennsylvania. Am. Compl.

---

[2] In a motion to dismiss, the Court "must consider only those facts alleged in the complaint and accept all of the allegations as true." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994). The facts discussed in this Memorandum are taken as true from the complaint and documents referenced within the complaint.

¶ 9. It is funded through deferrals of employee compensation, employer contributions, and investment performance, net of fees and expenses. Am. Compl. ¶ 11. At the end of 2014, the Plan had $3.8 billion in net assets and 21,412 participants, making it among the largest 0.02% of defined contribution plans in the United States based on total assets. Am. Compl. ¶ 12.

There are generally two main costs associated with investment accounts: plan administration and investment options management. Am. Compl. ¶ 35. Plan administration includes the use of recordkeepers, entities that track the amount of each participant's investments in various options in the plan. Recordkeepers usually provide participants with quarterly account statements, a website, call center, and investment education materials. Am. Compl. ¶¶ 40-41. A recordkeeper's fee is often partially covered by "revenue sharing" agreements. In revenue sharing arrangements, a mutual fund itself (rather than the participant) pays a portion of these expenses. The Plan at issue here operates on a revenue sharing model. Am. Compl. ¶ 119. The second main cost associated with investment accounts is investment options management. Investment options differ by offering different share classes. "Retail share" classes are geared toward small investments, whereas "institutional share" classes are aimed at large investments. Investment companies hope to persuade large plans to invest in these institutional funds by charging lower fees. Am. Compl. ¶ 45. The same way big box chains like Costco arguably can offer savings over the local convenience store by selling in bulk, institutional shares offer fee savings for bulk investments.

ERISA requires each plan to have one or more named fiduciaries that have the authority to operate and administer the plan. 29 U.S.C. § 1102(a)(1). The Plan at issue here is managed by an investment committee, designated by the Trustees of the University of Pennsylvania as a named fiduciary, responsible for the "selection, monitoring, and removal of Plan investment

options and providers." Am. Compl. ¶ 21. Jack Heuer as the Vice President of Human Resources is also a named fiduciary under the plan and designated as the Plan Administrator responsible for "Plan-related matters" including "establishing rules and procedures for the Plan's operation." Am. Compl. ¶ 23.

Employees (the beneficiaries, or participants, of the plan) may opt into the Plan, but as in all § 403(b) plans, they are limited in where they can invest. The Plan managers determine the range of options available to the beneficiaries, who then choose where their money is placed. The University of Pennsylvania, as manager of one of the largest funds in the country, has a diverse array of beneficiaries to serve, from grounds and cleaning crews to renowned Wharton School and Law professors, physicists, anthropologists, hockey coaches and endless others.[3] These individuals have different goals, risk tolerances, investment acumen and income.

To make it easier for potential investors, plan managers divided the investment options (which ranged between 76 and 118 options) into four tiers. Motion to Dismiss (*hereinafter* "Mot.") Ex. 6.[4] Tier 1 is for the "do it for me" investor; tier 2 is geared toward the "help me do it" investor; tier 3 is designed for the "mix my own" investor; and tier 4 is built for the "self-directed" investor. Mot. Ex. 6. In each of these plans, options are presented to the beneficiaries from TIAA-CREF and Vanguard, the two companies used in the Plan. The options range from one option from each company in the "do it for me" category to complete customization of

---

[3] Of course, the Court does not hazard a guess about the investment acumen or even instincts for "a good deal" of anyone on any campus—or Court for that matter—anywhere.

[4] Plaintiffs argue that this exhibit cannot properly be considered at this stage of the proceeding. Plaintiffs' Opposition to Defendants' Motion to Dismiss, Doc. No. 36 (*hereinafter* Opp.) at 13 n.12. A "court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guar Corp. v. White Consol. Indus*., 998 F.2d 1192, 1196 (3d Cir. 1993). Plaintiffs do not dispute the authenticity of any exhibits attached to the motion to dismiss, only that they are not referenced in the complaint. Exhibit 6 (the array of options given to plan participants) was incorporated by reference in the Amended Complaint, and therefore can properly be considered. *See* Am. Compl. ¶ 132 ("Defendants provided a dizzying array of duplicative funds in the same investment style" to participants causing "decision paralysis").

available options in tier 4. Mot. Ex. 6. Beneficiaries are informed that each mutual fund's prospectus is available online. Mot. Ex. 3. They are given detailed statistics on each of the investment options, including 1, 5 and 10 year returns, as well as total operating expenses. Mot. Ex. 3.

Since 2010, the Plan has offered as many as 118 investment options, and as of December 31, 2014, the Plan offered 78 options. Am. Compl. ¶ 77. Vanguard Group, Inc. manages 48 mutual fund options (totaling $1.3 billion) and TIAA-CREF manages the other 30 options including mutual funds and fixed and variable annuities (totaling $2.5 billion). Am. Compl. ¶¶ 77, 79. The Plan includes multiple recordkeepers; Vanguard and TIAA-CREF each serve as the recordkeeper for their respective offerings. Am. Compl. ¶ 78.

## II.     Plaintiffs' Claims

The Amended Complaint includes seven claims: Breach of fiduciary duties for locking the Plan into the CREF stock account and TIAA recordkeeping, in violation of 29 U.S.C. § 1104 (a)(1) (Count I); breach of fiduciary duties for unreasonable administrative fees, in violation of 29 U.S.C. § 1104 (a)(1) (Count III); breach of fiduciary duties for unreasonable fees in violation of 29 U.S.C. § 1104(a)(1) (Count V); and failure to monitor fiduciaries (Count VII). The plaintiffs allege that these actions also violate the "prohibited transactions" clause of ERISA, 29 U.S.C. § 1106(a)(1) (Counts II, IV & VI).

## DISCUSSION

## I.     Standard of Review

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint. Although Rule 8 of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), "to 'give the defendant fair

notice of what the . . . claim is and the grounds upon which it rests,'" the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted) (alteration in original).

To survive a motion to dismiss, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The question is not whether the claimant "will ultimately prevail . . . but whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011) (citation and internal quotation marks omitted). Thus, assessment of the sufficiency of a complaint is "a context-dependent exercise" because "[s]ome claims require more factual explication than others to state a plausible claim for relief." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010).

In evaluating the sufficiency of a complaint, the Court adheres to certain well-recognized parameters. For one, the Court "must consider only those facts alleged in the complaint and accept all of the allegations as true." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994); *see also Twombly*, 550 U.S. at 555 (stating that courts must "assum[e] that all the allegations in the complaint are true (even if doubtful in fact)"); *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) ("[A] court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents"). Also, the Court must accept as true all reasonable inferences emanating from the allegations, and view those facts and inferences in the light most favorable to

the nonmoving party. *See Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3d Cir. 1989); *see also Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010).

That admonition does not demand that the Court ignore or discount reality. The Court "need not accept as true unsupported conclusions and unwarranted inferences," *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 183-84 (3d Cir. 2000) (citations and internal quotation marks omitted), and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678; *see also Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (explaining that a court need not accept a plaintiff's "bald assertions" or "legal conclusions" (citations omitted)). If a claim "is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." *Phillips v. County of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008).[5]

## II.      Fiduciary Duty Under ERISA

Both sides agree that the defendants are fiduciaries to the plaintiffs under the Plan. ERISA imposes the "prudent man standard of care." 29 U.S.C. § 1104(a). This requires the fiduciary to

> (1) . . . discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
> > (A) for the exclusive purpose of:
> > > (i) providing benefits to participants and their beneficiaries; and
> > > (ii) defraying reasonable expenses of administering the plan;
> > (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

---

[5] Plaintiffs filed a complaint on August 8, 2016 (Doc. No. 1). Following the defense's initial motion to dismiss on October 28, 2016 (Doc. No. 25), Plaintiffs filed an amended complaint on November 21, 2016 (Doc. No. 27). Defendants filed a new motion to dismiss on January 5, 2017 (Doc. No. 33) and that motion is the subject of this memorandum. The parties took the offered opportunities for oral argument and supplemental briefing.

> matters would use in the conduct of an enterprise of a like character and with like aims.

29 U.S.C. § 1104(a).

"The fiduciary standard is 'flexible, such that the adequacy of a fiduciary's independent investigation and ultimate investment selection is evaluated in light of the character and aims of the particular type of plan he serves.'" *Renfro*, 671 F.3d at 322 (quoting *In re Unisys Sav. Plan Litig.* (*Unisys I*), 74 F.3d 420, 434 (3d Cir. 1996)). An ERISA fiduciary acts prudently when it gives "appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the . . . investment course of action involved . . . ." *Renfro*, 671 F.3d at 322 (quoting 29 C.F.R. § 2550.404a–1(b)(1)(i)). Accordingly, in evaluating a questioned decision, courts focus upon the fiduciary's "conduct in arriving at [that] investment decision." *Unisys I*, 74 F.3d at 434.

The Supreme Court has "often noted that an ERISA fiduciary's duty is 'derived from the common law of trusts.'" *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015) (quoting *Central States, Southeast and Southwest Areas Pension Fund v. Central Transport Inc.*, 472 U.S. 559, 570 (1985)). "In administering the trust the trustee may perform or fail to perform an act that results in loss to the trust beneficiaries. He is only liable when his conduct causing the loss failed to conform to the standard of care and skill applicable to trustees in the administration of trusts." GEORGE BOGERT ET AL, LAW OF TRUSTS AND TRUSTEES § 541, (3d ed. 2009) (June 2017 Update).

"A determination of what is due care or appropriate skill depends upon the circumstances of time and place as they appeared at the time the trustee took the action in question[, but t]here is no fixed formula which enables the court to determine what is due care under all circumstances." *Id*. In evaluating the effectiveness of an ERISA fiduciary's obligations,

"the range of investment options and the characteristics of those included options—including the risk profiles, investment strategies, and associated fees—are highly relevant" factors. *Renfro*, 671 F.3d at 327. The touchstone of an effective ERISA defined contribution plan is if it "offer[s] participants meaningful choices about how to invest their retirement savings." *Id*. Such a duty to offer choice is more pronounced in plans as large as Penn's, which serves a broad array of needs and desires.

### III.    Breach of Fiduciary Duty Claims (Counts I, III, & V)

The issues in this case primarily rise and fall with the inquiry of whether the defendants breached their fiduciary duty to the plaintiffs, and such an inquiry must begin with *Renfro*.

### A.  *Renfro v. Unisys Corp.*

In *Renfro v. Unisys Corp.*, retirement savings plan participants filed a putative class action against their employer for breach of fiduciary duty under ERISA. 671 F.3d 314 (3d Cir. 2011). The breach of duty alleged in *Renfro* was similar to the case at hand. The putative class challenged "the selection and periodic evaluation of the Unisys defined contribution plan's mix and range of investment options" in a § 401(k) plan. *Id*. at 325-26. In upholding the dismissal of the claim, the Third Circuit Court of Appeals held that courts must look to the "mix and range of options and . . . evaluate[] the plausibility of claims challenging fund selection against the backdrop of the reasonableness of the mix and range of investment options." *Id*. at 326. Under that framework, the Court concluded that in light of the available options—which included 73 investments with fees ranging from 0.10% to 1.21%—plaintiffs had "provided nothing more than conclusory assertions" of fiduciary breach and affirmed dismissal of the case. *Id.* at 327-28. This standard stops plan participants from second-guessing a plan fiduciary's investment decisions just because they lose money, while allowing plan participants latitude to bring suit for improper

management. It requires plaintiffs to show more than just a single sub-optimality in a given mutual fund. Instead, they must show systemic mismanagement such that individuals are presented with a Hobson's choice between a poorly-performing § 401(k) portfolio or no §401(k) at all.

This still allows multiple avenues for plaintiffs to challenge a breach of fiduciary duty. A plaintiff can allege an inadequate "mix and range of options" by alleging insufficient choice, that all (or the vast majority of) options breach the fiduciary duty, an insufficient variety among the range of options, or a kickback scheme where the fiduciaries directly benefit at the expense of plan participants. *See Renfro*, 671 F.3d 314 (insufficient mix and range; lack of options); *Hecker v. Deere & Co*., 556 F.3d 575 (7th Cir. 2009) (assuming insufficient variety among investment vehicles gives rise to a claim); *Braden v. Wal-Mart Stores, Inc*., 588 F.3d 585 (8th Cir. 2009) (endorsed by the *Renfro* court for its denial of dismissal due to allegations of a kickback scheme). At the same time, it effectively discharges Congress' "careful balancing of the need for prompt and fair" administration "against the public interest in encouraging the formation of employee benefit plans." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 42 (1987).

### B. The *Renfro* Standard and § 403(b)

At issue in this case are § 403(b) tax plans, the non-profit analogue to the far more common § 401(k) tax retirement plans used by private companies. *Renfro* and other similar cases have dealt with a § 401(k) retirement plan, while the Plan here is a § 403(b) tax advantaged retirement plan. While § 401(k) and § 403(b) plans have different historical roots and historical structures that demand different fiduciary duties for administrators, those differences have largely eroded over time. Today, the obligation of beneficiaries and fiduciaries in § 401(k) and § 403(b) plans are nearly identical.

ERISA was enacted in 1974 as "the growth in size, scope, and numbers of employee benefit plans" became "rapid and substantial," necessitating federal intervention to create a comprehensive enforcement mechanism. 29 U.S.C. § 1001(a). As retirement systems began to take shape in America in the late 1800s, there were few protections for employees. "There was no federal law applicable to such plans, and under state law, such plans were generally regarded as nonbinding expressions of the employers' present intent to make a future gift to aged employees." AMERICAN BAR ADMINISTRATION, EMPLOYEE BENEFITS LAW 1-1 (3rd Ed. 2012).

The modern-day understanding of retirement plans did not begin to take shape until the income tax legislation was enacted in 1913, forcing the government to give special status to pension plans in the Revenue Acts of 1921 and 1926. *Id*. at 1-4. This special status led to patchwork legislation about how the plans could be used and administered. *Id*. at 1-5. The economic boom of post-war America created a dramatic rise in retirement plans. *Id*. at 1-8. Employee benefits plans increased in size and scope as states tried to keep pace by passing their own regulations. As companies and unions operated increasingly across state lines, they were forced to "deal with different and sometimes inconsistent state laws." *Id*.

By the 1960s, a national consensus arguably formed that retirement funds needed comprehensive regulation. *Id*. at 1-9. As the "inadequacy of current minimum standards" became apparent, concerns arose that "the soundness and stability of plans with respect to adequate funds to pay promised benefits may be endangered." 29 U.S.C. § 1001(a). In response to these concerns, Congress enacted ERISA in 1974 to provide a comprehensive mechanism for regulating nationwide tax-advantaged retirement plans. EMPLOYEE BENEFITS LAW at 2-2. "ERISA's detailed provisions set forth a comprehensive civil enforcement scheme that represents a careful balancing of the need for prompt and fair claims settlement procedures

against the public interest in encouraging the formation of employee benefit plans." *Pilot Life*, 481 U.S. at 42.

Despite the uniform language of ERISA, coverage "of a plan under ERISA (i.e., the labor provisions) is unrelated to the tax status of that plan under the Code." EMPLOYEE BENEFITS LAW at 2-5. This is because tax advantaged retirement plans are created and administered through the IRS under a different (more dynamic) chapter of the U.S. Code than the one that created ERISA. *Compare* 29 U.S.C. § 1001 *et seq.* (ERISA) *with* 26 U.S.C. § 401 *et seq.* (tax). Over the years, Congress has amended Chapter 26 (and the IRS has supplemented it with regulations) such that the tax-advantaged retirement plans we know today are a far cry from those in place when ERISA was enacted. *See*, *e.g.*, 26 C.F.R. §§ 1, 31, 54 (2007) (promulgating rules under the IRS regarding § 403(b) plans).

Initially, § 403(b) and § 401(k) plans differed dramatically in both scope and structure. Section 403(b) plans initially were limited to annuity contracts (which function like a pension, paying a fixed amount for the remainder of the person's lifetime) and pre-dated § 401(k) plans by nearly 20 years. *See*, *e.g.*, Technical Amendments Act of 1958, Pub. L. No. 85-866, § 23, 72 Stat 1606 (1958) (outlining the requirements for tax advantaged § 403(b) accounts). While still governed by ERISA, these salient differences resulted in different management and fiduciary requirements, since the duties by a fiduciary to an annuity contract differs dramatically from the duties of a fiduciary managing mutual funds. Over the years, § 403(b) plans have moved away from annuity offerings to offer a range of options that are nearly identical to those offered by § 401(k) plans, such as the plan at issue here. Today, the fiduciary requirements by § 403(b) plan administrators are nearly identical to those requirements for § 401(k) administrators, especially with respect to their duties to plan beneficiaries.

ERISA's fiduciary duty standard does not differentiate between § 403(b) and § 401(k) plans. Rather, it defines a blanket fiduciary duty standard. ERISA "aims 'to provide *a uniform regulatory regime over employee benefit plans*' in order to ease administrative burdens and reduce employers' costs." *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 82 (3d Cir. 2012) (emphasis added) (quoting *Aetna Health Inc. v. Davila,* 542 U.S. 200, 208 (2004)). Because of the modern-day similarity between the two retirement plans and the historical roots of ERISA's goal to create a uniform regulatory system for retirement plans, the analysis of the fiduciary standards for § 403(b) and § 401(k) retirement plans must be the same. The *Renfro* reasoning (and other interpretations of § 401(k) cases) therefore serve as a guiding light for analyzing the different theories advanced by the plaintiffs.

### C.  Claim I: Locking the Plan into CREF Stock Accounts and TIAA Recordkeeping

The plaintiff's first claim is that by "allowing TIAA-CREF to mandate the inclusion of the CREF Stock Account and Money Market Account in the Plan" the defendants committed the plan to an "imprudent arrangement in which certain investments had to be included and could not be removed from the plan" even if the investments underperformed. Am. Compl. ¶ 187. In support of this assertion, Plaintiffs point to recent Supreme Court dicta in *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015). There, the Court noted (while addressing a statute of limitations question) that "under trust law, a fiduciary normally has a continuing duty of some kind to monitor investments and remove imprudent ones." *Id.* at 1828-29. However, the Court "express[ed] no view on the scope of respondents' fiduciary duty" and remanded the case to the Ninth Circuit. *Id*. at 1829.

Such a quibble over *Tibble*'s applicability misses the fact that, even assuming the dicta is binding, the plaintiffs' complaint here fails to allege conduct that violates the *Tibble* principle.

The only fact that the plaintiffs have pled is that the defendants "locked in" the Plan to TIAA-CREF. Am. Compl. ¶ 187. This, standing alone, is insufficient to create a plausible inference that this was a breach of fiduciary duty. Locking in rates and plans is a common practice used across the business and personal world. Companies often offer better terms to induce customers to "lock in" for a longer period. Cable companies offer discounts for signing a two-year contract, landlords offer cheaper rates for longer leases, and cell phone companies give free phones for signing a two-year agreement. Often times, locking in a plan for a stated period is better for all sides because customers save money with the discount offered by the company, and companies save money by eliminating the costs associated with customer acquisition while having an arguably reliable income stream to rely on.

The plaintiffs' claim that this violates the defendants' fiduciary duty does not meet the plausibility threshold. As in *Twombly*, the actions are at least "just as much in line with a wide swath of rational and competitive business strategy" in the market as they are with a fiduciary breach. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007).[6]

### D. Claim III: Unreasonable Administrative Fees

Plaintiffs next claim that Defendants allowed TIAA-CREF and Vanguard to charge unreasonable administrative fees in two ways: First, allowing TIAA-CREF and Vanguard to operate as their own recordkeepers (rather than consolidating all funds with a singular third-party recordkeeper) supposedly increased fees. Am. Compl. ¶ 107. Second, Plaintiffs claim that the plan administrators should have arranged a flat per-person fee rather than an "asset-based" fee. Am. Compl. ¶ 99.

---

[6] This Count fails to meet the requirements under Rule 12(b)(6), so the Court need not address the question of whether the claim is time-barred under 29 U.S.C. § 1113(1).

### 1. Multiple Recordkeepers

The argument that TIAA-CREF and Vanguard operated as their own recordkeepers fails in the face of the same realities discussed above. Bundling of services is not inconsistent with lawful, free market behavior in the best interests of those involved, including beneficiaries. Companies, for example, often "bundle" phone service in with the more popular cable and internet services, even when the users do not want a land line. In those instances, it is still a rational self-interested action to purchase the bundle because the other equipment is worth the price for the consumer, *even with* the unnecessary or undesired product or fee. Here, it is rational to comply with Vanguard's requirement that they serve as recordkeeper if that is required to gain access to the desired Vanguard portfolio. Just as the actions in *Twombly* were "consistent with conspiracy, but just as much in line with a wide swath of rational" actions, so too are the actions here—perhaps consistent with fiduciary breach, but also well in line with a wide swath of other rational actions. *Twombly*, 550 U.S. at 554.

But even if this were not true, the argument also fails as a factual matter because there is a reasonable "range of investment options with a variety of risk profiles and fee rates." *Renfro*, 671 F.3d at 327. Here, the fees range from 0.04% to 0.87%, markedly lower than the 0.10% to 1.21% at issue in *Renfro*. Mot. at 11-12. The plan offered 17 investment options with fees lower than the lowest fees in *Renfro* (0.10%) and only one plan above 0.57%. Mot. at 12. With such low fees, it is not inevitable to say that recordkeeping fees were unnecessarily high, especially when there are rational bundling reasons to allow separate recordkeepers. Even if there *were* cheaper options available for recordkeeping fees, ERISA mandates that fiduciaries consider options besides cost. Fiduciaries must balance "providing benefits to participants and their beneficiaries" *and* "defraying reasonable expenses of administering the plan." 29 U.S.C.

§ 1104(a)(1). Without plausibly pleading that these two options were not met, a plaintiff cannot state a claim for relief.

### 2. Asset-Based v. Flat Fee Charges

The plaintiffs next claim that the plan administrators breached their fiduciary duty by allowing recordkeepers to charge "excessive asset-based" fees rather than cheaper "per-participant fees." Am. Compl. ¶ 108.

This is a pure question of where the burden of recordkeeping costs should be placed—a question open to the discretion of a reasonable plan administrator. In flat per-participant fee systems, the burden is disproportionately placed on the lower income and lower investment individuals to subsidize higher income individuals. In the asset-based model, individuals must pay a pro rata share based on their investments, placing the burden disproportionately on the higher income individuals. For example, in a flat fee system, a young individual with only a $10,000 balance would pay the same as an older individual who has invested longer with a $100,000 balance. If there is a flat fee of $44, both parties would pay the same price, but a different percentage of their total account: the young investor would pay 0.44% of her account balance, while the older investor would pay 0.044% of the account balance. However, if there is a fee of 0.08% of asset value, the young investor pays only $8, while the older investor pays $80. In both instances, the fees collected by the recordkeeper are the same but collected differently among plan beneficiaries.

The plan administrators are fiduciaries to every plan member, whether she invests $10 or $10 million. It is not up to courts to second-guess how fiduciaries allocate that cost, only that the fiduciary "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" as a whole. 29 U.S.C. § 1104(a)(1). To the extent that this argument claims the

arrangement increased fees, it fails on the same reasoning as above: there are lawful explanations for such an arrangement, and the plaintiffs need something more than a claim that there may be (or even are) cheaper options available. The plaintiffs must show that there were no reasonable alternatives given to plan participants to choose from, which the plaintiffs have not pled. *Cf. Renfro*, 671 F.3d at 329 (holding that affording a reasonable mix of plan options to participants was sufficient to meet the fiduciary standard).

### E. Claim V: Unreasonable Investment Management Fees; Unnecessary Marketing, Distribution, Mortality and Expense Risk Fees; and Performance Losses

The plaintiffs next claim a litany of costly measures that they claim amount to a breach of fiduciary duty, including unnecessary fees, duplicative investments, retention of higher cost funds, retention of underperforming funds, and poor performance relative to the market. Am. Compl. ¶¶ 210-23. These claims broadly break down into three categories: (1) unnecessary fees, (2) participant confusion, and (3) poor market performance.

#### 1. Unnecessary fees

A variant on the argument above (that a necessary fee arrangement could have been cheaper) the plaintiffs also point to a number of charged fees that they claim were unnecessary or duplicative. *See* Am. Compl. ¶¶ 211-23. The majority of these "excessive fee" arguments fail to state a claim because the mix and range of fee options included fees as low as 0.04%, which neither side claims is excessive. The strongest argument advanced by the plaintiffs is that the plan contained "retail class" shares, rather than other identical options with lower fees, known as "institutional class" shares. Am. Compl. ¶¶ 121-30. Retail shares are generally available to regular market participants who have small investments, while institutional shares are only

available to larger institutions with more bargaining power and larger capital pools. Am. Compl. ¶ 121; Mot. at 16-18.

The plaintiffs overstate their argument. While some shares in the Plan are retail shares that could be replaced with institutional shares, nearly half of the shares (37 of 78) are already these lower-fee funds. Mot. Ex. 3. The plaintiffs' argument also ignores that these institutional class shares would only be available if significantly more money were funneled into each of them.[7] Switching from retail to institutional shares is not a matter of checking a different box. It requires fiduciaries to balance the menu of options given to plan beneficiaries against the fees. Sometimes, institutional shares are unavailable as an option because investment levels are too low in that fund. But these "institutional investment vehicles [also] come with a drawback: lower liquidity." *Loomis v. Exelon Corp.*, 658 F.3d 667, 672 (7th Cir. 2011). While retail funds allow daily transfers, where participants can withdraw money without fees, "[i]nstitutional trusts and pools do not offer that choice." *Id.*

The plaintiffs' argument that fiduciaries must maintain a myopic focus on the singular goal of lower fees was soundly rejected in *Renfro*. 671 F.3d at 327. ERISA requires fiduciaries to balance "providing benefits to participants" with "defraying reasonable expenses" in the plan. 29 U.S.C. § 1104(a)(1)(a). The plaintiffs here have not pled that these reductions in expenses could be achieved without changing the variety of benefits to participants. These same considerations motivated the Seventh Circuit's rejection of identical "institutional versus retail" arguments. *Loomis*, 658 F.3d at 671-72; *Hecker*, 556 F.3d at 580-81. Plaintiffs have only pled that the failure to replace these shares was a breach of fiduciary duty, which is insufficient to pass through the 12(b)(6) threshold.

---

[7] For example, the Vanguard Institutional Index Fund Institutional Shares require a $5 million minimum investment. *Vanguard*, VINIX Share Mutual Fund Profile (2017).

### 2. Participant Confusion

The plaintiffs next allege that defendants "provided a dizzying array of duplicative funds in the same investment style" leading to "'decision paralysis' for participants." Am. Compl. ¶ 132. This assertion is unsupported by the pleading. The plaintiffs have not alleged any participant who was confused by the different options, an omission that on its own causes the amended complaint to fail to state a factual basis for the claim. Moreover, the plan administrators broke the options down into four categories based on the participants' investment acumen to help guide them. *See generally* Mot. Ex. 6. Offering 78 different choices is not an unreasonably high number, especially with the tiered descriptive guidance given to participants. As a practical matter, plan administrators must offer a sufficient amount of choice to participants, while not overwhelming them to the point participants cannot actually choose. Providing 78 different investment options satisfies the "reasonable mix and range of investment options" required by *Renfro* without being unduly overwhelming. 671 F.3d at 327.

The plaintiffs' derivative claim, namely that offering duplicative funds was unnecessary, fails as well. On the contrary, duplicative investment options are necessary based on the structure of the Plan. Each of the four tiers becomes progressively more complex for plan participants. The "do it for me" tier (tier 1) has only one option from each of the two providers, but had a number of different underlying mutual funds or annuities in its umbrella. Mot. Ex. 6. In contrast, the "self-directed" plan (tier 4) allowed complete customization by participants. Mot. Ex. 6. That these tiers contained some of the same funds is unsurprising and raises no plausible inference of a breach of fiduciary duty. Indeed, if there was no overlap there could be greater cause for criticism or frustration.

### 3. Poor Market Performance

Finally, the plaintiffs claim that select funds were outperformed by the rest of the market, claiming that 60% of the Plan's investment options "underperformed their respective benchmarks over the previous 5-year period." Am. Compl. ¶ 151. To begin, there is no cause of action in ERISA for "underperforming funds." The statutory text requires fiduciaries to discharge their duties "with the care, skill, prudence, and diligence *under the circumstances then prevailing*" when they make decisions. 29 U.S.C. § 1104(a)(1)(B). (emphasis added). This standard requires courts to look at the actions taken by the fiduciary *at the time* that they took those actions. *See*, *e.g*., *Tussey v. ABB, Inc*., 746 F.3d 327, 338 (8th Cir. 2014) ("While it is easy to pick an investment option in retrospect (buy Apple Inc. at $7 a share in December 2000 and short Enron Corp. at $90 a share), selecting an investment beforehand is difficult. The Plan administrator deserves discretion to the extent its *ex ante* investment choices were reasonable given what it knew at the time"). Sophisticated investors and rank amateurs both look to buy low and sell high and wonder why they did not have clear enough vision to see the path for doing so early enough to make their fortunes. Chagrin does not inexorably become a cause of action.

Moreover, when examined closely, the plaintiffs' claims do not withstand scrutiny. A statistical sampling of funds would expect (all things being equal) half of the funds to be above benchmarks and half to be below benchmarks. Here, as opposed to what the simplistic statistical average would show, that 38 (half) of the 76 funds underperformed, the plaintiffs pled that 45 investment options performed below benchmarks. Am. Compl. ¶ 151. Such a *post hoc* analysis of market performance, where only 7 more funds underperformed than would be expected, *may* be consistent with a breach of fiduciary duty, but does not show that the plaintiffs have "nudged

their claims across the line from conceivable to plausible" and "their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## IV.    Prohibited Transaction Claims

Plaintiffs recast the same arguments above as violating the prohibited transactions clause of ERISA, § 1106(a).[8] This clause states that:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
> > (A) sale or exchange, or leasing, of any property between the plan and a party in interest . . .
> > (C) furnishing of goods, services, or facilities between the plan and party in interest;
> > (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . .

29 U.S.C. § 1106(a)(1)

This prohibited transaction requirement in ERISA imposes an additional duty on fiduciaries not to engage in deals using the plan assets and a "party in interest." A party in interest is defined as, *inter alia*, "a person providing services to such plan" 29 U.S.C. § 1002(14)(B). The prohibited transactions provision supplements the "foundational [fiduciary] obligation" by prohibiting "plan fiduciaries from entering into certain transactions. Subsection (a) erects a categorical bar to transactions between the plan and a 'party in interest' deemed likely to injure the plan." *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 82 (3d Cir. 2012); *see also Reich v. Compton,* 57 F.3d 270, 275 (3d Cir.1995).

Congress adopted the prohibited transactions provision of ERISA "to prevent plans from engaging in certain types of transactions that had been used in the past to benefit other parties at the expense of the plans' participants and beneficiaries." *Reich,* 57 F.3d at 275 (quoting *Commissioner of Internal Revenue v. Keystone Consolidated Indus.,* 508 U.S. 152, 160 (1993)).

---

[8] Defendants also claim that the prohibited transaction claims are time-barred. Mot. at 30. Because the "prohibited transaction" claims fail to state a claim, the Court offers no opinion as to whether the claims were timely.

In the decades before ERISA, plans could "engage in transactions with related parties so long as the transactions were 'arms-length.' Unfortunately, this rule was difficult to police and thus 'provided an open door for abuses' by plan trustees." *Id.* Congress amended ERISA "with the goal of creating a categorical bar to certain types of transactions that were regarded as likely to injure a plan." *Reich,* 57 F.3d at 275.[9]

The plaintiffs seek recovery under this section of ERISA under the theory that the contractual arrangement with TIAA-CREF and Vanguard constituted a prohibited transaction. This cannot be correct. Plaintiffs argue that paying these companies constitutes a sale of property under § 1106(a)(1)(A), a furnishing of services under § 1106(a)(1)(C), and a transfer of assets in the plan under § 1106(a)(1)(D). If such an argument were true, then any time plan administrators contracted with another party to provide services to plan participants in exchange for money (which includes the basic elements of retirement plans, including making mutual funds available or recordkeeping services) it would qualify as a prohibited transaction. After all, fees charged by these companies necessarily requires "transfer of assets." Plaintiffs claim this all while maintaining that there are no *per se* ERISA violations in the revenue sharing arrangement. *See generally*, Am. Compl.; *See also*, Opp. at 34.

Perhaps Plaintiffs attempt to balance on such an analytical tightrope because they cite no court that has been persuaded by such a novel argument. Moreover, the transactions at issue here were not done "to benefit other parties at the expense of the plans' participants and beneficiaries" but were simply operating expenses necessary to operate the plan on behalf of the plan

---

[9] The Senate Report leading to the amendment to ERISA provided a (non-exhaustive) list of examples of the prohibited transactions the provision sought to stop: "lending funds without adequate security and a reasonable rate of interest to the creator of the plan, his family, or corporations controlled by him . . . payment of excessive salaries, purchase of property for more than an adequate consideration, sale of property for less than an adequate consideration, or any other transactions which result in a substantial diversion of funds to such individuals." S.Rep. No. 93–383 (1974), *reprinted in* 1974 U.S.C.C.A.N. 4890, 4903.

beneficiaries. *Reich,* 57 F.3d at 275. While a kickback scheme such as that in *Braden*, where the fiduciaries are benefitting by engaging in these transactions, may be actionable under the prohibited transactions provision, the plaintiffs must plead that there is a "subjective intent to benefit a party in interest." *Id*. at 279. They have not done so here. The plaintiffs' attempts to shoehorn their fiduciary duty claims into the prohibited transaction provision simply fail as a matter of law.

## CONCLUSION

For the foregoing reasons, the motion to dismiss is granted. Counts I through VII of the complaint are dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

An appropriate Order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge