IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JENNIFER SWEDA *et al.*, <br> *Plaintiffs* <br><br> v. <br><br> THE UNIVERSITY <br> OF PENNSYLVANIA *et al.*, <br> *Defendants* | CIVIL ACTION <br><br><br><br> No. 16-4329 |

## MEMORANDUM

PRATTER, J.                                                                     DECEMBER 14, 2021

This class action litigation concerns alleged breaches of fiduciary duties and prohibited transactions by The University of Pennsylvania, Jack Heuer, and The University of Pennsylvania Investment Committee (collectively, "Penn") in violation of the Employee Retirement Income Security Act of 1974 (ERISA), as amended, 29 U.S.C. § 1001, *et seq.*, with respect to the management, operation, and administration of The University of Pennsylvania Matching Plan, The University of Pennsylvania Supplemental Retirement Annuity Plan, and The University of Pennsylvania Basic Plan (collectively, the "Plans"). The six named Class Representatives are current and former employees of The University of Pennsylvania and participants in the Plans. Specifically, Plaintiffs alleged that Penn caused the Plans to pay unreasonable recordkeeping and administrative fees while also maintaining high-cost and underperforming investment options.

The Court previously granted class certification and preliminary approval of the settlement on June 29, 2021 pending a fairness hearing. Doc. No. 103. The fairness hearing was held on October 29, 2021. Plaintiffs now seek the Court's final approval of the class action settlement agreement ("Agreement"), as well as attorneys' fees and Class Representative awards. The Court will grant final approval of the Agreement, attorneys' fees, and Class Representative awards.

1

## BACKGROUND

The parties reached a proposed settlement on November 30, 2020 after four weeks of negotiations. Doc. No. 95, at 1. The Gross Settlement Amount is $13,000,000 in an interest-bearing settlement account called the "Qualified Settlement Fund" (hereinafter the "Fund"). The Fund will be used to pay the class members' recoveries, administrative expenses, class counsel's attorneys' fees, and the class representatives' proposed awards. Doc. No. 108-1, at 3. The Class Members include current Plan participants and "Authorized Former Participants" who previously participated in the Plans and submitted an accepted claim form. Doc. No. 95-2 ¶¶ 2.5, 2.16, 6.1.

The Agreement also includes non-monetary and affirmative relief including use of a single recordkeeper and updated investment menu, as well as a three-year settlement period during which participants may redirect their assets in the Fund and Fund fiduciaries will undergo required training. Doc. No. 108-1, at 4–5. Relying on the expert testimony of Stewart Brown, C.F.A., Plaintiffs estimate that the total value of the Agreement including these non-monetary forms of relief is $38 million. *Id.* at 5; *see also* Doc. No. 107-4 (Brown Decl.).

The settlement administrator sent the Court-approved settlement notices to 44,252 Class Members. Doc. No. 108-1 at 10. The deadline for Class Members to file objections to the Settlement was September 27, 2021. Doc. No. 108 ¶ 4. While no formal objections were filed, two class members communicated their disagreement with the Settlement. Doc. No. 108 ¶ 4. The first objection, by Sara C., is a brief email that generally objects to the "vague notice" of the settlement and the adequacy of class settlements in general.[1] The second objection is a letter from A. Russell Localio focusing on the awards for the named Class Representatives and attorneys'

---

[1] Ms. C stated, "I don't even understand what this is about from this vague notice and I do not believe I should be required to research it to preserve any rights. . . . I do not support any class settlement; class action settlements are always far below private settlements and I am confident will be unfair to me, as I am not at the table." Doc. No. 108-6, at 1.

2

fees. Doc. No. 108-7. Mr. Localio objects that the named Class Representatives present "no more than an incantation of hypothetical harm" and do not provide time accounting or describe special skills to justify their assertion that they expended effort to justify the awards. *Id.* at 1–2. On attorneys' fees, Mr. Localio argues that the underlying claim is about the participants being charged excessive financial fees and the Agreement itself allows Class Counsel to charge excessive fees. *Id.* at 3. Specifically, Mr. Localio argues that Class Counsel are pursuing similar cases against at least four other universities and that the rates used to justify the fee amount are excessive compared to the compensation received by members of the class for their highly-skilled work at the university. *Id.* at 3–4. No objectors appeared at the October 29, 2021 fairness hearing.

In addition to the fairness hearing, the Court ordered supplemental briefing on the conclusion of the claims processing under the Agreement. Doc. No. 114. As of December 2, 2021, the parties have received final claims information. Doc. No. 115-1 ¶¶ 5–8. The settlement administrator represents that the total population of Class Members eligible for a distribution is 23,129 Class Members, excluding those with a claim below the de minimis amount of $10. *Id.* ¶ 7. The expected settlement payments range from $10 to $13,965.15, with 2,097 Class Members receiving more than $1,000. *Id.* ¶ 8.

Plaintiffs also filed a motion for attorneys' fees and Class Representative awards. Doc. No. 107. Class counsel seek an award of one-third of the settlement amount, which is $4,333,333 in attorneys' fees, as well as reimbursement of litigation expenses of $369,857. *Id.* The Class Representatives seek awards of $25,000 each. *Id.* Plaintiffs' motions are unopposed.[2]

---

[2] The proposed fees and awards will be paid out of the Fund, if approved. Doc. No. 107-1, at 1–2.

3

## LEGAL STANDARD

A settlement represents the result of a process in which opposing parties attempt to weigh and balance the factual and legal issues, with neither side ultimately choosing to risk taking the case to a final resolution on the merits. The settlement of a class action requires court approval. Fed. R. Civ. P. 23(e)(2). Under Federal Rule of Civil Procedure 23(e), a district court may approve a settlement agreement only "after a hearing and on finding that it is fair, reasonable, and adequate." *Id.* "Significant weight should be attributed to the belief of experienced counsel that settlement is in the best interest of the class." *Williams v. Aramark Sports, LLC*, No. 10-cv-1044, 2011 WL 4018205, at *7 n.7 (E.D. Pa. Sept. 9, 2011) (quoting *Lake v. First Nationwide Bank*, 900 F. Supp. 726, 732 (E.D. Pa. 1995)). "The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." *In re Nat'l Football League Players Concussion Inj. Litig.*, 821 F.3d 410, 436 (3d Cir. 2016) (quoting *In re Prudential Ins. Co. Am. Sales Practices Litig.*, 148 F.3d 283, 299 (3d Cir. 1998)).

The Third Circuit Court of Appeals has established nine *Girsh* factors to assess the fairness of a proposed settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation…

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) (internal quotations omitted). The Court of Appeals has also identified additional non-exclusive *Prudential* factors for courts to consider for a "thoroughgoing analysis of settlement terms." *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010). Those factors include:

4

> [1] the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; [2] the existence and probable outcome of claims by other classes and subclasses; [3] the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved – or likely to be achieved – for other claimants; [4] whether class or subclass members are accorded the right to opt out of the settlement; [5] whether any provision for attorneys' fees are reasonable; and [6] whether the procedure for processing individual claims under the settlement is fair and reasonable.

*Prudential*, 148 F.3d at 323. While the Court must make findings as to the *Girsh* factors, the *Prudential* factors merely illustrate additional factors that the Court should consider when appropriate. *In re Pet Food Prods.*, 629 F.3d at 350. "The proponents of the settlement bear the burden of proving that these factors weigh in favor of approval." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995).

## DISCUSSION

### I. Class Certification

Before turning to the fairness of the Agreement, the Court notes that its analysis regarding class certification for settlement purposes under Rule 23 remains unchanged. *See* Doc. No. 102, at 3–10. First, Plaintiffs satisfy the four prerequisites of Rule 23(a)—numerosity, commonality, typicality, and adequacy—because (1) the plan has more than 20,000 participants, (2) Plaintiffs present common claims regarding Penn's status as a fiduciary and whether it breached its fiduciary duties, (3) the circumstances of the Class Representatives reflect those of Plan participants generally, and (4) the Court accepts Plaintiffs' representations that they are committed to pursuing the interests of the class and finds that they and Class Counsel are qualified and do not present any apparent conflict of interest.

5

Second, Plaintiffs satisfy at least one subsection of Rule 23(b). Specifically, Rule 23(b)(1) provides for certification if separate actions by individual class members would create a risk of inconsistent or varying adjudications or adjudications that would affect other members not parties to the individual adjudications or would "substantially impair or impede their ability to protect their interests." Fed. R. Civ. P. 23(b)(1). Penn allegedly owed the same fiduciary duty to all Plan members, and allowing over 20,000 Plan members to pursue their own actions could easily create both a risk of varying adjudications and outcomes "likely to be dispositive of the interests of other Plan participants." *Boley v. Universal Health Servs., Inc.*, 337 F.R.D. 626, 639 (E.D. Pa. 2021). Therefore, the Court finds that class certification for settlement is proper.

## II. Settlement Approval

The Court now turns to Plaintiffs' motions. The Court begins with the Plaintiffs' request for final settlement approval, analyzing each of the relevant settlement fairness factors in turn.

### 1. *The Complexity, Expense and Likely Duration of the Litigation*

First, the Third Circuit Court of Appeals has explained that the first factor favors settlement where "continuing litigation through trial would have required additional discovery, extensive pretrial motions addressing complex factual and legal questions, and ultimately a complicated, lengthy trial." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 536 (3d Cir. 2004). The first factor also favors settlement where "it was inevitable that post-trial motions and appeals would not only further prolong the litigation but also reduce the value of any recovery to the class." *Id.*

While Plaintiffs concede this "case was hotly"—i.e., expensively—"litigated for over four years" before settlement, they argue that the parties settled before completion of expert discovery and dispositive motions practice. Doc. No. 108-1, at 9. Plaintiffs point to two cases previously litigated by Class Counsel that each lasted 13 years, arguing that a lengthy trial and appeals process

would have remained. *Id.* at 10. Plaintiffs also argue that ERISA is "an enormously complex and detailed statute" and that "[l]itigation regarding 403(b) plans entails highly technical investment matters, investment products, recordkeeping expertise, and industry practices." Doc. No. 107-1, at 16.

Looking to the length of similar cases that Plaintiffs cite in this contentious area of litigation, the Court finds that the likely expense and duration of the litigation are considerable. *See Tibble v. Edison Int'l*, 843 F.3d 1187 (9th Cir. 2016) (remanding case filed in 2007 on appeal); *Tussey v. ABB, Inc.*, 850 F.3d 951 (8th Cir. 2017) (remanding case filed in 2006 on appeal). The Court finds that the first factor weighs strongly in favor of settlement approval.

### 2. *The Reaction of the Class to the Settlement*

Next, the Court should consider the class's reaction to the settlement. Plaintiffs argue that, out of 44,252 notices to Class Members, only two members filed informal objections and none filed formal objections. Given that this 23(b)(1) class certification did not allow opt-outs, the Court will consider even the informal objections to fully assess fairness to all Class Members.

Plaintiffs argue that the email from Sara C. does not provide any particularized objections and the letter from Mr. Localio focused on the attorneys' fees and Class Representative awards. The Court agrees that the informal objections do not provide a reason for the Court to deny final approval of the Agreement. The Court finds that the low number of objections weighs in favor of final approval. *See In re Cendant Corp. Litig.*, 264 F.3d 201, 235 (3d Cir. 2001) ("The vast disparity between the number of potential class members who received notice of the Settlement and the number of objectors creates a strong presumption that this factor weighs in favor of the Settlement, and the objectors' arguments otherwise are not convincing.").

*3. The Stage of the Proceedings and the Amount of Discovery Completed*

Analyzing the stage of the proceedings and the amount of discovery completed, "courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *In re Gen. Motors Corp.*, 55 F.3d at 813. The parties reached the Settlement Agreement after Plaintiffs received almost 15,000 documents produced by the Defendants and relevant third parties. Doc. No. 108-1, at 2. The parties had completed 13 depositions of fact witnesses and had begun engaging expert witnesses when the parties reached the Agreement. *Id.* at 3. Fact discovery was fully completed before reaching the Agreement. *Id.* at 14.

Because the parties completed fact discovery, ensuring that counsel had "adequate appreciation of the merits of the case before negotiating," *In re Gen. Motors Corp.*, 55 F.3d at 813, the Court finds that this factor also weighs in favor of settlement approval.

*4. The Risks of Establishing Liability*

Next, Plaintiffs cite this Court's first dismissal of the Complaint, reversed on appeal, to argue that "the previous complete dismissal loomed heavy over the ultimate success of the remaining claims." Doc. No. 108-1, at 15–16. Defendants also continue to deny wrongdoing, so Plaintiffs argue that Defendants would have "mounted a vigorous defense" at each stage. *Id.* at 16. Plaintiffs also point to a similar case, *Sacerdote v. N. Y. Univ.*, 328 F. Supp. 3d 273 (S.D.N.Y. 2018), where Class Counsel lost a bench trial involving similar investment performance claims. In similar cases where Class Counsel have succeeded, courts have recently noted "the novel nature of th[ese] case[s] and adverse precedents." *Kelly v. Johns Hopkins Univ.*, No. 1:16-cv-2835, 2020 WL 434473, at *3 (D. Md. Jan. 28, 2020).

In considering this factor, it is also useful to consider how the maturity of the underlying substantive issues affects the complexity of the litigation. *Prudential*, 148 F.3d at 323. Here, the

underlying substantive issues are still working their way through the federal court system, with the Supreme Court just recently hearing oral argument in a case involving a similar challenge to a university retirement plan's management fees on December 6, 2021. *See Hughes v. Nw. Univ.*, No. 19-cv-1401, 141 S. Ct. 2882 (Mem.) (July 2, 2021) (granting certiorari). Based on the current uncertainty in this area of law and this Court's prior dismissal of the claims, the Court finds that the risks of establishing liability weigh strongly in favor of settlement approval.

### 5. & 6. *The Risks of Establishing Damages and Maintaining the Class Action Through Trial*

The next two factors do not weigh for or against settlement approval in the Court's analysis because this litigation does not present unique damages or class maintenance issues beyond the risk of establishing liability under the fourth factor.

### 7. *The Ability of The Defendants To Withstand A Greater Judgment*

"The ability of the Defendants to withstand a greater judgment generally only comes into play when 'a settlement in a given case is less than would ordinarily be awarded but the defendant's financial circumstances do not permit a greater settlement.'" *McDonough v. Toys R Us, Inc.*, 80 F. Supp. 3d 626, 645 (E.D. Pa. 2015) (quoting *Reibstein v. Rite Aid Corp.*, 761 F. Supp. 2d 241, 254 (E.D. Pa. 2011)). Plaintiffs concede that Defendants could likely pay more than $13 million. Doc. No. 108-1, at 16. Indeed, Penn's annual Academic operating budget alone is $3.7 billion. Penn Budget Planning & Analysis, *Operating Budget*, https://budget.upenn.edu/operating-budget/ (last accessed Dec. 8, 2021).

However, Plaintiffs argue that courts within "[t]he Third Circuit . . . 'regularly find[] a settlement to be fair even though the defendant has the practical ability to pay greater amounts.'" Doc. No. 108-1, at 16 (quoting *McDonough*, 80 F. Supp. 3d at 645). They are correct. And, as

discussed with regard to the next factor, the settlement amount compares favorably with similar cases. *See* Section I.8, *infra*. Therefore, the defendant's ability to pay does not come into play as a strong factor and the Court views it as, at most, a weak factor weighing against settlement approval.

*8. & 9. The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation*

Lastly, Plaintiffs argue that a recovery of $13 million is an "incredible result" relative to the initial dismissal of the case and that the amount compares favorably with similar cases. Doc. No. 108-1, at 17. Specifically, Plaintiffs point to six other university retirement fund cases with comparable or far lower settlement amounts. Doc. No. 108-1, at 17–18; *see Henderson v. Emory Univ.*, No. 16-cv-2920, Doc. No. 218-1 (N.D. Ga. 2020) ($16,750,000 settlement); *Cassell v. Vanderbilt Univ.*, No. 16-cv-2086, Doc. No. 145 (M.D. Tenn. 2019) ($14,500,000 settlement); *Kelly v. Johns Hopkins Univ.*, No. 16-cv-2835, Doc. No. 84 (D. Md. 2019) ($14,000,000 settlement) ; *Clark v. Duke Univ.*, No. 16-cv-1044, Doc. No. 149 (M.D.N.C. 2019) ($10,650,000 settlement); *Daugherty v. Univ. of Chicago*, No. 17-cv-03736, Doc. No. 57 (N.D. Ill. 2018) ($6,500,000 settlement); *Short v. Brown Univ.*, 17-cv-00318, Doc. No. 46 (D.R.I. 2019) ($3,500,000 settlement). Plaintiffs also maintain that the two factually strongest claims were for excessive recordkeeping and administrative fees, and that the $13 million monetary recovery totals to just over half of the best recovery possible for these claims. Doc. No. 108-1, at 17 (citing Doc. No. 106, May 25, 2021 Hearing Tr. at 19:22–20:23).

The Court finds that the amount of settlement is reasonable and reflects arms-length negotiations. The settlement amount compares favorably with cases such as *Kelly v. Johns Hopkins University*, No. 16-cv-2835, where the parties reached a settlement of $14 million for

similar claims involving a slightly higher number of plan participants. *Compare Kelly*, No. 16-cv-2835, Doc. No. 1 ¶ 9 (24,561 current participants) *with Sweda*, Doc. No. 69 ¶ 12 (21,412 current participants in this case). Because the settlement amount appears reasonable and the litigation risk is uniquely high when a similar case is on appeal to the Supreme Court, the eighth and ninth factors weigh in favor of settlement approval.

## III. Attorneys' Fees and Litigation Expenses

Class Counsel seek attorneys' fees of one-third of the monetary recovery ($4,333,333) and reimbursement of "reasonable" litigation expenses ($369,857). Doc. No. 107.

### A. Attorneys' Fees

Under the common fund doctrine, "a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). "In assessing attorneys' fees, courts typically apply either the percentage-of-recovery method or the lodestar method. The percentage-of-recovery method is generally favored in common fund cases because it allows courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure." *In re Rite Aid Corp. Secs. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005) (internal quotation marks omitted).[3] "Regardless of the method chosen, [the Court of Appeals for the Third Circuit has] suggested it is sensible for a court to use a second method of fee approval to cross-check its initial fee calculation." *Id.*

---

[3] The Third Circuit Court of Appeals has also established *Ursic* factors interpreting the right to attorneys' fees in ERISA suits under 29 U.S.C. § 1132(g)(1)), *Ursic v. Bethlehem Mines*, 719 F.2d 670, 673 (3d Cir. 1983), but these factors apply only to cases where a party has prevailed on the merits, *McPherson v. Emps.' Pension Plan of Am. Re-Ins. Co.*, 33 F.3d 253, 254 (3d Cir. 1994) (discussing application of the five *Ursic* factors to the attorneys' fees motion of a "successful plaintiff"). Settlements, no matter how profitable, do not count as a win on the merits.

"In common fund cases of this sort—in which the attorneys' fees and the clients' award come from the same source and the fees are based on a percentage amount of the clients' settlement award—district courts should consider several factors in setting a fee award. Among other things, these factors include: (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases." *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000). "These fee award factors 'need not be applied in a formulaic way . . . and in certain cases, one factor may outweigh the rest.'" *In re Rite Aid Corp.*, 396 F.3d at 301 (quoting *Gunter*, 223 F.3d at 195 n.1).

The most important factors are typically the complexity and duration of the litigation and the awards in similar cases (numbers four and seven). *Id.* On complexity and duration of the litigation, Class Counsel argue generally that ERISA litigation and claims involving 403(b) plans are complex. Doc. No. 107-1, at 16. As to awards in similar cases, Plaintiffs provide a list of 21 similar ERISA fee cases where a rate of one-third of the recovery plus costs was awarded. *Id.* at 19–20.[4]

Class Counsel also point to their recognition as a "preeminent firm" in ERISA excessive fee litigation by other courts as evidence of their skill and efficiency. *Id.* at 12–15. On risk of nonpayment, Class Counsel cite their representation on a contingent fee basis. *Id.* at 17. For amount of time devoted, Plaintiffs assert that they invested 8,144 hours overall prosecuting the

---

[4] Class Counsel also argue that using the actual value of the settlement amount, including tax deferral for 20 years and non-monetary relief, the requested fee is only 11 percent of the total value of the award. Doc. No. 107-1, at 11 & n.6. Class Counsel cite the expert testimony of Stewart Brown, C.F.A., to estimate the "actual value." *Id.*; *see also* Doc. No. 107-4 (Brown Decl.).

case, excluding time spent on the attorneys' fees request. *Id.* at 18. Plaintiffs also conduct a lodestar cross-check, arguing that a nationwide market rate is appropriate because the case was defended by a national firm with ERISA expertise. *Id.* at 22. The lodestar amount calculated is $6,155,434, which is higher than the amount requested of $4.3 million. *Id.* at 23.

Mr. Localio objects that the market rate of one-third of a settlement recovery is unreasonably high, particularly for a case based on unreasonable financial fees. Mr. Localio also points to similar litigation carried out by the same firm to suggest that fees should be reduced based on efficiencies of repeat litigation. Class Counsel respond that each case is "unique and extremely complex" and that Mr. Localio does not dispute that the requested amount is the market rate. Doc. No. 108-1, at 13–14. The Court agrees, and further notes that reducing attorneys' fees due to perceived economies of scale would not be a workable approach in individual cases. In light of the size of the class, the complexity of the litigation, and awards in similar cases, the Court finds that the requested attorneys' fees are reasonable.

## B. Litigation Expenses

Class Counsel also seek reimbursement of $369,857 in litigation expenses. "Attorneys who create a common fund for the benefit of a class are entitled to reimbursement of reasonable litigation expenses from the fund." *In re Aetna Inc.*, No. MDL-1219, 2001 WL 20928, at *13 (E.D. Pa. Jan. 4, 2001). In some cases, courts in this District have reduced the reimbursement of expenses where the Notice sent to class members anticipated a lower reimbursement request. *Id.* at *13.

Plaintiffs acknowledge that "[e]xpert expenses are most of the expenses sought by Class Counsel." Doc. No. 107-1, at 25. Class Counsel spent $299,884.11 on "experts and consultants." Doc. No. 107-3 ¶ 45. The next largest expense is $36,013.51 for depositions. *Id.* The only

13

settlement-related expense included for reimbursement is the cost of registering the domain for the settlement website. *Id.* ¶ 52. To support the reasonableness of the expenses, Class Counsel cite similar ERISA class action cases where courts awarded litigation expenses over $1 million. Doc. No. 107-1, at 25–26.

While reaching settlement prior to the development of expert reports would have certainly served all parties better than spending time and money preparing experts who would not ultimately testify, the Court recognizes that litigants must continue to prepare for trial until settlement is certain. The Notice sent to class members indicated that Class counsel would request reimbursement of "no more than $410,000 in litigation costs" (in addition to the attorneys' fees). Doc. No. 108-6, at 3. The requested expenses reimbursement of $369,857 falls below this projection. Based on the supporting exhibits in this case and the expenses reimbursed in similar cases, the Court finds that the requested reimbursement for litigation expenses is reasonable.

## IV. Class Representative Awards

Plaintiffs also request awards of $25,000 for each named Class Representative. They contend that such awards are consistent with case law recognizing the value provided by individuals who step forward to represent a class, especially in contested litigation where the potential benefit to any individual does not outweigh the cost of prosecuting class-wide claims. "[B]ecause the service payment comes out of the common settlement fund, and not the portion of the fund devoted to attorneys' fees, the Court must 'carefully review' the proposed payment for fairness to the other members of the class/collective." *Johnson v. Free State Mgmt. Grp.*, No. 20-cv-197, 2021 WL 2711528, at *7 (E.D. Pa. July 1, 2021) (quoting *Altnor v. Preferred Freezer Servs., Inc.*, 197 F. Supp. 3d 746, 770 (E.D. Pa. 2016)).

Courts consider the following factors: "[t]he risk to the plaintiff in commencing suit, both financially and otherwise; the notoriety and/or personal difficulties encountered by the representative plaintiff; the extent of the plaintiff's personal involvement in the lawsuit in terms of discovery responsibilities and/or testimony at depositions or trial; the duration of the litigation; and the plaintiff's personal benefit (or lack thereof) purely in his [or her] capacity as a member of the class." *Id.* (quoting *Ribstein v. Rite Aid Corp.*, 761 F. Supp. 2d 241, 257 (E.D. Pa. 2011)). Courts have considered awards around 3.1 to 3.5 percent of the total recovery as proportional. *Id.* at 8.

Here, Plaintiffs argue that the Class Representatives faced reputational risk, including some who were still Penn employees. The Class Representatives also provided information that served as the foundation for the lawsuit, attended court hearings and their own depositions, and responded to multiple rounds of discovery requests. Doc. No. 107-1, at 28. The total $150,000 requested for the six Class Representatives is 1.15 percent of the total monetary payment. *Id.*

Mr. Localio objects that the risks identified by the Class Representatives are merely hypothetical and unsupported. Plaintiffs note that "[e]ven where there is not a record of actual retaliation, notoriety, or personal difficulties, class representatives merit recognition for assuming the risk of such for the sake of absent class members." Doc. No. 108-1, at 12–13 (quoting *Guippone v. BH S & B Holdings, LLC*, No. 09-cv-01029, 2011 WL 5148650, at *7 (S.D.N.Y. Oct. 28, 2011)). Plaintiffs also point to their briefing detailing the effort expended and the low percentage value of 1.15 percent of the total monetary recovery. Doc. No. 108-1, at 12 (citing Doc. No. 107-1, at 26–28). Plaintiffs also identify 15 similar cases in which courts granted $25,000 incentive awards for Class Representatives. Doc. No. 107-1, at 26–27.

The Court agrees that such awards are typical for a class action of this nature,[5] and notes that the cited cases also involve similar numbers of named plaintiffs. *See, e.g., Pledger v. Reliance Tr. Co.*, No. 15-cv-4444, 2021 WL 2253497, at *9 (N.D. Ga. Mar. 8, 2021) (awarding $25,000 to each of the five named Class Representatives); *Henderson*, 2020 WL 9848978, at *5 (awarding $25,000 to each of the nine named Class Representatives). Therefore, the Court finds that the Plaintiffs' requested Class Representative awards are reasonable.

## CONCLUSION

For the foregoing reasons, the Court will grant final approval of the parties' Settlement Agreement and the requested attorneys' fees and Class Representative awards. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

---

[5] As this Court noted in its preliminary approval opinion, "[i]ncentive awards are not uncommon in class action litigation. . . . Even very generous incentive awards such as those proposed here are not uncommon." Doc. No. 102, at 12 n.2 (quoting *Chakejian v. Equifax Info. Servs., LLC*, 275 F.R.D. 201, 220 (E.D. Pa. 2011)).